# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEBBIE L. TREZVANT et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) CIVIL ACTION NO.  05-10673 WGY |
| | ) |
| FIDELITY EMPLOYER SERVICES | ) |
| CORPORATION et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## OPPOSITION TO MOTION FOR
## CONDITIONAL COLLECTIVE CERTIFICATION

Defendants Fidelity Employer Services Corporation ("FESCo" or "Company"), Fidelity

Employer Services Company LLC, and FMR Corp. (collectively, "Defendants") submit this

memorandum in opposition to Plaintiffs' Motion for Conditional Collective Certification and to

Facilitate Notice Pursuant to 29 U.S.C. § 216(b) ("Motion").[1]

## INTRODUCTION

A complaint and four self-serving named-plaintiff affidavits, containing general

allegations of unlawful wage and hour practices but devoid of specific evidence, do not meet the

plaintiffs' burden of proof for the conditional certification of a collective action under 29 U.S.C.

§ 216(b) of the Fair Labor Standards Act ("FLSA").  This is particularly true in matters premised

on the allegation that an employer misclassified employees pursuant to an exemption from the

FLSA's overtime requirements. The four plaintiffs, Trezvant, Cahill, Arch, and Piche

(collectively, "Plaintiffs;" individually, "Plaintiff"), allege that Defendants misclassified them

and 380 or more other employees at Defendants' Merrimack, New Hampshire facility with the

---

[1] Defendants file this response on October 7, 2005 pursuant to an agreement with Plaintiffs that this Court
acknowledged in its September 30, 2005 order.  Plaintiffs confirmed the agreement in an e-mail that they attached as
an exhibit to their response to Defendants' motion to extend the deadline for filing their opposition to Plaintiffs'
request for conditional certification.  Affidavit of Ira Spiro ("Spiro Aff."), ¶ 4 .

job titles "Business Analyst," "Configuration Analyst," "Project Analyst," "Reporting Analyst," and "Technical Analyst" as exempt from the FLSA's overtime requirements. The individualized analyses necessary to determine whether each of these 380 or more employees have been misclassified under the FLSA make this action inappropriate for collective treatment. The impropriety of collective treatment is compounded by the complexity of Defendants' operational structure, which differentiates the work of employees at every level of Defendants' organization. Further, Plaintiffs' cannot offer evidence to refute Defendants' evidence that employees in the disputed titles have dissimilar duties and responsibilities depending on, among other things: (a) the departments, groups, or teams in which they work; (b) their distinct supervisors or managers; (c) the client relationships that they have managed; and (d) the periods of time in which they were employed. From their time-eroded vantage point, Plaintiffs cannot sustain their burden of establishing a class of similarly situated individuals who want to join their lawsuit.

## FACTS

A. <u>The Business of FESCo</u>. The Plaintiffs worked for FESCo, a subsidiary of FMR Corp. that provides employee benefits, payroll, and human resources administration and other services to employers. Affidavit of Kyle Kane ("Kane Aff."), ¶ 4. Instead of administrating the benefits and human resources functions themselves, clients outsource the administration of those functions to FESCo. *Id*. Through its outsourcing relationships, FESCo assists its clients in managing their benefits, payroll, and human resources functions. *Id*. FESCo has four primary product lines: Health and Welfare ("H&W") plans, including health insurance; Defined Benefit plans; Defined Contribution plans; and Human Resources/Payroll ("HR Payroll"). *Id*. Until 2004 and throughout the period when Plaintiffs worked for FESCo, the Company was organized

according to these four product lines into divisions. Kane Aff., ¶ 6. All of the Plaintiffs worked exclusively in FESCo's Health and Welfare division. Kane Aff., ¶¶ 9, 18, 27, 33, 40.

Since 2002, FESCo has employed thousands of exempt and nonexempt employees. Kane Aff., ¶ 5. Many of the exempt employees manage client relationships and coordinate the multitude of services that FESCo provides and are classified as exempt pursuant to the FLSA's executive, administrative, professional, and computer professional exemptions. *Id.* Prior to 2004, in each of the four product divisions, teams comprised of Business Analysts, Configuration Analysts, Project Analysts, Reporting Analysts, and/or Technical Analysts, provided services to specific FESCo clients or to groups of several clients. Kane Aff., ¶ 7. The duties of individual team members within each job title depended upon the client(s) to which their teams were devoted. *Id.* Team members' duties were also influenced by the project managers, directors, and vice presidents who supervised and managed the teams' work. *Id.* Different project managers coordinated the work of one or several analysts, who individually focused on specific aspects of a client's human resources, benefits and/or payroll needs. *Id.* In the supervisory levels above project managers, FESCo's directors coordinated the work of project managers, and FESCo vice presidents coordinated the directors' work. *Id.*

In 2004, a year or more after the employment of all of the Plaintiffs had ended, FESCo restructured its operations to a "function based" model organized by the specific functions that it provides to its clients. Kane Aff., ¶8. These functions, or "groups", include, for example, Implementation, Operations, Technical, and Process Engineering. *Id.* The function approach to client service differs from the prior team-based model within which Plaintiffs worked. Generally, product-client teams were clustered in relative isolation around one or several clients, and thus

3

performed duties tailored to varying client requirements and expectations which were enforced by client team supervisors.  The function-based model categorizes employees according to specific functions, and the employees' duties have become more focused on those functions, instead of on all aspects of particular clients' needs.

    B.  Plaintiffs' Employment And Duties.  Trezvant began working in Merrimack in October 2001 as a Business Analyst in the H&W division and was assigned to the Health and Other Benefits System ("HOBS") Conversion project, which converted FESCo's client services system over a two-year period from Benesoft to HOBS.[2] Kane Aff., ¶ 10. Trezvant identified and researched problems that occurred during the conversion, and for evaluating and proposing solutions to those problems. *Id.* at ¶ 13. Trezvant's employment ended in October 2003. Kane Aff., ¶ 16.  Cahill began work for FESCo as a H&W Business Analyst in January 2001.  Kane Aff., ¶ 20.  He remained in the position until December 31, 2002, when he was terminated in a reduction in force. *Id.* Cahill also was a member of the HOBS Conversion team. *Id.*  Cahill did not work in any capacity other than as a H&W Business Analyst on the HOBS conversion project during the three years prior to the commencement of this lawsuit.[3] *Id.* at ¶¶ 26-27.

    As Arch states in her affidavit, she worked as a Business Analyst in the H&W division from March 2002 to January 2003. Kane Aff., ¶ 29. Arch, however, did not work on the HOBS

---

[2] Benesoft and HOBS are both computer system platforms.  During their employment, Trezvant and Cahill worked on the HOBS Conversion team.  The team was responsible for converting all FESCo clients from the Benesoft to the HOBS system.  The conversion project ended in late 2003, after all of the Plaintiffs' employment had terminated.

[3] Cahill claims that, in addition to working as a Business Analyst, he worked as a Configuration Analyst and a Reporting Analyst.  Defendants records indicate that he did not work in any position other than H&W Business Analyst during the three years prior to the commencement of this lawsuit.  If he worked as a Reporting Analyst, that position is different from the others in which he alleges he worked because it required an advanced knowledge of database structure and architecture, and involved the use of an interface software program called BRIO that facilitated the process of linking and extracting data from clients' databases.

project but on service implementation projects for new FESCo clients.  Implementation Business Analysts were expected to have strong research and writing, client communication, and negotiation skills. *Id.* at ¶ 30. The position also required much independent thinking and the ability to translate business plans to vendors, carriers, clients, and internal business partners. *Id.* Arch documented, analyzed, and converted client's health and welfare plan requirements into technical design specifications; and she evaluated and resolved configuration issues that interfered with the implementation of FESCo products. *Id.*

Piche, the only Plaintiff who claims she worked as a Project Analyst, ended her employment with FESCo on November 1, 2001, more than three years before the commencement of this action. Kane Aff., ¶ 37. She therefore worked outside of the period of time relevant to this lawsuit.  Although irrelevant to this action under the FLSA, her duties included creating evaluative reports for FESCo's clients and pursuant to internal requests from members of her product-line team and others. *Id.* at ¶ 36. She was expected to perform sophisticated duties that focused on ensuring that FESCo's clients' needs were met. *Id.*

C.  <u>Duties Of Employees in Challenged Job Titles</u>.  Plaintiffs do not provide any specific information about work performed by Business Analysts, Configuration Analysts, Project Analysts, Reporting Analysts, and/or Technical Analysts who worked in different product-based teams or functional groups.  They also do not allege facts about how positions may have changed since Plaintiffs' employment ended.  Importantly, as the affidavits submitted by Defendants reveal, the work of employees in these job titles varies significantly.  For example, Business Analysts' duties vary depending on the function they perform and the product they support.  Affidavit of Paul Lavertu ("Lavertu Aff."), ¶ 9. Implementation Business Analysts meet

extensively with new clients to collect information, discuss system capability with Configuration Analysts, follow up with the client to resolve any functionality gaps, and document the client requirements after extensive discussion and analysis of the client's needs. *Id.* at ¶ 7. HR Payroll Business Analysts were responsible for overseeing the entire process for clients. *Id.* at ¶ 8.

Project Analysts define and document business requirements for existing clients, implement changes to clients' health and other insurance benefit offerings, and troubleshoot problems. Affidavit of Elise McCaffrey ("McCaffrey Aff."), ¶ 6. Project Analysts must have strong analytical skills and must be able to analyze problems with little oversight or guidance. *Id.* They must possess excellent problem-solving and communication skills and interact with clients on a periodic basis in order to analyze their needs and develop appropriate solutions. *Id.*

The job title "Technical Analyst" actually encompasses a variety of distinct jobs, including Associate Technical Design Analysts, Technical Design Analysts, Senior Technical Design Analysts, and Consultant Technical Design Analysts, all of whom are paid at different grades depending on their levels of sophistication and experience.[4] Affidavit of Steve Glichrist ("Gilchrist Aff."), ¶ 6. Employees in these Technical Analyst positions analyze clients' business requirements; design, develop, and test solutions to those requirements; and direct technical projects toward completion, but they do so at different skill levels and according to the particular project or function to which they are devoted.  *Id.* at ¶ 7.  Configuration Analysts also have sophisticated duties that are individual to the specific project or function to which they are

---

[4] Plaintiffs' vague affidavits do not identify the type of Technical Analyst they allege should be included in a conditionally certified class.  Cahill is the only Plaintiff who alleges he worked in the position.  The duties Cahill attributes to all "Technical Analysts" do not, however, comport with the duties of any Technical Analysts or Technical Design Analysts employed in Merrimack since 2004.  Gilchrist Aff., ¶ 14.

assigned. Affidavit of Keith Maden ("Maden Aff."), ¶ 10.  According to Plaintiffs' testimony, therefore, Plaintiffs duties and employment circumstances do not comport with other FESCo employees.  To the contrary, even if accepted as true for present purposes, their testimony establishes that their job duties were dissimilar from any individual whom they seek to include in their class.

