# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DEBBIE L. TREZVANT, TIMOTHY CAHILL, DEBORAH CHERYL ARCH, and MARY-CATHERINE PICHE, each of them individually and on behalf of all others similarly situated and similarly situated current and former employees of Defendant<br><br>    Plaintiffs,<br><br> v.<br><br>FIDELITY EMPLOYER SERVICES CORPORATION, FIDELITY EMPLOYER SERVICES COMPANY, LLC, and FMR CORP.,<br><br>    Defendants. | Case No.  05-10673 (WGY) |

## APPENDIX OF NON-PUBLISHED CASES, STATUTES, AND TREATISES

   Plaintiffs hereby submit this Appendix of non-published cases, statutes, and treatises in support of their Opposition to Defendants' Motion to Dismiss or Strike Count II of the First Amended Complaint.

  **A.** Johansen v. United States v. National City Mortgages Company, 2005 WL

    2356913 (D. Mass.)

  **B.** Ashby v. Farmers Insurance Company of Oregon, 2004 WL 2359968 (D. Or.)

  **C.** Loy v. Motorola, Inc., 2004 WL 2967069 (N.D. Ill.)

  **D.** Ladegaard v. Hard Rock Concrete Cutters, Inc., 2000 WL 1774091 (N.D. Ill.)

  **E.** Frank v. Gold'n Plump Poultry, Inc., 2005 WL 2240336 (D. Minn.)

**F.** Goldman v. Radioshack Corporation, 2003 WL 21250571 (E.D. Pa.)

**G.** Harper v. Yale International Insurance Agency, Inc., 2004 WL 1080193 (N.D. Ill.)

**H.** Mascol v. E&L Transportation, Inc., 2005 WL 1541045 (E.D.N.Y.)

**I.** Trotter v. Perdue Farms, Inc., 2001 WL 1002448 (D. Del.)

**J.** O'Brien v. Encotech Construction, 2004 WL 609798 (N.D. Ill.)

**K.** Karpowicz v. General Motors Corporations, 1997 WL 285943 (N.D. Ill.)

**L.** N.H. Code Admin. R. Ann. 803.05 (2005)

**M.** 10 Newberg on Class Actions Appendix IX-F (4th ed.)

**Exhibit A**

2005 WL 2356913                                                   Page 1

--- F.Supp.2d ----, 2005 WL 2356913 (D.Mass.), 96 A.F.T.R.2d 2005-6330

**(Cite as: 2005 WL 2356913 (D.Mass.))**

**Motions, Pleadings and Filings**

United States District Court,
D. Massachusetts.
Marlene JOHANSEN, Plaintiff,
Defendant-in-Counterclaim,
v.
UNITED STATES of America, Defendant,
Plaintiff-in-Counterclaim,
v.
National City Mortgage Company, Timothy Burke,
Additional Defendants-in-
Counterclaim.
**No. CIV.A.2004-11789-RCL.**

Aug. 2, 2005.

**Background:** Former wife brought quiet title action against the United States, challenging federal tax lien on residential property, and alleging former husband had transferred his ownership interest to former wife as part of divorce agreement, so that the property was not available to satisfy former husband's tax liability. The United States counterclaimed against former wife for foreclosure of tax liens and fraudulent conveyance, and counterclaimed against two mortgagees for foreclosure of tax liens. Former wife and mortgagees brought motions to dismiss and strike counterclaims.

**Holdings:** The District Court, Lindsay, J., adopted the opinion of Collings, United States Magistrate Judge, which held that:
(1) joinder of mortgagees was feasible;
(2) United States stated a claim for tax lien foreclosure;
(3) United States stated fraudulent conveyance claim against former husband; and
(4) United States stated fraudulent conveyance claim against former wife.

Motions denied.

**[1] Federal Civil Procedure** ☞773

170Ak773 Most Cited Cases

**[1] Federal Civil Procedure** ☞786
170Ak786 Most Cited Cases
A counterclaim or cross-claim may not be directed against persons who are not already parties to the original action. Fed.Rules Civ.Proc.Rule 13, 28 U.S.C.A.

**[2] Federal Civil Procedure** ☞226
170Ak226 Most Cited Cases
Joinder of mortgagees was feasible, in former wife's quiet title action against United States, challenging federal tax liens for former husband's tax liabilities, on home for which former husband had transferred to former wife his ownership interest as part of divorce agreement, and thus, mortgagees could be made parties to United States' counterclaim against former wife for foreclosure of tax liens; complete relief could not properly be accorded without presence of mortgagees, so that validity and priority of all liens could be determined. Fed.Rules Civ.Proc.Rules 13(h), 19(a), 28 U.S.C.A.

**[3] Internal Revenue** ☞4794.1
220k4794.1 Most Cited Cases
United States, by setting out dates of tax assessments, by alleging that it had given notice of assessments, demanded payment, and filed notice of its tax lien, and by stating that it was seeking foreclosure of its tax lien, stated a claim for foreclosure of federal tax lien.

**[4] Fraudulent Conveyances** ☞61
186k61 Most Cited Cases

**[4] Fraudulent Conveyances** ☞73.1
186k73.1 Most Cited Cases
In general, under Massachusetts law, a fraudulent

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2356913                                                                                      Page 2

--- F.Supp.2d ----, 2005 WL 2356913 (D.Mass.), 96 A.F.T.R.2d 2005-6330

**(Cite as: 2005 WL 2356913 (D.Mass.))**

conveyance action must include claims that the transferor was insolvent at the time of the conveyance or rendered insolvent by it, and that the conveyance was made without fair consideration.

**[5] Fraudulent Conveyances ⬥61**
186k61 Most Cited Cases

**[5] Fraudulent Conveyances ⬥95(2)**
186k95(2) Most Cited Cases
United States, by alleging, in action to foreclose tax liens on home, that husband, who had tax liabilities to United States, transferred his interest in home to wife, in divorce agreement, for only one dollar, and that husband was insolvent when he made the conveyance, stated a claim under Massachusetts law for fraudulent conveyance.

**[6] Fraudulent Conveyances ⬥162.1**
186k162.1 Most Cited Cases
United States, which was seeking to collect husband's tax liabilities through foreclosure of tax liens on home, was not required, under Massachusetts law, to allege that wife shared in husband's purported fraudulent intent, in order to state a claim against wife for fraudulent conveyance, relating to husband's transfer to wife, in divorce agreement, of his interest in the home, where United States alleged that wife did not pay adequate consideration to husband for the transfer.
Timothy J. Burke, Burke & Associates, Braintree, MA, for Plaintiff.

Michelle C. Davenport, Harmon Law Offices, Newton, MA, James H. Everett, Burke & Associates, Braintree, MA, Melissa L. Halbig, Burke & Associates, Braintree, MA, Richard A. Oetheimer, Goodwin Procter, LLP, Boston, MA, David M. Rosen, Harmon Law Offices, P.C., Newton, MA, for Counter Defendants.

David Sean McMahon, Law Office of Meilman & Costa, PC, Newton, MA, for Intervenor Plaintiff.

Stephen J. Turanchik, U.S. Department of Justice, Trial Attorney, Tax Division, Washington, DC, for United States of America, Counter Claimant.

ORDER ADOPTING REPORT AND
RECOMMENDATIONS

COLLINGS, United States Magistrate Judge.

**\*1** ORDER ADOPTING REPORT AND RECOMMENDATIONS regarding [28] Motion to Dismiss by Timothy Burke and [9] Motion to Dismiss filed by Marlene Johansen. Action on motions: both motions are DENIED as recommended.

*REPORT AND RECOMMENDATION ON
PLAINTIFF'S MOTION TO DISMISS AND
STRIKE
COUNTERCLAIMS (# 9) AND ON THE
COUNTERCLAIM DEFENDANT'S MOTION
TO DISMISS
COUNTERCLAIM (# 28)*

COLLINGS, United States Magistrate Judge.

*I. Introduction*

This matter is before the Court on the plaintiff's motion to dismiss and strike counterclaims (# 9) and the counterclaim defendant's motion to dismiss counterclaim (# 28). The plaintiff, Marlene Johansen ("Ms.Johansen"), filed this quiet title suit pursuant to 28 U.S.C. § 2410(a)(1) against the United States (the "defendant"), challenging a federal tax lien on residential property located at 71 Pleasant Street, Stoneham, Massachusetts ("the Stoneham property"). Both Ms. Johansen and the plaintiff's ex-husband, Ralph Johansen ("Mr.Johansen"), maintain that Mr. Johansen transferred his ownership interest in the Stoneham property to Ms. Johansen as part of a divorce agreement, that Ms. Johansen owns the Stoneham property free and clear of any federal tax liens, and that the Stoneham property is not available to satisfy Mr. Johansen's tax liability.

The motions currently before the Court involve the defendant's counterclaims against Ms. Johansen, Timothy Burke ("Burke"), Ms. Johansen's attorney, and National City Mortgage Company ("National City Mortgage"), a mortgage company that holds a lien on the Stoneham property. In its Answer (# 7),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2005 WL 2356913 (D.Mass.), 96 A.F.T.R.2d 2005-6330

**(Cite as: 2005 WL 2356913 (D.Mass.))**

the defendant purports to assert counterclaims against Ms. Johansen, Burke and National Mortgage because they may all "claim an interest in the [Stoneham] property upon which the [defendant] seeks to foreclose liens." (# 7 ¶¶ 27, 28) [FN1]. The Court shall recommend that the plaintiff's motion to strike and dismiss counterclaims and the counterclaim defendant's motion to dismiss both be denied.

### II. Factual Background

The following facts are gleaned from the Complaint (# 1) and other documents currently before the Court. Ms. Johansen is an individual who currently resides at 71 Pleasant Street, Stoneham, Massachusetts. (# 1 ¶ 1) Mr. Johansen filed for divorce on November 16, 1998. (# 1 ¶ 5) The Judgment of Divorce Nisi issued by the Massachusetts Probate and Family Court dated March 21, 2001 found that Mr. Johansen had federal tax liability of $171,379.00, and ordered the Stoneham property to be sold to settle the federal tax liability. (# 1, Exh. 2) Subsequently, on December 24, 2001, the Johansens submitted a modification of the divorce decree in which Mr. Johansen agreed, among other things, to transfer his interest in the Stoneham property to Ms. Johansen by quitclaim deed, to assume sole responsibility for his tax liability and to hold Ms. Johansen harmless for his tax liability. (# 1, Exh. 4) That modification was incorporated into the Judgment of Divorce Nisi. (# 1, Exh. 4)

On January 4, 2002, the Johansens executed a quitclaim deed. (# 1, Exh. 5) The deed was recorded on December 11, 2002. (# 1 ¶ 16) On December 18, 2002, a Notice of Federal Tax Lien was recorded on the Stoneham property against Mr. Johansen as taxpayer. (# 1 ¶ 17; Exh. 6) On January 21, 2004, a Notice of Federal Tax Lien was recorded on the Stoneham property against Ms. Johansen as nominee for Mr. Johansen. (# 1 ¶ 19; Exh. 7) On August 17, 2004, Ms. Johansen filed this action against the United States asserting that the tax lien is invalid, and seeking to quiet title on the Stoneham property.

### III. Discussion

### A. Burke and National City Mortgage

*2 In its Answer and Counterclaim, the defendant answers the complaint filed by Ms. Johansen and asserts counterclaims against Burke and National City Mortgage. According to the defendant, the basis of these counterclaims is that both Burke and National City Mortgage may claim an interest in the Stoneham property, the property which is the subject of the underlying action, because Ms. Johansen gave mortgages on the Stoneham property to both Burke and National City Mortgage. (# 7 ¶¶ 39, 40) In response, both Ms. Johansen and Burke filed the instant motions to dismiss with supporting memoranda of law; Ms. Johansen asserts that the counterclaims must be dismissed because Burke and National City Mortgage are not parties to this action and because there is no "reasonable application of law" which would support the counterclaims and, similarly, Burke posits that the defendant's counterclaim against him should be dismissed because the defendant could not prevail on its counterclaim. (## 9, 28) [FN2]

Ms. Johansen argues that the defendant's counterclaims against Burke and National City Mortgage must be dismissed because a party cannot assert a counterclaim against an entity that is not a party to the action. However, Burke and National City Mortgage actually have been made parties to the instant action, although proof service on them has not yet been filed with the Court. [FN3]

[1] It is a fairly basic premise that counterclaims can be lodged only against those entities which are already parties to the action. "[A] counterclaim or cross-claim may not be directed...against persons who are not already parties to the original action...." Charles A. Wright & Arthur R. Miller, 6 Fed. Prac. & Procedure Civ.2d § 1435 (2005); *see also* Wright & Miller, 6 Fed. Prac. & Procedure Civ.2d § 1404 (2005) ("[T]he first sentence of [Federal] Rule 13(b) allows...a pleader to state a counterclaim that he has against an 'opposing party' at the time he serves his pleading."); *Operating Engineers Pension Trust v. Cecil Backhoe Service, Inc.*, 795 F.2d 1501, 1504, n. 1 (9 Cir., 1986)("Although styled a 'counterclaim', ...the claim against Local 12 and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2356913

Page 4

--- F.Supp.2d ----, 2005 WL 2356913 (D.Mass.), 96 A.F.T.R.2d 2005-6330

**(Cite as: 2005 WL 2356913 (D.Mass.))**

Joseph Chaves was in fact a third party claim because Local 12 and Chaves were not already parties to the action."); *UMLIC VP LLC v. Belardo,* No. Civ.2003/0037, 2003 WL 23218497, *1 (D.Virgin Islands, May 8, 2003)("Rule 13 of the Fed.R.Civ.P. allows persons who are already parties to an action to assert counterclaims against an opposing party."); *Bank of Vermont v. Lyndonville Sav. Bank & Trust Co.,* 906 F.Supp. 221, 228 (D.Vt., 1995)(holding that counterclaim could not be stated against a nonparty to the lawsuit who had not been served with a summons as a third party).

[2] However, Fed.R.Civ.P. 13(h) provides that "[p]ersons other than those made parties to the original action may be made parties to a counterclaim or cross-claim in accordance with the provisions of Rules 19 and 20 [the joinder rules]." Thus, Burke and National City Mortgage have been made parties to the defendant's counterclaim against Ms. Johansen pursuant to Fed.R.Civ.P. 19(a) which explains that:

*3 [a] person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party.

In the case at bar, it seems that complete relief could not properly be accorded without the presence of Burke and National City Mortgage. Ms. Johansen sued the defendant to "quiet title" on the Stoneham property and the defendant counterclaimed against Ms. Johansen in order to foreclose its tax liens on that property. Both Burke and Johansen hold liens on that same property. Thus, in order for a proper determination to be

made in this case--that is, who has valid liens on the Stoneham property and which liens take priority--Burke and National City Mortgage should be parties to the counterclaim asserted by the defendant against Ms. Johansen. [FN4]

Because the defendant has made Burke and National City Mortgage parties to the counterclaim against Ms. Johansen, the Court shall recommend that the Motion to Dismiss and Strike Counterclaims and the Counterclaim Defendant's Motion to Dismiss Counterclaim be denied. [FN5]

**B. Ms. Johansen**

Ms. Johansen moved to dismiss or strike the two counterclaims against her on the grounds that they are unsupportable as a matter of law. (# 10, pp. 5, 11) First, she argues that there is "no reasonable application of law which would support the contention that [she] is holding the property as a nominee" for her ex-husband (# 10, p. 5) and next, she contends that the Stoneham property could not have been fraudulently conveyed to her because it was done at the behest of the probate court. (# 10, p. 11) [FN6] The defendant responds by asserting that it has set forth sufficient facts to entitle it to relief. Specifically, it argues that in Count I it properly alleged that assessments were made and notice and demand were made on the taxpayer (# 13, p. 7) and that in Count II it was sufficient to allege that the conveyance of the Stoneham property to Ms. Johansen was not made for adequate consideration and that Mr. Johansen was insolvent at the time of the transfer. (# 13, pp. 13-14)

Although not specifically styled as such, Ms. Johansen's motion to dismiss the claims against her is a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6). The motion to dismiss standard is familiar. The party filing the 12(b)(6) motion asserts that one or more of an opponent's claims fail because the underlying allegations, even if true, fail "to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). Accordingly, the appropriate inquiry on a motion to dismiss is whether, based on the allegations of the complaint,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.Supp.2d ----, 2005 WL 2356913 (D.Mass.), 96 A.F.T.R.2d 2005-6330

**(Cite as: 2005 WL 2356913 (D.Mass.))**

the plaintiffs are "entitled to offer evidence to support their claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Furthermore, in reviewing a motion to dismiss, a court should accept as true "all well-pleaded factual allegations and draw all reasonable inferences as favorable to the non-movant." *Carroll v. Xerox Corp.,* 294 F.3d 231, 241 (1 Cir., 2002). "If, under any theory, the complaint is 'sufficient to state a cause of action in accordance with the law, a motion to dismiss the complaint must be denied.' " *Duncan v. Santaniello,* 900 F.Supp. 547, 549 (D.Mass., 1995) (citing *Knight v. Mills,* 836 F.2d 659, 664 (1 Cir., 1987)).

**\*4** Thus, in order to decide whether the defendant's counterclaims against Ms. Johansen-for foreclosure of federal tax liens (Count I) and for fraudulent conveyance (Count II)--should remain in the case, the Court, viewing the factual allegations in light most favorable to the defendant, must determine whether the defendant has set forth claims upon which relief could be granted.

*1. Foreclosure of Federal Tax Lien*

Ms. Johansen contends that the defendant's claim for foreclosure of a tax lien should be dismissed because the transfer of the Stoneham property was equitable given that it was made for adequate and full consideration. (# 10, pp. 6-11) Apparently, Ms. Johansen misapprehends the meaning of a motion to dismiss for failure to state a claim. That is, she puts forth arguments requiring an in-depth legal analysis and while it may eventually bear out that Ms. Johansen is entitled to judgment as a matter of law, at this point in the case, the issue before the Court is merely whether the defendant sufficiently has stated a claim for foreclosure of a federal tax lien.

In *U.S. v. Blakeman,* 997 F.2d 1084, 1089 (5 Cir., 1992), *cert. denied,* 510 U.S. 1042, 114 S.Ct. 687, 126 L.Ed.2d 654 (1994), the court held that the government had stated a claim based on a federal tax lien under 26 U.S.C. § 6321 because the complaint "(i) sets forth...the date the government assessed the estate tax against the estate; (ii) contains allegations that the government gave notice

of the assessment, demanded payment, and filed notice of the lien...; and (iii) states that the government was 'seek[ing] foreclosure of its federal tax lien.' " [FN7] The *Blakeman* court found that the complaint's "allegations were sufficient to put defendants on notice that the government was seeking foreclosure under the general federal tax lien statute."

[3] Similarly, in the case at bar, the defendant adequately has stated a claim for foreclosure of a tax lien. Specifically, the defendant set out the dates of the assessments (# 7 ¶ 29); alleged that it had given notice of the assessments, demanded payment and filed notice of its lien (# 7 ¶¶ 30, 38); and stated that it was seeking foreclosure of its tax lien (# 7 pp. 7, 14). [FN8] Thus, Ms. Johansen's motion to dismiss Count I of the counterclaim should be denied.

*2. Fraudulent Conveyance*

[4][5] In its counterclaim, the defendant does not set forth a statutory section pursuant to which it is pursuing its fraudulent conveyance claim. However, in general under Massachusetts law, a fraudulent conveyance action must include claims that the transferor was "insolvent at the time of the conveyance (or rendered insolvent by it)" and that "the conveyance [was made] without fair consideration." *Federal Refinance Co., Inc. v. Klock,* 352 F.3d 16, 24 (1 Cir., 2003); *see also* Mass. Gen. L. c. 109A, § 5(a)("A transfer made...by a debtor is fraudulent...if the debtor made the transfer (2) without receiving a reasonably equivalent value in exchange for the transfer...and (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay...."). In the instant case, the defendant has pled adequately a claim for fraudulent conveyance at least as against Mr. Johansen-it alleges that the transfer of the Stoneham property was made for $1.00, less than equivalent value (# 7 ¶¶ 35, 42, 46), and that when Mr. Johansen made the conveyance, he was insolvent. (# 7 ¶ 48)

**\*5** [6] However, the remaining issue is whether the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2356913
Page 6

--- F.Supp.2d ----, 2005 WL 2356913 (D.Mass.), 96 A.F.T.R.2d 2005-6330

**(Cite as: 2005 WL 2356913 (D.Mass.))**

defendant has pled sufficiently a claim for fraudulent conveyance as against *Ms. Johansen.* Since the defendant alleged that Ms. Johansen did not pay adequate consideration for the Stoneham property, it need not allege that she shared in Mr. Johansen's purported fraudulent intent. *See Cushman v. Noe,* 242 Mass. 496, 502, 136 N.E. 567, 568 (1922). Thus, the defendant has alleged enough to state a claim against Ms. Johansen for fraudulent conveyance. [FN9]

Ms. Johansen, in lodging her motion to dismiss the counterclaims, argues that the conveyance of the Stoneham property was for fair value and that the conveyance could not have been fraudulent because it was done pursuant to a judgment of the probate court. (# 10, pp. 11-12) While those arguments eventually may prove to be correct, that is best determined at a later stage of this case. At this juncture, the Court only need decide whether the defendant has stated a claim for fraudulent conveyance, and the Court finds that the defendant has done so. Therefore, Ms. Johansen's motion to dismiss Count II of the counterclaim should be denied.

### IV. Conclusion and Recommendation

In sum, the defendant sufficiently has stated counterclaims against Ms. Johansen for foreclosure of tax liens and for fraudulent conveyance. Moreover, the defendant properly has joined Burke and National City Mortgage as parties to the counterclaim against Ms. Johansen. For those reasons, I RECOMMEND that the Plaintiff's Motion to Dismiss and Strike Counterclaims (# 9) be DENIED and that the Counterclaim Defendant's Motion to Dismiss Counterclaim (# 28) be DENIED.

### V. Review by the District Judge

The parties are hereby advised that pursuant to Rule 72, Fed.R.Civ.P., any party who objects to these recommendations must file a specific written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations, or report to which objection is

made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed.R.Civ.P ., shall preclude further appellate review. *See Keating v. Secretary of Health and Human Services,* 848 F.2d 271 (1st Cir.1988); *United States v. Emiliano Valencia-Copete,* 792 F.2d 4 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 378-379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1st Cir.1980); *see also Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

July 14, 2005.

> FN1. The counterclaims against Ms. Johansen are for foreclosure of tax liens and fraudulent conveyance and the counterclaims against Burke and National City Mortgage are for foreclosure of tax liens.

> FN2. The Memorandum in Support of Plaintiff's Motion to Dismiss and Strike Counterclaims is docket entry # 10 and Burke's supporting memorandum, mistakenly entitled "Memorandum in Support of Plaintiff's Motion to Dismiss and Strike Counterclaim," is docket entry # 29. National City Mortgage did not file any motion regarding the counterclaims.

> FN3. On July 7, 2005, Mr. Turanchik, attorney for the defendant, informed the Court by telephone that he has served Burke and National City Mortgage with process and that he would file proof of service forthwith. Additionally, he informed the Court that the defendant and National City Mortgage had entered into a stipulation in which both parties agreed that National City Mortgage's mortgage on the Stoneham property had priority over the defendant's lien. *See* Stipulation and Order # 39. The Court (Lindsay, J.) endorsed the stipulation and order on May

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 WL 2356913                                                                    Page 7

--- F.Supp.2d ----, 2005 WL 2356913 (D.Mass.), 96 A.F.T.R.2d 2005-6330

**(Cite as: 2005 WL 2356913 (D.Mass.))**

20, 2005(# 41).

FN4. As will be discussed in detail below, the Court shall recommend that the counterclaims asserted by the defendant against Ms. Johansen remain in the case.

FN5. Burke argues that the counterclaim against him should be dismissed because, in essence, it failed to state a claim. However, because Burke is necessary for proper resolution of this matter and for the reasons discussed below in the section addressing the counterclaim for foreclosure of a tax lien against Ms. Johansen, the Court finds that the defendant did sufficiently state a claim against Burke.

FN6. Both Burke and Ms. Johansen also posited that the defendant's counterclaims cannot stand because the defendant makes reference to one Susan Bertrand as holding title to the Stoneham property. Clearly, the inclusion of the name Susan Bertrand was a typographical error, probably the result of the defendant's careless "cutting and pasting" of another pleading. It is obvious from the rest of the pleading that the defendant meant to refer to Ms. Johansen when it used the name "Susan Bertrand." The Court, therefore, does not address the "Susan Bertrand" argument.

FN7. Although this case was ultimately superseded by statute, that statute is irrelevant for purposes of analyzing the case at bar.

FN8. Additionally, the defendant in the instant case made specific reference to the federal statutes pursuant to which it was bringing suit (# 7 ¶¶ 41, 43), something that was missing in the complaint in the *Blakeman* case. 997 F.2d at 1089.

FN9. The Court notes that the defendant, even though it was not required to, likely

has set forth enough to support the allegation that Ms. Johansen was aware of Mr. Johansen's supposed fraud. *See* # 7 ¶ 49 (When Mr. Johansen "purportedly transferred his legal title in the [Stoneham] Property to Marlene Johansen, both [Mr. Johansen] and Marlene Johansen knew that [Mr. Johansen] had unpaid federal tax liabilities.").

--- F.Supp.2d ----, 2005 WL 2356913 (D.Mass.), 96 A.F.T.R.2d 2005-6330

**Motions, Pleadings and Filings (Back to top)**

• 2005 WL 2454416 (Trial Motion, Memorandum and Affidavit) United States' Opposition to Marlene Johansen's Motion for Summary Judgment (Aug. 09, 2005)

• 2005 WL 2454414 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Motion for Stay Pending Appeal (Aug. 05, 2005)

• 1:04cv11789 (Docket)
                                        (Aug. 17, 2004)

• 2004 WL 2007716 (Trial Pleading) Complaint (Aug. 16, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit B**

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1

Not Reported in F.Supp.2d, 2004 WL 2359968 (D.Or.)

(Cite as: 2004 WL 2359968 (D.Or.))

H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Oregon.
Douglas ASHBY, Carol Porto, and Grant Wenzlick,
Plaintiffs,
v.
FARMERS INSURANCE COMPANY OF
OREGON, Defendant.
**No. CV 01-1446-BR.**

Oct. 18, 2004.

N. Robert Stoll, Steven D. Larson, David F. Rees,
Stoll Stoll Berne Lokting & Schlachter, P.C.,
Portland, OR, Charles A. Ringo, Beaverton, OR, for
Plaintiffs.

Barnes H. Ellis, Stephen A. Redshaw, Stoel Rives,
LLP, Portland, OR, for Defendant.

OPINION AND ORDER

BROWN, J.

**\*1** This matter comes before the Court on the
Motion for Class Certification (# 113) of Plaintiffs
Carol Porto and Grant Wenzlick. [FN1]

> FN1. The Court previously granted FICO's
> Motion for Summary Judgment against
> Plaintiff Douglas Ashby. *See* Opin. and
> Order issued March 17, 2004.

Porto and Wenzlick allege FICO violated the Fair
Credit Reporting Act (FCRA), 15 U.S.C. § 1681, *et
seq.,* when FICO used information in consumer
credit reports to increase the insurance premiums
FICO charged upon renewal of personal lines

insurance policies issued to Porto and Wenzlick.
Porto purchased and renewed automobile and
homeowner insurance policies from FICO.
Wenzlick purchased and renewed renter insurance
policies from FICO. Porto and Wenzlick allege the
increase in their respective insurance premiums
constituted adverse actions for which FICO failed to
give adequate notice under § 1681m(a)(1). Porto
and Wenzlick seek statutory damages, punitive
damages, and attorneys' fees.

For the following reasons, the Court GRANTS the
Motion for Class Certification of Plaintiffs Porto
and Wenzlick.

*STANDARDS*

Fed.R.Civ.P. 23 provides in pertinent part:
(a) Prerequisites to a Class Action. One or more
members of a class may sue or be sued as
representative parties on behalf of all only if (1)
the class is so numerous that joinder of all
members is impracticable, (2) there are questions
of law or fact common to the class, (3) the claims
or defenses of the representative parties are
typical of the claims or defenses of the class, and
(4) the representative parties will fairly and
adequately protect the interests of the class.
(b) Class Actions Maintainable. An action may be
maintained as a class action if the prerequisites of
subdivision (a) are satisfied, and in addition:

* * *

(3) the court finds that the questions of law or fact
common to the members of the class predominate
over any questions affecting only individual
members, and that a class action is superior to
other available methods for the fair and efficient
adjudication of the controversy. The matters
pertinent to the findings include: (A) the interest
of the members of the class in individually
controlling the prosecution or defense of separate
actions; (B) the extent and nature of any litigation
concerning the controversy already commenced

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2

Not Reported in F.Supp.2d, 2004 WL 2359968 (D.Or.)

**(Cite as: 2004 WL 2359968 (D.Or.))**

by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

The decision to grant or to deny class certification is within the trial court's discretion. *Jordan v. County of Los Angeles,* 669 F.2d 1311, 1318 (9th Cir.), *vacated on other grounds,* 459 U.S. 810 (1982). Plaintiffs have the burden to establish compliance with Rule 23. *In re N. Dist. of Cal., Dalkon Shield IUD Prods. Liab. Litig.,* 693 F.2d 847, 854 (9th Cir.1982), *cert. denied,* 459 U.S. 1171 (1983). A class may be certified only if the court is satisfied "after a rigorous analysis that the prerequisites of Rule 23(a) have been satisfied." *Hanon v. Dataproducts Corp.,* 976 F.2d 497, 509 (9th Cir.1992) (citing *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161 (1982). A class may be certified as to one or more claims without certifying all of the claims alleged in the complaint. Fed.R.Civ.P. 23(c)(4).

**\*2** For purposes of ruling on a motion to certify a class, the court must take the substantive allegations of the complaint as true. *Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975), *cert. denied,* 429 U.S. 816 (1976). The determination of class certification does not require or permit a preliminary inquiry into the merits. *Id.* An extensive evidentiary showing by the plaintiff is not required as long as the court has sufficient material before it to determine the nature of the allegations and to rule on compliance with the requirements of Rule 23. *Id.*

### BACKGROUND

On October 7, 2004, this Court denied FICO's Motion for Summary Judgment in which FICO moved the Court to determine that the FCRA notice sent to Porto and Wenzlick complied with the notice requirements of § 1681m(a). The Court held "[FICO's] ... FCRA Notice requires the insured to inspect two separate documents and then to deduce that something negative in a consumer credit report caused the insurer to increase the premium charged on renewal." *See* Opin. and Order at 12 (issued Oct. 7, 2004). In other words, the Court found FICO did

not establish as a matter of law that the FCRA notices sent to Porto and Wenzlick met the requirements of § 1681m(a) because FICO's notice failed to state specifically the increase in the premiums charged to Porto and Wenzlick constituted an adverse action based on information in consumer credit reports.

### DISCUSSION

Porto and Wenzlick now move the Court for an order under Fed.R.Civ.P. 23(a) and (b)(3) certifying the following class, which is the class definition proposed by FICO: [FN2]

> FN2. FICO initially asserted the class definition proposed by Porto and Wenzlick was "grossly overbroad." Porto and Wenzlick, however, conceded their proposed class definition was overbroad in light of this Court's previous ruling in which it granted summary judgment in favor of FICO against the FCRA claims of Plaintiff Douglas Ashby. *See* Opin. and Order issued March 17, 2004. Accordingly, Porto and Wenzlick have adopted the class definition proposed by FICO.

All automobile and property personal lines insurance policyholders of Farmers Insurance Company of Oregon (FICO) during the period February 26, 2001 to August 1, 2002 who paid a renewal premium that was increased over the prior period's premium where such increase was based in whole or in part on any information contained in a consumer report, and excluding any current officer, director, or employee of FICO, Farmers Group, Inc. (FGI), [FN3] or its affiliates, or any former officer, director, or employee of FGI, FICO, or their affiliates who served during the class period, or any judge of the United States District Court for the District of Oregon.

> FN3. FGI is FICO's attorney-in-fact (AIF). Even though FGI was dismissed as a defendant in this action because FGI did not underwrite the insurance policies

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 3

Not Reported in F.Supp.2d, 2004 WL 2359968 (D.Or.)

**(Cite as: 2004 WL 2359968 (D.Or.))**

involved in this case, anyone affiliated with FGI is excluded from the class because, as FICO's AIF, FGI provided all of the management services related to FICO's insurance policies, including the creation and delivery of the FCRA notices at issue. *See* Opin. and Order at 11 (issued Feb. 20, 2003).

FICO opposes the Motion for class certification for the following reasons: (1) individual issues of proposed class members predominate over issues common to the class, (2) proposed class representatives Porto and Wenzlick and their counsel have a conflict of interest with proposed absentee class members, (3) the claims of Porto and Wenzlick are neither "typical" nor "adequate," and (4) enforcement of alleged "technical violations" of FCRA by means of a class action is inappropriate.

*1. Individual Issues of Fact as to Proposed Class Members.*

FICO asserts the individual fact issues pertaining to each proposed class member predominate over issues common to the class.

a. *Agent and Customer Communications.*

**\*3** FICO asserts there are individual fact issues pertaining to each proposed class member regarding conversations between FICO's agents and customers as to FICO's use of consumer credit reports to set insurance premium rates.

In *Mark v. Valley Insurance Company,* CV 01-1575-BR (filed Oct. 24, 2001), one of a series of FCRA cases pending in this Court, the Court stated:
Discussions between an insured and an insurance agent and the insured's understanding of the reasons for any higher premium rate are not relevant to the issue of whether Defendants gave adequate notice to the appropriate insureds. The specific notice requirements are set forth in 15 U.S.C. § 1681m(a). There is no statutory provision that allows a defense to the notice requirement on the basis of the insured's actual knowledge.

Opin. and Order at 8 (issued Feb. 6, 2004).

FICO attempts to distinguish this case from *Mark* on the grounds that many independent agents who sell personal lines insurance policies on behalf of FICO tell their customers that FICO uses information in consumer credit reports to set the premiums even though agents are not instructed to provide FCRA notices to their customers. In addition, FICO asserts its agents are a "dedicated agency force" who have agreements with FICO in contrast to the general agents used by Defendant Valley Insurance Company in *Mark.*

In *Mark,* no written notice of a renewal premium increase was given to the insureds. Here, however, FICO sent written notices "of the fact of an increase" to insureds in renewal insurance premiums as a supplement to similar oral communications made by its agents. FICO also presented a "specific record of [oral] communications from numerous agents to numerous class members relating to the sole alleged deficiency in the FICO written notice."

The Court finds FICO's evidence of *ad hoc* oral communications between its independent agents and insureds establishes only that some proposed class members may have had actual knowledge of the impact of their credit score on the premium FICO charged on renewal of the class members' policies. As noted, however, such evidence is not relevant as to whether FICO sent a notice that adequately complied with § 1681m(a).

On this record, the Court concludes conversations between independent agents and customers relating to FICO's use of consumer credit reports in setting premium rates are not relevant to the class members' FCRA claims based on FICO's alleged failure to give adequate notice of adverse actions FICO took against proposed class members.

b. *Increase in Premium Based on Information in a Consumer Credit Report.*

FICO asserts many factors may generate an increase in the premium charged to proposed class

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 4

Not Reported in F.Supp.2d, 2004 WL 2359968 (D.Or.)

**(Cite as: 2004 WL 2359968 (D.Or.))**

members on renewal of their insurance policies. For instance, changes in loss experience, coverage amounts, driving history, and general rate increases may increase the amount of the premium on renewal. Accordingly, FICO contends fact finding would be necessary as to each class member to determine whether the increase in the amount of premium charged on renewal was the result of information in a consumer credit report or one of the other factors set forth above. The Court disagrees.

**\*4** FICO creates a letter grade for every insured based on information in a consumer credit report. The letter grade determines the amount FICO will charge for the premium, which is a percentage of the base premium rate. The base premium rate incorporates the noncredit report factors described by FICO before calculation of the final premium.

Accordingly, the increase in the premium charged to an insured with a higher letter grade based on information in a consumer credit report will always be greater than the increase charged to an insured with a lower letter grade because the former will always pay a higher percentage of the base premium rate.

