UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
DEBBIE TREZVANT, TIMOTHY CAHILL,        )
DEBORAH ARCH, & MARY-CATHERINE          )
PICHE,                                  )
     Individually and on Behalf         )
     of All Others Similarly            )
     Situated,                          )
                                        )
          Plaintiffs,                   )
                                        )
          v.                            )  CIVIL ACTION
                                        )  NO. 05-10673-WGY
FIDELITY EMPLOYER SERVICES              )
CORPORATION, FIDELITY EMPLOYER          )
SERVICES COMPANY, LLC &                 )
FMR CORPORATION,                        )
                                        )
          Defendants.                   )
_____)


MEMORANDUM


YOUNG, D.J.                                          June 1, 2006



I.   **INTRODUCTION**

     This action was brought on behalf of current and former
employees ("the Employees") of Fidelity Employer Services
Corporation ("Fidelity Corp.") who worked in an analyst position
- Technical Analyst, Business Analyst, Configuration Analyst,
Project Analyst, and Reporting Analyst - as salaried employees
and were classified as exempt from overtime pay requirements.
Am. Compl. [Doc. No. 12] ¶¶ 1, 2.  The Employees allege

violations of the Fair Labor Standards Act ("Fair Labor Act"), 29 U.S.C. § 201 et seq., and New Hampshire wage and hour laws as a result of Fidelity Corp.'s alleged unlawful classification of the Employees as exempt, when actually they are non-exempt and entitled to overtime pay.  Id. ¶¶ 1, 13-19, 24-29.

On October 26, 2005, the Court granted the Employees' motion conditionally to certify a collective action under the Fair Labor Act as to Reporting Analysts, Project Analysts, and Business Analysts.  Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss [Doc. No. 32] ("Pl. Dismiss Opp.") at 4, n.1.  On February 14, 2006, the Court granted Fidelity Corp.'s and FMR Corporation's (collectively "Fidelity") motion to dismiss the Employees' claim of violation of New Hampshire wage law.  Motion Hr'g, Feb. 14, 2006, Tr. at 8:11-2.  On May 3, 2006, only a few more individuals having opted into the conditionally certified class, the Court decertified the class upon the joint motion of all parties. Order on the Parties' Stipulation and Joint Mot. [Doc. No. 54]. This memorandum explains these rulings.

## II.  Conditional Certification Of A Collective Action Under the Fair Labor Act

The Fair Labor Act requires an employer subject to its provisions to pay its employees at a rate of time-and-a-half for hours worked in excess of forty hours unless those employees are exempt.  29 U.S.C. § 207(a)(1), § 213(a)(1).  Employees that

serve in a bona fide executive, administrative, or professional capacity are exempt from this requirement. Id. § 213(a)(1). The Fair Labor Act also provides that:

> An action . . . may be maintained against any employer . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives consent in writing to become such a party and such consent is filed in the court in which such action is brought.[1]

29 U.S.C. § 216(b) ("Section 216") (emphasis added).

### A.    The Proper Standard of Review

This District has used at least two methods for determining whether potential plaintiffs are similarly situated for certification of the Section 216 "opt-in" representative action. The first method is a two-tier approach where the court makes an initial determination of whether the potential class should receive notice of the pending action and then later, after discovery is complete, the court makes a final "similarly situated" determination. Kane v. Gage Merchandising Servs., Inc., 138 F. Supp. 2d 212, 214 (D. Mass. 2001) (Gorton, J.). The second approach is to apply the standards of Rule 23 -

---

[1] As the plaintiffs accurately point out, see Pl.'s Mem. in Support of Mot. for Conditional Collective Certification and for Court Facilitation of Notice Pursuant to 29 U.S.C. § 216(b) [Doc. No. 20] ("Pl. Cert. Mem.") at 7, the statute of limitations for each collective class member continues to run until he or she has filed a consent to participate in the action. See 29 U.S.C. § 256.

numerosity, commonality, typicality, and adequacy of representation - to determine certification of a collective action.    Dionne v. The Ground Round Inc., No. 93-11083, 1994 U.S. Dist. LEXIS 21641, at *6-7 (D. Mass. July 6, 1994) (Stearns, J.) (applying Rule 23 to an age discrimination collective action to the extent it is consistent with Section 216(b)).

Although both methods have been applied in this District, the majority of courts addressing this issue in the First Circuit have adopted the two-tier approach. See Kane, 138 F. Supp. 2d at 214; Reeves v. Alliant Techsystems, Inc., 77 F. Supp. 2d 242, 246 (D.R.I. 1999); Cintron v. Hershey Puerto Rico, Inc., 363 F. Supp. 2d 10, 15 (D.P.R. 2005).    In addition, a majority of courts outside the First Circuit adopt the two-tier approach.    See Leuthold v. Destination America, 224 F.R.D. 462, 466 (N.D. Cal. 2004) (noting, in applying the two-tier approach, that a majority of courts adopt that approach); Threatt v. CRF First Choice, No. 05-CV-117, 2005 U.S. Dist. LEXIS 16903, at *6-7 (N.D. Ind. Aug. 12, 2005) (same).    The First Circuit has not yet addressed this issue.    This Court follows the majority of courts and adopts the two-tier approach.

Only a preliminary finding of "similarly situated" plaintiffs is necessary to authorize notice to potential class members.    Cintron, 363 F. Supp. 2d at 16.    Usually, the initial stage determination is based "only on the pleadings and any

4

affidavits which have been submitted." <u>Kane</u>, 138 F. Supp. 2d at 214. As a result of the minimal evidence available, this determination is made using a fairly lenient standard, which typically results in conditional certification of the representative class. <u>Id.</u> At this stage, courts do not need "to make any findings of fact with respect to contradictory evidence presented by the parties or make any credibility determinations with respect to the evidence presented." <u>Kalish</u> v. <u>High Tech Inst.</u>, No. 04-1440, 2005 U.S. Dist. LEXIS 8238, at *7 (D. Minn. Apr. 22, 2005) (internal quotation marks omitted).

Courts have held that plaintiffs can meet this burden by making a modest factual showing or asserting <u>substantial</u> allegations[2] that "the putative class members were together the victims of a single decision, policy, or plan that violated the law." <u>Thiessen</u> v. <u>Gen. Elec. Capital</u>, 267 F.3d 1095, 1102 (10th Cir. 2001); <u>see</u> <u>Cintron</u>, 363 F. Supp. 2d, at 16 (following what it describes as the decision of most courts by requiring "some factual support" for class allegations). Though the Employees argue that making an unsupported allegation of a common plan is

_____

[2] "Substantial allegations" have been defined as detailed allegations supported by affidavits that successfully engage defendant's allegations to the contrary. <u>Grayson</u> v. <u>K-Mart</u>, 79 F.3d 1086, 1097 (11th Cir. 1996); <u>Aquayo</u> v. <u>Oldenkamp Trucking</u>, No. 04-6279, 2005 U.S. Dist. LEXIS 22190, at *9-10 (E.D. Cal. Oct. 3, 2005).

sufficient for conditional certification,[3] Pl. Cert. Mem. at 11,
that position has been roundly rejected. See, e.g., Kane, 138 F.
Supp. 2d at 215 (allowing notice where the record suggested that
Defendants had a policy of treating plaintiffs as exempt from
Fair Labor Act overtime requirements). "[A]s a matter of sound
case management," a court should make a preliminary inquiry as to
whether a manageable class exists and require plaintiffs to make
a preliminary factual showing that there actually exists a
similarly situated group of potential plaintiffs. Cintron, 363
F. Supp. 2d at 18.