D.  <u>Class Allegations</u>.  Plaintiffs argue in their Motion that the Court should conditionally certify this case as a collective action pursuant to Section 216(b) of the FLSA.  Plaintiffs expressly do not seek the certification of the state law claim that they purport to bring in their Amended Complaint.[5]  (Motion ¶ 1).  Plaintiffs define the class for which they seek conditional certification as including individuals "employed by Defendants within the three years before the commencement of this action in jobs with the titles, 'Business Analyst,' 'Technical Analyst,' 'Configuration Analyst,' 'Project Analyst,' and 'Reporting Analyst.'"  Plaintiffs only worked in Defendants' Merrimack facility and have not suggested in their filings that they seek conditional certification of a class that would include employees outside of Merrimack.  They appear to argue, therefore, that they have satisfied their burden of showing that they are similarly situated to other employees in Defendants' Merrimack facility, but not elsewhere.[6]  In support of this argument, each Plaintiff submitted an affidavit describing his or her own duties and asserting in conclusive and unsubstantiated terms that other individuals performed similar duties.  Plaintiffs

---

[5] Defendants filed a partial motion to dismiss Plaintiffs claims under New Hampshire law, asserted as class claims pursuant to Fed. R. Civ. P. 23.
[6] Of course, any attempt by Plaintiffs to seek conditional certification of a class beyond Merrimack would be unwarranted because no Plaintiff worked outside of Merrimack, and there is absolutely no evidence presented that could conceivably allow Plaintiffs to meet their burden.  *Belcher v. Shoney's, Inc.*, 927 F. Supp. 249, 252 (M.D. Tenn. 1996) (denying certification where none of the plaintiffs had worked at other restaurants).

further seek a Court order requiring Defendants to provide them with contact information for all of these individuals and to notify current employees of the lawsuit.

ARGUMENT

This Court should deny Plaintiffs' motion for conditional certification and related relief. First, Plaintiffs mischaracterize the legal standard applicable to requests to conditionally certify misclassification claims under the FLSA. Second, Plaintiffs fail to sustain their burden of establishing that they are similarly situated to each other or to individuals whom they claim should be members of the putative class. Third, Defendants' evidence establishes that conditional certification is inappropriate because Plaintiffs, and individuals who they claim should comprise a class, are dissimilar because of their different duties, job titles, pay grades, and periods of time when they were employed. Fourth, Plaintiffs' requests for contact information and authorization to publish notice are premature, vague, overbroad, and inappropriate.

## I.    PLAINTIFFS' ARGUMENT FAILS TO SUPPORT CONDITIONAL CERTIFICATION OF THE CLASS THEY SEEK TO REPRESENT.

A collective action under § 216(b) of the FLSA may not be conditionally certified, and notice may not be authorized, unless the plaintiff establishes the existence of similarly situated individuals who wish to join the action. *Morisky v. Public Serv. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 496 (D.N.J. 2000) ("Plaintiffs bear the burden of showing they are similarly situated to the remainder of the proposed class"). Plaintiffs have failed to sustain their burden and their Motion should be denied.

Courts have required plaintiffs to produce at least some evidence of a similarly situated class, so that the notice and certification process does not become a tool for plaintiffs to create

litigation.  *See England v. New Century Fin. Corp.*, 2005 U.S. Dist. LEXIS 8403 (M.D. La.) (holding that "it would be a waste of the Court's and the litigants' time and resources to notify a large and diverse class only to later determine that the matter should not proceed as a collective action because the class members are not similarly situated"); *D'Anna v. M/A-COM, Inc.*, 903 F. Supp. 889, 894 (D. Md. 1995) (holding that "an employer should not be unduly burdened by a frivolous fishing expedition conducted by plaintiff at the employer's expense").  Many courts have applied a well-reasoned stringency to the determination of conditional certification motions where plaintiffs allege that they were misclassified under the FLSA.[7]

Plaintiffs argue for the application of an unreasonably lenient standard for conditional certification.  They suggest that the conditional certification of a collective action involving hundreds of employees is appropriate based upon a simple, unsubstantiated allegation that the defendant-employer misclassified employees under the FLSA.  The law, however, demands more than Plaintiffs' vague allegations in order to justify the expense and burden of a collective action.  *Id.*  Allegations that the Plaintiffs were individually misclassified as exempt or unsupported allegations of widespread FLSA violations do not establish a basis for conditional certification.  *Id.*; *Freeman*, 256 F. Supp. 2d at 945 (W.D. Ark. 2003); *Hall v. Burk, M.D.*, 2002 U.S. Dist. LEXIS 4163, *3 (N.D. Tex.) (conditional certification inappropriate where plaintiffs allege that "employees are similarly situated simply because they claim violations of the law by

---

[7] *Holt v. Rite Aid Corp.*, 333 F. Supp. 2d 1265, 1271 (M.D. Ala. 2004) (in FLSA exemption cases, "the similarly situated inquiry .  .  . requires an examination of [putative class members'] day-to-day tasks," and that necessarily individualized examination makes collective determination inappropriate) (collecting authorities); *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216 (D. Conn. 2003) ("[d]etermining whether an employee is exempt is extremely individual and fact-intensive, 'requiring a detailed analysis of time spent performing [certain] duties' and a 'careful factual analysis of the full range of the employee's job duties and responsibilities'").  *See also Freeman v. Wal-Mart Stores, Inc.*, 256 F. Supp. 2d 941, 945 (W.D. Ark. 2003).

the same employer"). *See also Dean v. Priceline.com, Inc.*, 2001 U.S. Dist. LEXIS 24982, *6 (D. Conn.) (refusing to conditionally certify class where "what plaintiff [is] really challenging here is defendant's determination that [plaintiff is] exempt under the FLSA"); *Kane v. Gage Merch. Servs., Inc.*, 138 F. Supp. 2d 212, 214-15 (D. Mass. 2001) (granting conditional certification of small, uniform class of employees misclassified as exempt to avoid overtime). Vague allegations of class-wide violations are particularly inappropriate as a basis for conditional certification in cases involving alleged FLSA misclassifications, as each employee's exemption status must be individually determined.[8] *Holt*, 333 F. Supp. 2d at 1270. The duties of all employees in a putative class simply cannot be extrapolated from the testimony of a few. *Id.*

Although Plaintiffs fail to identify any specific unlawful policy or practice, they seek the conditional certification of a class of 380 or more FESCo employees whom they hope to "represent" on the basis of mere allegations, without substantiation, that the employees were misclassified under the FLSA. The Court should not allow Plaintiffs to impose the burden of a potentially massive collective action on Defendants and the Court in the absence of a factual showing that they are similarly situated to members of the putative class.

    A.    <u>Plaintiffs have offered no evidence that they are similarly situated to members of the putative class, even under the lenient standard they propose.</u>

---

[8] "[T]his case is not a case where janitors are being classified as exempt executives," where an employer's specific policy or practice of misclassifying employees might be self evident. *Holt*, 333 F. Supp. 2d at 1271. Such a case would be similar to one in which putative class members are unified by an employer's policy of paying hourly employees fixed rates, regardless of their overtime hours. *See Realite v. Ark Rest. Corp.*, 7 F. Supp. 2d 303 (S.D. N.Y. 1998). Thus unified, an individualized analysis of duties would be irrelevant. *See id.* Plaintiffs admit that they were salaried employees; their description of duties allegedly performed by putative class members predominate Plaintiffs' affidavits. Because they have placed their individual duties at issue, they acknowledge the relevance of those duties and invite the necessary individualized analysis that makes conditional certification wholly inappropriate in FLSA exemption cases. *Holt*, 333 F. Supp. 2d at 1274 ("[t]his court must necessarily examine evidence of the job duties actually performed by" putative class members, which makes collective treatment improper).

Plaintiffs' complaint and affidavit testimony contain conclusory assertions and unsubstantiated statements that are not founded on personal knowledge and should not serve as a basis for conditional certification.[9]  Although Plaintiffs provided extensive discussion regarding their <u>own</u> job duties, Plaintiffs have failed to submit evidence that they are similarly situated to other individuals employed by Defendants.  Instead, they attempt to attribute their own duties to other unidentified employees with vague and generalized assertions.  For example, Cahill generally references his alleged duties as, "part of my job <u>and the jobs of other analysts at FESCo</u>;" and claims that "<u>I</u> <u>and other analysts at FESCo</u>" perform the duties he describes.  Affidavit of Tim Cahill ("Cahill Aff."), ¶¶ 3, 4, 7 (emphasis added).[10]  Arch, on the other hand, does not even claim that other employees shared her duties.  Instead, she attempts to attribute her duties to other employees by asserting that, when fulfilling job responsibilities, "<u>we</u> were to follow guidelines. . . ."  Affidavit of Deborah Cheryl Arch ("Arch Aff."), ¶ 4 (emphasis added).  None of the Plaintiffs' affidavits specifically identify other FESCo employees or state the basis for Plaintiffs' generalized assertions of job similarity.  Even Plaintiffs' claims that anywhere from 200 to 380 other employees worked in Merrimack lack foundation, as they fail to explain the basis for their knowledge regarding how many employees in the disputed positions were employed in Merrimack.  This trickery should not distract the Court from the fact that Plaintiffs failed to submit affidavits from any of the unidentified employees who they say performed duties

---

[9] The Court should disregard all statements in Plaintiffs' affidavits that are not founded on personal knowledge, including statements that refer to discussions with unidentified current or former employees who may have worked for Defendants.  *See Mike*, 274 F. Supp. 2d at 219 n. 4 (disregarding statements in plaintiffs' affidavits not founded on personal knowledge).