The Court, therefore, finds the only individual fact issues to be decided as to each proposed class member are (1) whether the class member's premium increased on renewal of the insurance policy and (2) whether the increase in the premium charged was greater than the increase in the premium charged to other insureds who had the most favorable credit rating and whose premium was calculated from the same base premium rate as the class member's premium. Accordingly, the Court concludes the necessity of making the described limited factual determinations does not bar class certification.

c.    *Proposed Class Members' Subjective Understanding of FCRA Notice.*

FICO contends there are individual fact issues as to whether each proposed class member actually understood from FICO's notice that the proposed

class member had suffered an adverse action in the form of an increased premium based on a consumer credit report. FICO asserts proposed class members who actually understood FICO had taken such adverse action would be barred from any recovery. The Court disagrees.

The Court finds the cases FICO relies on to support its assertion are not on point because in each instance issues of proof regarding reliance on misrepresentations and/or proof of actual damages incurred by individual class members predominated over issues common to the class. *See Buford v. H & R Block, Inc.,* 168 F.R.D. 340 (S .D. Ga.1996), *aff'd sub nom Jones v. H & R Block Tax Serv.,* 117 F.3d 1433 (11th Cir.1997) (court denied motion for class certification of taxpayers who alleged the defendant fraudulently misrepresented that its Refund Anticipation Loan program involved a tax refund rather than a loan because reliance on the alleged fraudulent misrepresentations was an essential element of each class member's claim). *See also Wilcox Dev. Co. v. First Interstate Bank of Or.,* 97 F.R.D. 440 (1983)(class action is inappropriate in a Sherman Act claim against a bank when proof of individual class members' injuries-in-fact and actual damages predominate over common issues).

Unlike *Buford, Wilcox,* and other cases relied on by FICO, the predominant issue in this case is the adequacy of a form notice of adverse action that FICO sent to thousands of insureds during a specific period. To the extent the proposed class members seek statutory damages, their subjective knowledge that FICO took adverse actions against them is irrelevant. *See Schnall v. Amboy Nat'l Bank,* 279 F.3d 205, 219 (3rd Cir.2002) (in a class action to recover statutory as opposed to actual damages under the Truth-in-Savings Act, class members need not show they relied on defective account disclosures or were misled by the bank's failure to comply with the Act's disclosure requirements).

**\*5** The Court, therefore, concludes the subjective knowledge of class members regarding adverse actions taken against them is not relevant to their claims for statutory damages under FCRA.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5

Not Reported in F.Supp.2d, 2004 WL 2359968 (D.Or.)

**(Cite as: 2004 WL 2359968 (D.Or.))**

d. *Proposed Class Members' Receipt of FCRA Notice.*

FICO asserts there are individual fact issues as to whether each proposed class member actually received a FCRA notice. As noted, however, class members need not prove they relied on the FCRA notice in order to recover statutory damages. The only issue is whether FICO gave adequate notice of an adverse action taken against an insured based on information in a consumer credit report. Proposed individual class members must establish only that they are within the class of insureds who should have been given adequate notice of such an adverse action. If the notice FICO gave was inadequate under FCRA, proof of the insured's receipt of the notice is irrelevant.

e. *Causation of Damage Suffered by Class Members.*

FICO asserts there are individual fact issues as to whether each proposed class member suffered actual harm because of FICO's failure to provide adequate notice of the adverse action it took against the class members. FICO asserts "FCRA's statutory damages provision should be interpreted as Congress' method of compensating a plaintiff who has incurred actual damages where proof of the amount is difficult." Congress, however, has stated in plain terms that statutory damages are available as an alternative remedy to actual damages for class members who are not provided adequate notice of an adverse action taken against them when the alleged inadequate notice arises from a willful violation of FCRA's notice requirements. 15 U.S.C. § 1681n(a)(1)(B).

f. *Amount of Actual Damages.*

FICO asserts there are individual fact issues as to each of those proposed class members who seek actual damages in addition to statutory damages. As noted, statutory damages are an alternate remedy to actual damages under 15 U.S.C. § 1681n(a)(1)(B). Accordingly, a proposed class member may not seek both actual and statutory damages. FICO's concern that individual fact issues will arise when

proposed class members seek both actual and statutory damages is, therefore, unfounded.

g. *Amount of Statutory Damages.*

FICO asserts there are individual fact issues as to the amount each proposed class member should receive as statutory damages because FCRA allows a range of statutory damages from $100 to $1000. 15 U.S.C. § 1681n(a)(1)(A). FICO asserts the range of damages awarded to each proposed class member may depend on whether the class member suffered "actual damages at all," whether proposed class members "exercised reasonable care," whether the premium amount charged was $1 or $500," or whether proposed class members seek "multiple recoveries."

At this stage of the proceedings, the Court cannot foresee every circumstance in which a plausible argument could be made that the amount of statutory damages awarded to individual proposed class members should be different. The Court, therefore, cannot rule out the possibility that certain proposed class members may be entitled to a greater or lesser award of statutory damages than other proposed class members. The Court, however, concludes FICO's concerns are premature for purposes of the Motion to Certify and do not provide a sufficient basis for this Court to exercise its discretion to disallow class certification. See *Mark v. Valley Insurance Company,* CV 01-1575-BR, Opin. and Order at 16 (issued Feb. 6, 2004)("the potential for individualized determinations of statutory damages is insufficient to defeat class certification."). Opin. and Order at 16.

2. *Conflict of Interest between Class Representatives and Proposed Class Members.*

**\*6** FICO asserts Porto and Wenzlick have a conflict with proposed absentee class members because Porto and Wenzlick seek only statutory damages and, therefore, "attempt to subvert a potentially larger individual claim [for actual damages] to accommodate their desire for class certification."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                           Page 6

Not Reported in F.Supp.2d, 2004 WL 2359968 (D.Or.)

(Cite as: 2004 WL 2359968 (D.Or.))

The Court's analysis in *Mark*, however, also applies here:

> Plaintiff does not have a conflict of interest based on the mere fact that putative class members may seek actual damages rather than statutory and punitive damages. In addition, Plaintiff must prove willful misconduct to establish her entitlement to statutory and punitive damages. A finding of willful misconduct necessarily includes negligent misconduct sufficient to justify an award of actual damages under FCRA. Plaintiff and her counsel have sufficient incentive to pursue Defendants' liability under FCRA as aggressively as a class member who may choose to seek actual damages only. The plaintiff in a FCRA class action who does not seek actual damages has "a significant and sufficient enough stake in the outcome; she has, and can be expected to vigorously and zealously this alleged grievance" particularly when "dissatisfied class members have a right to opt out of the class." *White v. Imperial Adjustment Corp .,* 2002 WL 1809084, at *13.

Opin. and Order at 14 (issued Feb. 6, 2004).

Although Porto and Wenzlick move only to represent a class of insureds who seek statutory and punitive damages based on FICO's allegedly willful violation of FCRA's notice requirements, they are capable of vigorously prosecuting the claims of those class members who seek actual damages but choose not to opt out of the class.

The Court, therefore, concludes Porto and Wenzlick do not have a conflict of interest in acting as class representatives for putative class members who seek actual damages based on FICO's alleged FCRA notice violation.

3. *Typicality and Adequacy of Claims of Class Representatives.*

FICO asserts Porto and Wenzlick are not typical or adequate class representatives because both of them are vulnerable to FICO's unique defense that neither Porto nor Wenzlick read the allegedly defective FCRA notices and, in fact, Wenzlick agreed to become a plaintiff in this action before he even received his FCRA notice. In addition, FICO asserts it has the unique defense that Porto did not suffer an adverse action arising from an increase in her homeowner insurance policy premium because the premium charged by FICO did not increase but, in fact, decreased after FICO discovered it had erroneously failed to credit discounts unrelated to information in Porto's consumer credit report.

As noted, the Court has found an insured's subjective knowledge as to the meaning of a FCRA adverse action notice is irrelevant in determining whether FCRA's notice requirements have been violated. Accordingly, the fact that Porto and Wenzlick may not have read the notices is not a viable defense. In addition, the Court found FICO failed to establish Porto did not suffer an adverse action regarding her homeowner policy. *See* Opin. and Order at 10 (issued Oct. 7, 2004).

**\*7** As also noted, this Court previously concluded FICO failed to establish that its notices of adverse action to both Porto and Wenzlick complied with the requirements of FCRA as a matter of law. The issue at trial, therefore, will be whether FICO willfully failed to provide an adequate notice of adverse action to Porto, Wenzlick, and the other proposed class members.

Accordingly, the Court concludes the FCRA claims of Porto and Wenzlick are typical of the proposed class members' claims. Porto and Wenzlick, therefore, are adequate class representatives.

4. *Enforcement of FCRA Notice Requirements by Class Action.*

FICO asserts a class action in this case is not the "superior" method to enforce FCRA notice requirements because the potential aggregate statutory damages awarded to the class would be "grossly disproportional to the offense alleged." To support this proposition, FICO relies on a line of cases decided under the Truth in Lending Act (TILA), 15 U.S.C. § 1601, *et seq.,* beginning with *Ratner v. Chemical Bank New York Trust Company,* 54 F.R.D. 412 (S . D.N.Y.1972).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2359968 (D.Or.)

(Cite as: 2004 WL 2359968 (D.Or.))

In *Ratner,* the plaintiff brought an action against a bank that issued him a "Mastercard" credit card. The plaintiff alleged the bank failed to show the statutorily required "nominal annual percentage rate" on a periodic statement that reported an outstanding principal balance on which no interest charge had accrued. The court agreed with the defendant's contention that certification of a class action was "unnecessary" because TILA provides for a "$100 minimum recovery and payment of costs and a reasonable fee for counsel; and (2) the proposed recovery of $100 each for some 130,000 class members would be a horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit to defendant, *for what is at most a technical and debatable violation of the Truth in Lending Act." Id.* 416 (emphasis added). *See also La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461, 468 n. 7 (9th Cir.1973) (the trend of authority is that class actions are inappropriate for claims based on a violation of TILA); *Mathews v. Book-of- the-Month Club, Inc.,* 62 F.R.D. 479, 480 (N.D.Cal.1974) (*Ratner* has "come to be the leading case in class actions in Truth in Lending cases, particularly, and generally in statutory actions where Congress has provided for minimum damages and attorneys' fees."). [FN4]

> FN4. Congress removed the potential for defendants to suffer crushing damages from class action litigation brought under TILA by amending the statute to limit the maximum aggregate recovery in a class action to "the lesser of $500,000 or 1 per centum of the net worth of the creditor." *See* 15 U.S.C. § 1640(a)(1)(B).

Other courts, however, have upheld class actions in TILA cases. *See Haynes v. Logan Furn. Mart, Inc.,* 503 F.2d 1161 (7th Cir.1974). In *Haynes,* the court held a class action is appropriate under TILA when the class size is manageable: for example, when the class has approximately 2500 members and actual damages are alleged. The court adopted a case-by-case determination in which the court weighs the benefits of a class action under TILA against the protection of defendants from crushing damages:

*8 [T]he purpose of enacting a statutory minimum damage provision was as much to induce creditor compliance with the Act as to provoke incentives for private litigants. Therefore, creditors disregarding their responsibilities under the Act and causing damages to members of a class however limited or extensive should have no assurance that their accumulated responsibility cannot be enforced through [a class action].... [W]hile procedural fairness with respect to protecting defendants from crushing damages predicated on the statutory minimum recovery is an important consideration in determining the superiority of the class action mode of adjudication, it is at least equally important to prevent violators of the Act from limiting recovery to a few individuals where actual, widespread noncompliance is found to exist.

*Id.* at 1164.

Here FICO asserts at least 130,000 of its insureds would be members of the class proposed by Porto and Wenzlick, and the potential range of verdict against FICO could be $52 to $520 million based on the assumption that each class member had four renewals for which FCRA notices were required. FICO asserts "a result so grossly disproportionate to the alleged notice deficiency is neither required nor permitted by the provisions of Rule 23 as applied to the facts of this case." The Court disagrees.

First, as noted, the Court has found Porto and Wenzlick have met each of the specific requirements for certification of a class action under Fed.R.Civ.P. 23. The underpinning of the cases rejecting class certification in TILA cases as well as other cases involving a range of consumer protection statutes is a policy determination by those courts that it is unfair to subject defendants to a potentially fatal financial blow based on technical violations of those statutes. This Court, however, is not persuaded it should follow a policy to protect defendants from potentially serious financial consequences based on their substantive violation of consumer protection statutes enacted by Congress. "In the absence of a direct expression by Congress of its intent to depart from the usual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8

Not Reported in F.Supp.2d, 2004 WL 2359968 (D.Or.)

**(Cite as: 2004 WL 2359968 (D.Or.))**

course of trying 'all suits of a civil nature' under the Rules established for that purpose, class relief is appropriate in civil actions brought in a federal court." *Califano v. Yamasaki,* 442 U.S. 682, 700 (1979). *See also Reiter v. Sonotone Corp.,* 442 U.S. 330, 344-45 (1979) ( "[T]hat the cost of defending consumer class actions will have a potential ruinous effect on small businesses in particular and will ultimately be paid by consumers ... are not unimportant considerations, but they are policy considerations more properly addressed by Congress than this Court.").

This Court is mindful of the potentially significant financial impact a successful class action may have on FICO. FICO has not asserted, however, that the impact will deal a fatal financial blow to its business. In addition, the Court does not credit FICO's apparent characterization of its alleged FCRA violations as "technical." FICO may be found liable to proposed class members for statutory damages only if the trier of fact finds FICO willfully violated FCRA's notice provisions. Although this Court has not decided the specific standard that should be applied to determine whether a violation of FCRA's notice requirements is "willful," [FN5] the Court is satisfied that a willful violation of the statute is more than a "technical" one.

> FN5. See related case of *Razilov v. AMCO,* CV 01-1446-BR, Opin. and Order at 19-20 (issued Mar. 3, 2004).

**\*9** The Court, therefore, concludes a class action seeking statutory damages for violations of FCRA's notice requirements is neither inappropriate nor unfair, and, in any event, these are policy considerations for Congress.

*CONCLUSION*

For these reasons, the Court GRANTS Plaintiffs' Motion for Class Certification (# 113) of the following class:

All automobile and property personal lines insurance policyholders of Farmers Insurance Company of Oregon (FICO) during the period February 26, 2001 to August 1, 2002, who paid a renewal premium that was increased over the prior period's premium when such increase was based in whole or in part on information contained in a consumer report, and excluding any current officer, director, or employee of FICO, Farmers Group, Inc. (FGI), or its affiliates, or any former officer, director, or employee of FGI, FICO, or their affiliates who served during the class period, or any judge of the United States District Court for the District of Oregon.

IT IS SO ORDERED.

Not Reported in F.Supp.2d, 2004 WL 2359968 (D.Or.)

**Motions, Pleadings and Filings (Back to top)**

• 3:01cv01446 (Docket)
                              (Sep. 28, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit C**

Not Reported in F.Supp.2d                                                                 Page 1

Not Reported in F.Supp.2d, 2004 WL 2967069 (N.D.Ill.)

**(Cite as: 2004 WL 2967069 (N.D.Ill.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois, Eastern Division.
Jessica LOY, f/ka/ Jessica Vincer, individually and
on behalf of all other
Motorola employees similarly situated, Plaintiff,
v.
MOTOROLA, INC., a corporation, Defendant.
**No. 03-C-50519.**

Nov. 23, 2004.

George S. Bellas, Clifford Law Offices, P.C.,
Chicago, IL, Paul R. Cicero, Cicero & France,
Rockford, IL, Brian J. Wanca, Anderson & Wanca,
Rolling Meadows, IL, Peter Thomas Shovlain,
Peter T. Shovlain & Associates, Gurnee, IL, for
Plaintiffs.

Michael A. Warner, Joan E. Gale, Scott A. Carlson
, Christopher Lawrence Casazza, Seyfarth Shaw,
Chicago, IL, for Defendant.

*MEMORANDUM OPINION AND ORDER*

MAHONEY, Magistrate J.

*1 Jessica Loy ("Plaintiff") filed a two count
Amended Complaint against Motorola, Inc.
("Defendant") individually and on behalf of all
other Motorola employees similarly situated, on
April 15, 2004. Plaintiff filed her Amended
Complaint pursuant to the Family and Medical
Leave Act of 1993 ("FMLA"), Section
107(a)(2)(B), 29 U.S.C. § 2601, et. seq., and in the
alternative, pursuant to Fed.R.Civ.P. 23(b)(3). [FN1]
Currently, no motions to certify a class or
collective action have been filed in this case. This

matter is now before the court on Defendant's
Renewed Motion for a Protective Order relating to
Plaintiff's First Request for Production and certain
depositions sought by Plaintiff. For the reasons
stated below, Defendant's Motion for a Protective
Order is denied.

FN1. The case was originally filed on
December 2, 2003, on behalf of
twenty-three Motorola employees, but the
original complaint was voluntarily
dismissed by the Plaintiffs.

*I. Background*

For the limited purposes of this motion, the court
accepts as true the background facts relayed in
Plaintiff's Response to Defendant's Motion for a
Protective Order. By doing so, the court makes no
judgment about the actual truth or accuracy of the
facts alleged. Plaintiff worked in the Login
Department at Motorola's Rockford facility from
April, 2001, to April, 2002. While working for
Defendant, Plaintiff was granted medical leave
under the FMLA from December 4, 2001, through
December 9, 2001, and intermittent leave thereafter.
Allegedly, Plaintiff's FMLA leave time was used to
calculate her employee production average, thereby
lowering her average and denying her the
opportunity to participate in various
benefits/incentive programs. On April 22, 2002,
Plaintiff was told that she was being terminated for
tardiness and attendance issues.

Plaintiff asserts that the alleged inclusion of FMLA
leave time into her productivity average was a
violation of the FMLA. In addition, Plaintiff alleges
that Defendant calculated other Motorola
employees' productivity without regard to the
FMLA's requirement of excluding leave time under
the Act. Thus, Plaintiff brings this action as an
individual and on behalf of other employees
similarly situated pursuant to Section 107(a)(2)(B)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 2967069 (N.D.Ill.)

(Cite as: 2004 WL 2967069 (N.D.Ill.))

of the FMLA, and in the alternative, Fed.R.Civ.P. 23

On or about June 8, 2004, Plaintiff served her First Request for Production of Documents on Defendant. Defendant did produce materials responsive to Plaintiff's request, in particular in regard to the original twenty-three Plaintiffs. Plaintiff, however, contends that outstanding materials have not been turned over, including various employee files and information on how Motorola calculated productivity rates at times relevant to her lawsuit. As part of her precertification discovery, Plaintiff also seeks to depose Motorola employees who are knowledgeable about Defendant's FMLA policies and practices and productivity tracking customs.

Defendant first moved for a protective order relating to Plaintiff's discovery on August 12, 2004. Defendant's motion was denied on August 18, 2004. Since then, Defendant has taken the deposition of the Plaintiff, and has renewed its Motion for a Protective Order based on information discovered at the deposition that convinced Defendant that Plaintiff is not an appropriate representative for additional individuals who may have claims against Motorola under the FMLA regarding productivity practices. Because of this, Defendant seeks to limit Plaintiff's broad discovery generally allowed under Fed.R.Civ.P. 23(b)(3).

**\*2** Underlying Defendant's Motion for a Protective Order is the issue of whether Plaintiff can proceed under Fed.R.Civ.P. 23(b)(3) as Plaintiff asserts, or whether FMLA class violations must be treated as collective actions under the Fair Labor Standards Act ("FSLA"), 29 U.S.C. § 216(b), as Defendant asserts. Claims filed under § 216(b) are different than Rule 23 class actions because § 216(b) collective actions require parties to "opt in" to be bound, while under Rule 23, parties must "opt out" not to be bound. *See Woods v. New York Life Ins. Co.*, 686 F.2d 578 (7th Cir.1982); *Mielke v. Laidlaw Transit, Inc.*, 313 F.Supp.2d 759 (N.D.Ill.2004). Class based discovery under Rule 23 is generally broader than in § 216(b) collective actions as well.

## II. Discussion

Whether or not Plaintiff's case can proceed as a class or collective action is not the issue currently before the court, nor is it normally a decision for the Magistrate Judge to make. However, whether Plaintiff proceeds under the FLSA or Rule 23 impacts Defendant's Motion for a Protective Order so the Magistrate must reach that issue.

Defendant argues that alleged class violations of the FMLA must be treated as collective actions under the FLSA, 29 U.S.C. § 216(b). Defendant bases its argument on the statutory language of the FMLA, stating that the language of the enforcement provision of the FMLA, 29 U.S.C. § 2617(a)(2) mirrors that of the FLSA, 29 U.S.C. § 216(b). Further, Defendant quotes FMLA legislative history that suggests the enforcement scheme of the FMLA was intended to be identical to that of the FSLA:

> [The FMLA's] enforcement scheme is modeled on the enforcement scheme of the FLSA, which has been in effect since 1938. Thus the FMLA creates no new agency or enforcement procedures, but instead relies on the time-tested FLSA procedures already established by the Department of Labor.... The Relief provided in the FMLA also parallels the provisions of the FLSA.

S.Rep. No. 103-3, at 35 (1993). Defendant also compares the FMLA with the Age Discrimination in Employment Act ("ADEA") because actions brought under ADEA have been treated as opt-in collective actions under the FLSA, not Rule 23. Defendant finally notes that courts interpreting the FMLA frequently track FLSA interpretations on collateral issues such as damages [FN2] and jury trials. [FN3]

> FN2. *See Thorson v. Gemini, Inc.*, 96 F.Supp.2d 882, 890 (N.D.Iowa 1999).

> FN3. *See McNeela v. United Air Lines, Inc.*, 1999 WL 987096, \*5 (N.D.Ill. Oct.28, 1999).

Plaintiff, on the other hand, argues that class violations of the FMLA must be treated as opt-out

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2967069 (N.D.Ill.)

**(Cite as: 2004 WL 2967069 (N.D.Ill.))**

actions under the FMLA, 29 U.S.C. § 2617(a)(2) and pursuant to Fed.R.Civ.P. 23(b)(3). In support of her argument, Plaintiff states that the statutory language of the FMLA § 2617(a)(2) clearly does not incorporate the express "consent" and "opt-in" language of the FLSA, which provides in § 216(b) that no person may be bound by, or benefit from, a judgment unless the person has filed a written consent to become a party. This is, of course, in direct contrast to Rule 23, which binds absent parties who fall within a certified class unless they opt out.

**\*3** Plaintiff also points out that when other statutes, like the ADEA, incorporate the "opt-in" enforcement procedures of § 216(b), they do so expressly. For example, Section 7(b) of the ADEA specifically directs that "provisions of this Chapter shall be enforced in accordance with the powers, remedies, and procedures provided in Sections ... 216 of this title." 29 U.S.C. § 626(b). [FN4] Plaintiff asserts that the FMLA contains no such provision, and absent a contrary intent of Congress, Fed.R.Civ.P. 23 is the appropriate enforcement mechanism. Plaintiff also analogizes the FMLA with class claims brought under Title VII and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, because these class claims, likewise, do not incorporate the FLSA, and are subject to certification by the court pursuant to Rule 23. [FN5]

> FN4. *See also King v. Gen. Elec. Co.,* 960 F.2d 617, 621 (7th Cir.1992)(citing *LaChapelle v. Owens-Illinois, Inc.,* 413 F.2d 286, 289 (5th Cir.1982)(finding that because ADEA § 7(b) "incorporates the enforcement provisions of the Fair Labor Standards Act, 29 U.S.C. § 216, by reference" the class action procedure under Fed.R.Civ.P. 23 is pre-empted).

> FN5. *See, e.g., Bowe v. Colgate-Palmolive Co.,* 416 F.2d 711, 719 (7th Cir.1965).

In *Califano v. Yamasaki,* the Supreme Court held that "[i]n the absence of a direct expression by Congress of its intent to depart from the usual course of trying 'all suits of a civil nature' under the Rules established for that purpose, class relief is appropriate." 442 U.S. 682, 700, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)(quoting Fed.R.Civ.P. 1). Because the plain language of the FMLA is silent as to the appropriate vehicle for an action to proceed on the behalf of others, this court is inclined to apply Fed.R.Civ.P. 23 as it moves with this case through its discovery stages. While Defendant argues that FMLA claims are highly factual, and thus inappropriate for a class context, Defendant has not pointed to any inconsistency between the FMLA and the procedures of Rule 23. Thus, this court finds that Rule 23 class action rules are appropriate to apply in this case. [FN6]

> FN6. Defendant cites the court to one reported decision where an FMLA class claim was brought under Rule 23. *See Bond v. Abbott Labs.,* 7 F.Supp.2d 967 (N.D.Ohio 1998).

Accordingly, this court turns to Defendant's Motion for a Protective Order. Under Rule 26(c), it is clear that "for good cause shown, the court in which the action is pending ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... (1) that the disclosure or discovery not be had." Fed.R.Civ.P. 26(c)(1). The district court has discretion to decide when a protective order is appropriate and what degree of protection is required. *Seattle Times Co., v. Rhinehart,* 467 U.S. 20, 36, 104, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). Only good cause is required in determining whether or not to issue a protective order. *Id.* at 37. In deciding whether good cause exists, the district court must balance the interests of the parties, taking into account the harm to the party seeking the protective order and the importance of the disclosure to the non-moving party. *Wiggins v. Burge,* 173 F.R.D. 226, 229 (N.D.Ill.1997). The party seeking the protective order has the burden of showing that good cause exists by alleging particular and specific facts. *See Gulf Oil Co. v. Bernard,* 452 U.S. 89, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2967069 (N.D.Ill.)

**(Cite as: 2004 WL 2967069 (N.D.Ill.))**

Further, courts have considerable discretion in deciding whether, and to what degree discovery in regards to class certification issues should go forward. Typically, discovery is permitted to allow Plaintiff to show the existence of a class. Specifically, discovery is allowed where there is a need to determine whether Rule 23 requirements are met and whether the action fits in one of the Rule 23(b) categories. Discovery must be sufficiently broad to give the plaintiff a realistic opportunity to meet the requirements of class certification, but at the same time, a defendant should be protected from overly burdensome or irrelevant discovery. *See McCray v. Standard Oil Co.,* 76 F.R.D. 490 (N.D.Ill.1977). Rule 26(c) provides courts the authority to limit the scope of discovery generally, and Rule 26(c)(4) allows the court to circumscribe discovery of irrelevant matters.

*4 While Defendant does argue that further production and depositions under Plaintiff's requests would be burdensome, Defendant does not lay out what its burden would be to produce under Plaintiff's request other than concluding that Plaintiff's discovery is "inappropriate, vexatious, and completely unnecessary." Instead, Defendant's central argument is that it should not be required to submit further discovery because Plaintiff cannot possibly be a proper class representative under Rule 23. Defendant maintains that it has turned over all materials relating to Plaintiff's individual claim, and that any other discovery is irrelevant and excessive in scope because Plaintiff seeks information beyond what Defendant characterizes as a "simple" claim regarding Plaintiff's termination for instances of tardiness that possibly should have been excused time under the FMLA. (Def.'s Mot., p. 7).

Defendant vehemently argues that Plaintiff's deposition testimony illustrates that she cannot connect her FMLA claims to productivity, and thus, there is no basis for her class claim challenging Defendant's productivity practices under the FMLA because she cannot be a proper class representative. Defendant quotes excerpts from Plaintiff's deposition transcript in support of its argument. Most of the excerpts go to showing that Plaintiff's claim is unrelated to productivity. For example,

Defendant cites Plaintiff's statement that she was not terminated for poor productivity, and that Plaintiff does not know if any of her FMLA leave time days were included in Motorola's productivity calculations; she just thought they were "kind of off." Defendant also notes that different employee teams used different productivity tracking systems, and that Plaintiff only knows about her own team. Finally, Defendant downplays Plaintiff's assertion that employees who took FMLA leave time were penalized by being refused time-off incentives because Plaintiff could not state which weeks she thinks she did not get a bonus of getting off early on Fridays because she took FMLA leave time.

Plaintiff argues, with equal confidence, that she has connected her claim for a violation of the FMLA to production average issues, maintaining that adverse employment actions were taken against her due to the inclusion of FMLA leave time in her productivity averages, *despite the fact that* other alleged FMLA violations ultimately resulted in her employment termination. Plaintiff asserts that her deposition testimony bears out her productivity claim, and she also presents the declarations of twenty other present and former Motorola employees who also claim FMLA leave time was used to lower their productivity averages.

Plaintiff cites excerpts from her deposition in support of her argument. She notes that she testified that "if she took the total of her productivity for the week and divided that number by the actual number of hours/days that she worked, her weekly production average was higher than the production average reported by Motorola. Further, if she divided her weekly production by 5 days (even if she worked less than 5 days), she would get the same exact weekly production average as determined by Motorola." (Pl.'s Resp., p. 3). Plaintiff also cites to her testimony that "employees who met their daily production quotas for each work day during that work week were permitted to leave work early on the last work day of that week. However, if an employee missed a day of work for any reason, including FMLA leave, that employee was not permitted to leave work early ... even if that employee had met his or her production quota." (*Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 5

Not Reported in F.Supp.2d, 2004 WL 2967069 (N.D.Ill.)

**(Cite as: 2004 WL 2967069 (N.D.Ill.))**

).

**\*5** The court has reviewed Plaintiff's deposition for evidence of a productivity related claim, and has considered both parties' arguments on this issue. At this time, the court finds that Defendant has failed to meet its burden to show that discovery sought by Plaintiff is either unreasonably burdensome or irrelevant. Plaintiff has connected her FMLA claims to productivity by alleging adverse employment actions taken against her due to the incorporation of FMLA leave time into her productivity average. While Plaintiff may also have other FMLA related claims against Defendant, it does not change the fact that Plaintiff has alleged wrongful productivity practices taken by Defendant, much the same as the other twenty employees that filed their declarations with the court.

Plaintiff's First Production Request also does not strike the court as overly broad. Plaintiff requests personnel and occupational health resources files for approximately 25 individuals, and productivity related documents for approximately 200 named individuals, with the team position of each individual already listed. Defendant does not specify its burden to produce these documents, and the court finds that Plaintiff's request falls in the amount and type of discovery necessary for Plaintiff to show that a class exists and that she is an appropriate representative. Plaintiff's requests for FMLA leave logs and documents related to FMLA compliance generated by six named individuals also are relevant to whether a class should be certified and the proper scope of the class action.

Plaintiff's proposed depositions of Michael Davies, Drew Williams, and Robert White, and further deposition of Krista Meyer, also do not appear beyond the scope of Plaintiff's complaint. Krista Meyer ran Motorola's FMLA program in Rockford. According to Plaintiff, Michael Davies submitted a Declaration that he has personal knowledge of the methods used to track production at Motorola's Rockford facility. Drew Williams was an IT expert at Motorola's Rockford facility and possesses information with regard to the computer programs used to track productivity. Robert White developed the software program that was used to track productivity at the Rockford plant. Because the court does not accept Defendant's assertion that Plaintiff cannot assert a claim of productivity at this time, the court finds no reason why Plaintiff should not be able to proceed with her deposition of persons knowledgeable of Defendant's productivity programs.

*III. Conclusion*

For the foregoing reasons, the court finds that Plaintiff is entitled to proceed with discovery to determine if a class should be certified under Rule 23. Defendant's Motion for a Protective Order is denied.

Not Reported in F.Supp.2d, 2004 WL 2967069 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 3:03cv50519 (Docket)

(Dec. 02, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit D**

Westlaw.

Not Reported in F.Supp.2d                                                                    Page 1

Not Reported in F.Supp.2d, 2000 WL 1774091 (N.D.Ill.), 142 Lab.Cas. P 34,179

**(Cite as: 2000 WL 1774091 (N.D.Ill.))**

▷

**Motions, Pleadings and Filings**

United States District Court, N.D. Illinois, Eastern
Division.
Sean LADEGAARD, individually and on behalf of
a class of employees, similarly
situated, Plaintiff,
v.
HARD ROCK CONCRETE CUTTERS, INC., et
al. Defendants.
**No. 00 C 5755.**

Dec. 1, 2000.

MEMORANDUM OPINION AND ORDER

LEFKOW, J.

*1 Plaintiff, Sean Ladegaard ("Ladegaard"), filed
this putative class action against defendants Hard
Rock Concrete Cutters, Inc. ("Hard Rock"), and its
principals, James M. Dvoratchek and Peter M.
Held, in the Circuit Court of Cook County, Illinois,
alleging violations of the Illinois Minimum Wage
Law ("IMWL"), 820 ILCS 105/1 *et seq.*, the Illinois
Wage Payment and Collection Act ("IWPCA"), 820
ILCS 115/1 *et seq.*, and the Fair Labor Standards
Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.* After
defendants removed the case to federal court,
plaintiff filed this motion for class certification of
the state law claims. [FN1] For the following
reasons, plaintiff Ladegaard's motion for class
certification is granted.

> FN1. Plaintiff's motion for class
> certification only specifically mentions the
> Illinois Minimum Wage Act claim.
> However, plaintiff's complaint and reply
> brief suggest that he is requesting class
> certification for both the IMWL and

IWPCA state law claims. The court has
evaluated the motion as applying to both
claims.

PROCEDURAL BACKGROUND

Plaintiff is a former employee of defendant Hard
Rock, an Illinois corporation. He seeks certification
of a class of former and current employees who
have worked for Hard Rock during the period
August 1, 1997 to the present and who were not
paid for hours worked and overtime compensation.
The complaint and motion for class certification
were filed August 15, 2000. On September 18,
2000, defendants removed the case to federal court.
On September 25, defendants filed their answer and
affirmative defenses.

Plaintiff renewed his motion for class certification
in federal court on September 27, 2000, and a few
days later, on October 3, he moved for immediate
certification of the class and to restrain defendants'
communications with class members, as well as to
begin notice to members of the plaintiff class on the
FLSA claims. The motion for immediate
certification asserted that defendants had provided
every member of the proposed class who is
currently working for Hard Rock with a release
which they could exchange for a check and which,
plaintiff asserts, carried the threat that they would
no longer be working with the company if they did
not sign. [FN2] At a hearing on October 5, the court
resolved the emergency motions by the following
agreement: "Pending disposition of the motion for
class certification, defendants represent on the
record that they will not contact potential class
members with respect to any matter relating to this
suit."

> FN2. Plaintiff's reply to defendants'
> response to plaintiff's motion for class
> certification notes that because defendants
> had not yet responded to discovery the
> means Hard Rock used to obtain the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2

Not Reported in F.Supp.2d, 2000 WL 1774091 (N.D.Ill.), 142 Lab.Cas. P 34,179

**(Cite as: 2000 WL 1774091 (N.D.Ill.))**

releases is unknown.

On October 16, 2000, defendants filed their consolidated response to plaintiff's motions for class certification; immediate certification of class and to restrain defendants' communications with class members; and to begin notice to members of the plaintiff class [hereafter "Def.'s Consol. Response"]. The defendants attached a copy of an example of a release, which purported to release the FLSA, IMWL and IWPCA claims (but no other claims against the company). The attached release had redacted the name of the employee and sum that the employee would receive (within 14 days of signing the release). It was signed by the employee on September 27, 2000 and by the company on September 28, 2000.

STANDARDS

"The Federal Rules of Civil Procedure ("the Rules") provide the federal district courts with 'broad discretion' to determine whether certification of a class-action lawsuit is appropriate." *Keele v. Wexler,* 149 F.3d 589, 592 (7 th Cir.1998). Under the Rules, a determination of class certification requires a two-step analysis. First, the named plaintiff must demonstrate that his action satisfies the four threshold requirements of Rule 23(a):

**\*2** (1) numerosity (the class must be so large 'that joinder of all members is impracticable'); (2) commonality (there must exist 'questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical ... of the class'); and (4) adequacy of representation (the representative must be able to 'fairly and adequately protect the interests of the class').

*Id.* at 594; Fed.R.Civ.P. 23(a). Failure to establish any one of these prerequisites precludes class certification. *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7 th Cir.1993). Additionally, the action must "qualify under one of the three subsections of Rule 23(b)." *Hardin v. Harshbarger,* 814 F.Supp. 703, 706 (N.D.Ill.1993); Fed.R.Civ.P. 23(b). In this case, plaintiff seeks certification under subsections 23(b)(2) and (b)(3). Rule 23(b)(2) provides that an action may be maintained as a class action if "the party opposing the class has acted or refused to act on grounds

generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(3) provides that an action may be maintained as a class action if "the court finds that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." [FN3] When evaluating a motion for class certification, the court accepts as true the allegations made in support of certification, and does not examine the merits of the case. *Hardin,* 814 F.Supp. at 706, *citing, inter alia, Eisen v.. Carlisle & Jacquelin,* 417 U.S. 156, 177-78, 94 S.Ct. 2140, 2152-53, 40 L.Ed.2d 732 (1974). The party seeking class certification bears the burden of showing that the requirements for class certification have been met. *Id., citing, inter alia, General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

> FN3. The effect of Rule 23(b)(2) certification as opposed to Rule 23(b)(3) certification is that under 23(b)(3) the court is required to inform the members of the right to opt-out, whereas under 23(b)(2) it is not. *Compare* Fed.R.Civ.P. 23(c)(2) and 23(c)(3).