     The factual showing necessary to satisfy this standard
varies. Some courts only appear to require evidence of a common
policy applied to the group of plaintiffs. See Frank et al. v.
Golden Plump Poultry, No. 04-1018, 2005 U.S. Dist. LEXIS 20441,
at *9-10 (D. Minn. Sept. 14, 2005) (holding that plaintiffs'
affidavits established a colorable basis for concluding that the
defendant had a common policy for not paying all its workers for

---

     [3]    The Employees cite Reeves for this proposition. In
Reeves, the court noted that Magistrate Judge Lovegreen allowed
notice based on plaintiffs' allegation that class members were
subject to a series of policies and practices enforced by
management to treat class members as non-exempt employees. 77 F.
Supp. 2d at 247. The Reeves court, however, identified a
specific memorandum which described procedures for enforcing a
45-hour work week; it is unclear whether this evidence was
produced at the notice stage in support of conditional
certification. Id. The Reeves court did not take a position on
what standard should be applied at the notice stage, focusing its
opinion on the second, decertification phase. Id.

time spent engaged in equipment maintenance).  Other courts focus

more on factual, as opposed to legal, similarities amongst the

class.  See Villatoro v. Kim Son Restaurant, 286 F. Supp. 2d 807,

810-11 (S.D. Tex. 2003) (requiring evidence only of similar job

requirements and pay provisions); Baldozier v. Am. Family Mutual

Ins., 375 F. Supp. 2d 1089, 1092-93 (D. Co. 2005) (holding that

allegations of a common policy coupled with a showing of

similarly situated plaintiffs are sufficient to grant conditional

certification).

Courts have also required some combined showing of similar

factual circumstances and legal claims.  See Hunter v. Sprint

Corp., 346 F. Supp. 2d 113, 119 (D.D.C. 2004) ("[A] substantial

identity both of factual circumstances and legal claims is

required before a collective action may proceed.").  Different

standards for this "combined showing" have been adopted by

courts.  Some have evaluated a group of plaintiffs based on a

three-part test: "1) whether [plaintiffs] all worked in the same

corporate department, division and location; (2) whether they all

advanced similar claims; and (3) whether they sought

substantially the same form of relief."  Lockhart v. Westinghouse

Credit Corp., 879 F.2d 43, 51-52 (3d Cir. 1989), overruled on

other grounds Hazen Paper Co. v. Biggins, 507 U.S. 604 (1993);

Hunter, 346 F. Supp. 2d at 119.  The Eleventh Circuit requires a

more substantial showing - namely, that there are other employees

7

with similar job requirements and pay provisions, and that these employees desire to opt in, Dybach v. Florida Dep't of Corrections, 942 F.2d 1562, 1567-68 (11th Cir. 1991), the latter indicative of a common legal claim.   Other courts have considered factors such as whether potential plaintiffs have been identified, whether affidavits of potential plaintiffs have been submitted, and whether evidence of a widespread discriminatory plan had been submitted.   England v. New Century Fin. Corp., 370 F. Supp. 2d 504, 508 (M.D. La. 2005); Olivio v. GMAC Mortgage Corp., 374 F. Supp. 2d 545, 548 (E.D. Mich. 2004); Pritchard v. Dent Wizard Int'l Corp., 210 F.R.D. 591, 596 (S.D. Ohio 2002).

After extensive review of the standards applied in other courts, this Court holds that the plaintiffs are required to put forth some evidence that the legal claims and factual characteristics of the class in this case are similar.   The court in Kane seemed implicitly to make a determination of conditional certification based on both considerations.   See Kane, 138 F. Supp. 2d at 215 (granting conditional certification to a "discrete class" of Crew Coordinators where the record suggested that the defendants had a policy of treating at least some of a class of Crew Coordinators as exempt from FLSA overtime requirements).

Fidelity urges the Court specifically to adopt what it describes as "the general rule" requiring the plaintiffs "submit

either one or more affidavits from other employees [besides the named plaintiffs] indicating the similarly situated nature of their job duties" or "at a minimum . . . a list of employees who [plaintiffs] contend would fit within the class."  Motion Hr'g, Oct. 26, 2006, Tr. at 10:18-24.  The Court declines to adopt such a hard-and-fast rule as to how plaintiffs seeking conditional certification must meet this lenient "similarly situated" standard at this initial stage.  While such evidence has been considered by courts, see Kane, 138 F. Supp. 2d at 215, this Court can find no court that requires a listing of potential plaintiffs as a general rule.  Similarly, affidavits of potential plaintiffs have been considered by some courts; however, the submission of additional affidavits beyond those of the named plaintiffs is not necessary to make a "similarly situated" showing, and this Court does not rule that such a submission is required.[4]  The Court requires a "modest factual showing" of similar factual and legal characteristics, so that the court is satisfied "that there is a basis to conclude that questions common to a potential group of plaintiffs would predominate a determination of the merits in this case."  Mike v. Safeco Ins. Co., 274 F. Supp. 2d 216, 220 (D. Conn. 2003).

---

[4]  Under this reasoning, had the Employees named only one plaintiff in this action (instead of four) and then submitted affidavits from the other three employees, as unnamed potential class members, this condition would have been satisfied.

9

Once discovery is complete, the party opposing the conditional certification may file a motion for decertification. Kane, 138 F. Supp. 2d at 214. At that point the Court can decide whether to decertify the class or to let the claimants proceed to trial as a collective action. Cintron, 363 F. Supp. 2d at 16. At that stage, courts consider factors such as:

> 1) the disparate factual and employment settings – e.g. whether plaintiffs were employed in the same corporate department, division, and location; 2) the various defenses available to defendant which appear to be individual to each plaintiff; and 3) fairness and procedural considerations.

Id. (quoting Reeves, 77 F. Supp. 2d at 247.); Thiessen, 267 F.3d at 1102-03.[5]

## B.    Evidence of Similarly Situated Plaintiffs

The Employees claimed that, although their job titles used the word "Analyst," they performed data entry and clerical work that "rarely, if ever, involved the exercise of discretion or independent judgment." Pl. Cert. Mem. at 4. More specifically, the Employees asserted that "[t]he work of the . . . Employees consisted of receiving information from other employees and sources, entering the information into Defendants' computer network, looking at computer screens to see if the data appeared

---

[5] Here, of course, that point was never reached as all parties have agreed to decertify the class. See supra p. 2.

where it was supposed to appear and reporting information to
supervisors." Id. at 5.

The Employees filed their motion to certify a collective
action consisting of "[a]ll current and former employees of
[Fidelity] who were or are employed as a 'Business Analyst,'
'Technical Analyst,' 'Configuration Analyst,' 'Project Analyst'
and/or 'Reporting Analyst' any time on or after April 5, 2002."
Pl. Cert. Mem. at 1 & Exh. A, Notice of Pendency of FLSA Lawsuit
("Proposed Notice") at 1.