[10] *See also* Affidavit of Debbie L. Trezvant ("Trezvant Aff."), ¶¶ 4, 6, 7 ("The primary duties and tasks of other analysts employed by FESCO were essentially the same."); Affidavit of Mari-Catherine Piche ("Piche Aff."), ¶ 3 (same).

like theirs and should be included in the class Plaintiffs seek. The Court should not take such unsubstantiated rhetoric as evidence that satisfies Plaintiffs' burden of establishing a basis for conditional certification of this action.[11]

Even if credited for purposes of this motion, Plaintiffs' affidavits are of limited probative value. They pertain only to the specific positions Plaintiffs held in Defendants' Merrimack facility and only to the finite periods of time when Plaintiffs were employed in those positions.[12] Based on Plaintiffs' own testimony: (a) no Plaintiff worked in any other facility other than Merrimack during the time period relevant to this lawsuit; (b) no Plaintiff was employed after October 2003; (c) Piche is the only Plaintiff who held the Project Analyst position, and she is barred by the relevant statute of limitations;[13] (d) Cahill is the only Plaintiff who alleges he held the Reporting Analyst, Configuration Analyst, and Technical Analyst positions (which means Plaintiffs have submitted only one affidavit about those positions);[14] and (e) Trezvant, Cahill, and Arch held the Business Analyst position, but only for periods prior to October 2003. *See*

---

[11] *See Holt*, 333 F. Supp. 2d at 1272 (ultimately determining that evidence concerning plaintiffs' job duties was "merely anecdotal" and specific to them, and thus did not show that they were similarly situated to potential class members); *Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231 (M.D. Ala. 2003) (statement in affidavit in support of certification that plaintiff "believes" that other similarly situated employees exist is not sufficient); *Freeman*, 256 F. Supp. 2d at 945 (although plaintiff's burden is "not heavy," "unsupported allegations of widespread violations are not sufficient"); *Hall*, 2002 U.S. Dist. LEXIS 4163, *7 ("Unsupported assertions of widespread violations are not sufficient to meet Plaintiff's burden."); *H & R Block v. Housden*, 186 F.R.D 399, 400 (E.D. Tex. 1999) (denying plaintiff's request for notice because the plaintiffs failed to offer anything more than conclusory affidavits); *Pfaahler v. Consultants for Architects, Inc.*, 2000 U.S. Dist. LEXIS 1772, *6 (N.D. Ill.) (plaintiff's "belief" regarding duties of other employees "not sufficient to meet the similarly situated requirement. [Plaintiff] must point to something concrete aside from his belief.").

[12] These time periods limit all but Trezvant's claims pursuant to the statutory limitations periods applicable to claims under the FLSA. *See* 29 U.S.C. § 255(a) (statute of limitations for a claim of non-willful FLSA violation is two years; for a willful violation three years). *See also* Kane Aff., ¶¶ 16, 24, 29, 31. Piche is entirely barred because her last date of employment was more than three years prior to April 5, 2005, when Plaintiffs commenced this action. *See* Piche Aff., ¶ 1. Only Trezvant alleges she was employed within the two years prior to the commencement of this action. Trezvant Aff., ¶ 1. *See also* Kane Aff., ¶ 16.

[13] *See* Defendants' partial motion to dismiss, pp. 9-10.

[14] *Hall*, 2002 U.S. Dist. LEXIS 4163, *3 (denying conditional certification because a single self-serving affidavit not founded on personal knowledge is insufficient to establish similarity);

Piche Aff., ¶¶ 1, 3-4; Arch Aff., ¶¶ 1, 3-4; Trezvant Aff., ¶¶ 1, 4-7; Cahill Aff., ¶¶ 1, 3-8. Their

testimony therefore cannot serve as a basis for conditionally certifying the class Plaintiffs seek.[15]

      B.    <u>Collective treatment is inappropriate because Plaintiffs have failed to establish the</u>
<u>existence of a common policy, practice or scheme to violate the FLSA.</u>

Plaintiffs allege, without any evidentiary support, that this Court should grant their

motion for conditional certification because Defendants had a policy or practice of

misclassifying employees as exempt under the FLSA. Defendants have never implemented a

policy or practice to violate the FLSA. Indeed, FESCo employs exempt and nonexempt

personnel and classifies employees based on the duties they perform and in consideration of

whether they are paid on a salary basis. Kane Aff., ¶ 5. Plaintiffs offer no evidence that any

unlawful policy or practice existed. As a threshold matter, an unsubstantiated, imprecise

allegation that Defendants' had such a policy or practice will not satisfy Plaintiffs' burden of

establishing the propriety of collective treatment. *Freeman*, 256 F. Supp. 2d at 945 (mere

allegation of widespread FLSA violation is insufficient to justify collective action treatment).[16]

The Plaintiffs urge this Court to apply the wrong standard. Contrary to Plaintiffs'

arguments, the Court should not base its conditional certification analysis on the question of

whether an employer had a policy or practice of misclassifying employees as exempt. *Morisky*,

111 F. Supp. 2d at 498. "The focus in [a misclassification case] is on the distinction between an

---

[15] *See Belcher*, 927 F. Supp. at 252 (denying certification where none of the plaintiffs had worked at other restaurants); *Bernard v. Household Int'l, Inc., 231 F. Supp. 2d 433, 436 (D. Va. 2002)* (nationwide notice of FLSA action denied because plaintiff's declarations were insufficient: "There are no declarations from employees in offices other than Chesapeake and Virginia Beach. There are not even any specific allegations regarding practices in other offices – no names of employees or supervisors, and no indication that the problems alleged through first-hand knowledge in the two Virginia offices exist elsewhere"); *Basco v. Wal-Mart Stores Inc.*, 2004 U.S. Dist. LEXIS 12441, *23-27 (E.D. La.) (dissimilar employment circumstances warrant decertification).
[16] *See also Hall*, 2002 U.S. Dist. LEXIS 4163, *8; *Bernard*, 231 F. Supp. 2d at 435-36.

exempt and non-exempt employee. . . .[T]he focus is not on [the employer's] actions, but instead on the nature of the employees' job duties in the context of the relevant exemption criteria."[17] *Id.* The exemption criteria require an <u>individualized analysis</u> to determine whether an exemption applies. As a result, misclassification actions are inherently inappropriate for collective treatment. *See Holt*, 333 F. Supp. 2d 1265 at 1270. The necessity of an individualized analysis in exemption cases negates the relevance of an employer's policies and practices at the conditional certification stage of litigation. *Morisky*, 111 F. Supp. 2d at 498. Here, the irrelevance of Plaintiffs' allegations regarding Defendants' policies or practices is particularly acute because those allegations are entirely unsubstantiated.

    C.   <u>The Court should deny conditional certification because Plaintiffs fail to establish that any other individuals are interested in participating in this action.</u>

To justify conditional class certification, Plaintiffs must also prove that members of the putative class are interested in participating in the litigation. *See, e.g., Pfohl v. Farmers Ins. Group*, 2004 U.S. Dist. LEXIS 6447, *31 (C.D. Cal.) (denying conditional certification of class in part because plaintiffs had failed to show that any members of the putative class were likely to assert similar claims); *Horne*, 279 F. Supp. 2d at 1236 (holding that before conditionally certifying an FLSA collective action, "the court must at least satisfy itself that there are other persons who are similarly situated <u>and who desire to opt into this case</u>") (emphasis added) (citing *Dybach v. Florida Dep't of Corr.*, 942 F.2d 1562, 1567-68 (11th Cir. 1991)); *Davis v. Charoen*

---

[17] The court in *Morisky* examined the differences between collective actions filed under the ADEA, in which allegations of broad discriminatory policies or practices unified a class of individuals over the age of forty, and misclassification actions filed under the FLSA. *Morisky*, 111 F. Supp. 2d at 498. ADEA and FLSA actions are both brought pursuant to 29 U.S.C. § 216(b). As the Court recognized in *Morisky*, and as Plaintiffs acknowledge in their Response to Defendants' Motion for Extension, the standards for conditional certification in an ADEA action are inapposite. *Id.*; Plaintiffs' Response, p. 7.

*Pokphand (USA), Inc.*, 303 F. Supp. 2d 1272, 1276-77 (M.D. Ala. 2004) (holding that plaintiffs failed to satisfy burden where they did not submit affidavits from putative class members, consents to join, or expert evidence).

Plaintiffs have failed to offer any evidence as to the existence of individuals who would be interested in opting into their lawsuit. They do not testify in their affidavit that any such individuals exist. Nothing in Plaintiffs' submissions suggest that any do. In fact, this action has been pending for six months and not a single individual other than the Plaintiffs has consented to join the action.[18] The Court should deny Plaintiffs' request for conditional certification for their failure to satisfy this necessary requirement.

## II.    DEFENDANTS' EVIDENCE DEMONSTRATES THAT MEMBERS OF THE PUTATIVE CLASS ARE NOT SIMILARLY SITUATED

The affidavits submitted by Defendants highlight dissimilarities that exist among the job titles at issue and among the duties of employees who have worked in those titles.[19] The dissimilarities are the consequence of employees' differing job titles, functions, and pay grades, as well as of changes that have occurred in FESCo's Merrimack operations.

FESCo's Merrimack operations are complex. When Plaintiffs worked there, Business Analysts, Project Analysts, Configuration Analysts, Technical Analysts, and Reporting Analysts worked in divisions dedicated to each of FESCo's products. The Plaintiffs all worked

---

[18] In light of the media attention that this lawsuit has attracted, Plaintiffs cannot argue that putative class members are unaware of the action. *See, e.g.*, Edward Mason, *Fidelity Unit Slapped with $5M Comp. Suit*, BOSTON BUS. J., Jun. 10, 2005.