DISCUSSION

As set out above, plaintiff asks this court to certify a class of former and current employees who have worked for Hard Rock during the period August 1, 1997 to the present and who were not paid for hours worked, including overtime compensation. Specifically, plaintiff alleges that from August 1, 1997 to the present, plaintiff and the class he seeks to represent have not been paid for time loading and unloading trucks and driving to the work site at the beginning of the work day, time spent driving from the job site back to the yard and loading and unloading equipment at the end of the work day, and time spent attending mandatory monthly safety meetings, as required by law.

First, defendants object to plaintiff's motion on the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 3

Not Reported in F.Supp.2d, 2000 WL 1774091 (N.D.Ill.), 142 Lab.Cas. P 34,179

**(Cite as: 2000 WL 1774091 (N.D.Ill.))**

ground that it was brought under the Illinois Rules of Civil Procedure as opposed to the federal Rules. Plaintiff admits that his renewed motion (which was originally brought in Illinois state court) relied on Illinois procedure but asserts that the Illinois requirements for class certification are similar to the four prerequisites of Rule 23(a). The court agrees that plaintiff's motion for class certification should have been brought under the federal Rules. Nevertheless, this defect is not fatal because, when taken together, the allegations in the complaint, the motion for class certification, and plaintiff's reply memorandum adequately address the requirements for class certification under the federal Rules. It would be a waste of time to require plaintiff to file a slightly different motion seeking the same relief.

A. The Requirements of Rule 23(a)

*3 Next, defendants argue that plaintiff's motion does not meet the requirements of Rule 23. Concerning the Rule 23(a) requirements, defendants' main objection is that plaintiff has failed to establish the numerosity requirement of Rule 23(a)(1). Defendants also make tangential arguments regarding the other 23(a) requirements. The court finds that plaintiff has satisfied his burden under Rule 23(a).

1. Numerosity--Rule 23(a)(1)

To meet the numerosity requirement, the class must be so large "that joinder of all members is impracticable." *Keele,* 149 F.3d at 594; Fed. R. Civ. Pro. 23(a)(1). Plaintiff asserts that the class of driver-operators and helpers that he seeks to represent is so numerous that joinder of all members is impracticable. Plaintiff estimates that the class has at least 50 members, judging from the number of trucks Hard Rock has, and defendants state that "[a]ccording to Defendants' records there are a total of 60 individuals who have been employed by Hard Rock as driver-operators or helpers since August 15, 1997." In order to establish numerosity, plaintiff need not allege the exact number of members of the proposed class. *Johnson v. Rohr-Ville Motors, Inc.,* 189 F.R.D. 363, 368 (N.D.Ill.1999). Generally, where the membership of the proposed class is at least 40, as

is likely the case here, joinder is impracticable and the numerosity requirement is met. *Id .,* citing *Swanson v. American Consumer Indus., Inc.,* 415 F.2d 1326, 1333 (7 th Cir.1969).

Defendants argue that the class size should be eleven because "all but eleven signed agreements releasing their claims." *See* Def.'s Consol. Response, at 7. Because the propriety of a class action is basically a procedural question, it is inappropriate at the class certification stage to resolve issues such as the validity of releases, which go to the merits of the case. *See, e.g., Dubin v. E.F. Hutton Group Inc.,* No. 88 CIV. 0876(PKL), 1990 WL 105757, at *4 n. 4 (S.D.N.Y. July 20, 1990) ("On the present record, the Court is unable to determine the effect, if any, of these alleged releases on the numerosity of the putative class. Furthermore, it is inappropriate for the Court to resolve this substantive issue at this time."); *Fraley v. Williams Ford Tractor and Equip. Co.,* 5 S.W.3d 423, 431 (Ark.1999) (citing, *inter alia,* treatises and federal cases, and reversing determination that numerosity requirement had not been met where many putative class members had signed releases because the determination of the validity of the releases prematurely intruded on the merits of case). While the court is aware of authority in which courts have denied certification or reduced the class size where a significant portion of the potential class had signed releases, [FN4] the instant case is distinguishable in that defendants' method of obtaining the releases may have intruded on the court's authority to oversee the notice to class members in the class certification process in a fair manner. [FN5] In such a case, it is even more imperative that a court not consider the releases at the certification stage. *Fraley,* 5 S.W.3d at 437; *see also* 1 NEWBERG ON CLASS ACTIONS, § 15.19 (3d ed.1992) [hereafter "NEWBERG"] ("Though the law has long favored settlements, releases from liability or exclusions from a class obtained by the defendant through misrepresentations or the coercive threat of economic sanctions will not receive judicial approval when challenged.").

FN4. *See, e.g., Melong v. Micronesian Claims Comm'n,* 643 F.2d 10, 14

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 4

Not Reported in F.Supp.2d, 2000 WL 1774091 (N.D.Ill.), 142 Lab.Cas. P 34,179

**(Cite as: 2000 WL 1774091 (N.D.Ill.))**

(D.C.Cir.1980) (denying on grounds of typicality and adequacy of representation); *Caspar v. Cunard Line, Ltd.,* 560 F.Supp. 240, 243 (E.D.Pa.1983) (evaluating numerosity excluding released plaintiffs; *but see Korn v. Franchard Corp.,* 456 F.2d 1206, 1212 (2d Cir.1972); *Meyer v. Stevenson, Bishop, McCredie, Inc.,* No. 74 Civ. 5274, 1976 WL 7888, at * 3 (S.D.N.Y. May 11, 1976) (suggested conditionally granting class status and if the releases are determined to be valid, the court could entertain a motion to decertify the class for failure to satisfy the requirement of numerosity).

FN5. The court cannot determine on the record before it how many or even if releases were signed by potential class members. Notably, the one release provided by the defendants was dated September 27, 2000, the day plaintiff filed its motion for class certification in this court.

*4 Defendants also attempt to narrow the class by asserting that the potential class should be divided into two sub-classes: 41 "driver-operators" who claim to be owed compensation for travel time to and from the yard and for time spent attending safety meetings and the remaining 19 who worked only as "helpers" and who claim compensation only for time spent attending safety meetings. Plaintiff disputes this characterization claiming that helpers also are entitled to travel pay to and from the yard. For purposes of this motion, the court takes plaintiff's allegations as true, and therefore, rejects defendants' attempt to reduce the class in this manner.

Finally, defendants argue that even if the proposed class size is 60, the court should evaluate other factors and determine that in light of these factors the class size is not so numerous that joinder is impracticable. Where the class size is relatively small, courts do consider other factors such as judicial economy by avoiding a multiplicity of actions, the size of individual claims, the financial resources of class members, the ability of the claimants to bring individual lawsuits and geographic dispersement. *See* Newberg, § 3.06; *Gaspar v. Linvatec Corp.,* 167 F.R.D. 51, 56 (N.D.Ill.1996) (citing cases where classes as small as 13 to 20 were certified). However, the consideration of other factors is usually only where the proposed class size is smaller than 40. *Rohr-Ville Motors, Inc.,* 189 F.R.D. at 368; *Wood River Area Devel. Corp. v. Germania Fed. Savings and Loan Assoc.,* 198 Ill.App.3d 445, 450-52, 555 N.E.2d 1150, 1153-54 (Ill.App.Ct.1990) (if a class has more than 40 people numerosity is satisfied and if between 25 and 40 other factors become relevant). Even considering such factors, however, the court would conclude that joinder is impracticable here. Defendants do not dispute that the proposed class members have limited financial resources to bring individual actions and that their claims will likely be small. *See* Newberg, at § 3.06 (noting that "permissive joinder presupposes 'a group of economically powerful parties who are obviously able and willing to take care of their own interests." '). The possibility of retaliation is also a factor when considering whether joinder is impracticable, *see id.; Rodriguez v. Berrybrook Farms, Inc.,* 672 F.Supp. 1009, 1014 (W.D.Mich.1987), and plaintiff has asserted that current employees may feel inhibited to sue making joinder unlikely. Although there is only plaintiff's suggestion of intimidation in this instance, the nature of the economic dependency involved in the employment relationship is inherently inhibiting. Further, the court does not agree with defendants' assertion that the availability of the FLSA action cures these problems.

2. Commonality--Rule 23(a)(2)

To meet the commonality requirement, "there must exist 'questions of law or fact common to the class." ' *Keele,* 149 F.3d at 594; Fed. R. Civ. Pro. 23(a)(2). "A common nucleus of operative fact is usually enough to satisfy the commonality requirement of Rule 23(a)(2)." *Id.* (quotation omitted). A common nucleus of operative fact exists where "defendants have engaged in standardized conduct towards members of the proposed class." *Id.* "[T]he

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5

Not Reported in F.Supp.2d, 2000 WL 1774091 (N.D.Ill.), 142 Lab.Cas. P 34,179

**(Cite as: 2000 WL 1774091 (N.D.Ill.))**

commonality requirement has been characterized as a 'low hurdle' easily surmounted." *Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181, 185 (N.D.Ill.1992). Immaterial factual differences among the class member's claims "will not defeat a class action." *See id.* Although there will be differences in the details of class members' claims, the essence of them all will be the alleged unlawful failure of Hard Rock to pay for certain categories of work performed during a particular period of time. The commonality requirement is satisfied.

3. Typicality--Rule 23(a)(3)

*5 To meet the typicality requirement, the named plaintiff's claims or defenses must be "typical ... of the class." *Keele,* 149 F.3d at 594; Fed. R. Civ. Pro. 23(a)(3). The typicality requirement, although closely related to the commonality question, focuses on the class representative. "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Id.; De La Fuente v. Stockly-Van Camp, Inc.,* 713 F.2d 225, 232 (7 th Cir.1983). "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar,* 167 F.R.D. at 57. The presence of defenses against some class members and not others does not defeat typicality. *Wagner v. NutraSweet Co.,* 95 F.3d 527, 534 (7 th Cir.1996) ("NutraSweet's defense based on the releases went too far. Typicality under Rule 23(a)(3) should be determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members."). Plaintiff's and the class members' claims arise out of the same allegedly unlawful conduct--defendants' failure to pay wages for hours worked and overtime rates. Indeed, plaintiff's specific claims are as broad as the claims that he is asserting on behalf of the class. He states:

plaintiff and the class represents [sic] were not paid for all hours worked in that they were not paid for unloading and loading truck in the morning and for the first hour spent driving to the first job site at the beginning of their work day and also they were not paid for the first hour of

driving the truck back to the yard at the end of their shift from the job site to the yard and the unloading and loading of the equipment and supplies at the yard and were not paid for attendance at monthly mandatory safety meetings. Complaint, ¶ 7. Thus, the typicality requirement is satisfied. [FN6]

> FN6. Defendants indirectly argue that because the named plaintiff, Ladegaard, is a former employee, his request for relief is not typical of the purported class, which includes current employees. Defendants cite to no case law in support of this proposition. This argument goes to Ladegaard's standing to raise the claims in the complaint, which the court addresses under the adequacy of representation requirement, below.

4. Adequacy of Representation--Rule 23(a)(4)

To meet the adequacy of representation requirement, "the representative must be able to 'fairly and adequately protect the interests of the class." ' *Keele,* 149 F.3d at 594; Fed. R. Civ. Pro. 23(a)(4). Under Rule 23(a)(4), the adequacy of representation determination "is composed of two parts: 'the adequacy of the named plaintiff's counsel, and the adequacy of protecting the different, separate, and distinct interest' of the class members." *Retired Chicago Police Ass'n,* 7 F.3d at 598 (quotation omitted). Defendants do not contest the adequacy of plaintiff's counsel. Plaintiff asserts that his counsel, Jac Cotiguala and Luanne Galovich, are experienced and recognized in wage and hour law and have been designated as class counsel in other class actions in state and federal court and he cites to these cases. The fact that attorneys have been found adequate in other cases is "is persuasive evidence that they will be adequate again." *Gomez v. Illinois State Bd. of Ed.,* 117 F.R.D. 394, 401 (N.D.Ill.1987). Plaintiff also notes that Mr. Cotiguala has handled cases under the IMWL and is current Chair of the National Employment Lawyers Association Wage and Hour Committee and past Chair of the CBA Labor and Employment Committee.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 6

Not Reported in F.Supp.2d, 2000 WL 1774091 (N.D.Ill.), 142 Lab.Cas. P 34,179

**(Cite as: 2000 WL 1774091 (N.D.Ill.))**

**\*6** As to the second factor, the class representative must not have "antagonistic or conflicting claims" with the members of the purported class. *Gammon v. GC Servs. Ltd. Partnership,* 162 F.R.D. 313, 317 (N.D.Ill.1995), *citing Rosario v. Livaditis,* 963 F.2d 1013 (7 th Cir.1992). Plaintiff is qualified to represent the class "only if his 'interest in proving his claim[s] will lead him to prove the claims of the remainder of his class.' " *Haraco, Inc. v. American Nat'l Bank and Trust Co. of Chicago,* 121 F.R.D. 664, 670 (N.D.Ill.1988) (quotation omitted). Plaintiff asserts that he will fairly and adequately protect the interests of the class because he was a driver-operator employed by defendants and worked with helpers on a frequent basis. Further, he asserts that as a former employee he is owed a substantial amount of money in overtime wages and has an incentive to request back wages.

Defendants argue, without citation to any authority, that because plaintiff does not currently work for defendant he has no standing to seek injunctive or declaratory relief and thus cannot fairly and adequately protect the interests of the class under Rule 23(a)(4). *See* Def.'s Consol. Response, at 4 n. 1. Defendants' contention is, in essence, an argument that because Ladegaard is a former employee his claims conflict with the claims of current employees. This argument lacks merit. While a named plaintiff "who is unable to secure standing for himself is certainly not in a position to 'fairly insure the adequate representation' of those alleged to be similarly situated," *Mintz v. Mathers Fund, Inc.,* 463 F.2d 495, 499 (7 th Cir.1972), to have standing to sue, the named representative "must possess the same interest and suffer the same injury shared by all members of the class he represents." *Keele,* 149 F.3d at 592- 93. The court finds that Ladegaard, the named plaintiff, possesses the same interest and has suffered the same injury as the other class proposed class members, whether former or current. He alleges he was deprived of wages for hours worked and for overtime and he requests a declaration, an accounting and back pay to remedy this. He alleges the same violation and remedy for the rest of the class. [FN7] *See Becher v. Long Island Lighting Co.,* 164 F.R.D. 144, 152 (E.D.N.Y.1994) ("All participants seek the same

'make-whole' relief claimed by the named plaintiffs.... [A]ccordingly, ... this Court finds the distinction between active and retired employees insufficient to bar certification."). The adequacy of representation requirement is satisfied.

>      FN7. Plaintiff does note that injunctive relief is possible under the IMWL, at least, and the title of his complaint includes injunctive relief as part of the relief sought. However, plaintiff does not identify the injunctive relief requested. Presumably, any injunctive relief would rest on a finding of unlawful failure to pay one or more types of wages sought and would require merely future obedience to the law in those respects. Although Ladegaard, as the named plaintiff, would not benefit from injunctive relief of that sort, he has no disincentive to ask for it on behalf of the class, and counsel for the class, as well, is undoubtedly cognizant of plaintiff's responsibility to adequately represent the class with respect to injunctive relief.

      B. Requirements of Rule 23(b)
Plaintiff seeks certification under both 23(b)(2) and 23(b)(3). Defendants argue that 23(b)(2) is not applicable and that plaintiff's motion fails to meet the requirement of 23(b)(3).

1. Rule 23(b)(2)

Rule 23(b)(2) provides that an action may be maintained as a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(2) is generally "invoked in cases where injunctive or declaratory relief is the primary or exclusive relief sought." *Byucks-Robertson v. Citibank Fed. Sav. Bank,* 162 F.R.D. 322, 335 (N.D.Ill.1995); *Doe v. Guardian Life Ins. Co. of America,* 145 F.R.D. 46, 477 (N.D.Ill.1992) ("the primary limitation on the use of Rule 23(b)(2) is the requirement that injunctive or declaratory relief be the predominant remedy

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 7

Not Reported in F.Supp.2d, 2000 WL 1774091 (N.D.Ill.), 142 Lab.Cas. P 34,179

**(Cite as: 2000 WL 1774091 (N.D.Ill.))**

requested for the class members"). Moreover, "[t]he declaratory judgment sought must correspond to injunctive relief, or serve as the basis for future injunctive relief." *Roman v. Korson,* 152 F.R.D. 101, 111 (W.D.Mich.1993); NEWBERG, at § 4.11 (same). Although the title of plaintiff's complaint indicates that he seeks injunctive relief, the complaint itself does not identify the injunctive relief he seeks. [FN8] The court agrees with defendants that plaintiff's complaint primarily requests a monetary remedy for himself and the class, back pay, and that the declaratory judgment requested would, if granted in plaintiff's favor, serve as a basis for a monetary award and the injunctive relief, if any, would be essentially a corollary to the principal relief obtained. *See Gaspar,* 167 F.R.D. at 59 (finding 23(b)(2) not applicable because request for benefits under retirement and severance plans "would be in the form of monetary relief, rather than the injunctive or declaratory relief required by Rule 23(b)(2)"). While 23(b)(2) certification has been granted where damages would flow from declaratory relief, [FN9] the court finds that another compelling reason not to certify plaintiff's class under 23(b)(2) in the instant case, is that the FLSA claim and the state law claims overlap. Because the potential class members have to opt in to the former suit, it is more consistent to permit them the opportunity to opt out of the state claims, an option not automatically provided under the notice rules for 23(b)(2). Therefore, the court finds that Rule 23(b)(2) is inapplicable for certification of this class action.

> FN8. In Count I, the Illinois Overtime Wage Payment, plaintiff requests: "a judgment for all back wages due," "prejudgment interest on the back wages," "punitive damages of 2% per months on the underpayments," "reasonable attorney's fees and costs of this action," "that the court determine the rights of the parties and direct the defendants to account for all hours worked and wages paid to the class members during the temporality of the class," and "such other and further relief as the Court may deem just and equitable." Complaint, ¶¶ A-E. In Count II, the Illinois Wage Payment and Collection Act, plaintiff requests "the court order defendants to make an accounting of all hours worked and wages paid to the plaintiff and to each and every class member he represents for the period August 1, 1997 to the present," "judgment in favor of the plaintiff and the class he represents ... for back wages due, plus prejudgment interest at the statutory rate" and "[s]uch other and further relief as may be just in law and equity." Complaint, ¶¶ A-C.

> FN9. *See Gammon,* 162 F.R.D. at 321 (reasoning that 23(b)(2) certification was appropriate because plaintiff requested declaratory relief under the Fair Debt Collection Act and such relief was appropriate to settle the issue of the legality of defendant's behavior with respect to the entire class and if plaintiff prevailed on the issue of liability, statutory damages would flow directly from the declaratory judgment and damages would be readily calculable on a classwide basis).

2. Rule 23(b)(3)

*7 Rule 23(b)(3) provides that a class can be maintained if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

a. Predominance of Common Questions

Defendants do not contend that predominance is not satisfied. In any event, the court already found with respect to commonality under Rule 23(a)(2) and typicality under Rule 23(a)(3) that questions of fact and law common to plaintiff's proposed class exist, and that plaintiff's and the other class members' claims arose from the same course of conduct of the defendants. Although 23(b)(3) requires a more searching inquiry as to whether the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 8

Not Reported in F.Supp.2d, 2000 WL 1774091 (N.D.Ill.), 142 Lab.Cas. P 34,179

**(Cite as: 2000 WL 1774091 (N.D.Ill.))**

common questions predominate over any questions affecting only individual members, the court concludes that the questions of defendants' liability for back wages and overtime predominates over any individualized questions of defenses or damages. *See Gaspar*, 167 F.R.D. at 60.

b. Superiority of Class Action Method

Defendants contend that because of the availability of the FLSA collective action claim, the class action would not be a superior method of resolving the controversy. Defendants assert that the FLSA provides relief similar to the state claims and that it would be confusing for the class members to receive notice from the court about their choices to "opt-in" to the FLSA action and "opt-out" of the state actions under Rule 23(b)(3).

In determining whether a class action is superior to other methods for resolving a controversy, pertinent findings include

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in a particular forum; (D) the difficulties likely to be encountered in the management of a class action.

*See* Fed.R.Civ.P. 23(b)(3). In evaluating these factors, the court finds that a class action is a superior method of adjudicating the state claims. The court has not been informed by either party of any pending suits brought by individual class members, other than plaintiff's. Thus, there does not appear to be an interest of individual members in controlling the prosecution of the state claims. The fact that the named plaintiff has instituted a federal claim--the FLSA action--does not alter this conclusion. The presence of both FLSA and state claims has not prevented courts from certifying the state claims under Rule 23(b). *See Brzychnalski v. Unesco, Inc.,* 35 F.Supp.2d 351, 354 (S.D.N.Y.1999) (granting authorization to pursue collective action for FLSA claims and class

certification under Rule 23(b)(3) for New York Minimum Wage Act claims finding that under 23(b)(3) "a class action is superior to other methods for the fair and efficient adjudication of the claims in question"); *see also Ramirez,* 1996 WL 529413, at *3 (granting class certification under 23(b)(3) for common law breach of contract claims where plaintiff had also brought FLSA claims); *Leyva v. Buly,* 125 F.R.D. 512, 514 (E.D.Wash.1989) (granting class certification to agricultural workers on state wage and contract law claims where plaintiffs had also sued for wage violations under the FLSA). Moreover, even with the presence of the FLSA action, individual plaintiffs could bring an action in state court on the state claims. To avoid this result, and to further judicial economy, it is desirable to concentrate the litigation in one forum. Finally, there are not likely to be great difficulties in the management of this class action. The class is a manageable size and plaintiff will likely not have problems contacting the potential members. Although defendants have suggested confusion will result from notice to class members of their right to "opt-in" to the FLSA action and "opt-out" of the Rule 23 state claims, plaintiff has indicated that this will not be a major obstacle because his attorneys have drafted such joint notices (supervised by other courts in this district) in the past. Further, any issues specific to individual members, such as damages ( *see* Def.'s Consol. Response, at 6 n. 3) or defenses, can be determined through a separate motion or hearing.

CONCLUSION

**\*8** Because plaintiff has satisfied the necessary elements of Rule 23(a) and Rule 23(b)(3), he may bring his action as a class action. The court defines the class as former and current driver-operators and helpers who have not been paid for wages and overtime for time loading and unloading trucks and driving to the work site at the beginning of the work day, time spent driving from the job site back to the yard and loading and unloading equipment at the end of the work day, and time spent attending mandatory monthly safety meetings for the period of August 15, 1997 to the present. [FN10]

FN10. Although plaintiff has used the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 9

Not Reported in F.Supp.2d, 2000 WL 1774091 (N.D.Ill.), 142 Lab.Cas. P 34,179

**(Cite as: 2000 WL 1774091 (N.D.Ill.))**

August 1, 1997 date as the beginning date for the temporality of the class, both parties appear to agree that the pertinent time of the class begins three years prior to the date that suit was filed. Because the specific filing date is August 15, 2000, the court adopts August 15, 1997 as the beginning date of the class period.

Not Reported in F.Supp.2d, 2000 WL 1774091 (N.D.Ill.), 142 Lab.Cas. P 34,179

**Motions, Pleadings and Filings (Back to top)**

• 2001 WL 34670831 (Trial Pleading) Third Amended Class Action Complaint for Injunction, Accounting and Judgment for Overtime and Back Wages (Apr. 24, 2001)

• 1:00CV05755  (Docket)

(Sep. 19, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit E**

Westlaw.

Slip Copy                                                                 Page 1

Slip Copy, 2005 WL 2240336 (D.Minn.), 10 Wage & Hour Cas.2d (BNA) 1627
**(Cite as: 2005 WL 2240336 (D.Minn.))**


**Motions, Pleadings and Filings**


United States District Court,
D. Minnesota.
Jason FRANK, Michael Hutchins, Erich Peasley,
Marjorie Simmons, Willard
Simmons, William Waters, and Robert Wilhelm,
Plaintiffs,
v.
GOLD'N PLUMP POULTRY, INC., Defendant.
**No. Civ. 041018JNERLE.**

Sept. 14, 2005.

J. Gordon Rudd, and Anne T. Reagan, Zimmerman
Reed, P.L.L.P., and T. Joseph Snodgrass, Larson
King, LLP, for Plaintiffs Jason Frank, Michael
Hutchins, Erich Peasley, Marjorie Simmons,
Willard Simmons, Robert Wilhelm, and William
Waters.

R. Scott Davies, and Mark G. Schroeder, Briggs
and Morgan, P.A., for Defendant Gold'n Plump
Poultry, Inc.


ORDER

ERICKSEN, J.

*1 Jason Frank, Michael Hutchins, Erich Peasley,
Marjorie Simmons (M.Simmons), Willard
Simmons (W.Simmons), Robert Wilhelm, and
William Waters (collectively, Plaintiffs) brought
this action against Gold'n Plump Poultry, Inc.
(Gold'n Plump) alleging that Gold'n Plump has a
practice of not fully compensating employees for
time spent donning, doffing, and sanitizing their
gear. Plaintiffs bring their claims against Gold'n
Plump under the Fair Labor Standards Act (FLSA),
29 U .S.C. §§ 201-219 (2000) (count one);
Minn.Stat. § 177.25 (2004) (count two); Wis. Stat. §
103.01-.03 (2004) and Wis. Admin. Code DWD

ch. 274 (2004) (count three); Minn.Stat. § 177.254
(2004) and Minn. R. 5200.0120 (2003) (count
four); and Wis. Stat. § 103.01-.03 and Wis. Admin.
Code DWD chs. 272, 274 (2004) (count five). They
also allege common law claims, including breach of
contract (counts six through nine), unjust
enrichment (count ten), and quantum meruit (count
eleven). The case is before the Court on Plaintiffs'
Motion to Certify and Provide Notice of FLSA
Claims and on Plaintiffs' Motion for Class
Certification of State Wage and Hour Claims under
Federal Rule of Civil Procedure 23. [FN1] For the
reasons set forth below, the Court grants Plaintiffs'
motion with respect to the FLSA claims and denies
as premature the motion for Rule 23 class
certification of the state law claims.


FN1. Michael Hutchins does not seek to
represent any class.

I. BACKGROUND
Plaintiffs are present and former line and sanitation
workers at Gold'n Plump's plants in Coldspring,
Minnesota; Luverne, Minnesota; and Arcadia,
Wisconsin. Specifically, M. Simmons and Wilhelm
are Second Processing line employees at Gold'n
Plump's Cold Spring plant. Waters is a former
Second Processing line employee at the Arcadia
plant. Frank, Peasley, and W. Simmons are former
full-time sanitation employees at the Cold Spring
plant. Plaintiffs have attested that they did not
receive compensation during their employment at
Gold'n Plump for time spent donning, doffing, and
sanitizing their protective clothing and gear.

Gold'n Plump is a private corporation
headquartered in St. Cloud, Minnesota. Employing
approximately 1,600 people in central Minnesota
and Arcadia, Wisconsin, Gold'n Plump processes
and markets chicken. It sells fresh, frozen, and
fully-cooked products in retail grocery stores and to
restaurants, delis, and institutional food services.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 2

Slip Copy, 2005 WL 2240336 (D.Minn.), 10 Wage & Hour Cas.2d (BNA) 1627

**(Cite as: 2005 WL 2240336 (D.Minn.))**

Gold'n Plump produces its various poultry products in two or, in some cases, three stages. During First Processing, live chickens are received, taken out of the modular system used to transport them, hung on a line, stunned, and processed into whole-chilled birds whose heads, feet, feathers, and viscera have been removed. During Second Processing, whole birds are packaged or cut up into parts and packaged in various configurations for shipment. Finally, during Further Processing, additional processes, such as custom packing, co-packing, freezing, and stuffing deboned chicken breasts, are performed. First and Second Processing are performed at Gold'n Plump's Cold Spring and Arcadia plants; Further Processing is performed at the Luverne plant. Employees are required to wear different types of protective gear depending in part upon the tasks to which they are assigned within each processing stage.

*2 In addition to employing First, Second, and Further Processing line employees, Gold'n Plump employed sanitation workers before 2004. The sanitation workers were responsible for cleaning and sanitizing their respective plants after each production shift; they were generally required to wear boots, hairnets, bump caps, earplugs, liners, and rain suits. Gold'n Plump outsourced its Cold Spring sanitation work to an independent contractor, Kaiser Services, beginning February 12, 2004; it outsourced its Arcadia sanitation work beginning March 27, 2004. Gold'n Plump has not employed any sanitation workers at the Luverne plant at any time relevant to this litigation.

## II. DISCUSSION
### A. FLSA Certification

Plaintiffs move to certify their FLSA claims under 29 U.S.C. § 216(b) and request that the Court authorize the issuance of notice to potential class members. Specifically, Plaintiffs propose certification of two FLSA subclasses. Subclass 1 would consist of "[a]ll present and former line employees processing chickens employed by Gold'n Plump from February 24, 2001 to the present." Subclass 2 would consist of "[a]ll present and former sanitation workers employed by Gold'n

Plump from February 24, 2001 to February 12, 2004."

The FLSA allows employees to bring a collective action "for and in behalf of ... themselves and other employees similarly situated." 29 U.S.C. § 216(b). Thus, to proceed as a collective action under the FLSA, the plaintiffs must show that the putative class members are "similarly situated." *Id.* To determine whether the putative class members are similarly situated for certification of a collective action under the FLSA, courts use a two-step process. *Kalish v. High Tech. Inst., Inc.,* Civ. No. 04-1440, 2005 WL 1073645, at *1 (D.Minn. Apr. 22, 2005) (citing *Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1102-03 (10th Cir.2001)). At the initial stage, the court determines whether the class should be conditionally certified for notification and discovery purposes. *Id.* At this conditional certification stage, the plaintiffs need only come forward with evidence establishing a colorable basis for their claim that the putative class members were together the victims of a single decision, policy, or plan. *See id.* at *2; *Severtson v. Phillips Beverage Co.,* 137 F.R.D. 264, 267 (D.Minn.1991) (*Severtson I* ). That is, the plaintiffs must show that there is some factual basis beyond the mere averments in their complaint for the class allegations. *Severtson I,* 137 F.R.D. at 267; *Severtson v. Phillips Beverage Co.,* 141 F.R.D. 276, 278-79 (D.Minn.1992) (*Severtson II* ). At the second stage--which comes after discovery is completed--the court uses a stricter standard for determining whether the putative class members are similarly situated and reconsiders whether the trial should proceed collectively or if it should be severed. *Kalish,* 2005 WL 1073645, at *1. At this second stage, the court conducts a fact-intensive inquiry of several factors, including: (1) the extent and consequence of disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. *See Thiessen,* 267 F.3d at 1102-03.

*3 Plaintiffs assert that the case is at the initial stage of the two-step process and, therefore, the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                        Page 3

Slip Copy, 2005 WL 2240336 (D.Minn.), 10 Wage & Hour Cas.2d (BNA) 1627

**(Cite as: 2005 WL 2240336 (D.Minn.))**

Court should apply the more lenient standard for determining whether the putative class members are similarly situated. Gold'n Plump asserts that the Court should apply the more stringent analysis because significant written discovery has occurred.

The Court finds that this case is at the initial stage. Although the parties have exchanged some written discovery, Gold'n Plump has declined to allow Plaintiffs' counsel to enter its plants and neither party has taken any depositions. In addition, the parties have stipulated to defer additional discovery pending the resolution of this motion. Substantial discovery has, in other words, yet to be conducted. The Court will therefore apply the more lenient standard for determining whether the putative class members are similarly situated. *See Kalish,* 2005 WL 1073645, at *2.

The Court turns to the question of whether Plaintiffs have come forward with evidence establishing a colorable basis that the putative class members are "the victims of a single decision, policy, or plan." *See id.* at *2. [FN2] According to Plaintiffs, the members of the proposed classes are similarly situated because they all experienced Gold'n Plump's practice of failing to pay its nonexempt workers for the time they spent donning, doffing, and sanitizing their clothes and equipment. Gold'n Plump maintains that Plaintiffs are not similarly situated because they work at different geographic locations and in different areas within the various plants, report to different supervisors who have autonomous decision-making authority, hold different job positions, work different hours, and don and doff different protective equipment. In addition, Gold'n Plump attributes particular significance to the fact that its line supervisors determine how employees are paid. According to Gold'n Plump, some employees are paid based on a supervisor punch, some are paid according to their scheduled start and stop time, some are paid according to their actual individual punch time, and some are paid using a combination of these methods.

> FN2. At the initial stage, the Court does not make any credibility determinations or findings of fact with respect to

contradictory evidence presented by the parties. *Kalish,* 2005 WL 1073645, at *2; *Severtson II,* 141 F.R.D. at 278-79.

Mindful that Plaintiffs have a fairly low burden at this stage, *see Kalish,* 2005 WL 1073645, at *1; *De Asencio v. Tyson Foods, Inc.,* 130 F.Supp.2d 660, 663-64 (E.D.Pa.2001), the Court finds that Plaintiffs have come forward with sufficient evidence that they and other prospective plaintiffs are similarly situated for purposes of conditional certification and facilitation of notice. Plaintiffs' affidavits provide a colorable basis for concluding that Gold'n Plump has a common practice of failing to pay its line workers for time spent donning, doffing, and sanitizing equipment, and that Gold'n Plump had a similar practice with respect to the sanitation workers before it began contracting out sanitation services. Each representative Plaintiff has averred that he or she is regularly denied pay for the time he or she spends donning, doffing, and/or sanitizing required equipment. Moreover, Plaintiffs have presented evidence that Gold'n Plump received notice from the Department of Labor in May 2002 informing Gold'n Plump that failure to pay its employees for donning, doffing, and sanitizing time violated the FLSA. Gold'n Plump's failure to address this notice and affirmatively require its supervisors to implement a practice of paying for donning, doffing, and sanitizing time is itself evidence of a single decision sufficient to warrant certification at this stage. [FN3] Finally, the Court notes that although employees may be paid according to different punch methods, those differences do not necessarily defeat Plaintiffs' argument that they are similarly situated. As Plaintiffs have indicated, even those employees who are paid according to their actual punch may, in fact, punch in after donning and punch out before doffing their equipment. Discovery will reveal whether this is the case. The Court concludes that Plaintiffs have satisfied their burden of demonstrating that they are similarly situated for purposes of conditional certification, notice, and discovery.

> FN3. At this stage of the litigation, the Court does not consider whether Gold'n

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4

Slip Copy, 2005 WL 2240336 (D.Minn.), 10 Wage & Hour Cas.2d (BNA) 1627

**(Cite as: 2005 WL 2240336 (D.Minn.))**

Plump's decision violated the FLSA.

*4 Gold'n Plump maintains that the Court ought to decline to certify the class for the additional reason that Plaintiffs have failed to come forward with evidence that others wish to opt into this lawsuit. In support of its argument, Gold'n Plump relies on *Davis v. Charoen Pokphand (USA), Inc.,* 303 F.Supp.2d 1272 (M.D.Ala.2004), and *Horne v. United Servs. Auto. Ass'n,* 279 F.Supp.2d 1231 (M.D.Ala.2003). Assuming, without deciding, that these cases correctly state Plaintiffs' burden, the Court finds these cases distinguishable from the present one. In this case, unlike *Davis* and *Home,* Plaintiffs have presented evidence that Gold'n Plump has discouraged its employees from participating in this litigation by suggesting that it has no merit. Nevertheless, six plaintiffs have joined the lawsuit. The Court finds that Plaintiffs have satisfied their burden of demonstrating interest among potential class members in the litigation.