    1.    The Employees' Allegations

The Employees alleged that:

    [T]hey are and have been similarly situated, have had
    substantially similar job requirements and pay
    provisions, and have been subject to Defendants'
    decision, policy, plan and common policies, programs
    . . . and rules of willfully failing and refusing to
    pay them at the legally required time-and-a-half rates
    for [overtime] and willfully failing to keep records
    required by the FLSA, and wilfully classifying them as
    exempt from overtime pay even though they were non-
    exempt . . . .

Am. Compl. ¶ 2.


    2.    The Employees' Affidavits

    In support of certification, the Employees submitted
affidavits from four former employees, the named plaintiffs in
this action.

11

Deborah Arch ("Arch") stated that she was employed as a Business Analyst by Fidelity from January 2001 through December 2002 at the Merrimack, New Hampshire office. See Affidavit of Deborah Cheryl Arch ("Arch Aff.") ¶ 1. She stated that her primary duties were to access and enter information on Fidelity's computerized system and observe whether new information inputted by Fidelity customers was correct within the Fidelity computerized system. Id. ¶¶ 3, 4. The latter was governed by specific written guidelines, according to Arch, and if data was not correctly inputted she was required to report that fact to her supervisors. Id. ¶ 4.

Timothy Cahill ("Cahill") stated that, between July 1999 through 2002, he has held the positions of Business Analyst, Technical Analyst, Configuration Analyst, and Reporting Analyst at Fidelity. See Affidavit of Timothy Cahill ("Cahill Aff.") ¶¶ 1, 3. Though he indicated that he worked at the Merrimack, New Hampshire office when employed as a Business Analyst (July 2000 through 2002), he did not indicate where he was located during his tenure in the other positions. Id. He described work similar to Arch's, as a Business Analyst, but added that part of his job, "and the job of other analysts at Fidelity," was to convert Fidelity's system from Benesoft to an Oracle software system, which involved locating and transferring data as well as inputting hypothetical data into the new system to see if it

12

showed up properly.  Id. ¶¶ 3, 4.  With regard to his general duties, Cahill stated that he received the information to input by reading the customers' existing benefit plan documents and speaking with Fidelity client service managers (liaisons to the client) for a particular client.  Id. ¶ 5.

As a reporting analyst, Cahill indicated that he was responsible for writing "projects" or "modifications" using a business text format already set up by Fidelity.  Id. ¶ 8.  He stated: "A Customer Service Manager or a member of their team had direct contact with the clients and would convey any . . . needs to me, and I would simply input the information per the clients' request into templates . . . ."  Id.  He also stated that he was responsible for sending the projects and modification via e-mail to the departments involved, asking them how much time it would take for them to complete their portion and the cost of their involvement, then e-mailing this information to the other employees at Fidelity.  Id. ¶ 8.

Mary-Catherine Piche ("Piche") stated that she was employed as a "Project Analyst" by Fidelity from October 2000 to January 2002 in the Merrimack, New Hampshire office.  See Affidavit of Mary Catherine Piche ("Piche Aff.") ¶ 1.  The description of her responsibilities was remarkably similar - almost verbatim - to Cahill's description of his reporting analyst responsibilities, except she added that after typing up the project or

13

modification, she would try to select, usually with her Project
Manager, what Fidelity departments needed to be included.  Id. ¶
4.

Debbie Trezvant ("Trezvant") stated that she was employed by
Fidelity as a Business Analyst from October 2001 to October 2003
in the Merrimack, New Hampshire office.  See Affidavit of Debbie
L. Trezvant ("Trezvant Aff.") ¶ 1.  Her responsibilities, as
described by her, were similar to those described by Cahill.  See
id. ¶¶ 3-7.

All of the four named plaintiffs indicated the varying
degrees of overtime they worked and their salaries, which ranged
from $43,000-$53,000.[6]  See Arch Aff. ¶ 6; Cahill Aff. ¶¶ 11, 12;
Trezvant Aff. ¶¶ 10, 11; Piche Aff. ¶¶ 5, 6.  The named
plaintiffs all stated that they were not paid overtime and were
paid a flat wage.  See Arch Aff. ¶ 7; Cahill Aff. ¶ 12; Trezvant
Aff. ¶ 11; Piche Aff. ¶ 6.  Cahill and Trezvant both identified
an instance where a supervisor told them that they were "not paid
to think."  Cahill Aff. ¶ 9; Trezvant Aff. ¶ 8.  Cahill added
that this was "a well-known frequently repeated statement by
supervisors at [Fidelity]."  Cahill Aff. ¶ 9.

None of the affidavits discussed the specific job
requirements for a "Technical" or "Configuration Analyst."
Cahill stated that he served in all those positions and that the

---

[6]  Arch did not indicate her salary while at Fidelity.

primary duties of those positions were essentially the same as the duties of the Business Analyst he described.  Id. at 3.

Trezvant, Arch and Cahill also submitted supplemental affidavits discussing the similarities they observed in the job duties of other analysts and the dissatisfaction they observed among the analysts.  See Reply Affidavit of Deborah Arch ("Arch Aff. II") ¶¶ 2-3, 5; Reply Affidavit of Debbie Trezvant ("Trezvant Aff. II") ¶¶ 9-10, 12; Reply Affidavit of Timothy Cahill ("Cahill Aff. II") ¶¶ 16-17, 19.  Both Cahill and Arch observed that the analysts they worked with were very dissatisfied with the long hours they were required to work and that the analysts were told by Fidelity that they were not entitled to overtime pay but would get "comp time" (compensatory time off) to make up for the long hours; both stated that there was very little comp time.  Arch Aff. II ¶ 5; Cahill Aff. II. ¶ 19.  Based on the dissatisfaction observed, both Cahill and Arch believed that "many, many analysts will be interested in participating in this lawsuit and making claims in it."  Arch Aff. II ¶ 5; Cahill Aff. II. ¶ 19.  Trezvant specifically referred only to the business analysts with whom she worked in making the same observations as Arch regarding dissatisfaction, promises about comp time, and interest in the lawsuit.  Trezvant Aff. II ¶ 12.

Trezvant, Cahill and Arch all represented that the primary
duties and tasks of an analyst were essentially the same
regardless of the particular division where an analyst worked -
health and welfare, human resources, defined benefit plans, and
defined contribution plans.  Arch Aff. II ¶ 3; Trezvant Aff. II ¶
10; Cahill Aff. II ¶ 17.

C.    **The Employees Did Not Show That The Analysts Have
      Similar Job Requirements And Pay Provisions**

The Employees provided no factual showing of the job
requirements or salary provisions of a Technical or Configuration
Analyst beyond one sentence in Cahill's Affidavit stating that
his work in these positions was similar to his work as a business
analyst.  Fidelity submitted detailed affidavits indicating that
these positions require specialized technical knowledge that
other analyst positions do not.  See Affidavit of Anthony Rigo
("Rigo Aff.") at ¶ 6; Affidavit of Keith Maden ("Maden Aff.") at
¶¶ 5, 8; Affidavit of Steve Gilchrist ("Gilchrist Aff.") ¶ 9.
Fidelity asserts that Configuration and Technical Analysts (or
"Technical Design Analysts" as referred to by Fidelity) have a
salary grading structure different from the other Analyst
positions - being categorized as T-grades, "[to] reflect[] the
highly technical nature of the position."  Gilchrist Aff. ¶ 6.
Fidelity also indicated that Configuration Analysts are
subdivided into "Implementation," "Conversion," and "Ongoing

16

Support Configuration Analysts" with varying responsibilities
between these subcategories. Maden Aff. ¶ 9. In the face of
evidence to the contrary, one sentence about the job
responsibilities of Technical and Configuration Analysts is
insufficient to warrant a finding that these positions are
situated similarly to other analyst positions. Cf. Kim Son
Restaurant, 286 F. Supp. 2d, at 811, n.9 (allowing notice for a
class of bus staff, cooks, and dishwashers but denying notice to
janitors employed by the restaurant where plaintiff only
mentioned them in passing and defendant submitted evidence that
they were employed by an independent company).