[19] *See Sheffield v. Orius Corp.*, 211 F.R.D. 411, 416 (D. Ore. 2002) (declining to certify collective action because members of proposed class held positions in nine different job categories and were paid according to multiple payment methods); *Reeves v. Alliant Techsystems, Inc.*, 77 F. Supp. 2d 242, 249 (D.R.I. 1999) (named plaintiffs not similarly situated to opt-in plaintiffs where they had different managers).

exclusively in the H&W division, and their duties differed from those of employees holding similarly-titled jobs in the HR/Payroll, Defined Benefit and Defined Contribution divisions.

Conditional certification of an FLSA collective action is inappropriate when allegedly similar employees are managed by different managers or supervisors. *Reeves*, 77 F. Supp. 2d at 249. Within the divisions, different FESCo vice presidents coordinated multiple client relationships. They assigned directors to the management of those relationships. Project managers helped directors coordinate client-based teams comprised of Business Analysts, Project Analysts, Configuration Analysts, Technical Analysts, and/or Reporting Analysts. The duties of team members with various job titles depended on the clients or functions to which their teams were assigned, and on the manner in which supervising Project Managers, Directors, and Vice Presidents expected duties to be performed.

Conditional certification also is inappropriate when allegedly similar employees occupy job titles that have different duties and responsibilities. *Holt*, 333 F. Supp. 2d at 1270. The duties of Business Analysts, Project Analysts, Configuration Analysts, Technical Analysts, and Reporting Analysts differed. Business Analysts, for example, performed duties that focused on client interactions and assessment of clients' human resources and benefits needs. Configuration Analysts and Technical Analysts performed highly sophisticated data systems-related work and interacted with clients on a less frequent basis. Reporting Analysts conducted sophisticated querying in response to client needs and to diagnose data problems. They interacted with internal and external clients. The duties of employees in all of these positions distinguished them from one another.

16

Even differences among employees within the same job title compel denial of a conditional certification motion in an FLSA misclassification case, as an individualized assessment of employees is determinative in those cases. *Id.* at 1271-72. Differences exist among employees, as well, within the same job titles because they perform duties that are directed towards different functions and work at varying levels of sophistication depending upon their compensation grade. FESCo divides Configuration Analysts, for instance, into three separately titled positions, all of which perform distinctly focused work, called Implementation Configuration Analysts, Conversion Configuration Analysts, and Ongoing Support Configuration Analysts. The Implementation and Conversion Configuration Analysts design and build entire software packages from the ground up. The Ongoing Support Configuration Analysts deal with existing clients and make changes, modifications, and fixes to the existing programs. These distinctions among employees within the Configuration Analyst title demonstrate that one Configuration Analyst's duties are not representative of other Configuration Analyst's duties; similar distinctions are typical among the Business Analyst, Project Analyst, Technical Analyst, and Reporting Analyst titles. *Id.* at 1270 ("[t]he status as non-exempt cannot be litigated through representative proof").

Compensation grades also distinguish employees, and these differences make conditional certification inappropriate. *See Sheffield*, 211 F.R.D. at 416. FESCo categorizes employees by compensation grade on the basis of skill level, sophistication, and other varying factors. Business Analysts, for instance, are distinguished by several grades. Employees at higher grades perform work that requires greater levels of sophistication. In addition to increasing levels of sophistication in the higher grades, employees' coaching and development responsibilities

increase, and they are expected to mentor employees in lower grades. Employees at higher grade levels have greater responsibilities than those at lower levels, both in terms of their skill sets and their responsibilities to other employees.

Employees' duties in Merrimack also have changed in the years since Plaintiffs were employed. FESCo's operational model has changed since 2003 when any Plaintiff last worked for the Company. FESCo was restructured in 2004 and is now organized along functional, rather than product, lines. Where there were separate divisions for each of FESCo's products when Plaintiffs were employed, FESCo now is divided by function, including separate Implementation, Operations, Technology and Process Engineering divisions. For example, all Business Analysts, Project Analysts, Technical Design and Configuration Analysts working on new client implementation projects now work within the Implementation division; they are supervised by Implementation project managers, directors, and vice presidents, rather than by a client-oriented team leader. These changes that occurred after Plaintiffs' employment terminated compel denial of Plaintiffs' Motion. *Basco*, 2004 U.S. Dist. LEXIS 12441, *23-27 (varied employment circumstances served as basis for court's refusal to certify FLSA collective action). *See also Smith v. Tradesman Intern., Inc.*, 289 F. Supp. 2d 1369, 1372 (S.D. Fla.) (conditional certification improper where alleged violations did not occur during the same time period).

The impropriety of conditional certification is further demonstrated by the fact that the project on which Trezvant and Cahill worked has ended and those jobs no longer exist. *Basco*, 2004 U.S. Dist. LEXIS 12441, *23-27. The HOBS project involved converting the entire software platform from which FESCo provided client services to a new, more efficient and flexible system. Plaintiffs worked on various aspects of the conversion. FESCo completed the

conversion in late 2003, after Trezvant's employment terminated. Cahill's employment ended earlier in 2002.

FESCo's evidence concomitantly establishes differences among Plaintiffs, their duties, and the duties of putative class members. These differences are the result of the different supervisors for whom Plaintiffs and other putative class members have worked, the different clients that FESCo has served, the types of work that those employees have performed, a change in the way FESCo serves its clients, and the completion of the project on which Plaintiffs worked. All of these considerations demonstrate that the collective treatment of Plaintiffs' claims is improper and that their Motion should be denied.

## III.    PICHE, CAHILL, AND ARCH ARE NOT MEMBERS OF THE PUTATIVE CLASS THAT PLAINTIFFS SEEK.

The Court also should deny Plaintiffs' motion to certify a collective action to the extent that they are not members of the class they seek to represent. In order to bring an FLSA claim on behalf of members of a putative class, a named plaintiff must be a member of the class he or she seeks to represent. *See Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974); *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000); *Pfohl*, 2004 U.S. Dist. LEXIS 6447, *32-33.

Piche's last date of employment with FESCo was November 1, 2001, more than three years prior to the commencement of this action. At most, the statute of limitations for claims under the FLSA is three years. 29 U.S.C. § 255(a). Piche is not, therefore, a member of the class Plaintiffs allege. Furthermore, this Court may apply a three-year statute of limitations only if Plaintiffs establish that Defendants willfully violated the FLSA, which Plaintiffs have not

done.  Otherwise, the statute of limitations is two years.  Only Trezvant worked for FESCo within the past two years.  Cahill and Arch are not members of the proposed class unless Plaintiffs establish a willful violation.  This Court should not conditionally certify a class that would include them as members.  *Id.*

## IV.    DEFENDANTS OBJECT TO THE ADDITIONAL RELIEF PLAINTIFFS SEEK

Defendants object to the notice Plaintiffs propose, to their request for the names and addresses of putative class members, and to the novel request that notices be posted in the workplace.  Plaintiffs request an order requiring Defendants to post notices of the lawsuit in FESCo facilities.  The posting of notice in the workplace would jeopardize the privacy interests of FESCo's current and former employees.[20]  If any notice is authorized should summarize not only of Plaintiffs' claims against FESCo, but also the Company's defenses, and it should describe the discovery and other obligations that may be imposed on opt-in plaintiffs.  *See, e.g., Rosen v. Reckitt & Colman, Inc.,* 77 Fair. Emp. Prac. Cas. (BNA) 370, 373 (S.D.N.Y. 1994).  Defendants object to Plaintiffs' request for names and addresses of putative class members.  The request is premature and overbroad, and this Court should deny it.  Defendants respectfully request leave to file a brief further explaining the grounds for their objections in the event that the Court reaches this issue.

### CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

---

[20] The notice seems directed solely at leveraging settlement by publicizing this lawsuit, as notice posted in Defendants' workplace would not reach former employees who Plaintiffs purport to represent.

Respectfully submitted,

DEFENDANTS,
By their attorneys,

_____/s/ Richard L. Alfred_____
Richard L. Alfred (BBO # 015000)
Brett C. Bartlett (Georgia Bar No. 040510)
(admitted *pro hac vice*)
Krista G. Pratt (BBO # 644741)
Barry J. Miller (BBO # 661596)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA 02210-2028
Telephone:     (617) 946-4800
Telecopier:     (617) 946-4801

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served
on Thomas E. Kenney, Pierce & Mandell, P.C., 11 Beacon St.,
Suite 800, Boston, MA 02108 by first class mail, postage prepaid,
on October 7, 2005.

_____/s/ Barry J. Miller_____
Barry J. Miller

21

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEBBIE L. TREZVANT, TIMOTHY CAHILL, DEBORAH CHERYL ARCH, and MARY-CATHERINE PICHE, each of them individually and on behalf of all others similarly situated and similarly situated current and former employees of Defendants, <br><br> Plaintiffs, <br><br> v. <br><br> FIDELITY EMPLOYER SERVICES CORPORATION, FIDELITY EMPLOYER SERVICES COMPANY LLC, and FMR CORP., <br><br> Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    CIVIL ACTION NO. 05-10673 WGY |

### AFFIDAVIT OF KYLE KANE

Kyle Kane, being duly sworn, hereby deposes and says:

1.      I am over eighteen years of age and I understand the obligation of an oath.

2.      I make this affidavit based upon my own personal knowledge and upon information provided to me by reviewing the corporate records of Fidelity Employer Services Company ("FESCo") pertaining to the four named plaintiffs. This affidavit is made in support of FESCo and in defense of the claims asserted by former employees Debbie Trezvant, Timothy Cahill, Deborah Cheryl Arch, and Mari-Catherine Piche ("Plaintiffs").

3.      I began working at Fidelity in November, 1996. My current title is Director, Management Effectiveness.

4.      FESCo provides employee benefits, payroll, and human resources administration services to employers of various sizes.  Instead of administrating the benefits and human resources functions, the employers outsource the administration of those functions to FESCo. Through its outsourcing relationships, FESCo assists its client-employers in managing their

benefits, payroll, and human resources functions. FESCo has four primary product lines: Human Resources/Payroll ("HR Payroll"); Health and Welfare plans, including health insurance; Defined Benefit plans; and Defined Contribution plans.