B. Rule 23 Certification

Plaintiffs also move to certify their state law claims under Federal Rule of Civil Procedure 23(b)(3). Plaintiffs propose four subclasses, defined as follows:

   Subclass 1: All present and former line employees processing chickens employed by Gold'n Plump at its Cold Spring or Luverne, Minnesota poultry processing plants from February 25, 2001 to the present.
   Subclass 2: All present and former line employees processing chickens employed by Gold'n Plump at its Arcadia, Wisconsin poultry processing plant from February 25, 2002 to the present.
   Subclass 3: All former sanitation workers employed by Gold'n Plump at its Cold Spring or Luverne, Minnesota poultry processing plants from February 25, 2001 to February 12, 2004.
   Subclass 4: All former sanitation workers employed by Gold'n Plump at its Arcadia, Wisconsin poultry processing plant from February 25, 2002 to February 12, 2004.

To certify a class under Rule 23(b)(3), the Court

must be satisfied that the requirements of both Rule 23(a) and Rule 23(b)(3) are satisfied. Under Rule 23(a), the party seeking class certification must demonstrate: "(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Rule 23(b)(3) further requires the party moving for class certification to demonstrate "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

A court may certify a class action only if it is satisfied after "rigorous analysis" that these prerequisites have been met. *See Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 161 (1982). The strength of the plaintiffs' claims should not affect the certification decision, but the court "certainly may look past the pleadings to determine whether the requirements of [R]ule 23 have been met." *Thompson v. Am. Tobacco Co., Inc.,* 189 F.R.D. 544, 549 (D.Minn.1999) (quoting *Castano v. Am. Tobacco Co.,* 84 F.3d 734, 744 (5th Cir.1996)). "Indeed, going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Id.*

*5 Gold'n Plump first argues that certifying an opt-out Rule 23(b)(3) class with respect to Plaintiffs' state claims would undermine congressional intent that FLSA classes proceed as opt-in classes. Gold'n Plump asserts that the Court should therefore decline to certify the state law claims. [FN4] The Court is not persuaded by Gold'n Plump's argument; courts routinely certify FLSA opt-in classes and Rule 23 opt-out classes in the same action. *See, e.g., Chavez v. IBP, Inc.,* No CT-01-5093, 2002 WL 31662302 (E.D.Wash. Oct. 28, 2002); *Trotter v. Perdue Farms, Inc.,* Civ. A. 99-893, 2001 WL 1002448 (D.Del. Aug. 16, 2001).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 5

Slip Copy, 2005 WL 2240336 (D.Minn.), 10 Wage & Hour Cas.2d (BNA) 1627

**(Cite as: 2005 WL 2240336 (D.Minn.))**

Indeed, "the FLSA action and state law remedies are entirely separate rights that may be pursued by the plaintiffs.... Nothing in the [FLSA] limits available remedies under state law." *McLaughlin v. Liberty Mut. Ins. Co.,* 224 F.R.D. 304, 308 (D.Mass.2004).

> FN4. Gold'n Plump initially argued that the Court ought to decline to exercise supplemental jurisdiction over Plaintiffs' state class claims under 28 U.S.C. § 1367(c). It has since abandoned that position. The Court has nevertheless examined this issue carefully and sees no reason at this stage of the litigation to decline to exercise supplemental jurisdiction over Plaintiffs' state claims. *See, e.g., Chavez v. IBP, Inc.,* No CT-01-5093, 2002 WL 31662302, at *2 (E.D.Wash. Oct. 28, 2002); *Beltran-Benitez v. Sea Safari, Ltd.,* 180 F.Supp.2d 772, 774 (E.D.N.C.2001).

In the alternative, Gold'n Plump argues that the Court should defer ruling on Plaintiffs' motion. The Court agrees. As noted previously, discovery is at an early stage in this case. Neither party has conducted any depositions. Plaintiffs' counsel has not yet had access to the three Gold'n Plump plants. Moreover, Plaintiffs themselves acknowledge, albeit in a different context, that "the need for discovery continues" on the class issue. Indeed, a more developed record is required before the Court can determine whether common questions of fact and law predominate over individual issues. It would therefore be premature to rule on the merits of Plaintiffs' Rule 23(b)(3) class certification motion. Accordingly, the Court will deny for now Plaintiffs' Rule 23(b)(3) class certification motion. Plaintiffs may move anew for Rule 23(b)(3) when the record is more fully developed. At that point, both the parties--particularly Plaintiffs--and the Court will have a better understanding of the variety of Gold'n Plump's workers, their donning, doffing, and sanitizing practices, and the extent of Gold'n Plump's line supervisors' discretion as it relates to Plaintiffs' compensation. As a result, the Court will be better able to determine whether common issues

predominate over individual issues.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Plaintiffs' Motion to Certify and Provide Notice of FLSA Claims [Docket No. 23] is GRANTED.

2. Plaintiffs' Motion for Class Certification of State Wage and Hour Claims [Docket No. 17] is DENIED WITHOUT PREJUDICE to Plaintiffs' right to move for class certification when the record is more fully developed.

3. Within 30 days of the date of this Order, the parties shall submit a joint proposed notice. If the parties are unable to agree on the notice, each are ordered to file their preferred notices, together with briefing not to exceed ten pages per side no later than October 31, 2005.

Slip Copy, 2005 WL 2240336 (D.Minn.), 10 Wage & Hour Cas.2d (BNA) 1627

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 3029709 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Motion for Class Certification of State Overtime Claims (Nov. 24, 2004)

• 2004 WL 3038442 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Plaintiffs' Motion to Certify and Provide Notice of Flsa Claims (Nov. 24, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit F**

Westlaw.

Not Reported in F.Supp.2d                                                              Page 1

Not Reported in F.Supp.2d, 2003 WL 21250571 (E.D.Pa.)

**(Cite as: 2003 WL 21250571 (E.D.Pa.))**

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Pennsylvania.
Mark A. GOLDMAN Plaintiff,
v.
RADIOSHACK CORPORATION Defendant.
**No. Civ.A. 2:03-CV-0032.**

April 16, 2003.

*MEMORANDUM AND ORDER*

VANANTWERPEN, J.

**\*1** Presently before this court is Plaintiff Mark A. Goldman's Motion for Conditional Certification of a Federal Fair Labor Standards Act ("FLSA") Claim and Facilitation of Notice Pursuant to 29 U.S.C. § 216(b), and for Class Certification of Pennsylvania Minimum Wage Act ("MWA") and Wage Payment and Collection Law ("WPCL") Claims Pursuant to Fed. R. Civ. P. 23 filed on February 14, 2003 [Docket # 18]. Plaintiff's motion will be granted in part and postponed in part. We will grant Plaintiff's motion for conditional certification of the FLSA claim. We also believe that the proposed state law class action meets all the requirements of Fed. R. Civ. P. 23(a) and the superiority requirement of Fed. R. Civ. P. 23(b)(3), but we will postpone class certification because further discovery is needed regarding the predominance test of Fed. R. Civ. P. 23(b)(3). We will therefore refrain from a complete Rule 23(a) and partial Rule 23(b)(3) inquiry until we rule on the entire Rule 23(b)(3) motion.

*I. Background & Procedural History*

Goldman brings a three count complaint against Defendant RadioShack Corporation ("RadioShack") on behalf of himself and all other similarly situated plaintiffs. He worked at RadioShack from November 1985 to September 2001. Goldman alleges that RadioShack violated federal and state minimum wage laws because it did not pay its "Y" Store Managers [FN1] overtime wages when they worked in excess of forty hours per week. RadioShack claims that Store Managers are exempt from both federal and Pennsylvania overtime pay requirements because they are exempt executive personnel under 29 U.S.C. § 213(a)(1), or 29 C.F.R. §§ 541.1-541.119. Goldman alleges that the Store Managers were actually nothing more than sales associates with a few extra tasks to preform. He alleges that RadioShack merely put an executive sounding label on the Store Managers to avoid paying overtime wages. Goldman has filed affidavits of himself and four other former "Y" Store Managers that describe their day-to-day activities. Each affidavit and the complaint alleges that Store Managers performed sales associate tasks including: sales; restocking shelves; and cleaning. Moreover, they do not have the discretionary powers associated with executive or managerial positions, including but not limited to: merchandising; hiring or terminating employees; determining employee salaries; controlling inventory levels; setting store hours; training employees; and designing store layout. Goldman further alleges that Store Managers were required to keep their managerial activities to less than 22% of their work week through the RadioShack "7-1-1" plan. The "7-1-1" plan required Store Managers to work as sales associates for seven out of every nine hours worked. The "1-1" in the plan refers to one hour of paperwork and one hour of training per day. *See* Pl.'s Motion for Conditional Certification: Exs. 6 & 7, filed on Feb. 14, 2003[# 18]. The plan also required Store Managers to work at least 54 hours per week without any overtime compensation.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 2

Not Reported in F.Supp.2d, 2003 WL 21250571 (E.D.Pa.)

**(Cite as: 2003 WL 21250571 (E.D.Pa.))**

> FN1. RadioShack "Y" stores are RadioShack locations that had over $500,000 in annual gross revenues in fiscal year 2000 and thereafter.

**\*2** In defense, RadioShack argues that the percentage of time spent on managerial duties is not the correct test for whether an employee is exempt from the overtime pay statutes; and that the Store Managers are exempt employees because they are actual managers.

Goldman filed his complaint against RadioShack in Court of Common Pleas of Philadelphia County on December 17, 2002. Defendant properly removed the complaint to this court in January 2003. Goldman now moves to conditionally certify an FLSA opt-in representative action, and moves to certify a Rule 23(b)(3) opt-out class action alleging violations of MWA and WPCL. The FLSA suit would therefore include only those plaintiffs who expressly decide to take part while conversely the state actions consist of "all persons who were employed by RadioShack as a "Y" Store Manager in Pennsylvania at any time on or after December 11, 1999." *See* Pl .'s Motion filed on Feb. 14, 2003, at 2 [Docket # 18]. [FN2]

> FN2. Goldman's complaint defines both the FLSA and the MWA/WCPL classes as:
> All persons who were employed by RadioShack as a "Y" store manager in Pennsylvania at any time on or after December 11, 1999, and during at least one workweek during that period worked in excess of 40 hours without receiving compensation for the excess hours at a rate not less than one and one-half times the regular rate at which the person was employed.
> *See* Def.'s Notice of Removal Exhibit: Pl.'s Complaint filed on Jan. 3, 2003 [# 1].

*II. Jurisdiction*

This case was properly removed to this court pursuant to 28 U.S.C. § 1441. We have original federal question jurisdiction over Plaintiff's FLSA

claim pursuant to 28 U.S.C. § 1331. We have supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because the MWA and WPCL claims form part of the same controversy between the parties as the FLSA claim. The FLSA and the MWA require overtime pay for each hour in excess of forty hours per week that the employee works. *Compare* 29 U.S.C. § 207(a); *with* Pa. Stat. Ann. tit. 43 § 104(c). The WPCL requires overtime compensation to be paid in the next period. *See* Pa. Stat. Ann. tit. 43 § 260.3. If the overtime wages are not timely paid, then the employer may be liable for liquidated damages under the WPCL. *See* Pa. Stat. Ann. tit. 43 § 260.10 . The FLSA, MWA and WPCL comprise the same case or controversy between Goldman, the proposed class and RadioShack.

RadioShack argues that we do not have jurisdiction over the state law claims brought on behalf of proposed class members who do not opt-into the FLSA representative action because in the absence of an accompanying individual federal claim we would not have original jurisdiction over their individual claims. RadioShack argues that the state law class should not encompass any proposed plaintiff that does not expressly opt-into the FLSA representative action. It argues that to exercise jurisdiction would be an impermissible and unauthorized use of so-called "pendent-plaintiff" jurisdiction. *See* Def.'s Mem. in Opp'n, at 44-45 filed on Feb. 2, 2003 [# 26-1].

In support, RadioShack cites two types of cases. First, RadioShack lists a series of cases decided before § 1367 was extensively altered in 1990. *See Sperling v. Hoffman-La Roche, Inc.,* 118 F.R.D. 392, 411- 14(D.N.J.1988) (finding no pendent-party question because plaintiff voluntarily defined the Rule 23 state claims class as only those members in the opt-in ADEA representative class); *Robinson v. Sizes Unlimited, Inc.,* 685 F.Supp. 442, 444-49 (D.N.J.1988) (exercising discretion to refuse pendent-party jurisdiction over state law claims because court wanted to "effectively eliminate defendant's concerns" regarding the jurisdictional problems but not deciding the jurisdictional issues when the ADEA class and the New Jersey state law

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3

Not Reported in F.Supp.2d, 2003 WL 21250571 (E.D.Pa.)

**(Cite as: 2003 WL 21250571 (E.D.Pa.))**

class have few overlapping plaintiffs); *Pirrone v. No. Hotel Assocs.*, 108 F .R.D. 78, 83-84 (E.D.Pa.1985) (exercising discretion to refuse pendent-party jurisdiction because Congress had not yet extended pendent-party jurisdiction beyond the scope of the FLSA); *Isaac v. Wm. H. Pflaumer & Sons, Inc.*, Civ. A. No. 90-1622, 1990 WL 102808 (E.D.Pa. July 17, 1990) (exercising discretion pursuant to § 1441(c) to remand pendent-party class members to state court). In each of these four cases, the court declined to reach the issue of whether pendent-party jurisdiction existed. Instead, in three of the cases, court refrained from reaching the issue by exercising discretion pursuant to § 1441 or § 1367 to remand or refuse jurisdiction over the pendent-parties. In *Sperling*, the court did not face the question because the plaintiff did not move the court to exercise jurisdiction over non-opt-in potential class members. These cases are not analogous to the instant case.

*\*3* Moreover, these cases have no relevance since Congress altered § 1367 to overrule the Supreme Court's *Finley* decision. In *Finley*, the Supreme Court held that exercising pendent-party jurisdiction in federal question cases exceeded the statutory authority granted to the courts by Congress. *See Finley v. United States*, 490 U.S. 545, 549 (1989). The 1990 amendments to § 1367 combined pendent and ancillary jurisdiction into supplemental jurisdiction, and allowed supplemental jurisdiction to extend to the full limits of Article III in federal question cases, thus overruling *Finley*. Section 1367(a) states:

[I]n any civil action of which the district courts have original jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such jurisdiction shall include claims that involve the joinder or intervention of *additional parties*.

28 U.S.C. § 1367(a) (emphasis added).

The text of the statute does not limit the additional parties to defendants, as RadioShack argues. Instead, § 1367(a) expressly allows supplemental jurisdiction over "additional parties" which we

believe would include related claims of any additional party. By creating a class of all Pennsylvania "Y" Store Managers under Rule 23, Goldman is seeking their joinder to this action as additional parties with claims that form part of the same case or controversy. *See Zahn v. International Paper Co.*, 414 U.S. 291, 296, 299- 300 & n. 6 (comparing class action and joinder cases) (citations omitted); *Snyder v. Harris*, 394 U.S. 332, 397 (1969) (same); 7A Charles Alan Wright et al., *Federal Practice and Procedure*, § 1752 (discussing history of Rule 23, spurious class actions and joinder). Goldman is properly using § 1367(a). The proposed opt-out class members are "additional parties" bringing "claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a).

Second, RadioShack cites four post-1990 cases for the proposition that courts do not have supplemental jurisdiction over state law claims related to an FLSA representative action. *See Marquis v.. Tecumseh Prods.*, 206 F.R.D. 132, 162-65 (E.D.Mich.2002) (exercising discretion to decline certifying state law class action which included pendent-parties, because the named plaintiffs failed to exhaust their administrative remedies regarding their Title VII claims that gave court original jurisdiction and state law issues predominated); *Zelaya v. J.M. Macias, Inc.*, 999 F.Supp. 788, 782-83 (E.D.N.C.1998) (questioning federal jurisdiction over pendent-plaintiffs and declining jurisdiction under the court's discretion pursuant to § 1367(a)); *Ballaris v. Wacker Siltronic Corp.*, No. Civ. 00-1627-KI, 2002 WL 926272, at *3 (D.Or. Feb. 7, 2002) (noting absence of pendent-party issue because plaintiff intended to move for certification of a state law Rule 23 class that consisted of only the FLSA opt-in members); *De La Fuente v. FPM Ipsen*, No. 02-C-50188, 2002 WL 31819226, at *1-2 (N.D.Ill.Dec. 16, 2002) (declining to rule on class certification until the conclusion of discovery; not addressing jurisdictional concerns). *Zelaya* is the only case cited by Defendant that is on point, because the court in the other three cases did not reach the pendent-plaintiff jurisdictional issue. We decline to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 4

Not Reported in F.Supp.2d, 2003 WL 21250571 (E.D.Pa.)

**(Cite as: 2003 WL 21250571 (E.D.Pa.))**

follow *Zelaya.*

**\*4** *Zelaya* was concerned with the risk that plaintiffs could manufacture original jurisdiction over the case in an attempt to gain federal jurisdiction over the tenuously related state law claims. *See Kelley v. SBC, Inc.,* [5 Wages-Hours] Lab. L. Rep .(BNA) 16, 1998 U.S. Dist. LEXIS 18643, at \*38 (N.D.Cal. Nov. 13, 1998) (exercising supplemental jurisdiction over state law claims when original jurisdiction was founded upon FLSA claims and distinguishing *Zelaya* because *Kelley* was removed by the defendant). No such risk exists here because Goldman filed in state court and it was RadioShack which chose to remove this case to federal court. RadioShack had the option of litigating the claims in state court because the FLSA allows concurrent state and federal court jurisdiction. *See* 29 U.S.C. § 216(b) ("An action ... may be maintained against an employer in any Federal or State court of competent jurisdiction ....") (parenthetical omitted). If the case had remained in Pennsylvania state court, Goldman would have been able to maintain the FLSA opt-in representative action and bring the state law claims under Pennsylvania's opt-out class action mechanism. *See* Pa. R. Civ. P. 1702 & 1708 (listing requirements and factors to be considered for certifying a class). Goldman did not choose the federal forum to gain federal jurisdiction over tenuously related state claims.

We note also that *Zelaya* has not received a welcomed reception in federal courts. *See Ansoumana v. Gristede's Operating Corp.,* 201 F.R.D. 81, 95-96 (S.D.N.Y.2001) (criticizing *Zelaya* and citing cases holding that supplemental jurisdiction is proper) (citations omitted); *Kelley,* 1998 U.S. Dist. LEXIS 18643, \*38 (distinguishing *Zelaya* and exercising supplemental jurisdiction). *Zelaya* has not been followed. District Courts routinely exercise supplemental jurisdiction over related state labor law claims when the original jurisdiction is founded on 28 U.S .C. § 1331 and the plaintiffs are bringing an FLSA representative action. *See Scott v. Aetna Servs., Inc.,* 210 F.R.D. 261 (D.Conn.2002) (certifying FLSA opt-in and Rule 23 opt-out classes without limiting opt-out

class to only opt-in members); *O'Brien v. Encotech Const Servs.,* 203 F.R.D. 346, 350-53 (N.D.Ill.2001) (same); *Ansoumana,* 201 F.R.D. at 89-96 (providing an extensive history and discussion of the topic and exercising supplemental jurisdiction because § 1367(a) retained the pre-1990 restrictions only for cases where original jurisdiction was founded solely on § 1332 diversity jurisdiction); *Brychnalski v. Unesco, Inc.,* 35 F.Supp.2d 351 (S.D.N.Y.1999) (same as *Scott,* 210 F.R.D. 261); *Ladegaard v. Hard Rock Concrete Cutters, Inc.,* No. 00-C-5755, 2000 WL 1774091 (N.D.Ill.Dec. 1, 2000) (same); *DeAsencio v. Tyson Foods, Inc.,* [8 Wages-Hours 2d] Lab. L. Rep. (BNA) 190, 2002 WL 1585580, at \*5 (E.D.Pa. July 17, 2002) (exercising supplemental jurisdiction); *Kelley,* 1998 U.S. Dist. LEXIS 18643, at \*38 (same); *cf. Dunlop-McCullwn v. Parham,* No. 97-Civ.-0195, 2002 WL 31521012, at \* \*9- 10 (S.D.N.Y. Nov. 13, 2002) (exercising supplemental jurisdiction over state law claims when original jurisdiction was founded on §§ 1331 & 1337 when plaintiff brought a LMRDA case). The clear weight of authority is in favor of exercising supplemental jurisdiction.

**\*5** We find that § 1367(a) gives us the power to exercise supplemental jurisdiction over the opt-out plaintiffs who are not opt-in members of the FLSA action. The question remains as to whether we will exercise that power because § 1367 allows us to exercise our discretion and retain or remand these claims. We choose to retain these claims. It is prudent to try these related claims together in the interest of judicial economy. *See West Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir.1995) (" '[C]onsiderations of judicial economy, convenience and fairness to litigants' weigh in favor of hearing the state law claims at the same time as the federal law claims.") (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966)). The FLSA and WPCL claims "are premised on the same events" and "parallel one another." *De Asencio,* 2002 WL 1585580, at \*5. "It is likely that the two claims will either prevail or fail together." *Id.* If we were to remand certain class members, the two cases would be so related that any decision on the merits in one action would have preclusive effects on the other action. If the preclusive effects did not come to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 5

Not Reported in F.Supp.2d, 2003 WL 21250571 (E.D.Pa.)

**(Cite as: 2003 WL 21250571 (E.D.Pa.))**

fruition, the cases may result in conflicting findings or judgments. Proceeding in both forums would needlessly increase litigation expenses for both parties. [FN3]

> FN3. Judge Hellerstein stated the reasoning well:
> If the related FLSA and [state] Minimum Wage Act claims were to be litigated in parallel fashion, ..., there would be great potential for confusion of issues; considerable unnecessary costs, inefficiency and inconsistency of proceedings and results; and other problems inherent in parallel class action litigation ..... Congress enacted § 1367 to avoid such problems. Defendants short-sightedly argue to reverse the Congressional wisdom. I decline to do so.
> *See Ansouman,* 201 F.R.D. at 96; *see De Asencio,* 2002 WL 1585580, at * 5 (exercising discretion for the sake of judicial economy).

Moreover, we do not want to create incentives for defendant forum shopping. This action could have easily been maintained in state court because the Pennsylvania courts have jurisdiction over the FLSA and state law claims. RadioShack choose this forum. Defendants might be encouraged to remove to federal court, not because they are an out of state defendant, but because the federal forum's jurisdictional limitations would complicate plaintiffs' case and increase plaintiffs' litigation expenses.

Pursuant to § 1331, we have original jurisdiction over the opt-in FLSA representative class. For the reasons stated, we will exercise our discretion to assume supplemental jurisdiction pursuant to § 1367(a) over the related state law claims and the proposed Rule 23 opt-out class as well.

### III. FLSA Representative Class
*A. Applicable Law*

Employers are required to pay time and a half for each hour in excess of forty hours that the employee

works. *See* 29 U.S.C. § 207(a). There are exceptions to the rule, including one which provides that employees who are employed in a bona fide executive capacity are not entitled to overtime wages. *See* 29 U.S.C. § 213(a)(1). An employee may bring an action on behalf of himself and other similarly situated employees pursuant to 29 U.S.C. § 216(b). FLSA claims are not subject to the usual Rule 23 class action requirements. Instead, 29 U.S.C. § 216(b) provides a special opt-in representative action mechanism for joining claims and plaintiffs. Each employee who wishes to join the action must affirmatively consent to be a member of the action by filing written consent to that effect. *See* 29 U.S.C. § 216(b); *Lusardi v. Lechner,* 855 F.2d 1062, 1068 n. 8 (3d Cir.1988).

**\*6** Although the FLSA creates an opt-in mechanism, district courts nevertheless have wide discretion in managing joinder of parties and notice to parties. *See* Fed. R. Civ. P. 83(b) (allowing court discretion to manage cases when the rules are silent on an issue); *cited by Sperling,* 493 U.S. at 170-72 (urging early trial court management of the notice process in § 216(b) opt-in actions to ensure that parties are made aware of the action's benefits and avoiding multiple lawsuits); *De Asencio v. Tyson Foods, Inc.,* 130 F.Supp.2d 660, 662 (E.D.Pa.2001).

Before facilitating notice, we must first find that the action can proceed as an FLSA representative action. *See De Asencio,* 130 F.Supp.2d at 662. There are only two requirements under § 216(b) for an action to proceed as a representative action: (1) class members must be "similarly situated"; and (2) all members must affirmatively consent to join the action. *See* 29 U.S.C. § 216(b); *Sperling,* 862 F.2d at 444, *aff'd* 493 U.S. 165; *De Asencio,* 130 F.Supp.2d at 662. The statute does not provide an express test for determining who are "similarly situated" employees under § 216(b). In the absence of Third Circuit or Supreme Court guidance, a two-tiered test structure has developed among the district courts in the Third Circuit. *See De Asencio,* 130 F.Supp.2d at 662-63; *Mueller,* 201 F.R.D. 425, 427-28 (W.D.Pa.2001); *Morisky v. Public Serv. Elec. & Gas Co.,* 111 F.Supp.2d 493, 497 (D.N.J.2000); *Lusaridi v. Xerox Corp.,* 118 F.R.D.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 6

Not Reported in F.Supp.2d, 2003 WL 21250571 (E.D.Pa.)

**(Cite as: 2003 WL 21250571 (E.D.Pa.))**

351 (D.N.J.1987), *modified* 122 F.R.D. 463 (D.N.J.1988) (decertifying class because representative action members not "similarly situated"); *Bunnion v. Consol. Rail Corp.,* [5 Wages-Hours 2d] Lab. L. Rep. (BNA) 717, 1998 WL 372644, at * 17 (E.D.Pa. May 14, 1998); *see also Hipp v. Liberty Nat. Life Ins. Co.,* 252 F.3d 1208 (11th Cir.2001) (adopting the two-tiered approach and citing *Lusardi,* 118 F.R.D. 351); *Mooney v. Aramco Servs. Co.,* 54 F.3d 1207, 1213-14 (5th Cir.1995) (adopting the *Lusardi,* 118 F.R.D. 351, two-tiered test).

The first tier of the test occurs at the beginning of the case when the court has minimal evidence. *See De Asencio., 120 F.Supp.2d at 662-63.* At this stage, the court may only conditionally certify the class so that the Plaintiff may send notice to the potential representative action members. *Id.; Mueller,* 201 F .R.D. at 428. "A court may conditionally certify the class for purpose of notice and discovery under a comparatively liberal standard, i.e., by determining that the members of the putative class 'were together the victims of a single decision, policy or plan." ' *Mueller,* 201 F.R.D. at 428 (quoting *Sperling,* 118 F .R.D. at 407). The conditional certification is by no means final.

The second tier of the test occurs after all opt-in forms have been received and discovery has concluded. At that time, the court may make a more thorough finding regarding the "similarly situated" requirement. *Id.* The court will conduct a "fact-specific review of each class member who has opted-in, taking into account factors such as employment setting," variations in employment activities, employment oversight and instruction, and discretionary powers entrusted to individual opt-in plaintiffs. *See id.* If the court then decides that the plaintiffs are not "similarly situated," the FLSA representative action will be decertified and the plaintiffs will proceed with their individual claims. *See De Asencio,* 130 F.Supp.2d at 663.

*B. RadioShack's Arguments Against Conditional Certification*

*7 RadioShack argues that the first tier conditional certification is unwarranted in this case because: (1) there is a pending FLSA representative action in United States District Court of the Northern District of Illinois which has yet to be certified; (2) Goldman is not an appropriate representative because he is an exempt employee under the FLSA; and (3) the proposed representative action members are not "similarly situated." We do not find RadioShack's arguments persuasive.

*1. The Illinois Action*

Comity does not dictate that we postpone first tier conditional certification until certification of the FLSA representative action in Illinois is decided. RadioShack claims that Pennsylvania "Y" Store Managers could simply join the nationwide representative action in Illinois, rendering this action redundant. RadioShack's arguments fail for two reasons. First, we are dealing with two different *opt-in* actions. If the Illinois court was entertaining a motion to certify a nationwide *opt-out* class, then our proceeding with a Pennsylvania - wide action could well complicate and frustrate our sister court's jurisdiction. Creating two overlapping opt-out classes would create conflict. This is not the present situation. We are dealing with two *opt-in* actions. No plaintiff will be a member of both representative actions because they must choose one or the other. [FN4]

> FN4. If RadioShack is dissatisfied with this result it may make a 28 U.S.C. § 1407 request for transfer to the Judicial Panel on Multidistrict Litigation to consolidate the two actions. *See* Manual for Complex Litigation § 31.13 (discussing multidistrict transfers under § 1407).

Second, while the two cases are similar, they provide different relief and benefits. The Illinois FLSA action does not include any state claims. Therefore, the opt-in plaintiffs will be entitled to two years of back overtime wages if they prevail. They could also recoup three years of back overtime wages but only if they prove RadioShack's alleged willfulness to the court. Damages under the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 7

Not Reported in F.Supp.2d, 2003 WL 21250571 (E.D.Pa.)

(Cite as: 2003 WL 21250571 (E.D.Pa.))

FLSA are limited to "the payment of wages lost and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). The FLSA statute of limitations is not tolled until the employee opts-in.

The Pennsylvania action in our case may allow greater relief to class members because Goldman filed a class action alleging violations of the MWA and the WPCL. Unlike the FLSA, the state statute of limitations is three years without the extra burden of proving willful conduct. Damages under the MWA and the WPCL amount to the unpaid wages, plus liquidated damages equal to the greater of $500 or 25% of the lost wages due, plus reasonable attorney's fees and costs. *See* Pa. Stat. Ann. tit. 43 §§ 260.10 & 333.113. Thus, the Pennsylvania action allows a longer period of recovery without the extra burden of proving willful conduct, but provides for lower liquidated damages. The Illinois case does not provide these extra opportunities for recovery.

Moreover, the opt-out nature of the potential Rule 23(b)(3) class allows potential class members to be included in the class without making a public declaration. Although the FLSA protects current workers from employer retribution, the reality is that some current employees may be hesitant to join a opt-in class out of fear of retribution. The opt-out class will allow current employees relief-albeit not identical relief-as the opt-in plaintiffs without the same concerns regarding retribution.

*2. Goldman's Exempt Status Is Irrelevant At This Stage*

**\*8** RadioShack argues that Goldman should not be allowed to pursue an FLSA representative action because he is an exempt employee who is not entitled to overtime wages. *See* Def.'s Memo. in Opp'n, at 19-31, filed on Mar. 21, 2003 [# 26]. We will not consider the substance of RadioShack's arguments on the merits at this stage because only a motion for conditional certification is presently before us. *See Eisen v. Carlisle & Jacqueline*, 417 U.S. 156, 178 (1974) ("In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits...."); *Ansoumana*, 201

F.R.D. at 85 (merits of the case are irrelevant to class certification); *Hoffman v. Sbarro, Inc.*, 982 F.Supp. 249, 262 (S.D.N.Y.1997) (merits of the case are irrelevant to "similarly situated" test); *Jackson v. New York Tel. Co.*, 163 F.R.D. 429, 432 (S.D.N.Y.1995) (merits of the case irrelevant to motion for authorization of notice). All of RadioShack's arguments on this issue go to the merits of Goldman's case. The conditional certification inquiry only focuses on the lenient first tier "similarly situated" test. At this stage, with little evidence before us, we believe that Goldman and other "Y" Store Managers were similarly situated because they all had the same minimum weekly hours and did not receive overtime compensation. If Goldman is an exempt employee under the FLSA, it is likely that the other "Y" Store Managers are also exempt employees. However, the merits of the plaintiff's case are not at issue today because this is a motion for conditional certification and not a summary judgment motion. [FN5]

> FN5. RadioShack's discussion of Department of Labor's newly proposed regulations, 68 Fed.Reg. 15560, governing exemptions to the FLSA's overtime requirements are not relevant. *See* Def.'s Supp. Br. in Opp'n filed on Apr. 8, 2003[# 31]; Def.'s Notice of Errata filed on Apr. 10, 2003 [# 32]. First, the regulations defining exempt employees go to the merits of the case which are not currently at issue. Second, the proposed regulations are just that, only proposed regulations and not actual regulations. If and when they are enacted, and if they are binding on this case which was filed before 68 Fed.Reg. 15560 was proposed, the new regulation will be relevant only when the merits of Goldman's case are at issue.

*3. A Fact-Specific "Similarly Situated" Inquiry Is Premature*

RadioShack contends that Goldman was a special "Y" Store Manager that was not similar to regular "Y" Store Managers because: (1) his store had fifteen employees instead of the normal two

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 8

Not Reported in F.Supp.2d, 2003 WL 21250571 (E.D.Pa.)

**(Cite as: 2003 WL 21250571 (E.D.Pa.))**

employees; (2) Goldman was trained three times to become a District Manager; and (3) Goldman was designated a "Hiring Manager" with the responsibility to hire employees at several locations; and (4) RadioShack labeled Goldman a "Team Captain."

This may or may not be the case, but we will not delve into a fact-specific "similarly situated" inquiry at this time. As discussed *supra* Section III.A., conditional certification requires a lax showing of "similarly situated." During this first-tier inquiry, we ask only whether the plaintiff and the proposed representative class members allegedly suffered from the same scheme. A fact-specific inquiry is conducted only after discovery and a formal motion to decertify the class is brought by the defendant. Moreover, any class certification effort should not turn on the merits of the case even after the discovery period has closed. *See Eisen,* 417 U.S. at 178; *Ansoumana,* 201 F.R.D. at 85; *Hoffman,* 982 F.Supp. at 262; *Jackson,* 163 F.R.D. at 432. It is simply premature to do so now because we lack sufficient evidence to conduct a more rigorous inquiry.

*C. Conditional Certification is Warranted*

**\*9** We find that the potential members of Goldman's FLSA representative action are "similarly situated" under the first tier test because they were all subjected to the same employment contract with RadioShack. They were all required to work at least 54 hours per week and all were denied overtime pay. We will conditionally certify the FLSA representative action at this time so that Goldman may send notification to potential opt-in plaintiffs. To this end, we will order RadioShack to produce the names and last known addresses of all potential members of the FLSA representative action. This potential group consists of all RadioShack "Y" Store Managers who worked at Pennsylvania RadioShack locations at any time on or after December 11, 1999. [FN6]

> FN6. This group may be over inclusive after a more thorough analysis of the FLSA statute of limitations. For our present

purposes, we would rather be over inclusive than under inclusive so that potential action members may state their claim and influence any future statute of limitations debate.

*IV. MWA and WCPL Rule 23(b)(3) Class Action*
Unlike the FLSA claims, Pennsylvania's MWA and WCPL do not provide independent joinder mechanisms. Therefore, the proposed MWA and WCPL class actions are opt-out classes governed by Fed. R. Civ . P. 23. In order to certify a class under Rule 23, the class representative must fully comply with the four requirements of Rule 23(a) and fulfill the requirements of either Rule 23(b)(1), 23(b)(2) or (b)(3). *See Monahan v. City of Wilmington,* 49 Fed. Appx. 383, 384 (3d Cir.2002). Goldman seeks to certify a Rule 23(b)(3) class of all Pennsylvania RadioShack "Y" employees who worked as Store Managers at any time on or after December 11, 1999. At this time, we believe that Goldman's proposed Rule 23(b)(3) class complies with all of the requirements of Rule 23(a) and the superiority requirement of Rule 23(b)(3). However, we believe it is premature to find that the proposed class complies with the predominance requirement of Rule 23(b)(3). Specifically, we are concerned that common issues may not predominate over individual issues relating to each manager's employment setting, employment activities, and discretionary powers. RadioShack discussed how Goldman's "Y" store differed from other stores because the larger number of employees meant that he may have spent more time on managerial duties and less time on sales associate duties when compared to average "Y" Store Managers. RadioShack mentioned these allegations and theories in an effort to prevent conditional certification of the FLSA claim. We have already stated that such discussions are premature during an FLSA conditional certification inquiry. However, we believe they are relevant to a Rule 23(b)(3) class certification analysis because it is not a conditional or preliminary certification mechanism. In light of RadioShack's contentions, a more developed record is obviously required before we rule that common issues of fact and law predominate over individual variations. [FN7]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9

Not Reported in F.Supp.2d, 2003 WL 21250571 (E.D.Pa.)

**(Cite as: 2003 WL 21250571 (E.D.Pa.))**

FN7. At this time, we are not predisposed to either finding regarding predominance.