     The Employees made a sufficient showing that employees in
the remaining analyst positions - Business Analyst, Project
Analyst and Reporting Analyst - are similarly situated.
Different job titles or positions do not preclude a finding that
plaintiffs are "similarly situated." See Baldozier v. Am. Family
Mutual Ins., 375 F. Supp. 2d 1089, 1092-93 (D. Co. 2005)
(granting conditional certification for all vehicle damage claim
representatives who were treated as exempt and denied overtime
pay where named plaintiffs submitted affidavits asserting that
all of these representatives have the same job function
regardless of location or specific title). Fidelity argued that
the class is not similar because there are dissimilarities
between the various analyst positions. Def.'s Opp'n to Mot. for

17

Conditional Certification [Doc. No. 26] ("Def. Cert. Opp.") at
15-17; <u>see</u> Affidavit of Paul Lavertu ("Lavertu Aff.") ¶¶ 6-9;
Affidavit of Elise McCaffrey ("McCaffrey Aff.") ¶¶ 6-11;
Affidavit of Erica Piesz ("Piesz Aff.") ¶ 7-8.  Although there
are clear differences between these three positions, there are
sufficient similarities to have warranted a finding, at this
initial phase, that these positions are similarly situated.  The
Employees' affidavits pointed to data collection and data entry
as the primary duties of each position, indicating little
analysis and very little client contact in the respective
positions.  <u>See</u> Trezvant Aff. ¶¶ 3-4, 7; Cahill Aff. ¶¶ 3-5, 8;
Piche Aff. ¶ 3-4.  Fidelity challenged that these were accurate
depictions of these positions, asserting that the analysts have
much more varied and complex responsibilities.  Def. Cert. Opp.
at 16; <u>see</u> McCaffrey Aff. ¶ 6-9; Piesz Aff. ¶ 7; Lavertu Aff. ¶
6.  This, however, goes to credibility - something that is not
given consideration at this phase.  Further, the affidavits
submitted by Fidelity did support the contention that all three
types of analysts are involved in some form of data collection
and data entry.[7]

---

[7] Fidelity personnel indicated that a Reporting Analyst
"conduct[s] sophisticated ad hoc querying of client data in
response to client service needs and to diagnose data problems."
Piesz Aff. ¶ 7.  One of the duties of a Project Analyst,
according to Fidelity personnel, is to "work with databases
containing client information and conduct ad hoc querying, data
and trend analysis, and root cause analysis to solve data

18

Fidelity also argued that the Employees are not similarly situated because the named plaintiffs worked in only one division of Fidelity Corp., and none of them worked there in 2004 when the divisions were restructured.  Def. Cert. Opp. at 15-16, 18.  According to Fidelity, Fidelity Corp. has four primary product lines: Health and Welfare plans, including health insurance, Defined Benefit plans, Defined Contribution plans, and Human Resources/Payroll.  Id. at 2.  Kyle Kane, Director of Management Effectiveness for Fidelity, stated that until 2004, the company was organized according to these product lines, with teams in each of the four product divisions consisting of the various types of analysts (business, technical) within the company.[8]  Affidavit of Kyle Kane ("Kane Aff.") ¶ 7.  Kane further asserted that the duties of the individual team members depended on the client to which the team was assigned, as well as the project managers, directors and vice-presidents who were assigned to

---

problems."  McCaffrey Aff. ¶ 6.  The description of a Business Analyst's duties provided by Fidelity, though more abstract, includes "translat[ing] business requirements into functional and technical design documents" (HR Payroll Business Analysts), Lavertu ¶ 6; gathering and documenting functionality requirements of a client (Health and Welfare Business Analysts), id. ¶ 7; and generally being familiar with data-oriented tasks, id. ¶ 8.

[8]  Specifically, Kane stated that, prior to the reorganization, a Fidelity Corp. Vice President located in Merrimack was responsible for coordinating the assignment of multiple team members to several Directors; Directors coordinated the management of the clients' work with the assistance of Project Managers; Project Managers coordinated teams comprised of a mixture of the various analyst-types.  Kane Aff. ¶ 7.

manage and supervise the team.  Id.   In 2004, according to Kane,
Fidelity Employer Services was restructured and a new
organization called Fidelity Human Resources Services was created
within Fidelity Corp.; this new entity re-organized along
functional rather than product lines - namely, Implementation,
Operations, Technology, and Process Engineering.  Kane Aff. ¶¶
6,8.  According to the company, this meant that whereas before
teams "clustered in relative isolation around one or several
clients" and "performed duties tailored to varying client
requirements," now employees are categorized according to
specific functions and their duties "have become more focused on
those functions, instead of on all aspects of particular clients'
needs."  Def. Cert. Opp. at 3-4.

    Though Fidelity described the changes in the organization
structure at Fidelity Corp. after the restructuring, it failed to
illustrate how these changes affected the duties of the analyst-
types now in issue - business, reporting, and project - so as to
have precluded an initial finding by the Court that analysts
before and after the restructuring are similarly situated.  Kane
described changes that relate to the organization of work -
whereas work was formerly coordinated on a team-level based on
client needs and is now coordinated within broader function-
oriented divisions, Kane Aff. ¶¶ 7-8 - and did not discuss any
changes in the particular duties of the analysts.  None of the

other affidavits submitted by Fidelity describing the duties of
these analysts discussed any change in those duties after the
restructuring of divisions.  Absent a showing to the contrary,
the Court considered the Employees' descriptions of the job
duties of the various analysts relevant to the period after the
restructuring.

The Court also rejected, at that stage, Fidelity's
contention that because the affiants for the Employees only
worked in one division of the company, the Employees could not
establish that analysts across divisions are similarly situated.
According to Kane - Trezvant, Cahill, Piche, and Arch all worked
in the Health and Welfare division when they were analysts for
Fidelity Corp.  Kane Aff. ¶¶ 27, 33, 40.  Cahill, Trezvant, and
Arch, however, based on their personal knowledge, stated that the
"primary duties and tasks" of the analysts were essentially the
same across divisions.  Arch Aff. II ¶ 3; Trezvant Aff. II ¶ 10;
Cahill Aff. II ¶ 17.  The only affidavit submitted by Fidelity
that described difference in the duties of analysts based on
their division was the Lavertu affidavit which discussed the
duties of Business Analysts in various divisions.  See Lavertu
Aff. ¶ 6-8.  Since both Trezvant and Arch made representations to
the contrary, the Court found that the Employees made a
sufficient showing that Business Analysts in different divisions
have the same primary duties and tasks.  A more critical

21

evaluation of the class based on different factual and employment settings (i.e., divisions) would have been made in the second "decertification" stage, should that point in the litigation have been reached.  See Thiessen v. GE Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001).