5.     Since 2002, FESCo has employed an average of over 1,800 employees per year in its Merrimack, New Hampshire facility. The workforce is comprised of nonexempt and exempt employees. FESCo classifies employees who manage and coordinate client relationships and services as exempt employees pursuant to the Fair Labor Standard's executive, administrative, professional and computer professional exemptions, depending upon the duties that they perform.

6.     Recently, in 2004, FESCo was restructured, creating a new organization called Fidelity Human Resources Services ("FHRS") within FESCo. FHRS is now organized along functional, rather than product lines.

7.     Prior to the reorganization, there were separate divisions for each of FESCo's products, including Health & Welfare, HR/Payroll, Defined Benefit and Defined Contribution. A FESCo Vice President located in Merrimack was responsible for coordinating the assignment of multiple teams to several Directors. Directors coordinated the management of several of those clients' work with the assistance of project managers. Project managers coordinated teams that were comprised of a mixture of Business Analysts, Project Analysts, Configuration Analysts, Technical Analysts, or Reporting Analysts. The duties of team members with various job titles depended upon the clients to which their teams were devoted, as well as upon how the supervising project managers, directors, and vice presidents expected duties to be performed.

8.     In order to increase efficiency and improve client service, FHRS changed to a functional model, including separate Implementation, Operations, Technology and Process

Engineering divisions. For example, all Business Analysts, Project Analysts, Technical Design and Configuration Analysts working on new client implementation projects now work within the Implementation division and report to the same organization hierarchy.

9.     All four Plaintiffs worked for FESCO in the Health and Welfare group, prior to the FHRS reorganization, in the company's Merrimack, New Hampshire facility.   Each Plaintiff's job duties, for the time period from April 2002 to the end of his or her employment, are described below.

**Debbie Trezvant**

10.     Debbie Trezvant was hired by FESCo in February 2000.  In October 2001, Ms. Trezvant began working as a Business Analyst in Health & Welfare Conversion Services (a salaried grade 25 position).   In that capacity, Ms. Trezvant worked on the Health and Other Benefits System ("HOBS') Conversion project.

11.     Ms. Trezvant's annual salary was $48,464 from October 15, 2001, until July 1, 2002, and $49,464 for the remainder of her employment.

12.     In her role as a Business Analyst on the HOBS Conversion team, Ms. Trezvant was responsible for converting current external FESCo clients from Benesoft, the company's previous core record-keeping system, to HOBS, the new server-based configurable platform. She gathered information regarding business requirements from the internal FESCo group responsible for client relationships (and occasionally the client) and worked with systems development group to ensure that the business requirements were accurately translated into technical requirements.

13.     Ms. Trezvant also was responsible for identifying areas where the requirements were incomplete and for researching and evaluating solutions to complete these missing

requirements. If she determined that the problem could not be resolved by implementing existing processes, she worked with the technical team to create an appropriate solution. She was responsible for proposing solutions to functionality gaps and overcoming project issues through the application of technical skills. She also worked with the test team to develop and deploy test case scenarios. In addition, in this position Ms. Trezvant was expected to analyze current processes and develop alternatives based on timing, costs, process ramifications, and technical feasibility. In order to perform these complex tasks, she was expected to develop strong knowledge of the HOBS system and the Health & Welfare service offerings.

14.    Ms. Trezvant's work had a significant impact on whether client data was successfully converted, and therefore influenced service levels and profitability. Ms. Trezvant was expected to prioritize projects, handle multiple tasks, and complete and document her work with little direct supervision.

15.    Ms. Trezvant's last review, in July 2003, documents Ms. Trezvant's poor job performance. She received a merit rating of "Needs Improvement", the lowest possible rating. The review documented that Ms. Trezvant had trouble meeting deadlines, did not perform consistently, did not always understand her work, and had trouble multi-tasking: "Deb does not always meet the deliverables which she's assigned," "[t]the quality of Deb's work is not always consistent," and "Deb does not always demonstrate that she understands the requirement for which she's responsible." Ms. Trezvant's failure to complete her work in a timely and accurate manner impacted the company's credibility with vendors. For example, her manager noted that: "Deb sent a file to a vendor which did not meet the intent or requirement of the testing which was documented, established, and reviewed by both the vendor and internal constituents,

4

resulting in the need for the team to come in on a weekend to recover the effort." Her manager also documented several instances when incomplete test files sent to vendors by Ms. Trezvant.

16.    Following a leave of absence, Ms. Trezvant was terminated on October 6, 2003.

17.    Ms. Trezvant never held the position of Reporting Analyst, Configuration Analyst, Project Analyst, or Technical Analyst.

18.    As a Business Analyst, Ms. Trezvant never supported any FESCo product lines other than Health & Welfare or worked in any facility other than Merrimack.

**Timothy Cahill**

19.    In July 1997, Mr. Cahill began working for FESCo in Merrimack, NH.

20.    In January 2001, Mr. Cahill became a grade 25 Business Analyst in Health & Welfare Conversion Services, and remained in that position until his employment was terminated effective December 31, 2002, during in a reduction in force. In this role, Mr. Cahill also was a member of the HOBS Conversion team.

21.    Mr. Cahill's annual salary was $54,000 from January 2001 to July 2002, and $54,825.00 from July 2002 until the end of his employment.

22.    In April 2001, Mr. Cahill began to demonstrate performance issues. Mr. Cahill met with his manager regularly throughout the remainder of 2001 (approximately once per week) to discuss conduct that his manager deemed "not appropriate." In December 2001, Mr. Cahill received an unsatisfactory performance rating of 2.5 out of 5.0. He received this rating because "certain tasks were not completed in a timely or quality manner" and because his managers "received co-worker and customer complaints associated with his performance."

23.    Due to his performance issues, as well as a "perceived disrespect for co-workers and management," Mr. Cahill was placed on a 60-day performance plan starting on April 9,

2002. The performance plan informed Mr. Cahill that "coworkers on the conversion project have expressed a lack of confidence in your ability to lead the business-analysis work on these projects"; as a result, "inconsistent performance has forced us to replace you as lead analyst" on some of the projects in order to "restore confidence with our internal customers and ensure that these projects remain on track."

24.     Although his performance briefly improved, further performance issues led to Mr. Cahill's selection for termination as part of a reduction in force on December 31, 2002.

25.     In exchange for his receipt of various severance benefits, Mr. Cahill signed an agreement that included a comprehensive release of all claims, including "claims for wages, bonuses, incentive compensation, stock payments or appraisal rights, phantom stock payments, or any other compensation or benefits. . ."

26.     From the period April 2002 to his termination, Mr. Cahill did not hold the position of Reporting Analyst, Configuration Analyst, Project Analyst, or Technical Analyst.

27.     From April 2002 to December 31, 2002, when Mr. Cahill worked as a Business Analyst at FESCo, he only supported the Health & Welfare product line and worked exclusively in FESCo's Merrimack facility.

**Cheryl Arch**

28.     Cheryl Arch began working for FESCo in Merrimack, NH, as a temporary employee in June 1996 and later held a variety of other positions as a regular, full-time employee.

29.     From March 2002 to January 2003, Ms. Arch worked as an Analyst for Implementation in the Health & Welfare group. Ms. Arch's annual salary was $46,184.45 from September 2001 until her employment was terminated on December 31, 2002.

30. Ms. Arch was responsible for documenting, analyzing, and converting client business requirements into technical design specifications; evaluating and resolving system configuration issues; and completing integration testing. Implementation Business Analysts were required to have strong research and writing skills, as well as strong client communication and negotiation skills. The position also required much independent thinking and the ability to translate the business plan to vendors, carriers, clients, and internal business partners.

31. In early July 2002, Ms. Arch received an unsatisfactory performance review with a rating of 2.5 out of 5.0. As a result, she was placed on a 90-day performance plan in July 2002, notifying her that her job was in "serious jeopardy." The performance plan was superceded by a transition agreement dated October 2002, which gave her until December 31 to find other employment. Her employment was terminated on December 31, 2002.

32. From April 2002 to December 31, 2002, Ms. Arch never held the position of Reporting Analyst, Configuration Analyst, Project Analyst, or Technical Analyst.

33. While a Business Analyst at FESCo, Ms. Arch never supported any product lines other than Health & Welfare and worked exclusively in Merrimack, New Hampshire.

**Mari-Catherine Piche**

34. In October 2000, Ms. Piche began working as a Project Analyst at FESCo and was paid a an annual salary of $43,000.

35. In her role as Project Analyst, Ms. Piche was responsible for ensuring the delivery of client-requested changes to functionality and service. In order to do this, she was expected to develop a strong understanding of the FESCo systems and products. She was responsible for proactively following through with other internal groups to ensure that enhancements were

7

implemented and for actively taking responsibility for the resolution of issues surrounding the enhancement.

36.    Ms. Piche had great difficulty performing the functions of a Project Analyst, and in March 2001, she acknowledged that she "had not gained the systems or process understanding needed to be successful" and that she "needed a position that was less technical and involved more routine." As a result, Ms. Piche entered into a transition agreement with FESCo on April 6, 2001, which gave her until May 4 to find other employment. This agreement was postponed by Ms. Piche's decision to take a medical leave of absence.

37.    After returning from leave for a short period, Ms. Piche took another leave of absence from October 6, 2001 until November 1, 2001, when her employment at FESCo ended.

38.    Ms. Piche has not worked for any Defendants in any capacity from April 5, 2002, through the date of this affidavit.

39.    Ms. Piche never held the position of Reporting Analyst, Configuration Analyst, Technical Analyst, or Business Analyst.

40.    While a Project Analyst at FESCo, Ms. Piche never supported any product lines other than Health & Welfare and only worked at the Merrimack facility.

Signed under the pains and penalties of perjury this 6th day of October, 2005.