We will postpone a Rule 23(b)(3) finding, pursuant to Local Rule 23.1(c), until the close of discovery, at which time Goldman may move anew for 23(b)(3) class certification. *See* E.D. PA. R. 23.1(c) ("In ruling upon a motion, the Court may allow the action to be so maintained, may disallow and strike the class action allegations, or *may order postponement of the determination pending discovery* or such other preliminary procedures as appear to the appropriate and necessary in the circumstances.") (emphasis added); *Slater v. Philadelphia Hous. Auth.,* 1999 WL 997758, at * 5 (E.D.Pa. Nov. 2, 1999) (denying defendant's motion to dismiss plaintiff's class action complaint because the court's earlier denial of class certification without prejudice was a delay of the class action certification pending discovery pursuant to Local Rule 23.1(c) and not a denial on the merits) (citations omitted); *Gomberg v. Western Union Corp.,* 1997 WL 338938, *5 (E.D. Pa. June 16, 1997) (allowing motion for certification to proceed following discovery pursuant to Local Rule 23.1(c) when the parties treated the action as a class action throughout litigation, defendant refused to participate in discovery unless the motion was delayed, and defendant suffered no undue hardship); *see also De La Fuente,* 2002 WL 31819226, at * 1-2 (declining to rule on class certification until after discovery concluded). We will not discuss the requirements of Rule 23 because any such discussion would be dicta at this time. We acknowledge receipt of RadioShack's March 21, 2003 letter requesting oral arguments on all certification issues. We believe that oral arguments may well be appropriate, but it would be more productive if the oral arguments and accompanying testimony were heard following discovery. The parties should remember that a proposed class action shall proceed as if it is a class action until class certification is denied or the class is decertified. *See* Manual for Complex Litigation § 30.11 ("When an action has been filed as a class action, the court must treat it as one until it has determined otherwise.").

*V. Conclusion*

*10 We will conditionally certify Goldman's proposed FLSA federal representative action because he has fulfilled the first tier test for certification. RadioShack's fact-specific arguments on the merits are premature. We will postpone Goldman's motion for class certification of the state claims until discovery is concluded. We believe that it is proper to rule on the final FLSA certification and the Rule 23 class certification at the same time because: (1) the parties and the court will have a better understanding of the facts after conducting discovery; and (2) the second tier of the similarly situated inquiry overlaps with the Rule 23 inquiry such that they are properly analyzed together. Goldman may move for class certification after discovery and the parties may request oral argument at that time.

An appropriate Order follows.

*ORDER*

AND NOW, this 16th day of April, 2003, upon consideration of Plaintiff Mark A. Goldman's Motion for Conditional Certification of the Federal Fair Labor Standards Claim Pursuant to 29 U.S.C. § 216(b) and for Class Certification of the Pennsylvania Minimum Wage Act and Wage Payment and Collection Law Claims Pursuant to Fed. R. Civ. P. 23 filed on February 14, 2003 [Docket # 18]; Plaintiff's Supplemental Memorandum in Support filed on February 25, 2003 [# 21]; Defendant RadioShack Corporation's Memorandum in Opposition filed on March 21, 2003 [# 26]; Plaintiff Mark A. Goldman's Reply Memorandum filed on April 4, 2003[# 30]; and Defendant RadioShack Corporation's Supplemental Brief in Opposition filed on April 8, 2003 [# 31], it is hereby ORDERED consistent with the foregoing memorandum that:

1. Plaintiff Mark A. Goldman's Motion for Class Certification of the Pennsylvania Minimum Wage Act and Wage Payment and Collection Law Claims Pursuant to Fed. R. Civ. Pro. 23(b)(3) is DENIED at this time· pursuant to Local Rule E.D. Pa. R. 23.1(c) WITHOUT PREJUDICE to Plaintiff Mark A. Goldman's right to move for Class Certification

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 10

Not Reported in F.Supp.2d, 2003 WL 21250571 (E.D.Pa.)

**(Cite as: 2003 WL 21250571 (E.D.Pa.))**

of these Pennsylvania claims following the close of discovery;

2. Plaintiff Mark A. Goldman's Motion for Conditional Certification of the Federal Fair Labor Standards Act Claim and Facilitation of Notice Pursuant to 29 U.S.C. § 216(b) is GRANTED at this time subject to further review as set forth in our memorandum;

3. Pursuant to 29 U.S.C. § 216(b) and Fed. R. Civ. P. 83, this Court conditionally certifies an opt-in Class of all former or current employees of RadioShack Corporation (and/or Tandy Corporation) who managed a RadioShack "Y" store in Pennsylvania at any time on or after December 11, 1999, for the claim under the Federal Fair Labor Standards Act;

4. Plaintiff Mark A. Goldman is conditionally designated as the representative of the Class;

5. Plaintiff's Counsel, Roda & Nast, P.C. and the Wexler Firm, are hereby appointed as Counsel for the Class;

6. Within thirty (30) business days from the date of this Order, Defendant RadioShack Corporation SHALL PRODUCE to Plaintiff's Counsel a list of the names and last known addresses of all potential members of the Class described in the Paragraph Three of this Order;

*11 7. Plaintiff's Counsel SHALL CAUSE to be sent by first-class mail, to all members of the Class described in Paragraph Three of this Order, a Notice Packet consisting of a Notice and Notice of Consent form that are substantially in the form of Exhibits Six and Nine attached to Plaintiff's Supplemental Memorandum in Support filed on February 28, 2003 [Docket # 21]; and

8. Any person who fits within the Class described in Paragraph Three of this Order may join this action by sending a completed Notice of Consent form to Plaintiff's Counsel postmarked on or before July 31, 2003. Any person who does not send a completed Notice of Consent form to Plaintiff's

Counsel postmarked on or before July 31, 2003 SHALL NOT be permitted to participate in the Federal Fair Labor Standards Act Representative Action.

Not Reported in F.Supp.2d, 2003 WL 21250571 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2:03cv00032 (Docket)

(Jan. 02, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit G**

Not Reported in F.Supp.2d                                                     Page 1

Not Reported in F.Supp.2d, 2004 WL 1080193 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1496

(Cite as: 2004 WL 1080193 (N.D.Ill.))

C

**Motions, Pleadings and Filings**

United States District Court,
N.D. Illinois, Eastern Division.
Levay HARPER and Shenita Jones, individually
and on behalf of a class of
persons similarly situated, Plaintiffs,
v.
YALE INTERNATIONAL INSURANCE
AGENCY, INC., Insurance Plus Agency II, Inc. and
Constantine Danos, Defendants.
No. 03 C 3789.

May 12, 2004.

Ernest Thomas Rossiello, Ernest T. Rossiello &
Associates, P.C., Chicago, IL, for Plaintiff and
Counter-Defendant.

Daniel John McMahon, Curt Justin Schlom, David
M. Holmes, Lisa Handler Ackerman, Wilson, Elser,
Moskowitz, Edelman & Dicker, Sara Amy Weinberg
, Myers, Miller, Standa & Krauskopf, Chicago, IL,
for Third-Party Plaintiffs and Defendants.

Peter Gregory Frezados, Gregory A. Frezados,
Philip Peter DeMaertelaere, Regas, Frezados, Harp
& Dallas, Chicago, IL, for Third-Party Defendants.

*MEMORANDUM OPINION AND ORDER*

PALLMEYER, J.

*1 Plaintiffs Levay Harper and Shenita Jones have
filed suit against Yale International Insurance
Agency, Inc. ("Yale"), Insurance Plus Agency II,
Inc. ("Insurance Plus"), and Constantine Danos,
alleging violations of the Fair Labor Standards Act
("FLSA"), 29 U .S.C. § 201 *et seq.,* the Illinois
Minimum Wage Law ("IMWL"), 820 ILCS 105/1
*et seq.,* and the Illinois Wage Payment and

Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.*
The court certified a class of plaintiffs for the
IMWL claim and Plaintiffs now seek an order
approving their proposed notice. In response to
concerns raised by the court regarding the propriety
of exercising supplemental jurisdiction over an
entire class of state law claimants, Defendants have
moved to decertify the class. For the reasons set
forth here, Defendants' motion to decertify is
granted and Plaintiffs' motion regarding class notice
is denied as moot.

*BACKGROUND*

Harper was hired by Yale as a customer service
representative on April 16, 2002. She worked "on
salary," which was supposed to be based on an
income of $25,000 per year for a 40-hour work
week. (Cmplt.¶ 3.) [FN1] Instead of receiving
$12.02 per hour, however, Harper claims that she
was paid only $10.01 per hour. (*Id.*) Harper also
alleges that she was not paid overtime wages for
hours she worked in excess of 40 per week. (*Id.* ¶
4.) On March 15, 2003, Harper was discharged
from her position. (*Id.* ¶ 10.) Several months later
on June 3, 2003, Harper filed a complaint against
Yale alleging violations of the minimum wage and
overtime provisions of the FLSA, the IMWL and
the IWPCA. The following day, Harper filed an
Amended Complaint reasserting her statutory wage
and hour claims, and adding a claim for
discriminatory discharge in violation of the FLSA,
29 U.S.C. § 215(a)(3). Harper also sought to certify
a class under the IMWL, comprised of "non-exempt
hourly waged employees employed by [Yale] within
three years of June 3, 2003 and the present and who
were not paid overtime wages for hours worked in
excess of 40 in each work week." (Amend. Cmplt.
Count III ¶ 1.)

    FN1. Plaintiffs' Second Amended
    Complaint is cited as "Cmplt. ¶ __."

On September 17, 2003, Harper filed a Second

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1080193 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1496

**(Cite as: 2004 WL 1080193 (N.D.Ill.))**

Amended Complaint, adding Shenita Jones as a plaintiff, and naming Insurance Plus, Danos, George R. Rogiokos, and Haralambos "Harry" N. Konstantopolous as defendants. [FN2] Shortly thereafter on September 30, 2003, Plaintiffs moved to certify a class for the IMWL claim, defined as follows:

> FN2. Plaintiffs voluntarily dismissed Rogiokos and Konstantopolous as defendants on January 13, 2004. The remaining defendants all filed Third-Party Complaints against James F. Pappas, individually and as agent of J. Pappas Accounting Group; Preferred Payroll Services, Inc.; Pappas & Kapolas, Inc.; and Hospitality Accounting Systems, alleging breach of contract and malpractice in performing accounting and payroll services on Defendants' behalf. Yale also filed a counterclaim against Harper for wages she was allegedly overpaid while employed by the company.

All hourly waged employees employed by [Yale] who were employed more than forty hours in any work week, including those employees who were required to attend meetings on weekends or after regular business hours without pay or overtime between June 3, 2000 and the present; and all hourly waged employees employed by [Insurance Plus] who were employed more than 40 hours in any work week between September 17, 2000 and the present, including those employees who were required to attend meetings on weekends or after regular business hours without pay or overtime who are due back overtime pay under the [IMWL].

**\*2** (Motion for Class Certification, at 2.) On November 3, 2003, the court overruled Defendants' objections to class certification and directed the parties to confer regarding the appropriate class definition and notice to putative class members. Plaintiffs moved for approval of their notice on November 26, 2003, but the court found the proposed class definition ambiguous and denied the motion without prejudice. On January 28, 2004, the court rejected Plaintiffs' amended notice, again due

to ambiguity in the class definition. Plaintiffs have now submitted a third version of the proposed notice, which is currently before the court. Defendants object to Plaintiffs' proposal and seek to have the class decertified.

*DISCUSSION*
A. Motion to Decertify

In ruling on a motion to decertify a class, the court considers whether "economy favors adjudicating multiple disputes in a single action, without sacrificing fairness." *Ellis v. Elgin Riverboat Resort,* 217 F.R.D. 415, 418 (N.D.Ill.2003). Federal Rule of Civil Procedure 23(a) sets forth four requirements for class certification: (1) the class is so numerous that joinder of all members is impracticable (numerosity); (2) there are questions of law or fact common to the class (commonality); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and (4) the representative parties will fairly and adequately protect the interests of the class (adequate representation). *See Rosario v. Livaditis,* 963 F.2d 1013, 1017 (7th Cir.1992). If a plaintiff meets all of these prerequisites, she must further satisfy one of the requirements set forth in Rule 23(b). *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 596 (7th Cir.1993). In this case, where Defendants objected only on commonality and numerosity grounds, the court concluded that Plaintiff had made the showing necessary for certification of a class under Rule 23(b)(3). Under that Rule, a class may be certified if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

A court has broad discretion to resolve whether certifying a class is proper. *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir.1998). In making this determination, the substantive allegations in the complaint are taken as true and, generally, the ultimate merits of the case are not examined. *Eggleston v. Chicago Journeymen Plumbers' Local*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 3
Not Reported in F.Supp.2d, 2004 WL 1080193 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1496

(Cite as: 2004 WL 1080193 (N.D.Ill.))

*Union No. 130*, 657 F.2d 890, 895 (7th Cir.1981); *Hill v. Shell Oil Co.*, No. 98 C 5766, 2002 WL 663583, at *2 (N.D.Ill. Mar.28, 2002). The court should, however, "make whatever factual and legal inquiries are necessary under Rule 23" before deciding whether a case should proceed as a class action. *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675 (7th Cir.2001); *Woodard v. Tower Automotive Products Co.*, No. 00 C 50459, 2002 WL 832572, at *2 (N.D.Ill. May 1, 2002). The court's initial determination to certify a class is "inherently tentative" and the court "remains under a continuing obligation to review whether proceeding as a class action is appropriate." *Ellis*, 217 F.R.D. at 419 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n. 11, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978)). *See also Binion v. Metropolitan Pier and Exposition Authority*, 163 F.R.D. 517, 520 (N.D.Ill.1995) (court "remains free to modify or vacate a certification order if it should prove necessary"). Plaintiffs bear the burden of "producing a record demonstrating the continued propriety of maintaining the class action." *Ellis*, 217 F.R.D. at 419.

*3 In challenging Plaintiffs' original motion for class certification, Defendants focused primarily on the fact that Plaintiffs are seeking to represent employees of two separate employers: "Plaintiffs fail to cite a single case where this Court has certified a class action lawsuit against two distinct legal entities for the entities' alleged distinct practices." (Memorandum of Law in Opposition to Plaintiff's Motion for Class Certification, at 5.) (*See also id.* at 7) ("Plaintiffs are attempting to certify a class of two distinct employers who employed two distinct groups of former and current employees"). In response to concerns recently raised by this court regarding federal certification of a class of state law claimants, Defendants now argue that class certification is not a superior method of adjudicating Plaintiffs' IMWL claims as required under Rule 23(b)(3) because Congress has stated a "clear preference for opt-in collective actions" under the FLSA. (Def. Mem., at 4-5.) [FN3] The court agrees.

FN3.    Defendants'    Brief    Regarding

Whether this Court has Supplemental Jurisdiction over the Class Members who are Not Bringing Claims Under the Fair Labor Standards Act and Motion to De-Certify the Class is cited as "Def. Mem., at ___."

Plaintiffs have alleged claims under the FLSA but do not seek to proceed with an FLSA collective action; instead, Plaintiffs are only pursuing an IMWL class action. No court has yet addressed whether a plaintiff seeking class treatment of wage and hour claims in federal court is required to pursue an FLSA collective action. Courts in this district are split as to whether plaintiffs may simultaneously pursue FLSA collective actions and state law class actions, but no court has allowed a plaintiff to proceed solely under the latter theory.

In *De La Fuente v. FPM Ipsen Heat Treating, Inc.*, No. 02 C 50188, 2002 WL 31819226 (N.D.Ill.Dec.16, 2002) (Reinhard, J.), for example, the plaintiffs moved to begin opt-in notice on their FLSA collective action and simultaneously sought class certification of their IMWL and IWPCA claims. *Id.* at *1. The defendants did not object to the FLSA collective action and the court granted the plaintiffs' motion to proceed with notice of the class members' opt-in rights. *Id.* The court, however, declined to certify a Rule 23 class until after the opt-in period on the FLSA action closed. "The court shares *Thiebes [v. Wal-Mart Stores, Inc.*, No. 98-802-K1, 1999 WL 1081357 (D.Or. Dec.1, 1999) ] concern about a notice that both calls for a decision whether to opt-in to the collective action and also whether to opt-out of the class action." 2002 WL 31819226, at *2. The court stated that it would have a better idea whether joinder was impractical after the opt-in period closed. *Id.*

The plaintiffs in *Muecke v. A-Reliable Auto Parts and Wreckers, Inc.*, No. 01 C 2361, 2002 WL 1359411 (N.D.Ill. June 21, 2002) (Kennelly, J.) also filed suit under the FLSA, the IMWL, and the IWPCA, and sought to send collective action opt-in notices under the FLSA claim and to certify a class under Rule 23 for the state law claims. *Id.* at *1. The court agreed to let the plaintiffs proceed with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 1080193 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1496

**(Cite as: 2004 WL 1080193 (N.D.Ill.))**

an FLSA collective action but declined to certify a Rule 23 class until after the opt-in period closed, at which time "we will have before the Court as plaintiffs all of the present and former employees who wish to pursue a claim for unpaid wages." *Id* . at *2. The court noted the possibility that only a few employees would opt-into the FLSA action, and explained that it would be incongruous to have "an FLSA 'class' including only a tiny number of employees who are interested in seeking back wages, with a state-law class that nonetheless includes all or nearly all of the companies' present or former employees." *Id.* The court concluded that a Rule 23 class action was not a superior means of resolving the state law claims and declined to "impose on the collective FLSA class an overlay of a Rule 23(b)(3) state-law class." *Id.*

*4 In *Rodriguez v. The Texan, Inc.,* No. 01 C 1478, 2001 WL 1829490 (N.D.Ill. Mar.7, 2001) (Shadur, J.), the plaintiff attempted to represent a class of similarly situated persons under the FLSA, the IMWL, and the IWPCA. The court issued an opinion *sua sponte* notifying the plaintiff that the FLSA did not permit Rule 23 class certification, instead requiring the use of an opt-in procedure. *Id.* at *1-2. The court then explained that the plaintiff would have "an uphill burden" to obtain class certification of the state law claims:

> There are powerful policy considerations that led Congress to change the original version of the Fair Labor Standards Act by enacting the Portal to Portal Act of 1947 so as to require the opt-in procedure via individualized written consents by employees wishing to join such actions ... That policy and the underlying congressional intent would be thwarted if a plaintiff were permitted to back door the shoehorning in of unnamed parties through the vehicle of calling upon similar state statutes that lack such an opt-in requirement.

*Id.* at *1 (internal citations omitted). The court noted that the rules regarding supplemental jurisdiction under 28 U.S.C. § 1367(a) support this view. Section 1367(a), which gives federal courts jurisdiction over state law claims that are sufficiently related to the federal claims, provides that "[s]uch supplemental jurisdiction shall include claims that involve the joinder or intervention of

additional parties." That language, the court stated, "plainly betokens actual joinder or intervention, not the type of representative treatment that is sought by Rodriguez and his counsel here instead of such actual joinder." *Id.* at *4.

Other courts in this district have allowed class certification of state law wage claims in addition to FLSA collective actions, despite the potential confusion among putative class members receiving notice of a right to opt-into the FLSA claim and opt-out of the Rule 23 class claim. *See Ladegaard v. Hard Rock Concrete Cutters, Inc.,* No. 00 C 5755, 2000 WL 1774091 (N.D.Ill.Dec.1, 2000) (after removal from state court, court certified a class under the IMWL and IWPCA despite the availability of a class action for FLSA claims, observing that potential confusion could be eliminated by appropriately-drafted notice); *O'Brien v. Encotech Constr. Servs., Inc.,* 203 F.R.D. 346 (N.D.Ill.2001) (following *Ladegaard,* court permitted plaintiffs to proceed both with FLSA collective action and a Rule 23 class action on their IMWL and IWPCA claims, as the possibility of separate claims in state court would be inefficient, and notice need not be unduly confusing to class members).

This court itself recently considered whether a plaintiff must pursue an FLSA collective action either simultaneously with, or instead of, a state law class action in *Sorensen v. CHT Corp.,* Nos. 03 C 1609, 03 C 7362, 2004 WL 442638 (N.D.Ill. Mar.10, 2004). The plaintiff in *Sorensen* filed a complaint in state court alleging violations of the FLSA, the IMWL, and the IWPCA, and sought to certify a class for the state law claims. *Id.* at *3. The defendants removed the case to federal court and challenged class certification on the grounds that it was not a superior method of adjudication. *Id.* The court noted that allowing plaintiffs to avoid the FLSA's opt-in procedure-- which was enacted by Congress to limit collective actions, *Rochlin v. Cincinnati Ins. Co.,* No. IP00-1898CHK, 2003 WL 21852341, at *15 n. 6 (S.D.Ind. July 8, 2003) --simply by omitting a request for collective action and seeking class certification of state law wage claims would arguably subvert congressional intent.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 1080193 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1496

**(Cite as: 2004 WL 1080193 (N.D.Ill.))**

*Sorensen,* 2004 WL 442638, at *11 (citing *Rodriguez,* 2001 WL 1829490, at *1). The court also recognized, however, that Illinois courts contemplate class action treatment for IMWL and IWPCA claims, *Id.* (citing *Gelb v. Air Con Refrigeration and Heating, Inc.,* 326 Ill.App.3d 809, 260 Ill.Dec. 421, 761 N.E.2d 265 (1st Dist.2001)), and that permitting defendants to remove state law claims and then object to class action treatment of those claims arguably subverts the rights of unnamed class members. *Id.*

*5 Another factor weighing in favor of class certification, in this court's view, was the applicable statute of limitations on FLSA claims: "[b]ecause [the plaintiff] has not sought inclusion of other bath house workers in her FLSA claim, denial of th[e] motion for class certification may effectively dispose of the rights of persons whose interests [the plaintiff] purports to protect." *Sorensen,* 2004 WL 442638, at *11. *See also* 29 U.S.C. § 256 (for an individual not named in a complaint, his or her FLSA action is commenced on the date he or she consents to be a party plaintiff). At the same time, the court was troubled by the fact that granting the plaintiff's motion for class certification would result in a single individual's FLSA claim forming the only basis for the court's jurisdiction over a potentially large class of claimants under a state law theory. *Id.* at *12 (citing *De Asencio v. Tyson Foods, Inc.,* 342 F.3d 301, 311 (3d Cir.2003)) (where FLSA claims were brought together with fair wage claims under state law, the court observed that "the disparity in numbers of similarly situated plaintiffs [alleging state as opposed to federal claims] may be so great that it becomes dispositive by transforming the action to a substantial degree, by causing the federal tail represented by a comparatively small number of plaintiffs to wag what is in substance a state dog"). The court ultimately asked the parties to submit supplemental briefs on the issue of whether the plaintiff's state law class claims should be remanded to state court. *Id.*

In this case, Plaintiffs opted to file their complaint in federal court, so there is no concern that Defendants have strategically removed the case to

avoid a class action lawsuit. Plaintiffs, however, have arguably subverted congressional intent in creating the FLSA opt-in procedure by choosing to seek class certification of their IMWL claims instead of pursuing an FLSA collective action. In addition, certifying a potentially large class of state law claimants could result in "the federal tail represented by a comparatively small number of plaintiffs [wagging] what is in substance a state dog." *De Asencio,* 342 F.3d at 311. *De La Fuente, Muecke,* and *Rodriguez* all suggest that class certification of state law claims is inappropriate before the scope of an FLSA collective action has been determined. The court finds these cases persuasive because they all honor congressional intent to limit collective actions under the FLSA through the opt-in procedure. In addition, as the *Rodriguez* court noted, the language of § 1367(a) regarding supplemental jurisdiction "plainly betokens actual joinder or intervention, not the type of representative treatment that is sought by [Plaintiffs] and [their] counsel here instead of such actual joinder." 2001 WL 1829490, at *4. Plaintiffs have not responded to Defendants' motion to decertify, nor have they presented any basis for upholding class certification of their IMWL claims. *See Ellis,* 217 F.R.D. at 419 ("[t]he party seeking class certification ... bears the burden of producing a record demonstrating the continued propriety of maintaining the class action"). Thus, Defendants' motion to decertify is granted.

**B. Supplemental Jurisdiction**

*6 Having determined that class certification of the state law claims is inappropriate here, the court declines to retain jurisdiction over them. Defendants argue that the case should be concentrated in one forum "to promote judicial economy, fairness and convenience to the litigants, which are central to the purpose of 28 U.S.C. § 1367(a)." (Def. Mem., at 3-4) (citing *Ladegaard,* 2000 WL 1774091, at *7). Defendants, however, cannot have it both ways. It would be unfair to absent class members to decertify the class in this case and at the same time prevent Plaintiffs from representing those class interests in state court. The court recognizes that the parties may be forced to litigate similar wage and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 6

Not Reported in F.Supp.2d, 2004 WL 1080193 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1496

(Cite as: 2004 WL 1080193 (N.D.Ill.))

hour issues in separate courts, but such a result most closely preserves both congressional intent under the FLSA and the interests of the putative class members in this case.

*CONCLUSION*

For the reasons stated above, Defendants' Motion to De-Certify the Class (Docket No. 90-1) is granted without prejudice. Plaintiffs' IMWL claims are dismissed without prejudice to refiling in state court. Plaintiffs' Revised Motion for Order Approving Issuance of Notice (Docket No. 77-1) is denied as moot.

Not Reported in F.Supp.2d, 2004 WL 1080193 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1496

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2173952 (Trial Motion, Memorandum and Affidavit) Defendants' Brief Regarding Whether This Court Has Supplemental Jurisdiction Over the Class Members Who are not Bringing Claims Under the Fair Labor Standards Act and Motion to De-Certify the Class (Apr. 01, 2004)

• 2004 WL 2173950 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply Brief in Support of Their Revised Motion for Order Approving Class Definition, and for Issuance of Notice to the Class (Mar. 01, 2004)

• 2004 WL 2173945 (Trial Pleading) Preferred Payroll Services, Inc.'s Answer to Constantine Danos' Third Party Complaint (Feb. 27, 2004)

• 2004 WL 2173941 (Trial Motion, Memorandum and Affidavit) Defendants' Response to Plaintiffs' Revised Motion for Order Approving Issuance of Notice of Pendency of This Action to This Class (Feb. 23, 2004)

• 2004 WL 2173937 (Trial Pleading) Constantine Danos' Third-Party Complaint (Feb. 13, 2004)

• 2004 WL 2173934 (Trial Pleading) Konstantinos Danos' Answer to Plaintiffs' Second Amended Complaint and Affirmative Defenses (Feb. 11, 2004)

• 2004 WL 2173922 (Trial Pleading) Preferred Payroll Services, Inc.'s Answer to Insurance Plus Agency II, Inc.'s Third Party Complaint (Feb. 09, 2004)

• 2004 WL 2173926 (Trial Pleading) Preferred Payroll Services, Inc.'s Answer to Yale International Insurance Agency, Inc.'s Third Party Complaint (Feb. 09, 2004)

• 2004 WL 2173930 (Trial Pleading) James F. Pappas, J. Pappas Accounting Group, Pappas & Kapolas, Inc., and Hospitality Accounting Systems' Answer to Insurance Plus Agency II, Inc.'s Third Party Complaint (Feb. 09, 2004)

• 2004 WL 2173915 (Trial Motion, Memorandum and Affidavit) Yale International Insurance Agency, Inc. and Insurance Plus Agency II, Inc.'s Memorandum of Law in Support of Its Motion to Stay Proceedings (Jan. 07, 2004)

• 2004 WL 2173902 (Trial Pleading) Insurance Plus Agency II, Inc.'s Third-Party Complaint (Jan. 05, 2004)

• 2004 WL 2173905 (Trial Pleading) Insurance Plus Agency II, Inc.'s Answer to Plaintiffs' Second Amended Complaint and Affirmative Defenses (Jan. 05, 2004)

• 2004 WL 2173910 (Trial Motion, Memorandum and Affidavit) Plaintiffs' Reply to Defendants' Answer to the Motion for Order Approving Class Definition and for Issuance of Notice to the Class (Jan. 05, 2004)

• 2003 WL 23797629 (Trial Pleading) Yale International Insurance Agency, Inc.'s Third-Party Complaint (Dec. 12, 2003)

• 2003 WL 23797639 (Trial Pleading) Yale International Insurance Agency, Inc.'s Counterclaim Against Levay Harper (Dec. 12, 2003)

• 2003 WL 23797622 (Trial Motion, Memorandum

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 7

Not Reported in F.Supp.2d, 2004 WL 1080193 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1496

**(Cite as: 2004 WL 1080193 (N.D.Ill.))**

and Affidavit) Defendant, Yale International Insurance Agency, Inc.'s, Reply in Support of Its Motion to Compel Plaintiff, Levay Harper, to Accept Its Offer for Judgment and Motion to Dismiss (Oct. 27, 2003)

• 2003 WL 23797614 (Trial Motion, Memorandum and Affidavit) Reply to Defendants' Answer to the Motion for Class Certification and Proposed Notice to the Class (Oct. 21, 2003)

• 2003 WL 23797618 (Trial Pleading) Answer to Motion to Compel Plaintiff Levay Harper to Accept Offer for %ADsic%BD Judgment and Motion to Dismiss (Oct. 20, 2003)

• 2003 WL 23797606 (Trial Motion, Memorandum and Affidavit) Defendant, Yale International Insurance Agency, Inc.'s Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification (Oct. 15, 2003)

• 2003 WL 23797602 (Trial Pleading) Yale International Insurance Agency, Inc.'s Answer to Plaintiffs' Second Amended Complaint and Affirmative Defenses (Oct. 07, 2003)

• 2003 WL 23797581 (Trial Pleading) Second Amended Complaint Jurisdiction and Venue (Sep. 17, 2003)

• 2003 WL 23797557 (Trial Pleading) Complaint Jurisdiction and Venue (Jun. 04, 2003)

• 2003 WL 23797569 (Trial Pleading) Amended Complaint Jurisdiction and Venue (Jun. 04, 2003)

• 1:03CV03789 (Docket)

(Jun. 03, 2003)

• 2003 WL 23797574 (Trial Pleading) Yale International Insurance Agency's Answer to Plaintiff's Amended Complaint and Affirmative Defenses (2003)

• 2003 WL 23797595 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant's Motion to Compel Plaintiff, Levay

Harper, to Accept the Offer for Judgment and Motion to Dismiss (2003)

• 2003 WL 23797648 (Trial Motion, Memorandum and Affidavit) Yale International Insurance Agency, Inc.'s Response to Plaintiffs' Motion for Order Approving Class Definition, Plaintiffs' Proposed Notice to the Class, and for Issuance of Notice of Class (2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit H**

Westlaw.

Slip Copy                                                                     Page 1

Slip Copy, 2005 WL 1541045 (E.D.N.Y.)

**(Cite as: 2005 WL 1541045 (E.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Franklin MASCOL, et al., Plaintiffs,
v.
E & L TRANSPORTATION, INC., et al.,
Defendants.
**No. CV-03-3343 CPS.**

June 29, 2005.

Barry I. Levy, Shapiro, Beilly, Rosenberg, Albert & Fox LLP, Elan Raviv Kandel, Shapiro, Beilly, Rosenberg, Aronowitz, Levy & Fox, LLP, New York, NY, for Plaintiffs.

Christopher A. Smith, Raquel A. Williams, Trivella, Forte & Smith, LLP, White Plains, NY, for Defendants.

MEMORANDUM OPINION AND ORDER

SIFTON, Senior J.

**\*1** This is a civil action brought by six named plaintiffs in their individual capacities and on behalf of others similarly situated for claims under sections 7(a), 11(c), 15(a)(2)(5), 16 and 17 of the Fair Labor Standards Act, as amended (29 U.S.C. §§ 207(a), 211(c), 215(a)(2)(5), 216 and 217 (2004)) ("FLSA") and claims under Article 19 of the New York State Labor Law ("NYS Labor Law") and its implementing regulations, N.Y. Comp.Codes R. & Regs. tit. 12, § 142-2.2 (2004). The complaint, as amended, alleges that defendants failed to pay plaintiffs--current and former ambulette drivers--overtime pay at a rate of time and one half for hours worked over 40 hours per week in violation of FLSA and NYS Labor Law. Plaintiffs seek unpaid overtime wages from July 9, 2000 through the date of judgment, as well as liquidated damages, pursuant to the FLSA and unpaid overtime from July 9, 1997 through the date of judgment and liquidated damages equal to 25% of the unpaid wages pursuant to state law. In addition, plaintiffs seek an injunction and declaratory relief and attorneys' fees.

On January 27, 2004, the Court dismissed plaintiffs' claims for declaratory and injunctive relief under the FLSA and granted plaintiffs' motion to permit the action to proceed as a representative action under 29 U.S.C. § 216(b) with respect to the FLSA claims. The court ordered (1) defendants to turn over the names and addresses of potential plaintiffs by March 2, 2004, (2) plaintiffs to send notice to potential class members by April 2, 2004, and (3) potential plaintiffs to return notices by May 28, 2004.

Plaintiffs, on consent, amended the complaint on March 17, 2004 to add Elbrus Transportation, Inc. ("Elbrus"), [FN1] Boris Shamiloff, Arkadi Ashurov, and Eduard Pardilov, as successors in interest to the original named defendants E & L Transportation, Inc., E & L Transportation, Inc. d/b/a Community Transport, Community Transportation, Inc., LCH Transportation Corp., Ely Matalon, and Leon Krisinovsky. [FN2] On March 29, 2004, the Court (1) extended its January 27, 2004 order to apply to the new defendants, (2) gave the new defendants until April 1, 2004 to turn over the names and addresses of potential plaintiffs; (3) gave the plaintiffs until April 15, 2004 to send out notices; and (4) required the notices be received by June 15, 2004. On April 13, 2004, the March 29, 2004 order was again modified to (1) give defendants until April 30, 2004 to turn over the names and addresses, (2) give the plaintiffs until May 15, 2004 to send out notices; and (3) require that return notices be received by July 15, 2004.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                    Page 2

Slip Copy, 2005 WL 1541045 (E.D.N.Y.)

**(Cite as: 2005 WL 1541045 (E.D.N.Y.))**

> FN1. Elbrus purchased the assets of the original defendants in March of 2004.

> FN2. The complaint names Leon Krisinovsky. The correct spelling would appear to be Kryzhanovsky.

On May 9, 2005 this Court granted plaintiffs' motion for partial summary judgment on liability under the FLSA and NYS Labor Law. On June 7, 2005, defendants filed a Notice of Appeal to this decision. [FN3]

> FN3. Although the filing of a notice of appeal generally divests jurisdiction from the district court and confers jurisdiction upon the courts of appeals, pursuant to 28 U.S.C. § 1291, "the jurisdiction of the federal courts of appeals is limited to appeals from final decisions of the district courts." *Savino et al. v. Computer Credit, Inc.,* 173 F.R.D. 346, 350 (E.D.N.Y.1997) (citing *United States v. Rogers,* 101 F.3d 247, 251 (2d Cir.1996)). However, divestiture of jurisdiction is not a per se rule but "a judicially crafted rule rooted in the interest of judicial economy". *Rogers,* 101 F.3d at 251,
> Where, as here, a party appeals from an interlocutory order that does not expressly direct judgment pursuant to F.R.C.P. 54(b), nor authorize an interlocutory appeal pursuant to 28 U.S.C. § 1292(b), "such an appeal does not deprive [this Court] of the power to proceed." *Hoffenberg v. United States,* 2004 U.S. Dist. LEXIS 20668, * 6 (S.D.N.Y. October 18, 2004) (citing *Leonhard v. United States,* 633 F.2d 599, 610 (2d Cir.1980) (internal citations omitted) (finding "no efficiency to be gained by allowing a party to halt the district court proceedings by filing a plainly unauthorized notice"); *See also Liberty Mutual Ins. Co. v. Wetzel,* 424 U.S. 737, 742, 96 S.Ct. 1202, 47 L.Ed.2d 435 (1976); *Rogers,* 101 F.3d at 251; *Savino,* 173 F.R.D. at 351.
> Accordingly, this Court finds that it has

> jurisdiction to decide the motions presently before it, notwithstanding defendant's notice of appeal. *See Savino,* 173 F.R.D. at 350-351; *See also Weisman v. Darneille,* 79 F.R.D. 389, 391 (S.D.N.Y.1978) ("Where a notice of appeal refers to an order which is clearly non-appealable, the mere taking of the appeal is insufficient to divest the district court of jurisdiction. In such circumstance, the district court may ignore the notice of appeal and may proceed with the case.").

Plaintiffs now move for class certification pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure ("FRCP") with respect to their New York State ("NYS") Labor Law claim. Plaintiffs also seek to waive, on behalf of the putative state law class, any claim for liquidated damages. [FN4] In addition, plaintiffs request that Tyrone Ladson be joined to the FLSA action despite his untimely opt-in notice.