The Employees also provided sufficient evidence to indicate that their pay provisions are similar, indicating that the analyst-types in issue all receive a flat wage and do not receive overtime pay.  Fidelity argued that different compensation grades within an analyst position (higher grades reflecting higher degrees of sophistication) preclude class certification.  See Def. Cert. Opp. at 17.  Fidelity, however, did not identify any different compensation grades for Business Analysts, and, while an affidavit identifies two different grades for Reporting Analysts, see Piesz Aff. ¶ 5, it did not discuss distinctions based on those grades.  According to Fidelity, the Project Analyst position is graded and consists of Project Analysts, Senior Project Analyst, and Project Analyst Team Leader, the latter two having managerial and supervisory responsibilities.[9] See McCaffrey Aff. ¶ 12.  Given these uncontradicted distinctions in level of responsibility, the request for certification was

---

[9]  Fidelity also submitted affidavits discussing the different grades in the Technical Analyst position - Technical Design Analyst, Associate, Senior, Principal, and Consultant. See Gilchrist Aff. ¶ 6.

22

limited to "Project Analysts" alone, and not "Senior" or "Team Leader Project Analysts".

D.     **Sufficiency Of The Employees' Factual Support For Their Legal Claims of Misclassification and Denial of Overtime Pay**

The Employees showed that the remaining analysts - Business, Reporting, and Project Analysts - are also similarly situated with regards to legal claims.  Trezvant, Cahill, and Arch identified a practice in which analysts were told that they were not entitled to overtime pay and promised by the company that, instead, they would receive comp time for the long hours they worked.  Arch Aff. II ¶ 5; Trezvant Aff. II ¶ 12; Cahill Aff. II ¶ 19.

The supplemental affidavits of Trezvant, Cahill, and Arch made a showing, albeit "modest" that other Analysts worked long hours and were dissatisfied with the Fidelity's policy of allowing comp time in lieu of overtime pay.  See Arch Aff. II ¶ 5; Trezvant Aff. II ¶ 12; Cahill Aff. II ¶ 19.  While Trezvant specifically refered only to the business analysts with whom she worked in making this observation, see Trezvant Aff. II ¶ 12, Cahill and Arch referred more generally to "analysts [they] worked with," see Cahill Aff. II ¶ 19, Arch Aff. ¶ 5.  According to Fidelity's own description of its organizational structure, different types of analysts worked together in teams.  Kane Aff.

23

¶ 7, 8.  Therefore, the Court regarded the reference made by Cahill and Arch as referring to different types of analysts. Based on these representations, the Court concluded that the Employees made a satisfactory showing regarding the legal claim of misclassification as to Business Analysts, Reporting Analysts, and Project Analysts.[10]

The Employees failed to show that Fidelity's policies regarding the classification of Analysts are company-wide, including offices beyond Merrimack, New Hampshire.  Fidelity made no admission that they classify all analysts as exempt.  See Mason v. Ecolab, No. 04-Civ-4488, 2005 U.S. Dist. LEXIS 18022, at *40-41 (S.D.N.Y. Aug. 18, 2005) ("Substantial allegations . . . as well as an admission by defendants that such actions reflect a company-wide policy, sufficiently demonstrate a factual nexus between plaintiffs' situation and other potential class members . . . .").  Further, the affidavits were all from employees that worked in the company's New Hampshire office.  None of the

---

[10]  For a similarly situated showing as to the claim of unpaid overtime based on misclassification, some courts focus primarily on the job duties of the potential plaintiffs insofar as those duties relate to whether they were correctly classified. See, e.g., Scholtisek v. The Eldre Corp., 229 F.R.D. 381, 389 (W.D.N.Y. 2005); Holt v. Rite Aid Corp., 333 F. Supp. 2d 1265, 1271 (M.D. Ala. 2004) ("[T]he 'similarly situated' inquiry in this case must be analyzed in terms of the nature of the job duties performed by each putative plaintiff, because the ultimate issue to be determined is whether each employee was properly classified as exempt."); Morisky v. Pub. Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 498 (D.N.J. 2000) (same).

Employees submitting affidavits purported to know the policies of
other branches of the company.  See Threatt v. CRF First Choice,
05-CV-117, 2005 U.S. Dist. LEXIS 16903, at *16-18 (N.D. Ind. Aug.
12, 2005) (rejecting a nationwide conditional collective action
where plaintiffs provided no evidence of policies and job
requirements of employees in other states and certifying the
class only as to the one office for which the requisite evidence
was submitted).  The Employees, therefore, lacked the sufficient
factual showing necessary to establish that all the analysts in
the company are subject to a common policy.[11]  Certification was
therefore limited to the Merrimack, New Hampshire group of
analysts.

> **E.    The Named Plaintiffs As Representatives For The
>         Collective Action**

Fidelity argued that three of the named plaintiffs are not
members of the class the Employees seek to certify based on
statute of limitations requirements.  Def. Cert. Opp. at 19.
Under the Fair Labor Act, an action for unpaid compensation must
commence within two years after a cause of action accrues and
three years if the cause of action arises out of a willful

---

[11]   The Employees cited Belcher v. Shoney's, 927 F. Supp.
249, 252 (M.D. Tenn. 1996), among other cases, for the
proposition that different geographic locations are immaterial to
a "similarly situated" determination at this phase.  In Belcher,
however, the plaintiffs submitted 24 affidavits from employees in
the defendant's restaurants in ten different states.  See id.

violation.  29 U.S.C. § 255(a).  Fidelity asserts because

Cahill's and Arch's claims accrued more than two years ago[12] and

are, therefore, within the statute of limitations only if the

Employees establish a willful violation of the Fair Labor Act,

they cannot be considered members of the class.  Def. Cert. Opp.

at 20.  The Court does not make a determination of willfulness at

this stage and should therefore assume that the longer three-year

statute of limitations applies.  Roebuck v. Hudson Valley Farms,

Inc., 239 F. Supp. 2d 234, 240 (N.D.N.Y. 2002).  Cahill's and

Arch's claims are, at this point, presumed valid and, as such,

they are members of the Employees' class.

Fidelity, however, correctly argued that Piche is not a

member of this class.  Def. Cert. Opp. at 19.  Though the

company's argument was based on the fact that Piche's claim falls

outside of the three-year statute of limitations for the Fair

Labor Act,[13] Id., even more fundamentally, the Employees' own

definition of the class excluded Piche as a class member.  The

Employees sought certification of a class of those analysts

employed by Fidelity "within three years before the commencement

of this action."  Pl. Mot. at 1; See Proposed Notice at 1

---

[12]  Arch and Cahill were both employed at Fidelity until the
end of 2002.  Arch Aff. ¶ 1; Cahill Aff. ¶ 1.

[13]  Fidelity has filed a motion to dismiss Piche from this
action.  See Mem. in Supp. of Mot. to Dismiss Count II of Pl.'s
First Am. Compl. [Doc. No. 17] ("Def. Dismiss Mem.") at 9.