_Kyle P. Kane_
Kyle Kane

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEBBIE L. TREZVANT, TIMOTHY CAHILL, DEBORAH CHERYL ARCH, and MARY-CATHERINE PICHE, each of them individually and on behalf of all others similarly situated and similarly situated current and former employees of Defendants,<br><br>                Plaintiffs,<br><br>v.<br><br>FIDELITY EMPLOYER SERVICES CORPORATION, FIDELITY EMPLOYER SERVICES COMPANY LLC, and FMR CORP.,<br><br>                Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO. 05-10673 WGY<br>)<br>)<br>)<br>)<br>)<br>) |

## AFFIDAVIT OF ANTHONY RIGO

Anthony Rigo, being duly sworn, hereby deposes and says:

1.      I am over eighteen years of age and I understand the obligation of an oath.

2.      I make this affidavit based upon my own personal knowledge as an employee of Fidelity Employer Services Company ("FESCo"). This affidavit is made in support of FESCo and in defense of the claims asserted by former employees Debbie Trezvant, Timothy Cahill, Deborah Cheryl Arch, and Mari-Catherine Piche ("Plaintiffs").

3.      I began working at Fidelity on February 10, 1997. My current position is Vice President of Configuration Services, in the Implementation group of the Fidelity Human Resources Services ("FHRS") division of FESCo.

4.      FESCo provides employee benefits, payroll, and human resources administration services to employers of various sizes. Instead of administrating the benefits and human resources functions, the employers outsource the administration of those functions to FESCo. Through its outsourcing relationships, FESCo assists its client-employers in managing their

benefits, payroll, and human resources functions. FESCo has four primary product lines: Human Resources/Payroll ("HR Payroll"); Health and Welfare plans, including health insurance; Defined Benefit plans; and Defined Contribution plans.Prior to 2002, FESCo utilized a software program called Benesoft to support the benefits administration services provided to its clients. In late 2001, we began preparations for converting all clients to our current Health and Other Benefits Systems ("HOBS") server-based platform. By 2003, all FESCo clients had been converted to the new HOBS platform.

5.    From 2002 through mid-2003, my duties involved supervising aspects of the HOBS conversion. During that time, I supervised Technical Design Analysts, also referred to as Configuration Analysts.

6.    Currently, my team includes employees with the job title Technical Design Analyst or Configuration Analyst ("Configuration Analysts"). Configuration Analysts configure FESCo software to fit a client's needs, provide ongoing support for clients using FESCo software, and convert client-specific requirements obtained from Business or Project Analysts into technical designs used to configure FESCo's systems, particularly for major client events such as annual benefit enrollment. Configuration Analysts build client-specific versions of the HOBS platform, adapting its established functional capabilities to customer requirements. Where a client's requirements exceed the current capabilities of HOBS – creating a functionality gap – Configuration Analysts work together and with other technical partners to create the necessary functionality, often by writing new code. This task is extremely complex and technical in nature, requiring a high level of technical skill.

7.    The Configuration Analyst job title includes several subtitles that are based on employees' pay grades. The lowest pay grade that is classified as exempt from the FLSA's

minimum wage and overtime requirements is the Associate Technical Design Analyst. The highest pay grade is the Senior or Principal Technical Design Analysts. Employees in the higher pay grades perform more sophisticated work than employees in the lower pay grades, though all of the work is highly technical and important to our Merrimack operations. Configuration Analysts in the higher pay grades also serve the important functions of coaching and mentoring employees in lower pay grades, and are thus responsible for ensuring that those more junior employees develop and advance in the organization.

8.     The Configuration Analysts I supervise work with one or more of the products offered to FESCo's clients, including Health and Welfare, HR Payroll, and Defined Benefit services. Some Configuration Analysts specialize in a single functional area of HOBS, while others have the ability to work in more than one functional area. The duties of each Configuration Analyst vary based on the skill and job grade of the Configuration Analyst, the customer requirements, the type of product, and the complexity of the project. Our group is currently attempting to improve the cross-functionality of Configuration Analysts, so that each is familiar with each of the services FESCo provides. As a result, the Configuration Analyst role has grown more complex and requires a broader range of knowledge and technical skill.

9.     I have reviewed the Affidavit of Timothy Cahill submitted in support of the Plaintiffs' Motion for Conditional Certification, in which he asserts that he held the positions of "Technical Analyst" and "Configuration Analyst," and attributes duties to himself and other employees in those positions, as well as in the Business Analyst and Reporting Analyst titles. The duties Mr. Cahill describes in his affidavit are not consistent with those of the Technical Design Analyst or Configuration Analyst, as described above.

Signed under the pains and penalties of perjury this __6th__ day of October, 2005.

Anthony Rigo

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEBBIE L. TREZVANT, TIMOTHY CAHILL, DEBORAH CHERYL ARCH, and MARY-CATHERINE PICHE, each of them individually and on behalf of all others similarly situated and similarly situated current and former employees of Defendants, <br><br>             Plaintiffs, <br><br> v. <br><br> FIDELITY EMPLOYER SERVICES CORPORATION, FIDELITY EMPLOYER SERVICES COMPANY LLC, and FMR CORP., <br><br>             Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO. 05-10673 WGY<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF ELISE MCCAFFREY

Elise McCaffrey, being duly sworn, hereby deposes and says:

1.      I am over eighteen years of age and I understand the obligation of an oath.

2.      I make this affidavit based upon my own personal knowledge as an employee of Fidelity Employer Services Company ("FESCo"). This affidavit is made in support of FESCo and in defense of the claims asserted by former employees Debbie Trezvant, Timothy Cahill, Deborah Cheryl Arch, and Mari-Catherine Piche ("Plaintiffs").

3.      I began working at Fidelity on May 10, 1999. My position is Operations Director, in the Operations group of the Fidelity Human Resources Services ("FHRS") division of FESCo.

4.      FESCo provides employee benefits, payroll, and human resources administration services to employers of various sizes.  Instead of administrating the benefits and human resources functions, the employers outsource the administration of those functions to FESCo. Through its outsourcing relationships, FESCo assists its client-employers in managing their

benefits, payroll, and human resources functions.  FESCo has four primary product lines: Human Resources/Payroll ("HR Payroll"); Health and Welfare plans, including health insurance; Defined Benefit plans; and Defined Contribution plans.

5.    As an Operations Director, I oversee Project Analysts who work in Merrimack, New Hampshire.  These Project Analysts work exclusively in FHRS Operations; therefore, they work only with existing clients and do not work on implementing new clients.  The FHRS division of FESCo was created in 2004.

6.    FHRS Project Analysts define and document business requirements for existing clients, implement changes to clients' health and other insurance benefit offerings, and troubleshoot problems that arise.  Project Analysts must possess technical skills including proficiency in FESCo's systems in order to accomplish these tasks.  The job requires excellent problem-solving and communication skills.  The Project Analysts also work with databases containing client information and conduct ad hoc querying, data and trend analysis, and root cause analysis to solve data problems.

7.    When working to resolve problems or implement changes, Project Analysts must interact with external clients on a periodic basis in order to analyze their needs and develop appropriate solutions.

8.    Project Analysts must have strong analytical skills and must be able to analyze problems with little oversight or guidance. The process of analyzing client requirements involves more than simply asking questions.  The Project Analyst must know which questions to ask and be able to ascertain the underlying meaning and impact of a client's answer from a system functionality standpoint.  The Project Analyst must then translate the client's business needs, changes or problems into the appropriate system configuration requirements.   In order to

2

accomplish these goals, the Project Analysts must have a comprehensive understanding of FESCo's systems and of the product line they support.

9.      When a Project Analyst determines that there is a systems-related problem in a client's platform, they may work with Configuration and Oracle database developers to resolve the issue.

10.      Currently, there are three types of Project Analyst teams in place within Operations: a client-focused team, a functional team, and a centralized team. The Client-Focused Project Analysts have client-specific expertise and can perform all project-related functions for the clients they support. The Functional Project Analysts focus on issues related to one process, such as Payroll or NetBenefits (web-based access for clients' employees) set-up, but can perform that function for any client. Central Team Project Analysts can also support any client, but their work tends to focus on ad hoc database reports and querying, performing data analysis, and applying bulk data updates to the recordkeeping system. There is some overlap in the day-to-day duties of the three types of Project Analyst.

11.      In addition, the work performed by each Project Analyst within a team varies significantly, based on the client or function supported by the Project Analyst. For example, a large client with a heavily unionized workforce will require more detailed analysis and documentation of benefits structures than a small or non-unionized company with a simpler benefits package.

12.      Project Analysts are graded pursuant to FESCo's internal grading structure. In my group, I currently have Project Analysts (Grade 23), Senior Project Analysts (Grade 25), and Project Analyst Team Leaders (Grade 27). The Project Analysts in each grade are expected to use their independent judgment and discretion to analyze and resolve problems for clients.

3

However, Project Analysts have varying levels of skill and responsibility, and therefore perform different duties, at each grade level. A Senior Project Analyst (Grade 25) must be proficient in all eight "key competencies", including, for example, Communication Skills, Problem Resolution, and Client Knowledge. Successful Senior Project Analysts must be able to mentor other employees effectively and train other Project Analysts. A Project Analyst Team Leader (Grade 27) must have complete mastery of the role of Project Analyst. While Team Leads do not have direct reports, they do play a supervisory role on the team, and they manage the workflow of lower level Project Analysts. Many of these Team Leads attend supervisory and management training classes, such as "Supervisory Essentials," that are designed for supervisors with no direct reports. The Team Leads also assist their managers on a regular basis; for example, if I am unable to attend a meeting, I will have a Team Lead attend to represent the team.

      13.    I have reviewed the Affidavit of Mari-Catherine Piche submitted in support of the Plaintiffs' Motion for Conditional Certification, in which Ms. Piche describes the tasks that she alleges she performed while employed as a Project Analyst at FESCo between October 2000 and January 2002. The duties that Ms. Piche attributes to Project Analysts when she was employed in Merrimack are different from those of the Project Analysts under my supervision. The Project Analysts I supervise are responsible for problem solving and analysis, while Ms. Piche suggests that she was merely responsible for entering data into Microsoft templates. Her affidavit does not mention other functions performed by the Project Analysts I supervise, including ad hoc querying, data and trend analysis, and root cause analysis. Finally, at the time Ms. Piche worked at FESCo, the company had not yet developed the client-focused, functional and a centralized Project Analyst teams we now have.