> FN4. NYS Law forbids class actions for liquidated damages unless a class action is authorized by the statute giving rise to the cause of action. N.Y. C.P.L.R. § 901(b) (2004). The NYS Labor Law in question here does not do so. N.Y. Lab. Law § 663 (2002).

**\*2** For the reasons set forth below, the motion for class certification is granted for a class of ambulette drivers not paid overtime wages, who worked for defendants at any time during the six years preceding the commencement of this action to the present who expressly waive any claim to any liquidated damages under NYS Labor Law § 663. [FN5] Plaintiffs are ordered to give notice to putative class members pursuant to FRCP 23(c)(2)(B), including a clear and concise explanation of the nature of any potential liquidated damages claim under the NYS Labor Law § 663, and the implications of the waiver of such damage claim. Finally, plaintiffs' request to join Tyrone Ladson to the FLSA action despite his untimely opt-in notice is granted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                              Page 3

Slip Copy, 2005 WL 1541045 (E.D.N.Y.)

**(Cite as: 2005 WL 1541045 (E.D.N.Y.))**

FN5. A six year statute of limitations applies to plaintiffs' labor law claims. NYS Labor Law § 663(3).

*Background*

The following facts are drawn from the complaint and the papers submitted with this motion and are undisputed unless otherwise noted.

Plaintiffs' motion for class certification under FRCP 23(a) and (b)(3) [FN6] for their NYS Labor Law claim describes the class they seek to represent as:

FN6. Plaintiffs mistakenly state that they seek certification pursuant to FRCP 23(g), which governs appointment of class counsel. The mistake is made repeatedly in their papers. (*E.g.* Pls. Mem. Supp. Mot. Partial Summ. J. at 2.)

former and present ambulette drivers and helpers that were employed by the Defendants during the six (6) years preceding the filing of the Complaint through the present, and who regularly worked over forty (40) hours a week for the Defendant, but who were not paid overtime pay at a rate of time and one-half as required by FLSA, Section 7 (29 U.S.C. § 207) and Article 19 of the NYS Labor Law.

(Pls. Mem. Supp. Mot. Partial Summ. J. at 2-3.) Plaintiffs' counsel, Barry I. Levy and Elan R. Kandel, have over the last five years handled numerous labor litigation cases in the Southern and Eastern District of New York. (Decl. of Barry I. Levy ¶ 3.)

Despite this experience, plaintiffs' counsel fail to identify clearly the class they seek to certify. Plaintiffs include "helpers" in their description of the plaintiff class quoted above, but only refer to "ambulette drivers" in their discussion of whether plaintiffs meet the requirements of FRCP 23(a) and (b)(3). [FN7] Defendants maintain that the plaintiffs should not be allowed to certify a class that includes helpers and mechanics because of the differences in their contractual terms of employment. [FN8] (*See* Defs.' Aff. Opp'n Pls. Mot. for Summ. J. and in

Supp. of Defs.' Notice of Cross Mot. for Dismissal, hereinafter "Defs.' Aff. Opp'n", ¶¶ 153-63.) In response, plaintiffs assert in a footnote that they are not "seeking to represent helpers and mechanics employed by the Defendants relative to either Plaintiffs' FLSA claims or proposed New York State Labor Law class action claims." (Pls.' Mem. Further Supp. Mot. Partial Summ. J., hereinafter "Pls.' Mem. Further Supp.", at 2 n. 1.) Nevertheless, the payroll accounting report ("Ennis Report") submitted by the plaintiffs to demonstrate the potential numerosity of the putative class includes eight helpers and one mechanic. (*See* Defs.' Aff. Opp'n ¶¶ 153-63; Decl. of Barry 1. Levy, Exhibit A at 1-64, hereinafter "Ennis Report".)

FN7. *See* Pls. Mem. Supp. Mot. Partial Summ. J at 9 ("based upon a review of the Defendants' payroll records, the putative class consists of at least 90 present and former ambulette drivers"); *id* at 14 ("This action is based solely upon the Defendants' policy of requiring their present and former employees (ambulette drivers) to work overtime hours without proper compensation"). Named plaintiff Franklin Mascol, who is a ambulette driver, has declared that the only difference between himself "and other potential class members is the hours they worked and their salaries." (Decl. of Franklin Mascol ¶ 10.)

FN8. Defendants state that under a Collective Bargaining Agreement ("CBA") negotiated with the International Brotherhood of Teamsters Local 531, a newly hired ambulette driver was hired to work a salaried sixty hour week that broke down to $6.43 an hour for the first forty hours of work and then overtime pay at $9.64 an hour for the next twenty hours of work. (Defs.' Aff. Opp'n ¶ 34.) Plaintiffs dispute that any overtime was included in the weekly salary of the drivers. (Pls. Mem. Further Supp. at 23.) Defendants maintain that helpers were members of Local 531 but were not assigned 60 hour work weeks and were paid over time for all

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4

Slip Copy, 2005 WL 1541045 (E.D.N.Y.)

**(Cite as: 2005 WL 1541045 (E.D.N.Y.))**

work over 40 hours. (Defs.' Aff. Opp'n ¶ ¶ 47-48.)

*3 The Ennis Report is sixty-four pages long, gives no job description to accompany the listed names, and includes much redundancy. Eliminating eight helpers and one mechanic from the list, fifty-four ambulette drivers are listed in the report. (*See* Ennis Report at 1-64.) This number includes the six named plaintiffs and all the ambulette drivers who opted in with respect to the FLSA claim. [FN9]

> FN9. Plaintiffs and Defendants differ in their totals of the number of FLSA opt-in notices filed with the Court. The correct number of FLSA ambulette driver plaintiffs who opted in is twenty-seven, inclusive of the named plaintiffs. A survey of the attachments to the ECF Docket reveals thirty FLSA opt-in notices. (*See attachments to* ECF Docket at # 38, 40-44.) Two of the notices currently attached to ECF Docket # 42 are mistakenly duplicative of two of the attached entries to ECF Docket # 40. Notice from Jeffrey Ferguson and Clifford Jean Pierre should be attached instead. (*See* Letter from Kandel to Judge Sifton of 10/26/2004 at 2). Defendants allege that two of these opt-in plaintiffs were helpers and one a dispatcher. (Defs.' Aff. Opp'n ¶ ¶ 231-32.) Subtracting these three non-ambulette drivers, the Court arrives at the figure of twenty-seven opt-in FLSA ambulette drivers.

*Discussion*
This Court has jurisdiction over the pendent NYS Labor Law claim under 28 U.S.C. § 1367(a).

*Class Certification*
District Courts have considerable discretion with respect to class certification. *See Califano v. Yamasaki,* 442 U.S. 682, 703, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979); *Woe by Woe v. Cuomo,* 729 F.2d 96, 107 (2d Cir.1984) ( "It is often proper ... for a district court to view a class action liberally in the early stages of litigation"). The Court of

Appeals will only overturn a class certification for abuse of discretion and gives FRCP 23 a liberal construction. *Marisol v. Giuliani,* 126 F.3d 372, 375, 377 (2d Cir.1997). When considering a motion for class certification, a court should accept the allegations of the complaint as true, avoid an inquiry into the merits, and may consider material beyond the pleadings. *Monaco v. Stone,* 187 F.R.D. 50, 59 (E.D.N.Y.1999); *Ansoumana v. Gristede's Operating Corp.,* 201 F.R.D. 81, 85 (S.D.N.Y.2001) (granting class certification on pendent NYS Labor Law claim for low wage workers allegedly not paid overtime).

Plaintiffs bear the burden of proof on a motion for class certification under FRCP 23. *Monaco,* 187 F.R.D. at 59. First, Plaintiffs must demonstrate that under FRCP 23(a) the putative class has: (1) sufficient numerosity to make individual joinder impracticable; (2) commonality of questions of law or fact; (3) typicality of claims and; (4) representatives who fairly and adequately protect the interests of the class. (FRCP 23(a).) Second, because Plaintiffs move for class certification under FRCP 23(b)(3), they must show that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

*Numerosity*
Plaintiffs satisfy the numerosity requirement of FRCP 23(a)(1). The numerosity of a class is a gauge of the impracticability of individual joinder of all the potential class members but is not necessarily dispositive of the impracticability of joinder. *See* 7A Charles Alan Wright et al., *Federal Practice and Procedure* § 1762 (1986) (collecting cases with a wide range of class certifications and denials based on varying numerosity). In the Second Circuit a class of forty presumptively meets the numerosity requirement. *Consol. Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995) . Only some evidence is required to demonstrate the numerosity of a putative class, and this evidence need not be exact in number but merely needs to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                            Page 5

Slip Copy, 2005 WL 1541045 (E.D.N.Y.)

**(Cite as: 2005 WL 1541045 (E.D.N.Y.))**

consist of a reasonable class estimate. *Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993).

**\*4** In the present case, the Ennis Report submitted by Plaintiffs reveals that there are approximately fifty-four ambulette drivers who are potential class members. The defendants confuse the issue in asserting that because there are only twenty-seven members of the FLSA collective action, the putative class for the NYS Labor Law claim is not so numerous as to render individual joinder impracticable. (*E.g.,* Defs.' Reply Mem. Supp. Defs.' Cross Mot. Dismiss and in Further Opp'n to Pls.' Mot. Partial Summ. J. and Class Certification, hereinafter "Defs.' Reply Mem. Further Opp'n", at 7-9.) The issue is not how many collective action members there are under the FLSA claim, but what is a reasonable estimate of the putative class size for the NYS Labor Law claim. While defendants challenge the accuracy of the damages analysis in the Ennis Report, about which the Court expresses no opinion here, they do not challenge the number of ambulette drivers listed in the report beyond pointing out that there are nine persons listed in the Ennis Report who are not ambulette drivers. The Court has subtracted these nine from its total of ambulette drivers listed in the Ennis Report. (*Id.*) The Court finds the resulting number of fifty-four potential NYS Labor Law claim class members to be a reasonable, albeit inexact, estimate of the size of the putative class. Because of this, the Defendants' alternative request for a delay in class certification to allow for further discovery as to the size of the putative class is denied. (*See, e.g., id.* at 1.)

The presumption based solely on a head count, however, needs to be considered in light of the totality of the circumstances of the particular case, because impracticability of joinder is not just a matter of numbers. *Robidoux* 987 F.2d at 936 (citing *Demarco v. Edens,* 390 F.2d 836, 845 (2d. Cir.1968)). Relevant factors include: judicial economy; the geographical dispersion of class members; the financial resources of class members and their ability to bring suit individually; and "requests for prospective injunctive relief which would involve future class members." *Id.*

Judicial economy favors class certification in this case. There is no reason to think that the number of opt outs is likely to be substantial. Hence, the preclusive effect of a class action will avoid future duplicative litigation and preserve judicial resources both on the federal and state level.

Although the putative class members are not geographically dispersed, this factor is counter-balanced by practical considerations concerning the ability and willingness of putative class members to file suit individually. The amounts in controversy are not large when taken singly, and it may be not worthwhile for an individual plaintiff to pursue litigation over any allegedly unpaid overtime pay since filing and attorney fees could easily exceed any recovery. A class action consolidates all the plaintiffs' claims and thereby lowers the overall cost of litigation for the putative class members through the efficiency resulting from shared counsel.

**\*5** Finally, because prospective injunctive relief will not compensate the putative class for lost compensation, the Court is satisfied that the potential numerosity of the putative class is sufficient to make individual joinder of all the members impracticable.

*Commonality*

Plaintiffs satisfy the commonality requirement of FRCP 23(a)(2). A single common question of law or fact may satisfy this rule. *Monaco,* 187 F.R.D. at 61; *Ansoumana,* 201 F.R.D. at 86. The common question of fact here is whether the plaintiff class members were denied overtime pay. A common question of law is whether NYS Labor Law was violated by this alleged failure to pay overtime. *See Noble v. 93 Univ. Place Corp.,* 224 F.R.D. 330, 343 (S.D.N.Y.2004) ("The legal theory set forth in Noble's Complaint is common to all class members-- that this alleged failure to pay overtime violates New York's labor law. Accordingly, the commonality requirement is satisfied.").

Defendants argue that an individualized inquiry into each plaintiff's overtime claim is necessary, and that, "[a] conclusion as to one member of the class

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                 Page 6

Slip Copy, 2005 WL 1541045 (E.D.N.Y.)

**(Cite as: 2005 WL 1541045 (E.D.N.Y.))**

will not be determinative or even relevant to that of any other member" and therefore there is no commonality. (Defs.' Mem Opp'n Pls.' Mot. Partial Summ. J., hereinafter "Defs.' Mem. Opp'n", at 10.) This is incorrect. Plaintiff class members wages are governed by a common contract clause, [FN10] and resolution of the issue of whether the wage calculation under this clause included overtime will necessarily determine the relevant wage calculation for all class members. (*See* Defs.' Ex. C, at 9.) Therefore, the commonality requirement of FRCP 23(a)(2) is satisfied.

> FN10. There is an issue whether the original defendants' successor in interest was bound by the terms of the collective bargaining agreement. (*See* Defs.' Mem. Opp'n at 19-20.) Should the original defendants' successor in interest not be bound by the collective bargaining agreement, those ambulette drivers not working under the agreement may be split off as a subclass. *See* Fed.R.Civ.P. 23(c)(4) ("a class may be divided into subclasses").

*Typicality*

Plaintiffs satisfy the typicality requirement of FRCP 23(a)(3), which requires the claims of the class representatives to be typical of the class. Typicality is satisfied if similar legal arguments are used to prove each class members' claim, and if each class members' claim arises from the same course of events. *Robidoux,* 987 F.2d at 936; *Monaco,* 187 F.R.D. at 62; *Ansoumana,* 201 F.R.D. at 86. Here, the class representatives are alleging that they were not paid overtime in violation of NYS Labor law. The same legal and factual claims are being made for each individual class member. Therefore, the typicality requirement is satisfied. [FN11]

> FN11. Defendants argue that typicality is not met because helpers and mechanics performed different tasks than ambulette drivers. (Defs.' Mem. Opp'n at 12.) Because the putative class will only include ambulette drivers, this argument is irrelevant.

*Adequacy of Representation*

The plaintiffs satisfy the requirements of FRCP 23(a)(4), which requires that "the representative parties will fairly and adequately protect the interests of the class. The adequacy inquiry has two parts: (1) Class counsel must be " 'qualified, experienced and generally able to conduct the litigation' ", *Marisol,* 126 F.3d at 378 (quoting *In re Drexel Burnham Lambert,* 960 F.2d 285, 291 (2d Cir.1992)); and (2) "Plaintiffs must also demonstrate that there is no conflict of interest between the named plaintiffs and other members of the plaintiff class." *Id.*

*6 Defendants challenge the qualifications of plaintiffs' counsel by citing the allegedly poor quality of plaintiffs' counsels' work and their alleged lack of experience. (*See, e.g., Defs. Reply Mem. Further Opp'n at 11-13.) Although the Ennis Report, upon which Defendants mainly rely to bolster their claim that Plaintiffs' counsel is not qualified, leaves something to be desired in terms of clarity, the Ennis Report does not demonstrate the inadequacy of plaintiffs' counsel. The Ennis Report is not the only submission from the plaintiffs, and the Court is satisfied that plaintiffs' counsel is qualified on the basis of the competency demonstrated in the Plaintiffs' pleadings and other submissions to this Court. *See In re Frontier Ins. Group, Inc. Securities Litigation,* 172 F.R.D. 31, 44 (E.D.N.Y.1997) (Nickerson, J.) (stating that a court looks beyond reputation and to present competence in determining qualifications of counsel). Nor does this Court find there to be any serious question as to Plaintiffs' Counsel experience to try this case. Plaintiffs' counsel Mr. Barry I. Levy has satisfactorily demonstrated to this court that he and co-counsel Mr. Kandel have the requisite experience to try this case. (*See* Decl. of Barry I. Levy ¶ 3 (discussing experience of Mr. Levy and Mr. Kandel); Pls.' Mem. Further Supp. at 8 n. 5 (noting that Mr. Levy has argued more than fifty cases in the Second Circuit).)

Defendants also argue that plaintiffs have not shown "that they have the financial resources to represent a class." (Defs.' Mem. Opp'n at 16-17.) As a general rule however, the financial resources of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 7

Slip Copy, 2005 WL 1541045 (E.D.N.Y.)

**(Cite as: 2005 WL 1541045 (E.D.N.Y.))**

putative class representative should not preclude the representative from litigating for the putative class. *See, e.g., Rode v. Emery Air Freight Corp.,* 76 F.R.D. 229, 230 (W.D.Pa.1977) ("One of the major advantages of the class action suit was intended to be the increased accessibility to the judicial system for individuals of all income levels."). Courts have, however, found a class representatives financial resources to be a relevant factor in determining the adequacy of class representation when the ability of the class representative to finance notice to large, nationwide classes is questionable, as was the case in all of the cases defendants cite to support their argument. *Id.* (seeking class certification for a nationwide class of female employees allegedly discriminated against by defendant); *Apanewicz v. General Motors Corp.,* 80 F.R.D. 672, 675 (E.D.Pa.1978) (seeking class certification for a class of "all independent body shops in the United States ... who engage in the repair of automobile and truck bodies and parts thereof who purchase crash parts"); *Ralston v. Volkswagenwerk, A. G.,* 61 F.R.D. 427, 429 (W.D.Mo.1973) (seeking class certification for all Volkswagen purchasers nationwide who purchased from authorized Volkswagen dealers); *P.D.Q., Inc. v. Nissan Motor Corp.,* 61 F.R.D. 372, 374 (S.D.Fla.1973) (seeking class certification for nationwide class of Datsun purchasers purportedly numbering over 630,000). The class at issue here numbers approximately fifty-four persons who work in the New York metropolitan area. Therefore, the cases defendants cite are not on point. Furthermore, Plaintiffs' counsel are offering their services in the hopes of recovering costs and attorneys' fees from the defendants. (*See* Pls.' Mem. Further Supp. at 7-8.) [FN12] Accordingly, the Court is satisfied that the financial resources of the plaintiffs will not affect the adequacy of representation.

> FN12. In New York State, although an attorney may execute a contingency contract with a client, a client is ultimately liable for the expenses (as opposed to fees) incurred in litigation. N.Y. Comp.Codes R. & Regs. 22 § 1200.22 (2005).

*Rule 23(b)(3)*

**\*7** In order to satisfy the requirements of FRCP 23(b)(3) plaintiffs must demonstrate that common questions of law or fact predominate over questions affecting only individual members, and that a class action "is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The subsection lists four non-exclusive factors to be considered:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
>
> *Id.*

*Predominance*

The Court finds that common questions of law and fact predominate over individualized questions. In order to meet the predominance requirement the plaintiff must establish that issues of general proof predominate over issues of individualized proof. *In Re Visa Check/MasterMoney Antitrust Litigation,* 280 F.3d 124, 136 (2d Cir.2001). The predominant common questions in this class action are whether defendants failed to pay their ambulette drivers overtime wages and whether this alleged failure violated NYS Labor Law. *See generally, Noble,* 224 F.R.D. at 345 (finding FRCP 23(b)(3) predominance of common questions for pendent NYS Labor law claim because "the gravamen of the claim is that defendants engaged in a course of conduct that deprived employees of their right to overtime pay."); *Ansoumana,* 201 F.R.D. at 89 ("[A] single issue predominates ... because each proposed Plaintiff class member did substantially the same type of work, for the same type of employer, and was assigned in the same sort of way, during the relevant time period."). The general proof required is that which demonstrates the proper method of wage calculation for all ambulette drivers; indeed, the individualized inquiry as to what, if any, overtime wages are owed is only

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                           Page 8

Slip Copy, 2005 WL 1541045 (E.D.N.Y.)

**(Cite as: 2005 WL 1541045 (E.D.N.Y.))**

possible once the proper general wage calculation for all ambulette drivers is determined. [FN13] Therefore, the Court finds that a common question of fact, and a common question of law, predominate over any individualized questions.

> FN13. Because defendants argue that the successors in interest to the original collective bargaining agreement are not bound by that agreement, it is possible that there will be two wage calculations for each subclass of ambulette drivers; those that are governed by the collective bargaining agreement, and those that are not. (*See* Defs.' Mem. Opp'n at 19-20.) The Court makes no determination at this time as to whether the collective bargaining agreement applies to the successors in interest of the original defendants.

*Superiority*
The Court further finds that the class action form is superior to alternative methods of adjudicating this controversy. The class members in this case have no strong interest in individually controlling the litigation because it is unlikely a class member would bring individual litigation because the cost of an individual lawsuit likely would exceed any overtime wage recovery. *See Noble,* 224 F.R.D. at 346 (holding a FRCP 23(b)(3) class action superior to alternative methods of adjudication because of the negative value claims of the class members). Defendants maintain that individual joinder or "referring the plaintiffs to the grievance machinery in the collective bargaining agreement between the Union and the defendant E & L" are superior methods of adjudication to a class action in this instance. (*See* Defs. Mem. Opp'n at 18.) The class action in question, however, is a state claim pendent on a nearly identical Federal claim, and thus judicial and party economy are served by trying both these claims in one forum. Duplicative presentations of proof and rebuttal in different forums under different rules will not be required. Finally, the action in question is a straightforward one presenting no difficult case management issues greater than those posed by the collective FLSA action. *See Ansoumana,* 201 F.R.D. at 89 ("the

difficulties likely to be encountered in the management of the [pendent NYS Labor Law] class portion of this action are not likely to be different or greater than in the management of the [FLSA] portion of this action.") Therefore, the class action form is the superior method of adjudication for the common questions of law and fact at issue here.

*Appointment of Class Counsel*
**\*8** Pursuant to FRCP 23(g), the Court appoints as Plaintiffs' class counsel Barry I. Levy and Elan R. Kandel. The Court is satisfied that they meet the requirements of FRCP 23(g)(1)(C). *See* Adequacy of Representation discussion *supra* pp. 12-15.

*Liquidated Damages*
Defendants argue that class certification should be denied because Plaintiffs have not waived their liquidated damages claims for their NYS Labor Law claim, and NYS Labor Law does not permit class actions claiming liquidated damages unless expressly provided for by the statute giving rise to the cause of action. *See* N.Y. C.P.L.R. § 901(b) (2004); (Defs.' Reply Mem. Further Opp'n at 13-14.) The NYS Labor Law in question here does not do so. *See* N.Y. Lab. Law § 663.

New York law does, however, allow for the waiver of liquidated damages claims for class action claims for overtime wages as long as putative class members are given the opportunity to opt out of the class in order to pursue their own liquidated damages claims. *See Ansoumana,* 201 F.R.D. at 95 (citing *Pensantez v. Boyle Envtl. Servs., Inc.,* 251 A.D.2d 11, 673 N.Y.S.2d 659, 660 (1st Dep.1998)). Thus, the Court grants the class certification for the class of ambulette drivers allegedly not paid overtime wages, who worked and/or are working for defendants, from six years prior to the filing of the NYS Law Claim to the present, on the condition that Plaintiffs, in their notices sent to putative class members under FRCP 23(c)(2)(B), include a clear and concise statement that failure to opt out of the class constitutes a waiver of any claims for liquidated damages under NYS Labor Law § 663. Plaintiffs are directed to provide a clear and concise description explaining the nature of liquidated damages and the consequences of a waiver in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                              Page 9

Slip Copy, 2005 WL 1541045 (E.D.N.Y.)

**(Cite as: 2005 WL 1541045 (E.D.N.Y.))**

notice as well.

*Tyrone Ladson's Untimely FLSA Opt In Notice*
The Court grants Plaintiffs' request to allow Tyrone Ladson to opt-in to the FLSA action despite his untimely opt-in notice. This Court has broad powers to add or drop parties at any stage of litigation. Fed.R.Civ.P. 21 ("Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just."); *see Soler v. G & U Inc.,* 86 F.R.D. 524, 527-28 (S.D.N.Y.1980) (allowing additional workers to join a FLSA claim after original plaintiffs filed an amended complaint). Therefore, Tyrone Ladson is joined to the FLSA action despite his untimely notice. [FN14]

> FN14. Defendants claim that the FLSA opt-in notices of Jeffrey Ferguson and Clifford Jean Pierre, along with "seven or eight other notices, were not served on defendants and were not recorded in the docket sheet as received by the Court." (Letter from Hopkins to Court of 10/28/04.) There appears to have been a filing error on the ECF docket in relation to Mr. Ferguson's and Mr. Pierre's opt-in notices. Docket entry number 42 states that Mr. Ferguson's and Mr. Pierre's opt-in notices are attached, but they are not. Plaintiffs' counsel has pointed out this error to the Court and provided copies of Mr. Ferguson's and Mr. Pierre's opt in notices, and the Court finds that they are timely. (*See Letter from Kandel to Court* of 10/22/04 at 2.) Even if they were not, this Court could join them as parties under FRCP 21. Finally, as to the "seven or eight other notices," the Court has not included in its count of FLSA opt-in plaintiffs any records outside those recorded in the docket.

*Conclusion*
For the reasons discussed above, Plaintiffs motion for class certification is granted, contingent on the waiver of any liquidated damages claims under NYS Labor Law, as is Plaintiffs' motion to add

Tyrone Ladson as an additional FLSA plaintiff despite his untimely opt-in notice.

The Clerk is directed to furnish a filed copy of the within to all parties and to the magistrate judge.

SO ORDERED.

Slip Copy, 2005 WL 1541045 (E.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 2004 WL 2647870 (Trial Pleading) Answer to Plaintiffs' First Amended Class Action Complaint (May. 10, 2004)

• 2003 WL 23884176 (Trial Motion, Memorandum and Affidavit) (Dec. 24, 2003)

• 2003 WL 23884165 (Trial Pleading) Class Action Complaint (Jul. 09, 2003)

• 1:03cv03343  (Docket)
                                    (Jul. 09, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit I**

Westlaw.

Not Reported in F.Supp.2d                                                                                                   Page 1

Not Reported in F.Supp.2d, 2001 WL 1002448 (D.Del.), 144 Lab.Cas. P 34,364

**(Cite as: 2001 WL 1002448 (D.Del.))**

▷

United States District Court, D. Delaware.
Leona TROTTER, Joan Smith, Honorio Perez,
Joanne Autry, Marilyn Gilliam,
Samantha Michelle Jones, and Diana Webster, on
behalf of themselves and all
others similarly situated, Plaintiffs,
v.
PERDUE FARMS, INC. and Retirement and
Benefits Committee of the Perdue
Supplemental Retirement Plan, Defendants.
**No. CIV.A.99-893-RRM.**

Aug. 16, 2001.

ORDER GRANTING CLASS CERTIFICATION

MCKELVIE, District J.

*1 This is an employment case. Plaintiffs Leona
Trotter, Joan Smith, Honorio Perez, Joanne Autry,
Marilyn Gilliam, Samantha Michelle Jones, Diana
Webster, and Billie Jo Smiling are current or former
employees of Perdue Farms, Inc. Perdue Farms, Inc.
is a Maryland corporation that operates sixteen
chicken processing plants in eight states including
Delaware, Kentucky, Maryland, North Carolina,
and South Carolina. Plaintiffs seek class
certification for claims based on the Employee
Retirement Income and Security Act, 29 U.S.C. §§
1001, et seq., the Fair Labor Standards Act, 29
U.S.C. § 201, et seq ., and the wage and hour laws
of Delaware, Kentucky, Maryland, North Carolina,
and South Carolina. According to plaintiffs, Perdue
employs approximately 16,000 employees at its
chicken processing facilities.

Plaintiffs contend that they, and all others similarly
situated, are entitled to compensation for time spent
obtaining, putting on, removing, and sanitizing
required safety equipment. According to plaintiffs,
under federal Occupational Safety and Health
Administration ("OSHA") regulations and United

States Department of Agriculture ("USDA")
regulations, chicken processing employees are
required to wear and use protective equipment when
performing their job. Further, plaintiffs state that
failure to follow Perdue's safety manual and
sanitation policies, which require that chicken
processing employees wear OSHA and USDA
mandated safety and sanitary equipment, could lead
to discipline and termination.

Despite these requirements, plaintiffs contend that
Perdue does not compensate its production
employees for the time it takes them to obtain, don,
doff, and sanitize equipment. On December 12,
1999, plaintiffs filed suit in this court seeking
damages under the FLSA and state wage and hour
laws for the uncompensated time and under ERISA
for failure to contribute to the Supplemental
Retirement Plan.

On October 31, 2000, plaintiffs filed a motion for
class certification under Federal Rule of Civil
Procedure 23 and for collective action designation
under the FLSA, 29 U.S.C. § 216(b). According to
plaintiffs, the class meets the standard for
certification under Rule 23 because a) the class, and
appropriate subclasses are too numerous for
joinder; b) there are common question of law and
fact among the class members; c) the class
representatives are typical of the claims of the class
and the subclasses; and d) the class representative
will fairly and adequately represent the class.

On January 16, 2001, defendants filed an
answering brief. Defendants first argued that
plaintiffs cannot meet the standard for class
certification because there is no commonality or
typicality of the claims because throughout Perdue's
chicken-processing plants, each department uses a
different methodology for recording time and for
obtaining, donning, doffing, and sanitizing supplies.
Moreover, Perdue argues that the kind and type of
equipment varies among the departments depending

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 2

Not Reported in F.Supp.2d, 2001 WL 1002448 (D.Del.), 144 Lab.Cas. P 34,364

**(Cite as: 2001 WL 1002448 (D.Del.))**

on the function of the line worker. Lastly, defendants contend that differences in the physical layout of the plants means that some workers take more time to obtain and sanitize equipment than others. Defendants further argue that plaintiffs have not meet the standard for class certification because the plaintiffs are not adequate representatives.

**\*2** The Third Circuit has indicated that class actions should be looked upon favorably. *See Eisenberg v. Gagnon,* 766 F.2d 770, 785 (3d Cir.), *cert. denied, Weinstein v. Eisenberg,* 474 U.S. 946 (1985). The Supreme Court has also expressed its approval of class action proceedings, noting that "[c]lass actions serve an important function in our system of civil justice." *Gulf Oil Co. v. Bernard,* 452 U.S. 89, 99 (1981). In *Eisenberg,* 766 F.2d at 785, the Third Circuit went so far as to declare that " 'in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing a class action.' " (citations omitted).

Accordingly, the standard for determining whether the class action prerequisites are met is rather lenient. In addition, in considering whether to certify a class, the court may not consider "whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits." *Eisen v. Carlisle & Jacqueline,* 417 U.S. 156, 178 (1974). That is, a motion for class certification the court is not to test the sufficiency of the merits of the case, but should look to whether the plaintiffs meet the standard under Rule 23.

In light of these standards, the court finds in this case defendants concerns about the difference between different chicken processing plants do not undermine the plaintiffs' rationale for bringing this case as a class action. There are often small variables between plaintiffs' claims in a class action. These differences should not necessarily derail a class action. In this case, if plaintiffs can succeed on the merits, they will have to justify a damage figure for each member of the class. That work will take into account the average time lost by each class member that is required to obtain, don, doff, and sanitize equipment.

Therefore, having considered the arguments for and against class certification, the court finds that the plaintiffs' claims meet the requirements of Rule 23. That is, the proposed class, and subclasses, are so numerous that joinder is impracticable. Moreover, despite potential differences in the equipment used and the time it takes for individuals to don, doff, and sanitize that equipment does not undermine the common questions of law and fact for each the proposed class. Lastly, plaintiffs have appropriately addressed potential differences in the state wage and hour laws by proposing subdivisions for the potential class.

For the reasons set forth above, it is HEREBY ORDERED:

1. Plaintiff's motion for class certification and collective action designation (D.I.79) is granted;

2. The class is defined as:

All persons who at any time from December 16, 1993, to the present have worked or continue to work as non-exempt hourly production employees of Perdue Farms, Inc. in any one or more of the chicken processing facilities operated by Perdue, and who were or are participating in the Perdue Supplemental Retirement Plan.

**\*3** 3. The court also certifies the following opt-out subclasses:

*The "Delaware Subclass"*

All persons who at any time from the period from December 16, 1998, to the present have worked or continue to work as non-exempt hourly production employees of Perdue Farms, Inc. in any one or more of the chicken processing facilities operated by Perdue in the State of Delaware.

*The "Kentucky Subclass"*

All persons who at any time from the period from December 16, 1994, to the present have worked or continue to work as non-exempt hourly production employees of Perdue Farms, Inc. in any one or more

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2001 WL 1002448 (D.Del.), 144 Lab.Cas. P 34,364

**(Cite as: 2001 WL 1002448 (D.Del.))**

of the chicken processing facilities operated by Perdue in the State of Kentucky.

*The "Maryland Subclass"*

All persons who at any time from the period from December 16, 1996, to the present have worked or continue to work as non-exempt hourly production employees of Perdue Farms, Inc. in any one or more of the chicken processing facilities operated by Perdue in the State of Maryland.

*The "North Carolina Subclass"*

All persons who at any time from the period from December 16, 1997, to the present have worked or continue to work as non-exempt hourly production employees of Perdue Farms, Inc. in any one or more of the chicken processing facilities operated by Perdue in the State of North Carolina.

*The "South Carolina Subclass"*

All persons who at any time from the period from February 14, 1997, to the present have worked or continue to work as non-exempt hourly production employees of Perdue Farms, Inc. in any one or more of the chicken processing facilities operated by Perdue in the State of South Carolina.

*The "FLSA Subclass"*

All persons who at any time from the period from December 16, 1996, to the present have worked or continue to work as non-exempt hourly production employees of Perdue Farms, Inc. in any one or more of the chicken processing facilities operated by Perdue.

Not Reported in F.Supp.2d, 2001 WL 1002448 (D.Del.), 144 Lab.Cas. P 34,364

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit J**

Westlaw.

Not Reported in F.Supp.2d                                        Page 1

Not Reported in F.Supp.2d, 2004 WL 609798 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1628

**(Cite as: 2004 WL 609798 (N.D.Ill.))**

H

**Motions, Pleadings and Filings**

United States District Court,
N.D. Illinois, Eastern Division.
O'BRIEN, et al., Plaintiffs,
v.
ENCOTECH CONSTRUCTION, et al., Defendants.
**No. 00-CV-1133.**

March 23, 2004.

Jac A. Cotiguala, Luanne M. Galovich, Jac A. Cotiguala & Associates, Chicago, IL, for Plaintiffs.

Edward W. Bergmann, Noah A. Finkel, Seyfarth Shaw, Chicago, IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

GOTTSCHALL, J.

**\*1** This case involves allegations that defendant Encotech Construction Services, Inc., failed to pay hourly employees any wages for alleged work time (preparation, travel, and cleanup) before and after the period of the workday that Encotech considered to be compensable time. Also named as a defendant is Howard Frank ("Frank"), the corporate officer who manages Encotech's day-to-day operations and the husband of Encotech's sole shareholder. The failure to pay wages is claimed to be a violation of the employees' contract, federal wage law, and Illinois statutory law.

The Second Amended Complaint contains four counts. Count I is a claim under the Illinois Minimum Wage Law ("IMWL") asserting that the failure to pay any wages for particular work time violated minimum wage requirements of 820 ILCS 105/4 and overtime requirements of 820 ILCS 105/4a. Count II is a claim for unpaid wages under

the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1, *et seq.* Counts III and IV are Fair Labor Standards Act ("FLSA") claims for failure to pay minimum wage and overtime in violation of 29 U.S.C. §§ 206-07. Count IV alleges that the FLSA violations were willful.

As to the Counts III and IV FLSA claims, there is an "opt-in" class consisting of seven named plaintiffs. *See* 29 U.S.C. § 216(b); *King v. General Electric Co.,* 960 F.2d 617, 621 (7th Cir.1992); *Flores v. Lifeway Foods, Inc.,* 289 F.Supp.2d 1042, 1043-45 (N.D.Ill.2003). As to the Count I and II state law claims, a Fed.R.Civ.P. 23(b)(3) class has been certified that has approximately 45 members. *See O'Brien v. Encotech Construction Services, Inc.,* 203 F.R.D. 346, 350-53 (N.D.Ill.2001) (*"O'Brien I"*). The class is defined as:

All hourly paid persons who received a check from Encotech Construction Services, Inc. for hours worked in any work week during the time period February 1, 1997 through the present.
*Id.* at 352. [FN1]

FN1. As of the initial ruling on class certification, certain employees who had signed releases were to be excluded from the Rule 23(b)(3) class. *See O'Brien I,* 203 F.R.D. at 349-50, 353 & n .1. On reconsideration, however, it was held that the releases were not enforceable as to the state law claims so that these employees were not excluded from the class. *See O'Brien v. Encotech Construction Services, Inc.,* 183 F.Supp.2d 1047 (N.D.Ill.2002). It was previously held that the releases were not enforceable as to the FLSA claims. *See O'Brien I,* 203 F.R.D. at 349.