(proposing notice to all analysts employed any time on or after April 5, 2002).  By Piche's own account, she was last employed at Fidelity in January 2002, Piche Aff. ¶ 1, though Fidelity stated that her employment terminated in November 2001, Kane Aff. ¶ 37. The Employees suggested that because the standard for certification of a Section 216 collective action is less stringent than that for a Rule 23 class action, a named plaintiff does not necessarily have to be a member of the collective action.  Pl.'s Reply to Br. in Supp. of Pl.'s Mot. for Conditional Collective Certification [Doc. No. 28] ("Pl. Rep.") at 14-15 ("Defendants' assertion that a named plaintiff in an FLSA claim must be a member of the class . . . is unsupported by the relevant case law.").  The purposes of a Section 216(b) <u>representative</u> action, however, are undermined when non-class members are allowed to serve as representatives.  <u>Cameron-Grant</u> v. <u>Maxim Healthcare Servs., Inc</u>, 347 F.3d 1240, 1248 (11th Cir. 2003). ("Congress's aim in adding the 'opt-in' language to § 216(b) was to prevent large group actions, with their vast allegations of liability, from being brought on behalf of employees who had no real involvement in, or knowledge of, the lawsuit . . . .  Thus, the [Fair Labor Act] prohibit[s] what precisely is advanced under Rule 23 - a representative plaintiff filing an action that potentially may generate liability in favor of uninvolved class members." (citations and internal quotation

27

marks omitted)).  Under Section 216(b) "the named plaintiff does
not have the right to act in a role analogous to the private
attorney general concept."  Id. at 1249 (holding that a named
plaintiff has no procedural right under the Fair Labor Act to
represent other plaintiffs in a collective action when he has
settled all his personal claims).  Piche, therefore, cannot be a
named plaintiff in this action.

Even though Piche is not a class member, she asserted that
she was employed at Fidelity as a Project Analyst from October
2000 until January 2002, Piche Aff. ¶ 1, and provided sufficient
factual basis for determining that Project Analysts are similarly
situated with relation to each other and the entire Employee
class.  Fidelity submitted evidence that Project Analysts are now
structured to work in teams within Operations: a client-focused
team, a functional team, and a centralized team - a change which
appears to have resulted from the 2004 restructuring of the
company.  See McCaffrey Aff. ¶ 10.  Fidelity did not submit
evidence that the duties of the Project Analyst have changed due
to this restructuring, describing only organizational changes.[14]

───────────────

[14]  These positions are described as follows:

The Client-Focused Project Analysts have client
specific expertise and can perform all project related
functions for the client they support.  The Functional
Project Analyst focus on issues related to one process,
such as Payroll or Net Benefits . . . set up, but can
perform that function for any client.  Central Team
Project Analyst can also support any client, but their

See id.  Piche's affidavit can, therefore, be used as evidence that the plaintiffs are similarly situated.

The Employees have, in the context of the motion to dismiss, asked the Court to revisit this ruling dismissing Piche as a named plaintiff, arguing that the affidavit by Kyle Kane, submitted by Fidelity, raised an issue of fact as whether Piche claims fall outside the statute of limitations.  Pl. Dismiss Opp. at 17.  The Employees amended complaint and Piche's affidavit both state that she was last employed at Fidelity in approximately January 2002, outside the statute of limitations.[15]  Am. Compl. ¶ 11; Piche Aff., ¶ 1.  Kane's affidavit states that Piche's employment terminated in November 2001, and then states that "Ms Piche has not worked for any of the Defendants in any capacity from April 5, 2002" – the beginning date of the applicable statute of limitations time period.  Aff. of Kyle Kane, ¶¶ 37, 38.  The Employees suggest Kane's reference to the April 5th date raises doubt as to whether Piche is barred by the statute of limitations.  Pl. Dismiss Opp. at 17.  Kyle's

---

work tends to focus on ad hoc database reports and querying, performing data analysis and applying data updates to the record keeping system.

McCaffrey Aff. ¶ 10.

[15]  Though the four corners of the complaint are typically the only information considered on a motion to dismiss, Piche's standing as a named plaintiff implicated issues of class certification, which is why her dismissal was raised at the prior hearing.

statements do not raise an issue of fact, as he, in referring to the April 5th date, was only indicating that Piche had not worked for Fidelity during the statute of limitations period.  He did not state that April 5, 2002 was Piche's last day of work and the Employees and Piche confirm that her last day of work was approximately January 2002.  The Court, affirms its ruling dismissing Piche as a named plaintiff.


**III. New Hampshire Wage Law Claim & Rule 23 Class Certification**

   **A.    Background Relevant To The New Hampshire Wage Law Claim**

   The following recitation of facts is taken from the Employees' Amended Complaint.  For purposes of this Motion to Dismiss, the Court must take the allegations in the Employees' complaint as true and draw all reasonable inferences in their favor.  Citibank v. Grupo Cupey, Inc., 382 F.3d 29, 31 (1st Cir. 2004) (quoting TAG/ICIB Servs. v. Pan Am. Grain Co., 215 F.3d 172, 175 (1st Cir. 2000)).

   The Employees were salaried employees for Fidelity who worked overtime hours but were never paid overtime wages.  Am. Compl. ¶ 27.  They worked in positions with the "Analyst" job titles - Business Analyst, Technical Analyst, Configuration Analyst, Project Analyst, Reporting Analyst - and were classified based on their position as exempt from the overtime pay requirements of the Fair Labor Act.  Id. ¶ 1,2.  The Employees,

however, were improperly classified as exempt and are, in fact, non-exempt and entitled to overtime pay.  Id. ¶ 1.

**B.   Standard of Review**

As this Court has noted, a motion to dismiss under Rule 12(b)(6) tests the sufficiency of the plaintiff's pleadings and, as a result, must be considered in light of the liberal notice pleading requirements of the Federal Rules.   See Andrews-Clarke v. Lucent Techs., 157 F. Supp. 2d 93, 98 (D. Mass. 2001) (Dein, M.J.).   Accordingly, a complaint should not be dismissed for failure to state a claim unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief."  Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir. 1987) (emphasis added) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)); see also Rogan v. Menino, 175 F.3d 75, 78 (1st Cir. 1999) (noting that the plaintiff must "set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery").  Moreover, "the Court must accept as true all of the allegations made in the complaint and draw all reasonable inferences in the plaintiff's favor."  Baker v. Coxe, 940 F. Supp. 409, 414 (D. Mass. 1996) (Saris, J.) (citing Coyne v. City of Somerville, 972 F.2d 440, 442-3 (1st Cir. 1992)); see also, Conley, 335 U.S. at 45-46.  The standard for dismissal, however,

is not without any bite.  In taking the plaintiff's allegations
as true, the Court is not obliged to credit "bald assertions" or
"unsubstantiated conclusions."  <u>Dartmouth Review</u> v. <u>Dartmouth
College</u>, 889 F.2d 13, 16 (1st Cir. 1989).

C.    **The Employees Cannot Assert A Claim Under New Hampshire
      Wage Law**

     The Employees alleged that, under New Hampshire wage law,
they are entitled to overtime pay due under the Fair Labor Act.
New Hampshire state law does not entitle the Employees to
overtime pay.  New Hampshire specifically excludes employers
covered under the Fair Labor Act from its overtime wage
requirement.  N.H. Rev. Stat. Ann. § 279:21 (2005) (providing
that employees "be paid at the rate of time and one-half for all
time worked in excess of 40 hours in any one week," <u>unless</u> the
employees worked for an employer "covered under the provisions of
the federal Fair Labor Standards Act of 1938").