4

Signed under the pains and penalties of perjury this 6th day of October, 2005.

Elise McCaffrey

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEBBIE L. TREZVANT, TIMOTHY CAHILL, DEBORAH CHERYL ARCH, and MARY-CATHERINE PICHE, each of them individually and on behalf of all others similarly situated and similarly situated current and former employees of Defendants,<br><br>Plaintiffs,<br><br>v.<br><br>FIDELITY EMPLOYER SERVICES CORPORATION, FIDELITY EMPLOYER SERVICES COMPANY LLC, and FMR CORP.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO.  05-10673 WGY<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF ERICA PIESZ

Erica Piesz, being duly sworn, hereby deposes and says:

1.    I am over eighteen years of age and I understand the obligation of an oath.

2.    I make this affidavit based upon my own personal knowledge as an employee of Fidelity Employer Services Company ("FESCo"). This affidavit is made in support of FESCo and in defense of the claims asserted by former employees Debbie Trezvant, Timothy Cahill, Deborah Cheryl Arch, and Mari-Catherine Piche ("Plaintiffs").

3.    I began working at Fidelity on February 16, 1999.  My position is Manager of Data Reporting, in the Data Analysis Tools and Reporting group of the Fidelity Human Resources Services ("FHRS") division of  FESCo.  I work in FESCo's Marlborough, Massachusetts facility.

4.    FESCo provides employee benefits, payroll, and human resources administration services to employers of various sizes.  Instead of administrating the benefits and human resources functions, the employers outsource the administration of those functions to FESCo.

Through its outsourcing relationships, FESCo assists its client-employers in managing their benefits, payroll, and human resources functions. FESCo has four primary product lines: Human Resources/Payroll ("HR Payroll"); Health and Welfare plans, including health insurance; Defined Benefit plans; and Defined Contribution plans.

5.    From October 2004 until September 2005, as Manager of Data Reporting, I oversaw a group comprised of Reporting Analysts. The number of Reporting Analysts in my group varied between five and nine. They work in Merrimack, New Hampshire, and currently report to a new manager. The Reporting Analysts included Grade 23 and Grade 25 positions, pursuant to the company's internal compensation grading structure.

6.    The Reporting Analysts I supervised worked exclusively with the HR/Payroll product. To my knowledge, there were no other Reporting Analysts in Merrimack, although some employees in other product groups did perform "reporting" functions as part of their job.

7.    Each Reporting Analyst conducted sophisticated ad hoc querying of client data in response to client service needs and to diagnose data problems. The position required an advanced knowledge of database structure and architecture, so most Reporting Analysts had extensive data systems-related education or experience. Reporting Analysts worked with a user interface software program called BRIO that facilitated the process of linking relevant data and assisted the Reporting Analysts in locating where specific data resided in the database.

8.    For example, if a client was planning a payroll event, such as an annual bonus to a defined group of eligible employees, a Reporting Analyst would be asked by that client's Project Analyst (from the Operations group) to query the contents of the database and gather relevant data about the population. Similarly, when a specific payroll cycle runs incorrectly, the Project Analyst might ask a Reporting Analyst to design and implement a query to provide data about

2

the population, to assist in diagnosing the problem. Reporting Analysts had regular interaction with both internal and external clients. The types of queries Reporting Analysts conducted were often much more complex than the examples presented here.

9.      I have reviewed the Affidavit of Timothy Cahill submitted in support of the Plaintiffs' Motion for Conditional Certification, in which he asserts that he held the position of "Reporting Analyst" and that the duties for that position were the same as for the positions of Configuration Analyst, Technical Analyst and Business Analyst. The duties Mr. Cahill describes in his affidavit are not consistent with those of a Reporting Analyst.   For example, he states that his duties as a Reporting Analyst involved writing modifications and projects by entering client information info Microsoft Word and Excel templates, which then was imported into a Microsoft Access database.  Those duties are entirely different from those of the Reporting Analysts I supervised, who were responsible for sophisticated data querying and analysis.

Signed under the pains and penalties of perjury this 6th day of October, 2005.

Erica Piesz

3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| DEBBIE L. TREZVANT, TIMOTHY CAHILL, DEBORAH CHERYL ARCH, and MARY-CATHERINE PICHE, each of them individually and on behalf of all others similarly situated and similarly situated current and former employees of Defendants, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 05-10673 WGY |
| FIDELITY EMPLOYER SERVICES CORPORATION, FIDELITY EMPLOYER SERVICES COMPANY LLC, and FMR CORP., | ) ) ) ) ) | |
| Defendants. | ) | |

## AFFIDAVIT OF KEITH MADEN

Keith Maden, being duly sworn, hereby deposes and says:

1.      I am over eighteen years of age and I understand the obligation of an oath.

2.      I make this affidavit based upon my own personal knowledge as an employee of Fidelity Employer Services Company ("FESCo"). This affidavit is made in support of FESCo and in defense of the claims asserted by former employees Debbie Trezvant, Timothy Cahill, Deborah Cheryl Arch, and Mari-Catherine Piche ("Plaintiffs").

3.      I began working at Fidelity on December 18, 2000.  My position is Director of Configuration, in the Implementation group of the Fidelity Human Resources Services ("FHRS") division of FESCo.

4.      FESCo provides employee benefits, payroll, and human resources administration services to employers of various sizes.  Instead of administrating the benefits and human resources functions, the employers outsource the administration of those functions to FESCo. Through its outsourcing relationships, FESCo assists its client-employers in managing their

benefits, payroll, and human resources functions. FESCo has four primary product lines: Human Resources/Payroll ("HR Payroll"); Health and Welfare plans, including health insurance; Defined Benefit plans; and Defined Contribution plans.

5.    As Director of Configuration, I oversee three groups that include Configuration Analysts ["CAs"]. The CA position is technical in nature, requiring an understanding of technical concepts and system capabilities.

6.    When a member of a business team determines that there is a systems-related problem in a client's platform, they inform the configuration teams. The CAs then investigate and analyze the problem to determine the root cause and correct it.

7.    Health and Other Benefits Systems ("HOBS"), the server-based platform supporting FESCo's product lines, is parameter-driven and configurable, meaning it can be adapted to fit the needs of individual clients. CAs must have a thorough understanding of HOBS functionality and the options available to clients through HOBS. When the available options do not meet the requirements of a client, the CAs work with other programming specialists to enhance the functionality of HOBS, and then document the new specifications. The CAs must have the technical skills necessary to identify problems, map out solutions, test these solutions, and understand the specifications of the new rules.

8.    Configuration Analyst jobs are categorized as "T-grade" positions within FESCo's job grading nomenclature, reflecting the fact that they require highly specialized technical skills. I currently oversee Technical Design Analysts (Grade 64T), Senior Technical Design Analysts (Grade 65T and 66T), and Lead Technical Design Analysts (Grade 65T and 66T). The Configuration Analysts in each grade investigate, analyze, and correct problems in client platforms; however, Configuration Analysts have varying degrees of skills and responsibility at

each grade. Configuration Analysts in higher grades are expected to mentor Configuration Analysts in lower level grades and to oversee their work. Senior and Lead Technical Configuration Analysts are also expected to have a greater breadth and depth of technical knowledge.

9.    I am familiar with three different types of Configuration Analysts: Implementation Configuration Analysts, Conversion Configuration Analysts, and Ongoing Support Configuration Analysts. The day-to-day responsibilities of these analysts are different from one another. The Implementation and Conversion Configuration Analysts design and build the entire database, from the ground up. However, Implementation Configuration Analysts work with new clients, while Conversion Configuration Analysts worked with existing clients who were converted to the HOBS software platform from our prior system, Benesoft. The Conversion Configuration Analyst position existed at the time the Plaintiffs were employed by FESCo; however, this position is no longer in existence. The Ongoing Support Configuration Analysts deal with existing clients and make changes, modifications, and fixes to the existing databases. These Configuration Analysts require detailed knowledge of the product and client set-up, because they are responsible for troubleshooting problems with the existing set-up.

10.    Configuration Analysts also interact with external clients during the Implementation process, when they accompany Business Analysts on client visits. On those visits, the CA can provide on-the-spot analysis and input on any highly technical client issues or questions regarding system capabilities.

11.    In late 2001, FESCo began converting all clients from our former Benesoft system, which supported the employee benefits services offered to clients, to our current HOBS server-based platform.

3

12.     During this conversion, I was Director of Implementation Project Management in Health & Welfare. In this role, I supervised a team of three Project Managers, who in turn supervised teams of Business Analysts working on the HOBS conversion. The role of the Business Analysts on my team required a solid understanding of the new platform's functionality.

13.     The Business Analysts involved with the HOBS conversion collected the existing requirements documents from the Project Analysts supporting existing clients, analyzed the information, and reworked the requirement so that it could be used to configure the new HOBS platform. The Business Analyst was also responsible for recognizing efficiency opportunities and identifying potential functional gaps between the existing requirement and the new HOBS system functionality. When problems arose, the Business Analysts also investigated the cause of the problem and developed a solution. The Business Analysts were ultimately responsible for ensuring a seamless transition of the client's services to the new platform and verifying that all client requirements were satisfied.

14.     Unlike other Business Analysts at FESCo, the conversion Business Analysts dealt mostly with internal business partners, although their jobs required some client contact in order to verify business requirements and perform troubleshooting. By contrast, Implementation Business Analysts at FESCo had extensive client contact, and frequently met with clients to inquire about and analyze their business needs.

15.     Following the conversion to HOBS, Conversion Configuration and Business Analysts, as well as the project supervisors, were re-deployed in other capacities throughout the FESCo organization and the project was discontinued. Currently, there are no Business or Configuration Analysts dedicated solely to the task of converting clients from Benesoft to

HOBS, as all clients were converted from Benesoft by 2003 and new FESCo clients are implemented utilizing HOBS.

16.    I have reviewed the Affidavit of Timothy Cahill submitted in support of the Plaintiffs' Motion for Conditional Certification, in which he asserts that he held the position of "Configuration Analyst" and that the duties for that position were the same as for the positions of Reporting Analyst, Business Analyst, and Technical Analyst. The duties Mr. Cahill describes in his affidavit are not consistent with those of the Configuration Analysts I supervise, who configure client systems by designing new systems or modifying existing foundations. The position Mr. Cahill describes does not implicate the technical skills required for the Configuration Analyst positions I supervise.