Presently pending are the parties' cross motions for partial summary judgment. Plaintiffs contend that, as to all counts, they are entitled to summary

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 2

Not Reported in F.Supp.2d, 2004 WL 609798 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1628

**(Cite as: 2004 WL 609798 (N.D.Ill.))**

judgment as to liability for the time period from January 28, 1997 through January 31, 2000. Defendants contend they are entitled to summary judgment (a) dismissing all claims for minimum wage; (b) dismissing any claim for work after Encotech changed its compensation policy in May 2000; (c) dismissing state law claims as preempted; (d) dismissing the Count IV willful FLSA violation claim (which would limit the statute of limitations to a two-year period); and, alternatively, (e) dismissing the prayer for punitive damages as to the IMWL claim. The parties do not attempt to resolve questions regarding the particular uncompensated time worked by particular employees. The arguments instead focus on which categories of alleged work time are compensable under the federal and state statutes that plaintiffs invoke.

*I. Summary Judgment Facts*

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn and all factual disputes resolved in favor of the nonmovant. *Turner v. J.V.D.B. & Associates, Inc.,* 330 F.3d 991, 994-95 (7th Cir.2003); *Palmer v. Marion County,* 327 F.3d 588, 592 (7th Cir.2003); *Abrams v. Walker,* 307 F.3d 650, 653-54 (7th Cir.2002). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Outlaw v. Newkirk,* 259 F.3d 833, 837 (7th Cir.2001); *Wollin v. Gondert,* 192 F.3d 616, 621-22 (7th Cir.1999). The nonmovant, however, must make a showing sufficient to establish any essential element for which the nonmovant will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Binz v. Brandt Construction Co.,* 301 F.3d 529, 532 (7th Cir.2002); *Traylor v. Brown,* 295 F.3d 783, 790 (7th Cir.2002). The movant need not provide affidavits or deposition testimony showing the nonexistence of such essential elements. *Celotex,* 477 U.S. at 324. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *See NLFC, Inc. v. Devcom Mid-America, Inc.,* 45 F.3d 231, 236 (7th Cir.), *cert. denied,* 515 U.S. 1104, 115 S.Ct. 2249, 132 L.Ed.2d 257 (1995); *Covalt v. Carey Canada, Inc.,* 950 F.2d 481, 485 (7th Cir.1991); *Collins v. Associated Pathologists, Ltd.,*

844 F.2d 473, 476-77 (7th Cir.), *cert. denied,* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988).

**\*2** Except where noted, the following facts are undisputed and therefore taken as true for both parties' summary judgment motions. Plaintiffs are current or former employees of Encotech who are paid on an hourly basis. Encotech is in the business of cutting concrete. Defendant Frank is the chief executive officer and secretary-treasurer of Encotech. Frank's wife, Diane Frank, is the president and sole shareholder of Encotech. Diane Frank attends annual meetings but is not involved in the day-to-day operations of Encotech. Defendant Frank is solely responsible for establishing and implementing Encotech's pay practices.

Prior to May 2000, Encotech's practice was not to pay employees for time at the beginning of a workday driving from Encotech's yard to a job site nor for time at the end of the workday driving from a job site back to Encotech's yard. There was an exception for travel time of more than one hour; for employees who operated bobcats or a truck that dumps concrete; [FN2] and for laborers [FN3] who unloaded debris at the end of the day. As to the more than one hour exception, employees were paid only for time in excess of one hour, and the time was measured by the expected travel time, not the actual travel time that may have resulted from traffic conditions. These compensation rules applied even if the employee performed some or all of the following tasks at the yard prior to traveling to a job site: picking up work orders; filling water tanks on a work truck; hooking up trailers needed for work; safety and operational checks on the work vehicles; and minor repairs on work vehicles. [FN4] These rules also applied even if the employee performed some or all of the following tasks at the yard after returning to the yard from a job site: unhooking trailers; cleaning up equipment; completing paperwork; and turning paperwork in at the office. [FN5] It is undisputed that some or all of the named plaintiffs and class members at some time during the relevant time period performed such tasks and were not compensated for their preparation, travel, and cleanup time.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2004 WL 609798 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1628

**(Cite as: 2004 WL 609798 (N.D.Ill.))**

FN2. Plaintiffs contend that sometimes such employees were not compensated. The cited testimony, however, states only that the employee did not receive compensation for travel time when he was not doing the work of an operating engineer. *See* Pl. 56.1(a)(3) reply ¶ 5 (citing Giertz Dep. at 34-36).

FN3. The parties refer to employees who are laborers, helpers, operators, and drivers, but do not attempt to define these terms.

FN4. This type of activity will be referred to as "preparation."

FN5. This type of activity will be referred to as "cleanup."

In May 2000, after this lawsuit was filed, Encotech changed its policy to pay for travel time. [FN6] Encotech began paying the previously uncompensated travel time at $5.15 per hour, the minimum wage. It subsequently changed its policy to pay $10.00 per hour if the employee worked less than 40 hours that week and $15.00 per hour if the employee worked more than 40 hours that week. It is still Encotech's practice to pay these rates for travel time rather than the higher hourly rates provided for in the applicable collective bargaining agreements.

FN6. Neither party is clear as to whether this change also applies to preparation and cleanup time.

Employees had the option of filling water tanks at the yard or at the job site. However, if a job site did not have water, it was necessary to fill water tanks at the yard. Employees were sometimes required to pick up work orders and cutting bits at the yard before going to the travel site. Necessary supplies had to be loaded in the trucks before leaving for the job site. Not keeping equipment clean could be a ground for discipline. Employees were never instructed they could not do preparation work at the yard prior to leaving for the job site. Helpers generally traveled to job sites and back to the yard with operators, but were not required to do so. Operators were expected to unload debris at the yard. Laborers were paid half an hour to dump the debris. A factual dispute exists as to whether operators were paid if they assisted in dumping the debris. On Wednesdays, employees customarily returned to the yard at the end of the workday to get their paychecks and pick up supplies (*e.g.*, masks) that they used in their work.

**\*3** Factual disputes exist regarding how frequently employees performed preparation and cleanup work at the yard, as well as how often it was necessary to do such work at the yard instead of taking the opportunity to do so while on the job site and being compensated. It is undisputed that paperwork was supposed to be completed at the job site; it was not necessary to wait until returning to the yard to complete it. It is undisputed that employees typically arrived at the yard between 15 and 30 minutes before they had to be at the job site. Plaintiffs do not contest Frank's estimation that, on average, employees had an hour a day of uncompensated travel time.

Prior to the filing of this lawsuit in January 2000, most trucks were parked in the Encotech yard at night. Sometimes employees parked the trucks at home. Such employees were not paid to drive the trucks between their homes and job sites. Even if an employee drove a truck from his or her home to the yard to pick up other employees before going to the job site, the employee was not compensated for his or her travel time. The same was true if a driving employee dropped other employees off at the yard before taking the work vehicle to be parked at home. Employees who filled work truck water tanks at home before driving directly to the job site were not compensated for travel and preparation time.

Beginning September 11, 2001, employees parked the trucks in the yard and the trucks were unloaded by others.

During the pertinent time period, Encotech rules regarding compensation for preparation, travel, and cleanup time were not in writing. Records generally

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                   Page 4

Not Reported in F.Supp.2d, 2004 WL 609798 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1628

**(Cite as: 2004 WL 609798 (N.D.Ill.))**

were not kept as to the amount of uncompensated travel time and records were not kept as to when employees did preparation or cleanup.

During the time period in question, named and class plaintiffs were members of at least five different unions. Most plaintiffs were represented by the Construction and General Laborers' District Council of Chicago (the "Union"). [FN7] The "Joint Agreement" with the Union, which is a multi-employer collective bargaining agreement, was in effect from June 1, 1998 until May 31, 2001. From June 1998 through May 2000, hourly wages under the Joint Agreement were between $23.65 and $27.80 per hour, except that apprentices received $12.00 per hour. Employees often worked less than 40 hours per week, even if preparation, travel, and cleanup time had been included.

> FN7. Neither side attempts to distinguish named plaintiffs or class members who were members of the other unions. Therefore, the arguments relating to collective bargaining agreements with the Union will be assumed to apply to all plaintiffs. Also, it will be assumed that the collective bargaining agreement that preceded the June 1, 1998 Joint Agreement had the same terms as the Joint Agreement.

The Joint Agreement did not have an express provision regarding travel time. It defines "covered work" as including "all laboring work in connection with" various activity. The provision defining covered work also states: "in short, all unskilled labor connected with work undertaken by members of the Employer and the handling of all materials, or appliances in any trade where it will be more economical to have the work done by Laborers as may be decided by the Employer, subject to appeal to the decision of the Joint Grievance Committee." There is evidence that, during the time the Joint Agreement was in effect, some employers in the concrete cutting industry paid for preparation, travel, and cleanup time and some did not. There is a factual dispute as to what should be considered the custom in the industry.

*\*4* The collective bargaining agreement with the Union that has been in effect from June 1, 2001 through the present (the "Concrete Agreement") has a provision that "If a Laborer is directed to and does report to the yard prior to the normal starting time, he shall be paid the appropriate wages from the time he arrives at the yard prior to the shift until the time he returns to the yard at the end of the shift." There is no provision that travel, preparation, or cleanup time is paid at a lower rate. Defendants do not dispute that, since June 1, 2001, this provision requires that travel, preparation, and cleanup time covered by the Concrete Agreement be paid at appropriate rates provided for in that Agreement, which are more than $10.00 or $15.00 per hour.

The two Agreements have grievance procedures. There is no evidence that the Union has ever grieved Encotech's policies regarding paying or not paying for preparation, travel, and cleanup time.

Defendants concede that, prior to May 2000, some or all plaintiffs worked at least some preparation, travel, and cleanup time for which compensation had to satisfy the minimum wage and overtime requirements of the FLSA and the IMWL. There are certain categories of such time, however, that defendants contend would not be compensable time under those statutes. [FN8]

> FN8. The IMWL generally tracks provisions of the FLSA. *Haynes v. Tru-Green Corp.,* 154 Ill.App.3d 967, 107 Ill.Dec. 792, 507 N.E.2d 945, 951 (4th Dist.), *appeal denied,* 116 Ill.2d 573, 113 Ill.Dec. 314, 515 N.E.2d 123 (1987).

*II. Principal Activity*

The parties apparently agree that employees who drove a work vehicle directly between home and a job site are not entitled to compensation for that time. *See* 29 U.S.C. § 254(a); *Baker v. GTE North Inc.,* 110 F.3d 28, 29 (7th Cir.1997). They also agree that, where the employee necessarily stopped at the yard while traveling between home and a job site, the time between the yard and job site is time covered by the statutes. Plaintiffs contend that there are no time records which show the occasional days

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                          Page 5

Not Reported in F.Supp.2d, 2004 WL 609798 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1628

(Cite as: 2004 WL 609798 (N.D.Ill.))

that employees may have driven directly between home and a job site in a work vehicle. That factual issue, however, shall remain for trial by whatever method the parties employ in reconstructing uncompensated work time for each employee.

Defendants contend that time helpers spent traveling between the yard and job sites should generally be considered commuting time because they were not required to first report to the yard. As a general matter, this is an accurate statement of the law. *Baker,* 110 F.3d at 30-31. *Compare* 29 C.F.R. § 785.38. However, on any day that the helper performed preparation or cleanup that constituted a "principal activity," not just "preliminary" or "postliminary" activity, under 29 U.S.C. § 254(a), the helper's travel from a job site after preparation or from a job site before cleanup would be time covered by the statutes. *See* 29 C.F .R. §§ 785.38, 790.4(b)(2), 790.7(c). [FN9] Preparation or cleanup constitutes principal activity if it is an integral part of the employee's work. *Id.* §§ 785.24, 790.8(b). An employee may have more than one principal activity; principal activity is not limited to the employee's predominant activity. *Id.* § 790.8(a).

> FN9. The activity could also be time covered by the statutes if it is compensable under the terms of a contract or based on custom or practice. 29 U.S.C. § 254(b); 29 C.F.R. §§ 790.9-.10. Undisputed facts show neither of these exceptions apply to the present situation. The contractual exception applies only if the contract provision is express. 29 U.S.C. § 254(b)(1) ; 29 C.F.R. § 790.9(c). There was no express provision in the Joint Agreement requiring compensation. The express provision in the Concrete Agreement applies only to situations where the employer instructs the employee to first report to the yard. Presently under discussion is the situation where a helper chose to come to the yard to get a ride, but was not required to do so. The custom or practice exception does not apply because it must be a custom or practice at the particular establishment or job site. 29

U.S.C. § 254(b)(2); 29 C.F.R. § 790.10(a). Here, it is uncontested that, at least prior to May 2000, Encotech's practice was to not pay helpers for the travel time. A factual dispute exists as to industry practices. The custom or practice exception of § 254(b)(2) , however, is not satisfied by an industry custom or practice. 29 C.F.R. § 790.10(c).

*5 ... "[a]n activity is integral to a principal activity if the activity is made necessary by the nature of the work performed, it fulfills mutual obligations between the employer and his employees, the activity directly benefits the employer in the operation of his business, and the activity is closely related to other duties performed by the employees." *Hiner v. Penn-Harris-Madison Sch. Corp.,* 256 F.Supp.2d 854, 859 (N.D.Ind.2003)(citing *Steiner v. Mitchell],* 350 U.S. [247,] 252, 76 S.Ct. 330, 100 L.Ed. 267 [ (1956) ] ). Thus, in order for a particular activity to be "integral and indispensable," it must be necessary to the principal activity performed and done for the benefit of the employer. *Barrentine v. Arkansas-Best Freight Sys., Inc.,* 750 F.2d 47, 50 (8th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 480 (1985). *Gonzalez v. Farmington Foods, Inc.,* 296 F.Supp.2d 912, 924-25 (N.D.Ill.2003).

Here, the predominant activity of Encotech's employees was cutting concrete. Having tools, supplies, and equipment available and properly functioning, having water necessary for performing the cutting process, unloading debris, cleaning equipment, and completing paperwork are all activities necessary for the predominant activity of concrete cutting. All these activities benefitted Encotech. These are integral activities that qualify as principal activity, not preliminary or postliminary activity. On any day that a helper performed some preparation at the yard, the helper's travel from the yard to a job site was work covered by the statutes. On any day that a helper performed some cleanup, the helper's travel from the last job site to the yard was work covered by the statutes. *Cf. Dunlop v. City Electric, Inc.,* 527 F.2d 394, 400-01 (5th

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 6

Not Reported in F.Supp.2d, 2004 WL 609798 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1628

**(Cite as: 2004 WL 609798 (N.D.Ill.))**

Cir.1976); *Mitchell v. Mitchell Truck Line, Inc.,* 286 F.2d 721, 724-25 (5th Cir.1961); *Dole v. Enduro Plumbing, Inc.,* 1990 WL 252270 *4-5 (C.D.Cal. Oct.16, 1990).

Defendants contend that the performance of principal activities at the yard does not make travel time compensable because Encotech did not require that these activities be performed at the yard and that they could have instead been performed at job sites. That may be true of some activities, but not all. Water was not always available at the job site. Loading of additional supplies and equipment had to be performed at the yard. Performing inspections or repairs of equipment after leaving the yard would not be practical. Unloading of debris had to be performed at the yard. Even if not required to perform particular activities at the yard, employees were not told to discontinue performing those activities at the yard. They were still performing principal activities that benefitted Encotech before and after traveling to job sites. Defendants cite no case law holding that travel time after performing principal activity is not covered simply because the employer did not absolutely require that the activity be performed prior to travel. Nothing in the regulations supports such a holding.

*6 Contrary to defendants' argument, regulations provide that "[w]ork not requested but suffered or permitted is work time." 29 C.F.R. § 785.11. "[I]t is the duty of the management to exercise its control and see that the work is not performed if it does not want it to be performed. It cannot sit back and accept the benefits without compensating for them." *Id.* § 785.13. However, the work is not considered to have been "suffered or permitted" unless the employer knew or should have known that it was being performed. *Id .* § 795.11; *Kosakow v. New Rochelle Radiology Associates, P.C.,* 274 F.3d 706, 718 (2d Cir.2001); *Cunningham v. Gibson Electric Co. .,* 43 F.Supp.2d 965, 975 (N.D.Ill.1999). Knowledge of a supervisor is imputed to the employer, and it is sufficient that a manager or supervisor, acting with reasonable diligence, had the opportunity to acquire the knowledge. *Cunningham,* 43 F.Supp.2d at 975 (quoting *Reich v. Department of Conservation & Natural*

*Resources,* 28 F.3d 1076, 1082 (11th Cir.1994)). Here, it is uncontested that Frank did not have actual knowledge that helpers did preparation before traveling to a job site. Nevertheless, it is also uncontested that work at a job site generally began at 7:00 a.m. and that a management employee was generally at the yard at 6:00 a.m. The preparation work was done in the yard. A supervisor would have or should have known that helpers were engaging in preparation activity. Supervisory employees of Encotech also would have had the opportunity to observe cleanup activity.

If principal activity was performed before travel time or after travel time, the travel time was covered activity even if the principal activity could have been performed at the job site instead of at the yard.

*III. Minimum Wage -"Gap Time"*
Defendants argue that no plaintiff is entitled to damages based on a minimum wage violation because every plaintiff's average hourly pay for any given workweek always exceeded minimum wage. For example, if an employee was paid $320.00 based on $10.00 an hour for working 32 hours, but should have been considered to have performed an additional 8 hours of preparation, travel, and cleanup work, he or she arguably still received minimum wage because he or she received $320.00 for 40 hours of work, which is an average of $8.00 per hour and above the applicable minimum wage of $5.15 per hour. Defendants limit this argument to those workweeks in which the employee's total hours were 40 hours or less. Courts have used the term "gap time" to refer to "time that is not covered by the overtime provisions because it does not exceed the overtime limit, and ... time that is not covered by the minimum wage provisions because, even though it is uncompensated, the employees are still being paid a minimum wage when their salaries are averaged across their actual time worked." *Adair v. City of Kirkland,* 185 F.3d 1055, 1062 n. 6 (9th Cir.1999).

The regulations do not specifically provide that minimum wage is to be computed on a workweek basis rather than on an hour-by-hour basis. There is, however, an emphasis on the workweek as a basic

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 7

Not Reported in F.Supp.2d, 2004 WL 609798 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1628

**(Cite as: 2004 WL 609798 (N.D.Ill.))**

standard. *See* 29 C.F.R. § 776.4(a); *O'Brien v. Town of Agawam,* 350 F.3d 279, 298 (1st Cir.2003) . *See also* 29 C.F.R. §§ 778.103-.104; 778.322, 778.324 (overtime regulations). Although Department of Labor regulations do not provide that minimum wage is to be computed on a workweek basis, the Department of Labor has issued opinions adopting such a standard. *See Dove v. Coupe,* 759 F.2d 167, 171-72 & n. 8 (D.C.Cir.1985). Case law has generally applied such a standard as well. *See id.; Hensley v. MacMillan Bloedel Containers, Inc.,* 786 F.2d 353, 357 (8th Cir.1986); *United States v. Klinghoffer Brothers Realty Corp.,* 285 F.2d 487, 490 (2d Cir.1960); *Birch v. Kim,* 977 F.Supp. 926, 930-31 (S.D.Ind.1997); *Cuevas v. Monroe Street City Club, Inc.,* 752 F.Supp. 1405, 1416-17 (N.D.Ill.1990). *But compare Lamon v. City of Shawnee, Kan.,* 972 F.2d 1145, 1155 (10th Cir.1992), *cert. denied,* 507 U.S. 972, 113 S.Ct. 1414, 122 L.Ed.2d 785 (1993) (adopting opinion below, 754 F.Supp. 1518, 1521 & n. 1 (D.Kan.1991)). Plaintiffs attempt to distinguish the various cases as involving pay provisions other than on a straight hourly basis. Cases involving hourly wages plus other compensation, however, are not materially distinguishable. Moreover, *Klinghoffer* and *Cuevas* involved compensation calculated on an hourly basis only; the fact that *Klinghoffer* involved a criminal prosecution did not change the standard applied in determining whether there had been a minimum wage violation. The court will follow these cases.

*7 There is no evidence, or even contention, that any plaintiff received pay for a workweek that averaged below $5.15 per hour. Therefore, defendants are entitled to summary judgment dismissing the FLSA claims for minimum wage violations.

Plaintiffs contend the IMWL must be separately considered, but point to no reason for concluding that it should be construed differently from the FLSA regarding gap time. It is generally held that the IMWL parallels federal law, and the Illinois Administrative Code provides that federal FLSA regulations provide guidance in interpreting the

IMWL. *Haynes,* 107 Ill.Dec. 792, 507 N.E.2d at 951. The same analysis generally applies to both the FLSA and IMWL. *Id.; Laboy v. Alex Displays, Inc.,* 2003 WL 21209854 *2 (N.D.Ill. May 21, 2003); *Bjornson v. Daido Metal U.S.A., Inc.,* 12 F.Supp.2d 837, 842 (N.D.Ill.1998). The IMWL minimum wage claims will therefore also be dismissed.

*IV. IWPCA Unpaid Wages Claim*
Even if not a violation of minimum wage laws, defendants potentially owe plaintiffs for uncompensated preparation, travel, and cleanup time that breached contractual obligations. The problem with this claim, however, is that the contractual relationship between plaintiffs and Encotech is governed by collective bargaining agreements and those agreements require that claimed contractual violations be pursued through the grievance procedures outlined in the agreements. No grievance was pursued and plaintiffs do not attempt to bring a "hybrid" or any other type of claim pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. *See generally Neal v. Newspaper Holdings, Inc.,* 349 F.3d 363, 368 (7th Cir.2003); *Gonzalez,* 296 F.Supp.2d at 936. Instead, plaintiffs attempt to enforce contractual wage obligations by means of a state law IWPCA claim. Problematically, § 301 preempts state law claims that require interpretation of a collective bargaining agreement.

Whether Section 301 operates to preempt a state law claim entails a "case-by-case factual analysis." *In re Bentz Metal Prods. Co.,* 253 F.3d 283, 285 (7th Cir.2001). However, not every dispute that tangentially involves a provision of a collective bargaining agreement is preempted by federal law. *Allis-Chalmers [Corp. v. Lueck],* 471 U.S. [202,] 211, 105 S.Ct. 1904, 85 L.Ed.2d 206 [ (1985) ]. Thus, preemption will not occur if a dispute merely references or requires consultation of a collective bargaining agreement. *Livadas v. Bradshaw,* 512 U.S. 107, 124, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); *In re Bentz,* 253 F.3d at 285. Preemption is triggered when a claim is "founded directly on rights created by collective bargaining agreements," (*Caterpillar, Inc. v. Williams,* 482 U.S. 386, 394, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)) and when the resolution of a

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 8

Not Reported in F.Supp.2d, 2004 WL 609798 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1628

**(Cite as: 2004 WL 609798 (N.D.Ill.))**

state law claim "depends on the meaning of, or requires the interpretation of, a collective bargaining agreement." *Loewen Group Int'l, Inc. [v. Haberichter],* 65 F.3d [1417,] 1421 [ (1995) ] (citing *Lingle [v. Norge Division of Magic Chef, Inc.],* 486 U.S. [399,] 405-06, 407, 409-10, 108 S.Ct. 1877, 100 L.Ed.2d 410, [ (1988) ] ). Put differently, a claim is preempted if it is "substantially dependent on analysis of a collective-bargaining agreement." *Atchley v. Heritage Cable Vision Assocs.,* 101 F.3d 495, 499 (7th Cir.1996) (citations omitted). If the meaning of a contract term is at the heart of the dispute, Section 301 will have preemptive effect. *Livadas,* 512 U.S. at 124; *Caterpillar,* 482 U.S. at 394. Thus, "[e]ven if explicit terms of the collective bargaining agreement may not be on point, it is a matter of federal contract interpretation whether the words of a collective bargaining agreement create implied rights." *Atchley,* 101 F.3d at 499. Therefore, "if it is necessary to interpret express or implied terms of a [collective bargaining agreement], a state law claim is deemed federal in nature." *Id.*

*8 The Supreme Court has stated, though, that "when the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished." ' *Loewen,* 65 F.3d at 1421 (quoting *Livadas,* 512 U.S. at 124); *see also Milne Employees Ass'n v. Sun Carriers,* 960 F.2d 1401, 1409-10 (9th Cir.1991), *cert. denied,* 508 U.S. 959, 113 S.Ct. 2927, 124 L.Ed.2d 678 (1993). The Supreme Court further stated that "it is the legal character of a claim, as 'independent' of rights under the collective-bargaining agreement that decides whether a state cause of action may go forward" ' and also noted that " ' § 301 cannot be read broadly to preempt nonnegotiable rights conferred on individual employees as a matter of state law." ' *Loewen,* 65 F.3d at 1421 (quoting *Livadas,* 512 U.S. at 123-24) (citations omitted). *Gonzalez,* 296 F.Supp.2d at 934-35.

Here, the Joint Agreement contained no clear provision requiring that wages be paid for

preparation, travel, and cleanup time. Arguably, such a requirement was implicit in the terms of the Joint Agreement or was implied by industry custom or practice. Resort to implied requirements, though, calls for interpretation of the Joint Agreement, which would result in the IWPCA claim being preempted. Plaintiffs argue that the rates for this work time were established by Encotech's decision to pay travel time over one hour at the rates contained in the Joint Agreement. They argue that this does not constitute interpretation or enforcement of the Joint Agreement, but enforcement of a separate, unwritten agreement to pay these rates for preparation, travel, and cleanup time that falls outside the coverage of the Joint Agreement. But plaintiffs also argue that Encotech's unilateral decision to pay travel time at $5.15 per hour and later at $10.00 or $15.00 per hour was an unfair labor practice in violation of the National Labor Relations Act in that Encotech unilaterally modified the terms of a collective bargaining agreement. *See* 29 U.S.C. §§ 158(a)(5), (d); *Naperville Ready Mix. Inc. v.. NLRB,* 242 F.3d 744, 755 (7th Cir.), *cert. denied,* 534 U.S. 1040, 122 S.Ct. 614, 151 L.Ed.2d 537 (2001). Despite plaintiffs' attempt to posit an agreement separate from the parties' collective bargaining agreement, any decision as to an obligation to pay for the preparation, travel, and cleanup time is dependent on interpretation of provisions of the Joint Agreement that are not clear and indisputable. The IWPCA claim for the time period covered by the Joint Agreement is preempted.

Beginning June 1, 2001, the Concrete Agreement was in effect. It is unclear whether much, if any, uncompensated and disputed preparation, cleanup, and travel time occurred after that date. The Concrete Agreement contains an express provision regarding travel time. The express provision, however, is still subject to interpretation. It applies only if employees are "directed" to report to the yard. In light of evidence that defendants may have acquiesced in permitting employees to report to the yard, determining the effect of this provision requires interpretation of at least one provision of the Concrete Agreement.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                            Page 9

Not Reported in F.Supp.2d, 2004 WL 609798 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1628

**(Cite as: 2004 WL 609798 (N.D.Ill.))**

*9 There may be situations, however, in which it is undisputed that compensation was required under the Concrete Agreement, even though Encotech chose to compensate employees at a noncontractual rate of $5.15 or $10.00 per hour. Defendants do not rely on any provision of the Concrete Agreement to justify payment at a different rate from that provided in the Concrete Agreement. Resolution of such a claim would not require interpretation of the terms of the Concrete Agreement. Thus, with respect to the period in which the Concrete Agreement was in effect, the court can properly order defendants to pay plaintiffs at the contract rate, rather than a lesser rate, for hours of travel time that defendants agree is compensable. Plaintiffs' Count II IWPCA claim will be dismissed except as to this limited situation. [FN10]

> FN10. As is discussed regarding overtime, resolution of overtime claims does not necessitate an interpretation of the collective bargaining agreements. The IMWL overtime claims are not preempted.

It may be that plaintiffs received no pay or only $5.15 or $10.00 per hour for preparation, travel, and cleanup time that the applicable collective bargaining agreement required be paid at the rates provided for in the agreement. The appropriate forum for resolving such claims, however, was the grievance procedure provided for in the agreements and, possibly, a § 301 lawsuit filed by an appropriate party after the exhaustion of grievance remedies. No grievance proceedings having been instituted, the present lawsuit is an inappropriate proceeding for resolving questions as to the appropriate contractual rate for nonovertime, *Gonzalez,* 296 F.Supp.2d at 936.

*V. Overtime Claims*

To the extent plaintiffs make out claims for unpaid preparation, travel, and cleanup time in workweeks for which they worked more than 40 hours (including the previously unpaid time), plaintiffs are entitled to all hours up to 40 hours being paid at regular rates and hours above 40 hours being paid at one and one-half times regular rates. *See* 29 C.F.R. § 778.315; *Reich v. Midwest Body Corp.,* 843 F.Supp. 1249, 1251-52 (N.D.Ill.1994). *See also* 29 C.F.R. §§ 778.107, 778.110(a), 778.223. *Cf. id.* § 778.322. Such claims for unpaid overtime are not precluded because plaintiffs failed to pursue grievances under the applicable collective bargaining agreements. *See Belbis v. County of Cook,* 2002 WL 31600048 *3-4 (N.D.Ill. Nov.18, 2002), *reconsideration granted in part on other grounds,* 2003 WL 187407 (N.D.Ill. Jan.27, 2002). *See also Schwertfeger v. Village of Sauk Village,* 2001 WL 293115 at *3 (N.D.Ill. March 23, 2001). These hours having been otherwise unpaid, the regular pay rates under the applicable collective bargaining agreements will be used to determine appropriate regular pay up to 40 hours in a workweek and appropriate time and one-half for the hours above 40.

Unlike the preparation, travel, and cleanup time for which no compensation whatsoever was paid, preparation, travel, and cleanup time which was paid at rates of $5.15 or $10.00 per hour is treated differently. As previously discussed, determining whether the collective bargaining agreements required that the agreements' pay scales be paid for such time requires interpretation of the agreements. [FN11] In that situation, case law holds that the employee will not be able to avoid his or her failure to pursue a grievance under the collective bargaining agreement; instead, the rate actually paid for straight time will be treated as the regular rate of pay. *Vadino v. A. Valey Engineers,* 903 F.2d 253, 265-66 (3d Cir.1990); *Bester v. Chicago Transit Authority,* 1991 WL 249732 *1 (N.D.Ill. Nov.15, 1991). In those situations where a plaintiff was paid $5.15 or $10.00 per hour, that will be treated as part of the plaintiff's regular rate of pay in computing amounts due for unpaid overtime.

> FN11. As previously discussed, there is no dispute as to the applicability of Concrete Agreement rates to certain preparation, travel, and cleanup performed after that Agreement went into effect. As to that limited exception, the regular rate of pay will be considered to be the rates contained in the Concrete Agreement even if Encotech paid the employee at the $10.00

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 10

Not Reported in F.Supp.2d, 2004 WL 609798 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1628

**(Cite as: 2004 WL 609798 (N.D.Ill.))**

or $15.00 rate.

**\*10** Defendants further contend that, where travel time was paid at $5 .15 or $10.00 per hour, any overtime travel time may appropriately be paid at one and one-half those rates. On the facts before the court, that is an incorrect application of the statutory overtime provisions. Defendants rely on 29 U.S.C. § 207(g)(2), which provides that, "in the case of an employee performing two or more kinds of work for which different hourly or piece rates have been established," it is not a violation of overtime provisions if overtime "is computed at rates not less than one and one-half times such bona fide rates applicable to the same work when performed during nonovertime hours." *See also* 29 C.F.R. § 778.419. Arguably, § 207(g)(2) would apply to overtime travel for those plaintiffs who were paid a different nonovertime rate for travel time than for other nonovertime work.

Section 207(g)(2) is an exception to the usual overtime rules for which defendants bear the burden of proof. *Mathias v. Addison Fire Protection District No. 1,* 43 F.Supp.2d 916, 921 (N.D.Ill.1999) . To satisfy their burden, defendants must show the following:

  (1) the employee must perform two or more kinds of work;
  (2) the employer must establish a bona fide hourly rate for those different kinds of work;
  (3) the compensation must be paid pursuant to an agreement or understanding arrived at between the employer and the employee in advance of the performance of the work; and
  (4) the compensation must be computed at rates not less than one and one-half times such rates applicable to the same work when performed during nonovertime hours.
  *Id.* at 920-21.

Uncontested evidence shows that this exception is not applicable. The evidence indicates that defendants unilaterally imposed the rates, not that the rates were reached by agreement in advance of the work being performed. Even if, at some point in time, an understanding arguably existed, defendants fail to satisfy another requirement as well. The rate

cannot be found to be a bona fide rate in that defendant compensated some nonovertime preparation, travel, and cleanup at the higher rates provided for in the applicable collective bargaining agreement. If the rates are not consistently paid for the same type of work, they are not bona fide rates. 29 C.F .R. § 778.419(b).

Since the § 207(g)(2) exception does not apply, Encotech was required to pay overtime at one and one-half the employee's regular rate, not one and one-half of the employee's travel time rate. As to those employees who were paid two different nonovertime rates within the same workweek, the regular rate that is the basis for computing overtime pay should be the employee's weighted rate for nonovertime hours worked. *See* 29 C.F.R. § 778.115 . Thus, it was improper simply to pay such an employee $15.00 for travel time incurred during a week in which the employee worked more than 40 hours. Instead, a weighted average had to be determined for that workweek, and overtime paid at one and one-half that rate.

### VI. Willfulness

**\*11** The last question to consider is whether defendants' violations of overtime provisions were willful. A showing of willfulness is required both for a three-year statute of limitations for the FLSA claim, *see* 29 U.S.C. § 255(a), and for punitive damages for the IMWL violations, *see* 820 ILCS 105/12(a). Defendants argue that their conduct could not have been willful because they followed industry custom and practice. It need not be decided if that would be conclusive evidence of a lack of willfulness since disputed factual issues exist as to industry custom and practice. Plaintiffs do not point to conclusive evidence establishing willfulness. Willfulness is a disputed factual issue for trial.

### VII. Conclusion

Plaintiffs' claims for minimum wage and straight time wages are all being dismissed except for a limited claim under the IWPCA for employees who, after May 31, 2001, were expressly ordered to report to the yard but were compensated for travel time at $5.15 or $10.00 per hour. Claims for overtime pay under both the FLSA and IMWL

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                          Page 11

Not Reported in F.Supp.2d, 2004 WL 609798 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1628

**(Cite as: 2004 WL 609798 (N.D.Ill.))**

remain pending, including claims for punitive damages under the IMWL and claims based on a three-year statute of limitations under the FLSA. Defendants concede there is some liability for overtime pay, but plaintiffs have not identified specific plaintiffs for whom a liability will be due. Plaintiffs' motion for partial summary judgment is granted in part, but the order will not state, as plaintiffs request, that summary judgment on liability is being granted. The question of whether the order should state that summary judgment is granted as to liability is a semantical issue of no import or effect. The uncontested facts, statements of contested issues, and proposed jury instructions contained in the final pretrial order must be fully consistent with today's ruling and neither party will be permitted to make any argument to the jury that is inconsistent with today's ruling.

Prior to setting a date for submission of a final pretrial order, the parties shall first make a good faith effort to settle this case in light of today's ruling. Within two weeks from the date of today's order, plaintiffs shall serve a written demand for settlement upon defendants. Defendants shall respond within one week thereafter. A status hearing will be held on *April 21,* 2004 at 9:30 a.m. At the status hearing the parties shall report on the likelihood of settlement. If settlement does not appear likely, a short date will be set for submission of the final pretrial order.

IT IS THEREFORE ORDERED that plaintiffs' motion for partial summary judgment [75] is granted in part and denied in part. Defendants' motion for partial summary judgment [77] is granted in part and denied in part. All claims for minimum wage and straight time wages are dismissed except for a limited claim under the IWPCA based on employees who, after May 31, 2001, were expressly ordered to report to the yard but were compensated for travel time at $5.15 or $10.00 per hour. A status hearing is set for *April 21,* 2004 at 9:30 a.m.