     The Employees, therefore, argued that they are not seeking
overtime pay entitled to the Employees under this state statute;
they seek recovery under state law for federal overtime pay
entitled to the employees under the Fair Labor Act.  In their
complaint, they paraphrased a New Hampshire statute that requires
every employer to pay "<u>all wages due</u> to employees within 8 days
including Sunday after expiration of the week in which the work
is performed" or in some cases "less frequently than weekly

32

except that it shall be at least once each calendar month." Am. Compl. ¶ 25 (emphasis in original); N.H. Rev. Stat. Ann. § 275:43; Weekly (containing this language). The Employees also referenced the language of another New Hampshire wage statute asserting that under New Hampshire law "[w]henever an employer discharges an employee, the employer shall pay the employee's wages in full within 72 hours," and "[w]henever an employee quits or resigns, the employer shall pay the employee's wages no later than the next regular payday . . . ." Am. Compl. ¶ 25; N.H. Rev. Stat. Ann. § 275:44, Employees Separated From Payroll Before Pay Days (containing this language). The complaint then concluded that under these laws, an employer is required to pay all wages due, including all overtime wages due under federal or state law. Am. Compl. ¶ 25.

The Employees alleged that Fidelity violated New Hampshire law by not paying them overtime wages that were due to them under the Fair Labor Act. See Pl. Dismiss Opp. at 2. This state claim is, in essence, completely duplicitous of the claim brought directly under the Fair Labor Act; except of course that the Fair Labor Act/New Hampshire wage claim, brought as a Rule 23 class action, is now not subject to the Fair Labor Act's requirement that employees affirmatively opt-in to a collective action. See 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any [collective] action unless he gives consent in writing to

33

become such a party and such consent is filed in the court in which such action is brought.").

Fidelity argued that N.H. Rev. Stat. Ann. § 275:43 does not allow for recovery of federally mandated overtime pay because "overtime" is not "wages" for purposes of state law.  Def. Dismiss Mem. at 4.  New Hampshire defines "wages" as

> compensation, including hourly health and welfare, and pension fund contributions required pursuant to a health and welfare trust agreement, pension fund trust agreement, collective bargaining agreement, or other agreement adopted for the benefit of an employee and agreed to by his employer, for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or other basis of calculation

N.H. Rev. Stat. Ann. 275:42(III).  Fidelity asserted that based on this definition, wages are compensation due to employees pursuant to an employment agreement, and not something statutorily mandated like overtime.  Def. Dismiss Mem. at 4.  The Employees countered by arguing that New Hampshire regulations related to wage law incorporate portions of the Code of Federal Regulations which discuss overtime pay.  Pl. Dismiss Opp. at 5. The regulation entitled "Hours Worked" provides:

> For the purpose of determining "all wages due" for hours worked in accordance with RSA 275:43 I, the department of labor, under the authority provided by RSA 275:54, incorporates the "Wage and Hour Publication 1312, Title 29 Part 785 of the Code of Federal Regulations, United States Department of Labor."

N.H. Code Admin. R. Ann. 803.05 (2005). This section of the Code of Federal Regulations is also entitled "Hours Worked," and of its approximately 50 subsections, the Employees pointed to two as evidence that New Hampshire intended to include overtime wages required by the Fair Labor Act. Pl. Dismiss Opp. at 6. These provisions state:

> 785.5 General requirements of sections 6 and 7 of the Fair Labor Standards Act. Section 6 requires the payment of a minimum wage by an employer to his employees who are subject to the Act. Section 7 prohibits their employment for more than a specified number of hours per week without proper overtime compensation.

29 C.F.R. § 785.5; Principles for Determination of Hours Worked; "785.49 Applicable provisions of the Fair Labor Standards Act. [Section 7] provides that persons may not be employed for more than a stated number of hours a week without receiving at least one and one-half times their regular rate of pay for the overtime hours." 29 C.F.R. § 785.49(b); Miscellaneous Provisions.

Fidelity responded that the New Hampshire regulation cited by the Employees relates to the calculation of hours worked. Def.'s Reply Mem. in further Supp. of their Mot. to Dismiss [Doc. No. 38] ("Def. Dismiss Rep.") at 2. Similarly, the federal regulation it incorporates by reference also relates to the determination of hours worked. Id. Fidelity argued that "[the] reference to the federal regulation governing the calculation of

hours worked does not import the entire federal overtime pay scheme into New Hampshire law." Id.

The term "wages" as defined by New Hampshire expressly excludes compensation that is not the product of an agreement. The references in the federal regulations identified by the Employees cannot overcome this explicit limitation. The Introductory Statement to the federal regulation Section 785 on which the Employees rely, states the following:

> Section 6 of the Fair Labor Standards Act . . . requires that each employee, not specifically exempted, who is engaged in commerce, or in the production of goods for commerce, or who is employed in an enterprise engaged in commerce, or in the production of goods for commerce receive a specified minimum wage. Section 7 of the Act . . . provides that persons may not be employed for more than a stated number of hours a week without receiving at least one and one-half times their regular rate of pay for the overtime hours. The amount of money an employee should receive cannot be determined without knowing the number of hours worked. This part discusses the principles involved in determining what constitutes working time. It also seeks to apply these principles to situations that frequently arise. It cannot include every possible situation. No inference should be drawn from the fact that a subject or an illustration is omitted.

29 C.F.R. § 785.1; Introductory Statement (emphasis added). The regulation then goes on to construe terms such as "hours worked"; discuss the nuances of "waiting time," "rest and meal periods," and "travel time," and outlines provisions for recording working time. See generally 28 C.F.R. § 785. It is, therefore, reasonable to conclude that New Hampshire intended to make use of the various constructions and definitions regarding hours worked

provided by this regulation and apply them to its state wage law, not to broaden its definition of "wages" to include federally mandated overtime.

This reasoning is bolstered by the fact that the Employees could not identify one New Hampshire case - state or federal - in which plaintiffs sought a recovery of federally mandated overtime under the state statutes they referenced.[16]  In contrast to the implied incorporation of federally mandated overtime pay that the Employees argued was the state's intent, New Hampshire has explicitly incorporated the federal minimum wage into its wage law, providing that no employer shall employ anyone at "an hourly wage lower than that set forth in the federal minimum wage law" or the state's own minimum hourly rate, whichever is higher. N.H. Rev. Stat. Ann. 279.21 (2005).

Given the definition of wages provided by the state statute and the absence of state case law supporting plaintiff's position, the Court ruled that an action for federally mandated overtime cannot be had under the New Hampshire Wage law.

---

[16]  The Employees generally cited New Hampshire caselaw in support of the proposition that Chapter 275 and Section 275.53 (Employee remedies statute) in particular must be construed so as to "effectuate the broad purpose of protecting employees."  Pl. Dismiss Opp. at 3 (quoting Galloway v. Chicago-Soft, Ltd., 142 N.H. 752 (1998)).

**D.   Even If This Claim Were Viable, A Rule 23 Class Action Is Not The Appropriate Vehicle For This Claim**

1.   New Hampshire Wage Law May Not Allow Employee Class Actions

New Hampshire wage law provides:

Action by an employee to recover unpaid wages and/or liquidated damages may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves, or such employee or employees may <u>designate</u> an agent or representative to maintain such action.