Signed under the pains and penalties of perjury this ____ day of October, 2005.

Keith Maden

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DEBBIE L. TREZVANT, TIMOTHY CAHILL, DEBORAH CHERYL ARCH, and MARY-CATHERINE PICHE, each of them individually and on behalf of all others similarly situated and similarly situated current and former employees of Defendants, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 05-10673 WGY |
| FIDELITY EMPLOYER SERVICES CORPORATION, FIDELITY EMPLOYER SERVICES COMPANY LLC, and FMR CORP., | ) ) ) ) ) | |
| Defendants. | ) | |

## AFFIDAVIT OF PAUL LAVERTU

Paul Lavertu, being duly sworn, hereby deposes and says:

1.    I am over eighteen years of age and I understand the obligation of an oath.

2.    I make this affidavit based upon my own personal knowledge as an employee of Fidelity Employer Services Company ("FESCo"). This affidavit is made in support of FESCo and in defense of the claims asserted by former employees Debbie Trezvant, Timothy Cahill, Deborah Cheryl Arch, and Mari-Catherine Piche ("Plaintiffs").

3.    I began working at Fidelity on May 1, 2000.  My current position is Functional Manager for Solution Architects, in the Implementation group of the Fidelity Human Resources Services division of  FESCo ("FHRS").  FESCo and FHRS offer services that include the administration and management of human resources (HR) and payroll for employers of various sizes.  Since the start of my employment, I have worked exclusively with the HR and Payroll services offered to FESCo's clients.

4.      FESCo provides employee benefits, payroll, and human resources administration services to employers of various sizes.  Instead of administrating the benefits and human resources functions, the employers outsource the administration of those functions to FESCo. Through its outsourcing relationships, FESCo assists its client-employers in managing their benefits, payroll, and human resources functions. FESCo has four primary product lines: Human Resources/Payroll ("HR Payroll"); Health and Welfare plans, including health insurance; Defined Benefit plans; and Defined Contribution plans.

5.      Prior to assuming my current role, I worked as a Project Manager for HR Payroll. In that capacity, I supervised teams comprised of Business Analysts and "leads" responsible for other areas such as training, communication, systems and operations.

6.      The Business Analysts I supervised facilitated the process of providing value-added human resources and payroll solutions for external clients.  They analyzed client processes and developed process improvements.  Business Analysts also translated business requirements into functional and technical design documents.  They were responsible for clients' projects from start to finish.  Business Analysts determined the requirements of their clients' benefits and human resources functions, wrote the "functional design documents" that subsequently directed other FESCo employees what services to provide, designed and executed testing and validation processes to ensure that the design of the service model was functional, and resolved defects after FESCo implemented its service models.

7.      In other product areas, such as Health and Welfare ("H&W"), implementation Business Analysts were responsible for one aspect of a project.  For example, an H&W analyst would meet extensively with a new client, gather functionality requirements, discuss system capability with Configuration Analysts, follow up with the client to resolve any functionality

2

gaps and document the client requirements after extensive discussion and analysis of the client's needs. Configuration Analysts then began the process of designing and adapting the product to the client's needs. HR Payroll Business Analysts, by contrast, were responsible for overseeing the entire process for clients, including testing and defect resolution.

8.     Because Business Analysts in HR Payroll worked on each project from beginning to end, they had to be familiar with the entire payroll process and with a variety of tasks, including product configuration, data, interfaces (*i.e.*, the interface between FESCo's HOBS software platform and other related computer applications or programs, a very technical aspect of the job), and time keeping.

9.     The duties of HR Payroll Business Analysts varied depending on their skill level, area of expertise, and specific client requirements. For example, a Business Analyst might become more proficient in dealing with interfaces, and therefore spend more time on that task relative to others. The duties of each Business Analysts also varied from project to project. For example, a Business Analyst may serve as the data conversion lead on one client implementation, and as the configuration lead on a subsequent project. The complexity of the client may also impact the duties of a Business Analyst. For example, a Business Analyst might devote significant time on a project involving a unionized client with complex payroll requirements that utilize FESCo's timekeeping application.

10.     I have reviewed the Affidavits of Timothy Cahill, Cheryl Arch and Debbie Trezvant, submitted in support of the Plaintiffs' Motion for Conditional Certification, in which they each assert that they held the position of Business Analyst.     The Business Analyst positions that Cahill, Trezvant, and Arch describe differ from the HR Payroll Business Analyst position, for several reasons. None of the Plaintiffs worked in the HR Payroll group and each

worked with a different product, *i.e.*, H&W. Also, Cahill and Trezvant assert in their affidavits that they worked as Business Analysts on the conversion project involving the transfer of FESCo clients from the Benesoft software program to the new HOBS server-based platform, and they do not claim to have worked on the implementation of new clients, as the HR Payroll Business Analysts I supervised did. The conversion process was an 18-month project that was completed in 2003, and was very different from the implementation and operations tasks that Business Analysts in FHRS currently perform.

Signed under the pains and penalties of perjury this 6th day of October, 2005.

Paul Lavertu

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEBBIE L. TREZVANT, TIMOTHY CAHILL, DEBORAH CHERYL ARCH, and MARY-CATHERINE PICHE, each of them individually and on behalf of all others similarly situated and similarly situated current and former employees of Defendants,<br><br>                    Plaintiffs,<br><br>v.<br><br>FIDELITY EMPLOYER SERVICES CORPORATION, FIDELITY EMPLOYER SERVICES COMPANY LLC, and FMR CORP.,<br><br>                    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO.  05-10673 WGY<br>)<br>)<br>)<br>)<br>)<br>) |

### AFFIDAVIT OF STEVE GILCHRIST

Steve Gilchrist, being duly sworn, hereby deposes and says:

1.      I am over eighteen years of age and I understand the obligation of an oath.

2.      I make this affidavit based upon my own personal knowledge as an employee of Fidelity Employer Services Company ("FESCo"). This affidavit is made in support of FESCo and in defense of the claims asserted by former employees Debbie Trezvant, Timothy Cahill, Deborah Cheryl Arch, and Mari-Catherine Piche ("Plaintiffs").

3.      I began working at Fidelity on November 29, 1999.  My position is Director of Configuration and Development, in the Implementation group of the Fidelity Human Resources Services ("FHRS") division of FESCo.

4.      FESCo provides employee benefits, payroll, and human resources administration services to employers of various sizes.  Instead of administrating the benefits and human resources functions, the employers outsource the administration of those functions to FESCo. Through its outsourcing relationships, FESCo assists its client-employers in managing their

benefits, payroll, and human resources functions. FESCo has four primary product lines: Human Resources/Payroll ("HR Payroll"); Health and Welfare plans, including health insurance; Defined Benefit plans; and Defined Contribution plans.

5.      As Director of Configuration and Development, I oversee a group that includes Technical Design Analysts ["TDAs"]. The TDA position is technical in nature, requiring training and experience in developmental life cycle, Benefits Outsourcing, Oracle Advanced Benefits, and experience with standard software release procedures. Employees in the TDA position sometimes refer to themselves as Developers and/or Configuration Analysts.

6.      Pursuant to FESCo's internal compensation grading structure, TDAs are categorized as "T-grades", reflecting the highly technical nature of the position, as distinguished from business-oriented roles such as the position of Business Analyst. In my group, I currently have Associate Technical Design Analysts (Grade 62T), Technical Design Analysts (Grade 64T), Senior Technical Design Analysts (Grade 65T), Principal Technical Design Analysts (Grade 66T), and Consultant Technical Design Analysts (Grade 68T). The different grades represent different compensation levels. Compensation is higher at each respective pay grade. There are, in fact, T-Graded employees who are paid on an hourly basis, with annual compensation that is much lower than that of the salaried exempt employees at the higher grade levels.

7.      The TDAs in each grade analyze business requirements; design, develop, and test solutions to requirements; and move the project into production. However, TDAs have varying levels of skill and responsibility, and therefore perform different duties, at each grade. The duties performed by each TDA also vary significantly depending on individual customer requirements and the type of project assignment.

2

8.      TDAs design solutions to configuration problems, usually by recreating the problem and testing solutions. For example, the Health and Welfare benefit services offered to FESCo clients must be able to track and update the benefits information for each new employee of each client company. If the "new hire" life event process stops working properly, the business or operations group informs my team about the problem, and the TDAs will research the problem to determine the root cause. My team may determine that the life event process has caused the problem. More complex problems may require solutions that involve programming and writing new "rules" to facilitate the life event process. All TDA's are expected to assess the complexities of a problem and determine the solution.

9.      In general, Business Analysts, Project Analysts, and other business-oriented employees generally are not able transfer directly into a TDA position because they do not have the same skill set, training, or experience as TDAs.

10.      Typically, the TDAs in my group are working on several projects, for different clients, at the same time. Employees in the Implementation group, however, usually work on a new client implementation project for up to several months, which varies significantly based on the client's size and the complexity of the client's benefits structure, and do not work on any other projects during that time.

11.      Prior to 2002, FESCo utilized a software program called Benesoft to support the benefits administration services provided to its clients. In late 2000, we began preparations for converting all clients to our current Health and Other Benefits Systems ("HOBS") server-based platform. By 2003, all FESCo clients had been converted to the new HOBS platform.

12.      Before the HOBS conversion, TDAs were called simply "Technical Analysts" or "Senior Technical Analysts," depending upon their compensation grade level.

13.    I have reviewed the Affidavit of Timothy Cahill submitted in support of the Plaintiffs' Motion for Conditional Certification, in which he asserts that he held the position of "Technical Analyst" and that the duties for that position were the same as for the positions of Configuration Analyst, Reporting Analyst and Business Analyst.    The duties Mr. Cahill describes in his affidavit are not consistent with those of a Technical Analyst or TDA, as described above.

Signed under the pains and penalties of perjury this 6th day of October, 2005.

*Steve Gilchrist*

Steve Gilchrist