Not Reported in F.Supp.2d, 2004 WL 609798 (N.D.Ill.), 9 Wage & Hour Cas.2d (BNA) 1628

**Motions, Pleadings and Filings (Back to top)**

• 2003 WL 23417053 (Trial Motion, Memorandum and Affidavit) Joint Motion for Extension of time to file Summary Judgment Response Briefs (Apr. 29, 2003)

• 2003 WL 23417046 (Trial Motion, Memorandum and Affidavit) Memorandumin Support of Plaintiffs' Motion Forpartial Summary Judgment (Apr. 14, 2003)

• 2003 WL 23417051 (Trial Motion, Memorandum and Affidavit) Defendants' Memorandum of Law in Support of their Motion for Partial Summary Judgment (Apr. 14, 2003)

• 2002 WL 32450391 (Trial Motion, Memorandum and Affidavit) Joint Motion to Extend Discovery (Nov. 27, 2002)

• 2002 WL 32450387 (Trial Motion, Memorandum and Affidavit) Defendants' Motion for Entry of Agreed Protective Order (Nov. 12, 2002)

• 2002 WL 32450383 (Trial Motion, Memorandum and Affidavit) Motion to Find Release of Richard Gertz Void for Lack of Consideration (Jan. 07, 2002)

• 2001 WL 34483568 (Trial Motion, Memorandum and Affidavit) Defendants' Unopposed Motion to Extend time to file Response to Plaintiffs' Motion for Reconsideration (Dec. 20, 2001)

• 1:00CV01133  (Docket)

(Feb. 25, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit K**

Westlaw.

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1997 WL 285943 (N.D.Ill.)

**(Cite as: 1997 WL 285943 (N.D.Ill.))**

**⋈**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Illinois.
Rick KARPOWICZ, individually and on behalf of
all others similarly situated,
Plaintiff,
v.
GENERAL MOTORS CORPORATION, a
Corporation, Defendants.
**No. 97 C 1390.**

May 23, 1997.

MEMORANDUM OPINION

KOCORAS, District Judge.

**\*1** This case comes before the court on the
defendant's motions to strike the class allegations,
and to dismiss the remaining allegations for failure
to state a claim for which relief may be granted,
pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons
discussed below, the motion to dismiss is granted in
part and denied in part, and the motion to strike is
denied without prejudice.

BACKGROUND

The plaintiff, Rick Karpowicz, filed this complaint
in the Circuit Court of Kane County, Illinois. The
complaint alleges generally that the defendant,
General Motors Corporation ("GM"), committed a
number of violations of Illinois law through the sale
of and failure to repair certain automobiles. GM
removed the case to federal court under our
diversity jurisdiction. On March 27, 1997, we
denied the plaintiff's motion to remand. GM has
now filed motions to strike the class allegations and

to dismiss the rest of the complaint for failure to
state a claim for which relief may be granted. The
plaintiff's allegations, which we take as true at this
point, are set forth below.

Karpowicz is the president of Kopar Industries. In
January, 1989, Kopar entered a four-year lease with
Biggers Chevrolet, Inc, an authorized GM dealer
located in Elgin, Illinois. The lease was for a new
1989 Chevrolet Blazer with a silver metallic factory
paint job. The lease called for monthly payments
which would total $18,864, and included an option
by which Karpowicz could purchase the vehicle at
the end of the lease. The Blazer came with an
express warranty that provided "Bumper to Bumper
Plus" coverage for three years or 50,000 miles
(whichever came first), as well as coverage against
corrosion that was to last six years or 100,000
miles. The warranty also stated that, "[i]n order to
achieve maximum customer satisfaction, there may
be times when Chevrolet will establish a special
policy adjustment program to pay all or part of the
costs of certain repairs beyond the terms of the
warranty."

At some time before the lease expired, Plaintiff
noticed that paint was "delaminating"--that is,
peeling off--from the horizontal surfaces of the
Blazer, including the roof, hood, and grille between
the hood and front windshield. Plaintiff was
considering purchasing the Blazer, and asked
Bigger's if it would repaint the vehicle. He was
told that GM would fix the defect, despite the fact
that the "bumper to bumper plus" warranty had
expired. The plaintiff is somewhat vague on this
point. He implies that GM made some sort of
public statement indicating an intent to repair the
delamination, although he never gives any details as
to that statement.

Plaintiff purchased the vehicle from Bigger's on
May 1, 1993 for a total sales price of $13,822.
Eight to ten months later, Karpowicz took the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                            Page 2

Not Reported in F.Supp., 1997 WL 285943 (N.D.Ill.)

**(Cite as: 1997 WL 285943 (N.D.Ill.))**

Blazer to Bigger's to be repainted, and was told that GM would not repaint it. Plaintiff claims that he was told that GM had received so many complaints of delamination that it had changed its policy on repainting the vehicles. He also claims that someone at Bigger's told him that GM had a widespread problem with delamination. It was explained to him that in the manufacturing process, the entire body of a vehicle is dipped in a rust inhibitor, but that the primer coat--which is supposed to go on top of the rust inhibitor--was eliminated from the process. The vehicles were then painted, with the paint applied directly to the rust inhibitor. Unfortunately, the paint would not stick to the rust coating, and delamination resulted. Plaintiff still owns the Blazer, and paint has continued to peel off of the horizontal surfaces. GM has refused to repair it.

*2 In the summer of 1991, Plaintiff purchased a new GMC conversion van with a blue metallic paint job from Joyce Pontiac in Sycamore, Illinois. The van had a three-year/36,000 mile warranty, that extended to six years for corrosion. By 1996, the paint job was delaminating. In the summer of 1996, Plaintiff took the vehicle to the service department at Currie Motors Pontiac GMC Elgin Inc., in Elgin, Illinois, and asked to have the defect fixed. The service department said that it would contact GM to see whether GM would authorize and pay for the repairs. Eventually, Currie Motors told Plaintiff that GM would not repaint the vehicle. Again, he was told that, because of the large number of vehicles with delamination problems, GM was changing its policy on repainting cars. He was also told that the time within which GM was willing to repaint the cars. Finally, he was told that GM would have been more likely to repair the defect if he drove a Chevrolet van rather than a GMC van. On June 7, 1996, plaintiff called GM, and was told that it would not correct the defect. He still owns the GMC van, and the delamination has continued.

Plaintiff claims that his situation is typical: that the same problem-- delamination--with the same cause--failure to use a primer coat between the rust inhibitor and the paint--has afflicted numerous

owners of GM automobiles, including Buicks, Chevrolets, GMC trucks and vans, Oldsmobiles, and Pontiacs. He claims that GM has been aware of the problem since no later than January 1993, but has refused to notify purchasers and owners of these cars.

Plaintiff's complaint, which he filed on January 27, 1997, contains three counts. Count I arises under the Illinois Consumer Fraud Act, 815 ILCS 505 1/2 ("the ICFA"). Plaintiff alleges that GM suppressed and omitted a material fact by not telling purchasers of the delamination problem. He brings this claim on behalf of "all Illinois residents who purchased GM vehicles and discovered paint delamination on the horizontal surfaces of their vehicles within the last three years which GM has refused to correct." Count II is for breach of express and implied warranty. He alleges that GM breached its express warranty to fix all material defects, and its implied warranty that the vehicles were reasonably fit for the purpose for which they were intended. This count is also brought as a class action, on behalf of GM-owning Illinois residents who discovered delamination within the last 10 years. Finally, Count III is for common-law fraud. Plaintiff alleges that GM represented to potential purchasers and current owners that GM would correct any problems with the vehicles, including delamination. This count is brought on behalf of GM-owning Illinois residents who discovered delamination within the last five years.

As stated above, GM has moved to strike some of the allegations, and to dismiss the rest. We consider these motions separately.

LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. Defendants must meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted since, in ruling on a motion to dismiss, the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 3

Not Reported in F.Supp., 1997 WL 285943 (N.D.Ill.)

**(Cite as: 1997 WL 285943 (N.D.Ill.))**

taken as true. *Bontkowski v. First National Bank of Cicero,* 998 F.2d 459, 461 (7th Cir.1993), *cert. denied,* 510 U.S. 1012, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993). The allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Hartford Fire Insurance Co. v. California,* 509 U.S. 764, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Sherwin Manor Nursing Center, Inc. v. McAuliffe,* 37 F.3d 1216, 1219 (7th Cir.1994), *cert. denied,* 516 U.S. 862, 116 S.Ct. 172, 133 L.Ed.2d 113 (1995). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. *Lucien v. Preiner,* 967 F.2d 1166, 1168 (7th Cir.1992), *cert. denied,* 506 U.S. 893, 113 S.Ct. 267, 121 L.Ed.2d 196(1992).

*3 In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. Documents incorporated by reference into the pleadings and documents attached to the pleadings as exhibits are considered part of the pleadings for all purposes. Fed.R.Civ.P. 10(c). In addition, "[d]ocuments that a defendant attaches to a motion to dismiss are considered a part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Venture Associates v. Zenith Data Systems,* 987 F.2d 429, 431 (7th Cir.1993). It is with these principles in mind that we turn to the motion before us.

### DISCUSSION
#### Motion to Strike
GM has filed a motion to strike the class allegations in the complaint. It claims that its motion arises under Rule 12(f), which allows motions to strike "any insufficient defense, or any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). However, GM does not identify any matters in the class allegations which are redundant, immaterial, impertinent or scandalous; its beef is with the sufficiency of the class allegations. This motion more properly arises

under Rule 23(c)(1), which directs courts to determine "as soon as practicable" whether a case should be maintained as a class action. Fed.R.Civ.P. 23(c)(1). The court has discretion in determining what time is "practicable," and the time may vary with the circumstances of the particular case. *Wright v. Shock,* 742 F.2d 541, 543- 44 (9th Cir.1984).

In this case, we think that it is not practicable to rule on the motion to strike at this time. The plaintiff has already indicated that he will seek leave to amend his complaint. In light of our holdings below, the plaintiff seems likely to persist in this attempt. Therefore, we will presently deny the motion to strike without prejudice to the defendant's right to re-present it in the future, when the pleadings are more complete.

#### Motion to Dismiss
We must also consider the defendant's motion to dismiss. We will consider the arguments regarding each count separately.

#### I. Count I: Illinois Consumer Fraud Act

GM argues that Count I, brought under the ICFA, should be dismissed both because the plaintiff has failed to plead the elements of fraud with particularity under Rule 9(b), and because the ICFA's statute of limitations has expired. We consider these arguments separately.

#### A. Failure to Plead with Particularity

Rule 9(b) requires that "[i]n averments of fraud, the circumstances constituting fraud or mistake shall be stated with particularity." Under this rule, a plaintiff is required "to state 'the identity of the person making the representation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.' " *Uni*Quality, Inc. v. Infotronix, Inc.,* 974 F.2d 918, 923 (7th Cir.1992) (citations omitted). "In other words, the plaintiff must plead the 'who, what, when, and where' of the alleged fraud." *Id.* This requirement applies both to claims for common-law fraud, as well as to claims

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 4

Not Reported in F.Supp., 1997 WL 285943 (N.D.Ill.)

**(Cite as: 1997 WL 285943 (N.D.Ill.))**

under the ICFA. *Appraisers Coalition v. Appraisal Inst.,* 845 F.Supp. 592, 609 (N.D.Ill.1994). The plaintiff claims that he has satisfied this requirement.

**\*4** He has not. The elements of a cause of action under the ICFA are "(1) a deceptive act or practice; (2) the defendant's intent that plaintiff rely on the deception; and (3) that the deception occurred in the course of conduct involving trade of commerce." *Connick v. Suzuki Motor Co.,* 174 Ill.2d 482, 501, 221 Ill.Dec. 389, 675 N.E.2d 584 (Ill.1996). Karpowicz has not sufficiently alleged that GM made a misrepresentation, or that it intended the plaintiff to rely on the deception. In his brief, he argues that the misrepresentations were GM's concealment of the defect, and GM's dealers' reneging on their promises to repair the defects.

His pleadings on either point are insufficient. In *Connick,* the plaintiff sued an auto manufacturer under the ICFA and common-law fraud for statements made by the manufacturer and by its dealers. However, the plaintiff did not allege that the dealers were the manufacturer's agents. The Supreme Court of Illinois held that these allegations were not sufficiently particular with regard to the statements by the dealers, because the plaintiff had not alleged an agent-principal relationship between the dealers and the manufacturer. *Id.* at 502, 221 Ill.Dec. 389, 675 N.E.2d 584. For the same reason, Plaintiff here has not satisfied the particularity requirement with regard to any misrepresentations by the dealers.

Plaintiff argues that GM also made a direct misrepresentation. However, this misrepresentation is not apparent, let alone pled with particularity, in the complaint. The statement attributed directly to GM is the conversation with a GM employee (identified only as Beth). Beth allegedly told Plaintiff that GM would not repair the defect. All agree that Beth's statement was true. No other misrepresentations are attributed to GM with particularity. Plaintiff does hint at some public statement by GM, but he never pleads that statement with particularity. Therefore, the ICFA allegations fail to satisfy the Rule 9(b) requirements.

**B. Statute of Limitations**

GM also argues that the ICFA claim is time-barred with respect to the 1989 Blazer. Under the ICFA, the plaintiff must bring a claim within three years of the date the cause of action accrues. 810 ILCS 505/10(3). A cause of action accrues and the statute of limitations begins to run "when a person knows or reasonably should know of his injury and also knows that it was wrongfully caused." *Hermitage Corp. v. Contractors' Adjustment Co.,* 264 Ill.App.3d 989, 992, 202 Ill.Dec. 465, 637 N.E.2d 1201 (Ill.App. 1 Dist.1994), *aff'd in part and rev'd in part on other grounds,* 166 Ill.2d 72, 209 Ill.Dec. 684, 651 N.E.2d 1132 (Ill.1995). GM argues that Plaintiff knew of the delamination problem on May 1, 1993, when he bought the Blazer, and that the ICFA claim was time-barred when the plaintiff filed his complaint in January, 1997. Plaintiff argues the statute of limitations did not begin to run in May, 1993, because GM was promising to fix the problem at that time. Instead, Plaintiff argues that the statute did not begin to run until the summer of 1994, when Plaintiff was told that GM would not fix the defects.

**\*5** Plaintiff's argument is correct, but for one flaw. Fraudulent concealment of a fraud tolls the statute of limitations under the ICFA. *Continental Grain Co. v. Pullman Standard, Inc.,* 690 F.Supp. 628, 633-34 (N.D.Ill.1988). In order to show fraudulent concealment, a plaintiff must show affirmative acts which are calculated to prevent discovery. *Reshal Assocs. v. Long Grove Trading Co.,* 754 F.Supp. 1226, 1237 (N.D.Ill.1990). A promise to remedy a defect on which the promisor eventually reneges would seem to fall within this rule. Thus, the statute of limitations would have been tolled, so long as GM promised to repair. However, the plaintiff does not claim that GM made any such statement; he attributes the promises to Jerry Biggers Chevrolet. Moreover, he has not alleged that Jerry Biggers is an agent of GM. Therefore, the plaintiff's ICFA claim regarding the 1989 Blazer is time-barred as presently styled.

**II. Count II: Breach of Warranty**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 5

Not Reported in F.Supp., 1997 WL 285943 (N.D.Ill.)

**(Cite as: 1997 WL 285943 (N.D.Ill.))**

Plaintiff's Count II is for breach of express and implied warranty. GM has moved to dismiss this count on a number of grounds. We consider these arguments separately.

A. Statute of Limitations

GM first argues that the warranty claims are barred by the statute of limitations. There are two separate analyses involved here, because the plaintiff has alleged a breach of both implied and express warranties. Thus, we will consider the action for breach of implied warranty first.

1. Breach of Implied Warranty

The statute of limitations for claims for breach of implied warranty is four years. 810 ILCS 5/2-725. The statute runs from the time of delivery of the good, regardless of when the defect is discovered--that is, the "discovery rule" does not apply in claims for breach Of implied warranty. 810 ILCS 5/2-725(1); *Hagen v. Richardson-Merrell, Inc.,* 697 F.Supp. 334, 341-42 (N.D.Ill.1988). Even a claim of fraudulent concealment does not toll the statute of limitations, because the breach of warranty is deemed to occur at the time of delivery, regardless of the purchaser's knowledge. *Dohra v. Alcon, Inc.,* 1994 WL 395000, at *4 (N.D.Ill. July 26, 1994). Finally, the statute of limitations for a used vehicle runs from the date of the original sale. *See Davis v. Brunswick Corp.,* 854 F.Supp. 1574, 1582 (N.D.Ga.1993); *Elysium Corp. v. Nautor Oy Wilh. Schauman AB,* 618 F.Supp. 1343, 1344 (D.Md.1985). This is for the same reason--the breach occurs at the time the seller of new vehicle delivered it to the purchaser.

The Blazer was originally sold in 1989. Therefore, the statute of limitations began to run in 1989, and expired in 1993. This claim for breach of implied warranty was brought in 1997. Thus, it is time-barred.

2. Breach of Express Warranty

The plaintiff has styled his breach of warranty claim to include a claim for breach of express warranty. It arises out of the failure by GM to repair the automobiles, pursuant to its promise to do so. Illinois courts have held that such contractual provisions are not "warranties" within the meaning of the U.C.C. and the Illinois Statutes, and thus are not governed by the same statute of limitations that applied to the implied warranty. *See Cosman v. Ford Motor Co.,* 285 Ill.App.3d 250, 255-61, 220 Ill.Dec. 790, 674 N.E.2d 61 (Ill.App. 1 Dist.1996). Rather, such provisions are deemed "promises to repair," the breach of which does create a cause of action. *Id.; Saladino v. Team Chevrolet, Inc.,* 242 Ill.App.3d 735, 740, 183 Ill.Dec. 320, 611 N.E.2d 583 (Ill.App. 2 Dist.1993) ("Used Vehicle Mechanical Repair Agreement" was not a warranty, but an offer to repair defects). This cause of action accrues when the seller fails to repair, and the statute of limitations runs for four years from that point. *Id.* at 260-61.

**\*6** Thus, the defect must arise within the time limit contained in the contract of sale. The cause of action arises upon GM's breach of that duty, and any claim arising from the breach must be filed within four years of that breach. The plaintiff has alleged that he notified the dealer from which he bought the Blazer of the defect in early 1994. This is within the six year limit of the promise to fix any corrosion, but not within the three-year limit for bumper-to-bumper protection. (Again, Plaintiff has hinted that GM unilaterally extended this bumper-to-bumper protection for delamination, but never specifically alleges such.) At that time in 1994, he alleges that the dealer refused to repair the problem. Thus, the cause of action for the Blazer accrued in 1994, if the right to repairs arose under the corrosion guarantee. This latter question is one of fact, and cannot be resolved at this stage. Thus, the claim for the breach of the promise to repair any corrosion is not time-barred.

The reasoning is similar regarding the GMC van. Plaintiff brought it to the dealer to be repainted in the summer of 1996, within the six year limit of the promise to fix any corrosion (but not within the three-year bumper-to-bumper protection). The dealer refused to repair the problem. The cause of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                        Page 6

Not Reported in F.Supp., 1997 WL 285943 (N.D.Ill.)

**(Cite as: 1997 WL 285943 (N.D.Ill.))**

action arose at that time, and had to be filed by summer, 2000. Thus, this claim is also timely filed.

### B. Failure to Provide Notice

GM argues that Plaintiff failed to provide notice to GM that he considered GM to be in breach of warranty, under the notice requirement of the U.C.C. and the Illinois Statutes, 810 ILCS 5/2-607. Plaintiff argues that this notice requirement does not apply here, because GM had actual knowledge of the defect.

The notice requirement clearly applies to the implied warranty claim. As discussed above, the claim for breach of implied warranty arises under the U.C.C. As such, it is subject to the notice requirement, 810 ILCS 5/2-607. Actual knowledge of the general defect is not sufficient; the seller must "somehow [be] apprised of the trouble with the particular product purchased by a particular buyer." *Connick v. Suzuki Motor Co.,* 174 Ill.2d 482, 494, 221 Ill.Dec. 389, 675 N.E.2d 584 (Ill.1996). (It is true that the filing of a complaint may constitute notice; however, this exception applies where the consumer-plaintiff has suffered a personal injury as a result of the breach. *Id.* at 495, 221 Ill.Dec. 389, 675 N.E.2d 584.) The plaintiff has alleged that he asked the GM dealers to remedy the defects. He also called GM directly, and was told that GM would not repair the defect.

The contacts with the GM dealers are insufficient to satisfy the notice requirement, because Plaintiff has not alleged that the dealers were agents of GM. However, the allegation regarding Plaintiff's phone call to GM is sufficient to satisfy the notice requirement. Plaintiff alleges that he told GM of the delamination on the GMC van, and was informed that GM would not repair the defect. This is sufficient to have put GM on notice that repairs were needed on the van. However, Plaintiff does not allege that he told GM directly about the delamination on the Blazer, and thus the notice requirement is not satisfied with respect to the Blazer.

*7 The result is the same for the express warranty

claim. It is not a warranty claim under the U.C.C., and thus not subject to its notice requirement. Nevertheless, courts still hold that the seller's obligation to provide repairs does not arise until the buyer notifies the seller of the need for the repairs. *See Naiditch v. Shaf Home Builders, Inc.,* 160 Ill.App.3d 245, 263, 111 Ill.Dec. 486, 512 N.E.2d 1027 (Ill.App. 2 Dist.1987) (Reinhard, J.). Likewise, actual knowledge of a general defect in a product line is insufficient. The seller must be informed of a specific defect in a specific product.

As we have stated above, the plaintiff's communications with the dealers were insufficient to satisfy this notice requirement; only his direct communications with GM are sufficient. He alleges that he told GM directly about the problem with his GMC van, but not about the problems with his Blazer. Therefore, the notice requirement is satisfied with regard to the former, but not with regard to the latter.

### C. Lack of Privity

GM next argues that the implied warranty claims should be dismissed because the plaintiff lacks privity with GM. Plaintiff argues that this rule does not apply where the manufacturer participates significantly in a sale, and where the plaintiff seeks injunctive relief.

GM is correct. The Supreme Court of Illinois has held that a buyer may only bring claims for breach of implied warranty against the immediate seller of the goods, where the plaintiff seeks economic damages. *See Rothe v. Maloney Cadillac, Inc.,* 119 Ill.2d 288, 292, 116 Ill.Dec. 207, 518 N.E.2d 1028 (Ill.1988). The plaintiff argues that we should not apply this rule here, because he seeks injunctive relief. However, he cites no support for this argument, and we can find none. Thus, we will not create such an exception. Plaintiff also argues that the privity rule does not apply where the manufacturer "participated significantly in a sale," citing *Sanco, Inc. v. Ford Motor Co.,* 579 F.Supp. 893, 899 (S.D.Ind.1984), *aff'd,* 771 F.2d 1081 (7th Cir.1985), for this proposition. *Sanco* was a case arising under Indiana law. No such exception has

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 7

Not Reported in F.Supp., 1997 WL 285943 (N.D.Ill.)

**(Cite as: 1997 WL 285943 (N.D.Ill.))**

been created in Illinois, and we decline to do so here. Therefore, the implied warranty claims are barred by the privity rule.

D. Liability for Dealer's Statements

In his complaint, Plaintiff alleges that GM somehow "extended" the terms of the sale contract to six years, through some form of public statement. He gives no further explanation of this "extension." In the parties' briefs, they refer to a number of post-sale statements by GM, none of which is alleged in the complaint. Thus, without wading too deeply into this morass, we think it is sufficient to state again that the terms of the sale included an "express warranty." This label is in quotes because these terms were not "warranties" within the meaning of the U.C.C., as they did not relate to the future performance of the automobile. Rather, they constituted a promise by GM to repair certain defects. The defects included in these terms included three-year/50,000 mile coverage of what seems to be nearly all claims ("Bumper to Bumper Plus"), and six-year/100,000 mile coverage against corrosion.

*8 The briefs refer to statements by GM made after Plaintiff bought the vehicles. The parties disagree as to whether post-sale statements by GM constitute additional promises to repair. This point is moot, because the plaintiff has not alleged that GM made any such statements to that effect. He claims that the dealers told him that GM would repair the defects. However, he has not alleged that the dealers were GM's agents, and their statements are thus not attributable to GM. He also claims that he had one conversation with GM, in which GM said it would not repair the defects. Thus, there are no allegations of statements by GM which might constitute additional warranties.

III. Count III: Common-Law Fraud

Plaintiff's Count III is for common-law fraud. GM has moved to dismiss this count for failure to plead the elements of fraud with particularity, pursuant to Rule 9(b). We have held above that the plaintiff's allegations of misrepresentations by GM were not

sufficiently particular to support a claim for violation of the ICFA. *See* Part I.A., *supra*. The same reasoning applies to the plaintiff's claim for common-law fraud. Therefore, Count III is dismissed for failure to comply with Rule 9(b).

CONCLUSION

For the reasons discussed above, the motion to dismiss is granted in part and denied in part, and the motion to strike is denied.

Not Reported in F.Supp., 1997 WL 285943 (N.D.Ill.)

**Motions, Pleadings and Filings (Back to top)**

• 1:97cv01390 (Docket)

(Feb. 28, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**Exhibit L**

Westlaw.

NH ADC LAB 803.05                                                                          Page 1
N.H. Code Admin. R. Lab **803.05**

**STATE OF NEW HAMPSHIRE**
**OFFICE OF LEGISLATIVE SERVICES**
**DIVISION OF ADMINISTRATIVE RULES**
**DEPARTMENT OF LABOR**
**CHAPTER LAB 800. PAYMENT OF WAGES AND REQUIREMENTS OF EMPLOYERS**
**PART LAB 803. RESPONSIBILITIES OF EMPLOYERS AND THEIR REPRESENTATIVES**
Current through amendments available as of September 1, 2005.

Lab **803.05** Hours Worked.

 For the purpose of determining 'all wages due' for hours worked in accordance with RSA 275:43, I, the department of labor, under the authority provided by RSA 275:54, incorporates the 'Wage and Hour Publication 1312, Title 29 Part 785 of the Code of Federal Regulations, United States Department of Labor'.

<General Materials (GM)- Agency Filing History, References, Annotations,
or Tables>

 Source. #5491, eff 10-20-92, EXPIRED 10-20-98

 New. #7007, eff 5-26-99
NH ADC LAB **803.05**
END OF DOCUMENT

**Exhibit M**

Westlaw.

2 Newberg on Class Actions § 4:44 (4th ed.)
**(Publication page references are not available for this document.)**

## Newberg on Class Actions
Alba Conte and Herbert B. Newberg
**Database updated July 2005**

### Chapter 4. Class Categories and Defendant Classes

References

§ 4:44. Economic consequences of class action litigation: statutory minimum damages and joint and several liability--Reconciling Ratner's economic impact analysis with subsequent Supreme Court authority[FN1]

There is a tension, if not a conflict, between those cases considering economic impact in the superiority analysis and the U.S. Supreme Court's Rule 23 jurisprudence.

The premise of Ratner v. Chemical Bank and its progeny was that class relief was "inconsistent" with the individual remedy provided by minimum statutory damage claims, such that Rule 23 should not be applied.[FN2] However, in **Califano** v. **Yamasaki** the U.S. Supreme Court held that class relief under Rule 23 is available for any claim unless Congress has expressly restricted class relief.[FN3] Yamasaki holds that class relief is equally available for all claims, including minimum statutory damage claims, assuming there is no such express restriction.

The cases considering economic impact are also at odds with the U.S. Supreme Court's holding in Reiter v. Sonotone Corp.[FN4] In Reiter, the U.S. Supreme Court held that the "potentially ruinous effect" of a treble damage class action judgment was not a reason to preclude relief under the Clayton Act because the reasonableness of the treble damage remedy, even as amplified by Rule 23, is a "policy consideration[] more properly addressed to Congress than this Court."[FN5] In his concurring opinion, Justice Rehnquist stated that "the problem, if there is one, is for Congress and not the courts." [FN6]

Last, in Eisen v. Carlisle & Jacqueline, the U.S. Supreme Court held that: "nothing in either the language or history of Rule 23 gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action."[FN7] Because economic impact inquiry necessitates speculation by the court about whether the plaintiff will prevail and for how much, the consideration is arguably at odds with Eisen.

While none of these cases addresses the propriety of considering economic impact in the specific context of the Rule 23 superiority analysis, the holdings collectively cast serious doubt on the legitimacy of any such enterprise. The cases considering economic impact in the superiority analysis do not, unfortunately, make any meaningful effort at reconciliation with

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CLASSACT § 4:44          FOR EDUCATIONAL USE ONLY                    Page 2
2 Newberg on Class Actions § 4:44 (4th ed.)
**(Publication page references are not available for this document.)**

these U.S. Supreme Court decisions.

A recent decision of interest is ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit Inc.,[FN8] where the Arizona Court of Appeals rejected economic impact as a factor in the superiority analysis based in part on the U.S. Supreme Court's rulings in Reiter and Yamasaki. In ESI, the plaintiff sought class relief under the Telephone Consumer Protection Act [FN9] (TCPA) for the defendants' transmission of 90,000 unsolicited facsimile advertisements.[FN10] The TCPA provides for the recovery of actual damages or statutory damages of $500 per claim, and the court can increase the damages up to $1500 per claim for knowing or willful violations.[FN11]

Applying the Ratner economic impact analysis, the trial court reasoned that a 90,000 member class would result in a class damage award of $45,000,000 to $135,000,000, leaving the court "unable to fashion a reasonable sanction" and forcing it to impose a "horrendous, possibly annihilating punishment" upon the defendants.[FN12] Accordingly, the trial court found that a class action was not a "superior" device to litigate the dispute and denied class certification. [FN13] The Arizona Court of Appeals reversed based upon Ratner's inconsistency with Yamasaki, Reiter, and the manner in which Congress legislates when it intends to regulate class actions:

> The [trial] court's ruling evinces a greater concern with the fairness of the consequences to the defendants should a plaintiff class prevail than with the procedural fairness of adjudicating the matter through a class action versus some other method. We agree with ESI that the fairness of the statutory penalty for the specific form of violation alleged here has been decided by Congress in enacting the law and that the court's determination that it would be unfair is an improper consideration in deciding whether a class action is the superior method of adjudication.

* * *

Having provided for a private right of action and having decided the appropriate penalty, Congress did not preclude the use of class actions to obtain redress for violations. See 47 USC § 227. Rule 23 allows for class actions to "enhance the efficacy" of any private right of action provided by law. *Hawaii v. Standard Oil Co of Cal*, 405 US 251, 266 (1972). Class action relief is unavailable only if Congress expressly excludes it, ***Califano v. Yamasaki***, 442 US 682, 699-700 (1979), and Congress has done so in some statutes. See, eg, 15 USC § 6614 (2000) (limiting Y2K class actions); 29 USC § 732(d) (Supp 1999) (barring designated agency class actions); 15 USC § 2310(e) (2000) (restricting consumer warranty class actions). Congress provided no express exclusion of class action relief in 47 USC § 227.

Given that Congress determined the per-violation penalty and allowed for the pursuit of class actions under the statute, it is not for the court to determine that the penalty when applied in a class action context is unfair. The fairness of statutory punishment, within due-process concerns, is properly determined by the legislature. *Reiter v. Sonotone Corp*, 442 US 330, 344-45 (1979).

That "ruinous or annihilating" damages should not be considered in the superiority analysis is particularly compelling in circumstances such as this, where the size of the class,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CLASSACT § 4:44                FOR EDUCATIONAL USE ONLY                              Page 3
 2 Newberg on Class Actions § 4:44 (4th ed.)
**(Publication page references are not available for this document.)**

and therefore, the potential class liability, is entirely within the control of the defendants. To
deny the superiority of a class action because the size of the class made the damages
annihilating, would serve to encourage violation of the statute on a grand rather than a small
scale.[FN14]

While the decision in ESI may proceed through a further appeal,[FN15] it is--to date--the
only published decision to recognize the inconsistency between Ratner's economic impact
analysis and the Supreme Court decisions in **Califano** v. **Yamasaki** and Reiter v. Sonotone. In
addition, ESI is one of the few decisions to recognize the inconsistency between Ratner's
economic impact analysis and the manner in which Congress legislates when it wishes to
regulate class actions.[FN16] Thus, the ESI decision further establishes that the possible
economic consequences to a defendant are not a valid ground for refusing to certify a class
action.[FN17]

[FN1] Contributed by Edward Moomjian II, Esq. of Chandler, Tullar, Udall & Redhair LLP,
Tucson, Arizona; and Christopher A. LaVoy, Esq. of LaVoy & Chernoff PC, Phoenix, Arizona.

[FN2] Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412, 416, 15 Fed. R. Serv. 2d
1015 (S.D. N.Y. 1972) (TILA), discussed in § 4:42.

[FN3] **Califano** v. **Yamasaki**, 442 U.S. 682, 700, 99 S. Ct. 2545, 61 L. Ed. 2d 176 (1979).

[FN4] Reiter v. Sonotone Corp., 442 U.S. 330, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979).

[FN5] Reiter v. Sonotone Corp., 442 U.S. 330, 344, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979).

[FN6] Reiter v. Sonotone Corp., 442 U.S. 330, 346, 99 S. Ct. 2326, 60 L. Ed. 2d 931 (1979)
(Rehnquist, J, concurring).

[FN7] Eisen v. Carlisle and Jacquelin, 417 U.S. 156, 177, 94 S. Ct. 2140, 40 L. Ed. 2d 732, 9
Fair Empl. Prac. Cas. (BNA) 1302, 7 Empl. Prac. Dec. (CCH) ¶ 9374A, Fed. Sec. L. Rep. (CCH)
¶ 94570, 18 Fed. R. Serv. 2d 877, 4 Envtl. L. Rep. 20513 (1974).

[FN8] ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc., 203 Ariz. 94, 50
P.3d 844 (Ct. App. Div. 1 2002).

[FN9] 47 U.S.C.A. § 227.

[FN10] The TCPA prohibits, *inter alia*, the transmission of unsolicited facsimile advertisements.
*See* 47 U.S.C.A. § 227(b)(1)(C) ("It shall be unlawful for any person within the United
States...to use any telephone facsimile machine, computer, or other device to send an unsolicited
advertisement to a telephone facsimile machine").

[FN11] 47 U.S.C.A. § 227(b)(3).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2 Newberg on Class Actions § 4:44 (4th ed.)

**(Publication page references are not available for this document.)**

[FN12] ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc., 203 Ariz. 94, 50 P.3d 844 (Ct. App. Div. 1 2002).

[FN13] ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc., 203 Ariz. 94, 50 P.3d 844 (Ct. App. Div. 1 2002).

[FN14] ESI Ergonomic Solutions, LLC v. United Artists Theatre Circuit, Inc., 203 Ariz. 94, 50 P.3d 844, 851, 852 (Ct. App. Div. 1 2002) (citing Newberg, § 4:43). The court in ESI went on to find that, even if the Ratner economic impact analysis could be permissible under Rule 23, the analysis did not apply in that case because: (1) contrary to TILA, attorney's fees are not available as an incentive for individual litigation under the TCPA; and (2) Ratner involved a "technical violation" of failing to disclose information whereas unsolicited facsimile advertising "does not constitute a technical violation" because "the conduct alleged involved conscious decisions to take an affirmative act expressly prohibited by statute. It also involved taking or using the property of the recipients."

[FN15] At the time of publication, one defendant had filed a petition for review to the Arizona Supreme Court. See http:// www.cofad1.state.az.us/casefiles/cv010396.txt. However, civil appeals to the Arizona Supreme Court are discretionary. See Rule 23, Arizona Rules of Civil Appellate Procedure.

[FN16] See Roper v. Consurve, Inc., 578 F.2d 1106, 1114 (5th Cir. 1978), cert. granted, 440 U.S. 945, 99 S. Ct. 1421, 59 L. Ed. 2d 633 (1979) and judgment aff'd, 445 U.S. 326, 100 S. Ct. 1166, 63 L. Ed. 2d 427, 29 Fed. R. Serv. 2d 1 (1980) (rejecting economic impact argument and certifying statutory damages class action under National Banking Act by comparing to TILA and noting: "In Truth-in-Lending actions, Congress has manifested its concern about suits potentially ruinous to defendants by limiting recovery. 15 U.S.C.A. § 1691e. There appears to be no comparable limit for class actions under the National Banking Act").

[FN17] See § 4:43.

© 2005 Thomson/West

CLASSACT § 4:44
END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.