N.H. Rev. Stat. Ann. 275.53(I); Employees' Remedies (2005) (emphasis added).  Whether this language allows for a class action is unclear; it is clear, however, that the Employees did not pointed to a case, in state or federal court, where New Hampshire wage claims have been brought as a class action.[17]  The New Hampshire Supreme Court does adhere to the maxim <u>expressio unius est exclusio alterius</u> (the express mention of one thing implies the exclusion of others) in interpreting statutes granting standing and have limited standing to individuals enumerated in the governing statue.  Def. Dismiss Mem. at 6, n. 12; <u>St. Joseph Hosp. Of Nashua</u> v. <u>Rizzo</u>, 141 N.H. 9, 11-12 (1996)

_____

[17]   Fidelity cited <u>Labor Ready N.E., Inc</u> v. <u>New Hampshire Dep't of Labor</u>, 147 N.H. 721, 723 (2002), for the proposition that the statute does not authorize representative actions.  Def. Dismiss Mem. at 6.  The court's decision in <u>Labor</u>, relates to a different provision of the statute which specifically states that the commissioner (and the Department of Labor as his designee) can only bring an action on behalf of an employee upon "express assignment from the employee."  147 N.H. at 723; <u>See</u> N.H. Rev. Stat. Ann. 275:53(II).

38

(holding third party creditors lacked standing where the statute specifically enumerated parties empowered to sue); In re Guardianship of Raymond E., 135 N.H. 688, 691 (1992) (holding that only the individuals listed in the statute have standing to petition for guardianship). Interpreting statute 275:53 strictly would limit standing to the employee/employees or their designee.

The Employees, citing Califano v. Yamasaki, 442 U.S. 682 (1979), argued that, in the absence of an express intention by New Hampshire to prohibit class relief under its wage statue, the claim should be allowed. Pl. Dismiss Opp. at 8; Califano, 442 U.S. at 700 ("In the absence of a direct expression by Congress of its intent to depart from the usual course of trying 'all suits of a civil nature' [quoting Fed. R. Civ. P. 1] under the [r]ules established for that purpose, class relief is appropriate . . . ."). Califano involved a federal statute that did not enumerate the parties who could bring a suit, but stated that "any individual" may seek review of an agency decision by civil action. Califano, 442 U.S. at 698 n.12 (discussing 42 U.S.C. § 405(g)). The Supreme Court ruled that "[s]ection 205(g) contains no express limitation of class relief." Id. at 699. The New Hampshire statute may contain such an express limitation. The wording of the statute and the lack of class action employee wage lawsuits in New Hampshire leaves a significant degree of doubt as to whether class actions are allowed.

39

2.    The Fair Labor Act Definitely Does Not Allow
      Federal Overtime Claims To Be Brought As A Rule 23
      Class Action

The Fair Labor Act provides that:

Any employer who violates the provisions of section 206
and 207 of this Act shall be liable to the employee or
employees affected in the amount of their unpaid
minimum wages or their unpaid overtime compensation, as
the case may be, and in an additional equal amount as
liquidated damages . . . . An action to recover the
liability prescribed . . . may be maintained against
any employer . . . by any one or more employees for and
in behalf of himself or themselves and other employees
similarly situated.  No employee shall be a party
plaintiff to any such action unless he gives consent in
writing to become such a party and such consent is
filed in the court in which such action is brought.

29 U.S.C. § 216(b) (emphasis added).  Certainly the Fair Labor

Act states clearly that actions brought for violation of the Act

cannot be brought as class actions.  See Cameron-Grant, 347 F.3d

at 1248 (discussing Congress's intent to prevent Rule 23 class

actions in adding the "opt-in" language).  Though the Employees

bring a state-law claim, it is an action to recover unpaid

federally mandated overtime compensation.  As such, it must be

brought pursuant to the procedures in Section 216.

The Employees referenced a number of cases where claims

under state wage laws and the Fair Labor Act were brought

together in an action.  Pl. Dismiss Opp. at 12-16.  They cite

McLaughlin v. Liberty Mutual Ins. Co., 224 F.R.D. 304 (D. Mass.

2004) (Keeton, J.), for the proposition that there is no reason

to infer from the Fair Labor Act's restriction on federal

40

remedies "a concomitant restriction on state remedies." Id. at 308. In McLaughlin, however, the district court noted that the "FLSA action and state law remedies are entirely separate rights[18] that may be pursued by plaintiffs." Id. (emphasis added). The case law cited by the Employees presumes an independence between the two claims. See, e.g., Goldman v. RadioShack Corp., No. 2:03-CV-0032, 2003 U.S. Dist. LEXIS 7611, *6 (E.D. Pa. Apr. 17, 2003) (exercising supplemental jurisdiction over state claims, noting that Fair Labor Act and the state wage act, Pa. Stat. Ann. 43 §104(c), both "require overtime pay for each hour in excess of forty hours per week that the employee works"); Beltran-Benitez v. Sea-Safari, 180 F. Supp. 2d 772, 773-4 (E.D.N.C. 2001) (exercising supplemental jurisdiction over claims of improper deductions of certain wage amounts under the North Carolina law where plaintiffs also alleged failure to pay overtime under the Fair Labor Act; finding that the Fair Labor Act does not bar application of Rule 23 to a separate cause of action); Ansoumana v. Gristede's Operating Corp., 201 F.R.D. 81,

---

[18]    The plaintiffs in McLaughlin were seeking to recover overtime pay under the Fair Labor Act and Massachusetts law. 224 F.R.D. at 306. Though not cited in the opinion, the Massachusetts law claim relates to a statute governing the payment of overtime compensation. See Mass. Gen. Laws Ann. ch. 151 § 1A; see Def. Rep. at 7, n.7 (confirming from the docket that the state claims were asserted under chapter 151). Unlike New Hampshire's statute, employers covered under the Fair Labor Act are not exempt from this provision. See Mass. Gen. Laws ch. 151, § 1A.

84-5, 88 (S.D.N.Y. 2001) (granting Rule 23 class certification based on plaintiffs' allegations that they were not paid minimum wage, overtime premium pay, or "spread of hours" compensation in violation New York's Minimum Wage Act, N.Y. Lab. L. § 650 et seq., where plaintiffs also claimed violations of the Fair Labor Act); <u>Ladegaard</u> v. <u>Hard Rock Concrete Cutters</u>, No. 00 C 5755, 2000 U.S. Dist. LEXIS 17832, *1, *7 (N.D. Ill. Dec. 1, 2000) (granting Rule 23 class certification to claims of Illinois minimum wage and reporting violations where plaintiff also alleged Fair Labor Act violations).  The state law claims asserted in these cases are not akin to the Employees' "state law" claim that they ought have received federal overtime.

The Court therefore ruled that, under the provisions of the Fair Labor Act, even if the Employees had a viable claim under New Hampshire Wage Law for federally mandated overtime, this claim could not be brought as a Rule 23 class action.

## IV.   CONCLUSION

Accordingly, Fidelity's Motion to Dismiss Count II of the
Amended Complaint [Doc. No. 16] was ALLOWED.


SO ORDERED.

William G. Young

WILLIAM G. YOUNG
DISTRICT JUDGE