# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSSETTS

| | |
|---|---|
| DEBBIE L. TREZVANT, TIMOTHY CAHILL, DEBORAH CHERYL ARCH, and MARY-CATHERINE PICHE, each of them individually and on behalf of all others similarly situated and similarly situated current and former employees of Defendant<br><br>                    Plaintiffs,<br><br>          v.<br><br>FIDELITY EMPLOYER SERVICES CORPORATION, FIDELITY EMPLOYER SERVICES COMPANY, LLC, and FMR CORP.,<br><br>                    Defendants. | Case No.  05-10673 (WGY) |

## PLAINTIFFS' REPLY MEMORANUM IN FURTHER SUPPORT OF THEIR REQUEST TO CERTIFY QUESTIONS OF STATE LAW TO THE NEW HAMPSHIRE SUPREME COURT AND FOR A STAY OF THEIR CLAIMS

Plaintiffs, Debbie L. Trezvant, Timothy Cahill and Deborah Cheryl Arch, on behalf of themselves and the proposed Rule 23 class (collectively, "Plaintiffs"), respectfully submit this memorandum of law in further support of their request that this Court certify the questions of New Hampshire law to the New Hampshire Supreme Court for resolution.[1]  The memorandum is also in further support of a request to stay the proceedings in this Court until the New Hampshire Supreme Court has resolved or otherwise disposed of the Certified Questions in order to preserve the state court's

---

[1]        Plaintiffs' stand by their phrasing of the questions as more appropriate than Defendants'. *See* Pls.' Req. to Certify Questions, at 1-2.

jurisdiction to answer those questions and so as not to unfairly prejudice Plaintiffs and/or the proposed class.[2]

## **Preliminary Statement**

Since the February 14, 2006 hearing when the Court requested that the parties frame questions to be considered for certification to the Supreme Court of New Hampshire, the Plaintiffs were negotiating with the Defendants over the language of the questions, as well as discovery issues and the decertification of the FLSA opt-in class. Plaintiffs diligently worked to resolve as many issues as possible prior to the submission of the motion and did not delay.

Defendants have characterized Plaintiffs' motion to certify questions to the New Hampshire Supreme Court as one for reconsideration of rulings by this Court at the February 14, 2006 Hearing.  *See* Def.'s Opp'n, at 3-4.  We believe this characterization is incorrect.  Plaintiffs are not seeking reconsideration of the Court's dismissal of their state law claim.  Rather, the submission was at the Court's request for the submission of questions for certification to the New Hampshire Supreme Court.  *See* Tr. of Mot. Hr'g, dated February 14, 2006, at 8 (attached as Exhibit A) ("You frame the questions, the defense, or the plaintiff, rather, can frame the questions to be submitted to the Supreme Court of New Hampshire, serve a copy on the other side, they can state their objections, and I will consider certifying the key questions to the Supreme Court of New Hampshire.") and Minute Order ("The Court will consider whether to certify the question

---

[2]      As this memorandum addresses points raised by the Court's June 1, 2006 ruling which was issued after the Plaintiffs' original memorandum and Defendants' Opposition, it focuses on some issues which were not specifically addressed in either the original memorandum or the Opposition.  Plaintiffs respectfully request that in the interest of justice the Court consider the entire submission, especially in light of the somewhat unusual procedural posture here.

to the Supreme Court of New Hampshire.  A proposed question is to be prepared, served and filed.")

**I.      Plaintiff's Proposed Questions are Novel and Unsettled, and the Court
         Should Certify Questions to the New Hampshire Supreme Court**

As the Certified Questions are "novel" "dispositive legal question[s]," and "the state's law in the area is unsettled," they are appropriate for certification to the New Hampshire Supreme Court.  *Therrien v. Sullivan*, No. Civ. 04-31-SM, 2005 WL 589425, at *7 (D.N.H. Mar. 14, 2005).  The vigor and content of the parties' debate on the issues demonstrates that the certification is appropriate.  The heart of the questions posed by both sides is the interpretation of state statutes, which is an area properly "within the [purview] of the state's courts."  *See Acadia Ins. Co. v. McNeil*, 116 F.3d 599, 604 (1st Cir. 1997) ("Because the answer to this question is not obvious to us, and because New Hampshire's highest court is the final arbiter of the meaning of a statute of that state, we believe that we should certify this question.").

Thus, while Plaintiffs maintain that their reading of sections 275:42 and 275:43 is the most logical, it is readily apparent that the statutes are – at the very least – ambiguous on the issues of whether employees can bring a class action claim for FLSA mandated overtime under the New Hampshire statues.

A.  **Question 1 – Whether A Cause of Action or Claim for Relief Under Section 275:43 for Wages Due May Include Unpaid Federally Required Overtime Wages**

1.  **The Statutory Language Does Not Clearly Permit Or Prohibit An Action For Federally-Mandated Overtime, Nor Is There Any Clear Precedent On This Issue.**

Contrary to Defendants' assertions, it is unclear, unsettled, and wholly unaddressed whether Section 275:43 (I) permits an action for federally-mandated overtime pay.[3]  While this Court correctly points out Plaintiffs' failure to cite to any cases that address an action under Section 275:43 (I) for federally-mandated overtime pay (*See* June 1, 2006 Ct. Mem., at 37), Defendants similarly have been unable to cite to any cases that barred such an action.

Despite Defendants' reliance, the definition of "wages" in Section 275:42 does not answer the question of whether Section 275:43 (I) permits an action for federally-mandated overtime pay.  Section 275:42 (III) states:

> The term "wages" means compensation, including hourly health and welfare, and pension fund contributions required pursuant to a health and welfare trust agreement, pension fund trust agreement, collective bargaining agreement, or other agreement adopted for the benefit of an employee and agreed to by his employer, for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or other basis of calculation.

N.H. Rev. Stat. Ann. § 275:42 (III) (2006).  Defendants have taken the position that, despite its placement in the sentence, the phrase "or other agreement" limits the meaning of the term "compensation."  *See* Def.'s Opp'n, at 8 n.5.  This supposition is both illogical and ungrammatical.

---

[3]    Plaintiffs respectfully submit that a claim under 275:43 (I) is not duplicative of their FLSA claim.  Unlike the FLSA, the New Hampshire law provides a three-year statute of limitations period regardless of whether Plaintiffs are able to prove willfulness.  *See* Pls.' Req. to Certify Questions, at 16.

4

First, Defendants' understanding of Section 275:42 (III) is presumably based upon an interpretation of the word "including" as limiting, *i.e.*, creating an exclusive list. Although the word "include" may be used with this meaning, "*Include* is used most appropriately before an incomplete list of components . . ." THE AMERICAN HERITAGE DICTIONARY 651 (2nd College ed. 1985) (italics in original) (attached as Exhibit B). Accordingly, the most straightforward reading of 275:42 (III) is a provision which defines "wages" as "compensation" and then presents a non-exclusive list of types of compensation that are included.

Moreover, given the fact that the phrase "or other agreement" follows "hourly health and welfare" and "pension fund contributions" it is grammatically correct to interpret the "or other agreement" as modifying the later phrases, rather than the word "compensation." *See Anhydrides & Chemicals, Inc. v. United States*, 130 F.3d 1481, 1483 (Fed. Cir. 1997), *quoting* C. DALLAS SANDS, 2A SUTERHLAND STATUTORY CONSTRUCTION § 47.33 (4th ed.) (footnotes omitted) ("The rules of grammar apply in statutory construction: Referential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent, which consists of 'the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence.'"); *New Hampshire Mun. Trust Workers' Compensation Fund v. Flynn*, 133 N.H. 17, 21 (N.H. 1990), *quoting Lake County v. Rollins*, 130 U.S. 662, 670 (1988) ("To get at the thought or meaning expressed in a statute, a contract or a constitution, the first resort, in all cases, is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them.")

Indeed, Section 275:43 (III) states that "wages" includes "[v]acation pay, severance pay, personal days, holiday pay, sick pay and payment of employee expenses, when such benefits are a matter of **employment practice or policy**, or both."   N.H. Rev. Stat. Ann. § 275:43 (III) (2006) (emphasis added).  Clearly, the inclusion of payments made as a matter of "practice or policy" (in the context of benefits) undermines any reading of the term "wages" as including only payments made pursuant to an agreement. (This section, which discusses various benefits and not salary or hourly wages, should, of course, not be read as being an exclusive list of types of wages.)

Defendants have cited no authority restricting Section 275:42 (III) "wages" to compensation pursuant to an employment contract or agreement or barring the otherwise broad and remedial use of Section 275:43 (I) from permitting employees to recover federally mandated overtime pay.  To the contrary, the cases cited by Defendants support a broader interpretation of the definition of "wages" than the narrow one they propose, and by the use of ellipsis, indicate that "compensation" is not limited to "agreement[s]." For instance, *Ives v. Manchester Subaru, Inc.*, 126 N.H. 796, 800 (N.H. 1985), interpreted Section 275:42 (III) as broadly "defin[ing] wages as 'compensation … for labor or services rendered by an employee, whether the amount is determined on a time task, piece, commission or other basis of calculation.'" (*quoting*, § 275:42(III)) (ellipsis in original).  The court in *Ives* found that the plaintiff's profit sharing agreement fell under 275:42(III) because it was "compensation calculated on some 'other basis'" and was "compensation for labor and services."  *Id*.  Contrary to Defendants' claims, *Ives* did not purport to define or limit wages to compensation pursuant to an agreement.  Defendants' argument that *Ives* is restrictive is absurd.  *Ives* happened to involve a profit sharing

6

agreement; however, no restriction on the definition of "wages" can, under any possible reading of *Ives*, be implied. Indeed, if anything, *Ives* understood employment agreements to be merely one type of compensation.

Nor did *Gilman v. County of Cheshire*, 126 N.H. 445 (N.H. 1985), the only other case cited by Defendants, profess to limit "wages" to compensation pursuant to agreements. *Gilman* involved a sick leave policy, not an employment agreement, and rather than stating that wages/compensation are limited to employment agreements, the court stated that benefits which "constitute a part of an employee's compensation . . . form a part of the employment contract." *Id.* at 449. Again, no possible reading of *Gilman* implies a restriction of wages to agreements.

The Defendants actually misquote N.H. Code Admin. R. Ann. 803.02(g) as limiting wages to agreements; in actuality, the Rule states that the employer is required to "[p]ay wages based [both] upon required records of hours worked per RSA 279:27 and RSA 275:49, VI, and in accordance with written or verbal agreement between the parties per RSA 275:49, I-III . . . ." This is a mandate, not a restriction, and merely brings attention to Defendants failure to keep records of the hours worked by Plaintiffs and pay wages for those hours.

The Untied States District Court for the District of New Hampshire articulated the definition of "wages" in precisely the same manner as the New Hampshire Supreme Court. *See McCarthy v. Citigroup Global Markets, Inc.*, No. Civ. 04CV477JD, 2005 WL 3447958 at *5 (D.N.H. Dec. 15, 2005) ("The New Hampshire wage laws apply to "compensation … for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or other basis of calculation.") (*quotation*

*omitted*) (ellipsis in original). Furthermore, the court in *McCarthy* stated that an employee was entitled to have Section 275:43 (I) applied to his action for "earned compensation," despite the fact that the employee had signed an agreement to waive the payment of wages in order to participate in a stock purchase plan. *McCarthy*, 2005 WL 3447958 *8 (remanding the issue to arbitration). Thus, the court clearly contemplated the application of Section 275:43 (I) to an action for wages that was not pursuant to any agreement between the employer and employee – indeed, the wages sought in *McCarthy* were in **direct contradiction** to the parties' agreement.

The Supreme Court of New Hampshire has also recognized that an employee can bring a claim under the New Hampshire statutes for the payment of wages (including N.H. Rev. Stat. §§ 275:42, 275:43) for wages that were not pursuant to an employment contract or agreement. *Hobart v. Duvall*, 112 N.H. 420, 421-423 (N.H. 1972) (ruling that municipal employees could bring a claim to recover unpaid wages which had accumulated as a result of "departmental policy requiring one hour of free work before overtime is given" and which was in **direct contradiction** to the departmental policy).

As stated in Plaintiffs' Request to Certify Questions, the New Hampshire Supreme Court, in other contexts, has ruled that the term "wages" includes overtime pay. *See, e.g., In re Appeal of Berlin Educ. Ass'n, NHEA/NEA*, 125 N.H. 779, 783-84 (N.H. 1984) ("'[C]ourts have rather consistently held that such items as overtime pay, . . . are mandatory subjects of [collective] bargaining encompassed within the term 'wages.'"); *Brampton Woolen Co. v. Local Union 112*, 95 N.H. 255, 257 (N.H. 1948) (in determining arbitrability under a collective bargaining agreement, the court stated "[t]here can be little doubt that workers generally consider the money which comes to them as a result of their

8

labors, whether it be regular pay, overtime or vacation pay as a part of their wages and courts have recognized this fact").

Furthermore, as discussed in Plaintiffs' Request to Certify Questions, the position that "all wages due" includes FLSA overtime pay is consistent with (albeit, as this Court found, not mandated by) the accompanying regulations[4] and the New Hampshire Supreme Court's requirement that chapter 275 be interpreted to give effect to its broad remedial purpose. *See* Pls.' Req. to Certify Questions, at 5-6.

Finally, even if 275:43 (I) were, contrary to the arguments and authority set forth above, narrowly limited to claims for compensation that are the result of an agreement, such an agreement can here be found.   Fidelity defines employees as "Exempt" or "Nonexempt" pursuant to FLSA provisions.  (FID002971) (attached as Exhibit C). "Nonexempt employees are paid one and one-half times their regular hourly rate of pay for all hours worked in excess of 40 hours during the workweek." (FID003191; FID003192; FID003194; FID003195) (Exhibit C).  These writings and policies establish an agreement pursuant to which a nonexempt employee is entitled to overtime.  *See Straughn v. Delta Air Lines, Inc*., 250 F.3d 23, 45 n.11 (1st Cir. 2001) ("statements in employee handbooks regarding benefits may give rise to enforceable contracts under New Hampshire law.");  *Avery v. City of Talladega, Ala*., 24 F.3d 1337, 1348 (11th Cir. 1994) (finding that in the case that an employment handbook incorporates the FLSA, "[i]f a violation of the FLSA has occurred, then a violation of the **contract**, which incorporates the FLSA, will have occurred as well.") (emphasis added) *See also Gilman*,

---

[4]     Although New Hampshire law does not explicitly recognize that federally mandated overtime is incorporated in "wages" under 275:42 (III) and 275:43 (I), the law is certainly open to federally mandated overtime being included as wages, and thus it is a question ripe for certification to the New Hampshire Supreme Court.

126 N.H. at 449 (benefits which "constitute a part of an employee's compensation . . . form a part of the employment contract.")

**B. Question 2 – Whether the New Hampshire Legislature Directly Expressed an Intent to Prohibit Opt-Out Class Actions for Causes of Action or Claims for Relief Brought Pursuant to Section 275:43 for Wages Due**

**1. It Is (at Worst) Unclear Whether A Federal Rule 23 Class Action Can Be Brought For Violations of Section 275:43**

Although Plaintiffs have found no case in which employees as a class sought to vindicate their rights under Section 275:43, there is no language in the New Hampshire statutes which limit the availability of Rule 23 nor any indication that a Rule 23 Class Action was expressly excluded by the legislature. Nor have Defendants cited a single case rejecting a plaintiff's ability to bring a class action on a cause of action under Section 275:43. That research uncovers no class action previously brought under a statute is not a reason to either deny its availability or to decline to certify the question to the state court. To the contrary, an issue of first impression is precisely the type of issue that should be certified. If a class action under the statute at issue had previously been brought in New Hampshire, there could be no debate here – all parties would already know whether class treatment is or is not appropriate.

As this Court stated, N.H. Rev. Stat. Ann. 275:53(I) [5] may be interpreted "to limit standing to the employee/employees or their designee." (June 1, 2006 Mem. at 39) However, this may be immaterial as the named plaintiffs in a class are regularly referred to as being "designated" as the class representatives or lead plaintiffs. *See*, e.g. *Gratz v.*

---

[5]     "Action by an employee to recover unpaid wages and/or liquidated damages may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves, or such employee or employees may designate an agent or representative to maintain such action." N.H. Rev. Stat. Ann. 275:53(I)

*Bollinger*, 539 U.S. 244, 253 (2003); *Anchem Products, Inc. v. Windsor*, 521 U.S. 591, 602-603 (1997); *Ballard v. Tyco Int'l*, No. 02-MD-1335-PB, 2005 WL 928537 at * 1 (D.N.H. April 22, 2005). Moreover, as recognized by the Court, no prohibition is plainly obvious from the language of the statute, and it is an unsettled issue whether a class action can be brought for a Section 275:43 claim. There is no reason to assume the language is restrictive of a class action, and thus, the statute cannot possibly qualify as a "direct expression" prohibiting a class action.[6]

Because there is no "direct expression" by the state legislature to specifically and completely prohibit plaintiffs from pursuing a Rule 23 class action, the Court should follow federal procedural law to determine whether a class action can be brought and allow a Rule 23 class action under the line of cases cited in Plaintiffs opening brief. *See* Pls.' Req. to Certify Questions, at 11-13) At a minimum, whether the New Hampshire legislature made a "direct expression" of its intent to prohibit class actions is a question appropriate for certification to the New Hampshire Supreme Court.

Additionally, in addition to the vast majority of courts that routinely allow state law overtime class actions supplemental to FLSA actions, courts have recognized that Rule 23 class actions are appropriate for state wage collection claims based **only** upon FLSA required overtime. *See Bartleson*, 219 F.R.D. 629 at 638-639 (acknowledging that a Rule 23 class action *could* be brought for a state wage collections law based upon the employer's failure to pay federal overtime wages under the FLSA; however, the court found that numerosity was not met). "The very fact that the [state wage collections law] looks to the FLSA to determine the wages due under these circumstances [unpaid

---

[6]    A direct expression could, for instance, read as follows: "Class actions under this statute are prohibited."

11

overtime] lends support to the plaintiff's assertion that the FLSA and [state wage collections law] claims [brought as a Rule 23 class action] properly may be brought in the same action." *Bartleson v. Winnebago Indus.*, No. C02-3008-MWB, 2003 WL 22427817, *3 (N.D. Iowa Oct. 24, 2003), *modified by*, 219 F.R.D. at 634.

Finally, as noted above in footnote 3, the New Hampshire statute is not duplicative of the FLSA. The statute at issue here varies from the FLSA in one critcal aspects, the limitations period. Under the FLSA, the limitations period is two years, absent a showing of willfulness. The New Hampshire statute under consideration has a three year statute without regard to willfulness.

### 2. Courts Have Interpreted State Wage Collections Statutes to Cover FLSA Overtime and Allowed Opt-out Rule 23 Class Actions

The fact that other courts have interpreted their state's wage collections statutes as including FLSA overtime provides further indication that Plaintiffs' proffered interpretation of the statute is at least worthy of consideration by the state's highest court, which has never addressed this question.

"If the goal of the FLSA is generally to protect workers and their right to minimum wages and overtime, no real threat to accomplishment of that goal is posed by [a state law which "borrows" from the FLSA yet which has "enhanced remedies"]. *Willis v. Cal-Western Transport*, No. CV-00-5695, slip op. at 10, 19 (E.D.Cal. December 22, 2000) (ruling that the FLSA did not preempt a Rule 23 opt-out class action under California unfair competition state law, and accordingly, "the more permissive treatment of class actions under the [state law] . . . [did] not conflict with any congressionally mandated exclusive arrangement.")

> [S]tate wage actions . . . which are governed by procedures more
> beneficial to plaintiffs than those in the FLSA and which may provide for
> remedies to plaintiffs more beneficial than those in the FLSA do not
> frustrate congressional purpose as evidence by the FLSA and the Portal to
> Portal Act amendments.

*Aragon v. Bravo Harvesting, Inc.*, No. CIV-89-1282-PHX-RCB, 1993 WL

432402 at * 6 (D. Ariz. May 7, 1993) (Ruling that Plaintiffs could bring an

Arizona state law claim – which had been certified as a Rule 23 class action – to

remedy FLSA violations)

   In *Anthony v. State*, the Iowa Supreme Court ruled that FLSA overtime pay is

covered by state wage collections law, which provides employees an action to collect

unpaid wages similar to Section 275:43.  632 N.W. 2d 897, 901-902 (Iowa 2001).  In

doing so, the court found that FLSA overtime fell under the definition of "wages," which

is defined under the relevant Iowa law as "compensation owed by an employer."  The

Iowa statute is, for our purposes, identical to the New Hampshire statute. [7]

   Moreover, in a case nearly identical to the one currently before this Court, the

United States District Court for the Northern District of Iowa ruled that the plaintiffs in

an FLSA case could bring a separate cause of action under the state wage collections law,

based upon the employer's failure to pay federal overtime wages under the FLSA.

---

[7]   The full definition of "wages" under the relevant Iowa law is as follows:  "compensation
owed by an employer for:
*a.* Labor or services rendered by an employee, whether determined on a time, task, piece,
commission, or other basis of calculation.
*b.* Vacation, holiday, sick leave, and severance payments which are due an employee
under an agreement with the employer or under a policy of the employer.
*c.* Any payments to the employee or to a fund for the benefit of the employee, including
but not limited to payments for medical, health, hospital, welfare, pension, or profit-
sharing, which are due an employee under an agreement with the employer or under a
policy of the employer. The assets of an employee in a fund for the benefit of the
employee, whether such assets were originally paid into the fund by an employer or
employee, are not wages.
*d.* Expenses incurred and recoverable under a health benefit plan."
Iowa Code § 91 A.2(7).

*Bartleson v. Winnebago Indus.*, 219 F.R.D. 629, 634 (N.D. Iowa 2003).  ("[T]he [state wage collections] claim is essentially 'duplicative' of the FLSA claim in this action. However, the court does not agree with [the defendant] that a claim that is duplicative or that merely states an alternative theory of recovery on the same nucleus of facts is 'futile' or 'frivolous,' such that leave to amend to assert such a claim should be denied.").

Many other courts have taken the same position. S*ee, e.g. Barrois v. Title*, No. CIV A. 96-727, 1996 WL 312063, at *1 (E.D. La 1996) (plaintiff brought suit under Louisiana state law requiring employer to pay employee "all wages due within seventy-two hours following an employee's termination" for unpaid federal (FLSA) overtime wages); *Aguayo v. Oldenkamp*, No. CV F 04-6279 ASI LJO, 2005 WL 2436477 at *8-11 (E.D. Cal Oct. 3, 2005) *mot. denied by on other grounds by*, 2006 WL 845876 (E.D.Cal. Mar 31, 2006) (ruling that FLSA overtime rights can be "vindicated" through a Rule 23 opt-out class action on a California unfair competition state law); *Scholtisek v. The Eldre Corp.*, 229 F.R.D. 381, 392 (W.D.N.Y. 2005) (internal quotation omitted) (Certifying a Rule 23 class action under New York state laws which "require that any employee receive overtime pay as provided in the FLSA . . . .")

## II.    The Court Should Grant Plaintiff's Motion to Stay Final Decision on Count II Pending An Answer to the Certified Questions

In requesting that the Court stay its decision regarding dismissal of Plaintiffs'' state law claim, Plaintiffs are not seeking reconsideration of the Court's decision, but instead, seeking clarification.  With the greatest respect, Plaintiffs suggest that the Court had something else in mind in the wording of its February 14, 2006 ruling.

Plaintiffs understand the Court's ruling to recognize that Plaintiff's questions were dispositive and not addressed by New Hampshire Court.  *See* Exhibit A at 5-6

14

("Suppose I do dismiss Count II but I certify your two key questions to the Supreme Court, it is the Supreme Court, I believe, of New Hampshire, since New Hampshire has no law on it and these are questions that would be dispositive.")  Accordingly, although the Court dismissed Count II, it requested the parties to submit questions for certification.  *See id.* at 8 ("I think you're right, though, that Count II should be dismissed.  It will be dismissed.  You frame the questions, the defense, or the plaintiff, rather can frame the questions to be submitted to the Supreme Court of New Hampshire, serve a copy on the other side, they can state their objections, and I will consider certifying the key questions to the Supreme Court of New Hampshire.") and Minute Order ("After hearing the Motion to Dismiss is ALLOWED.  The Court will consider whether to certify the question to the Supreme Court of New Hampshire.  A proposed question is to be prepared, served and filed.")

As discussed in Plaintiffs' Request to Certify Questions, Plaintiffs understand that a final dismissal of their state law claim would deprive the New Hampshire Supreme Court of jurisdiction to consider the proposed Certified Questions.  *See* Pls.' Req. to Certify Questions, at 14-15.  *See also* N.H. Sup. Ct. R. 34 ("This court may answer questions of law . . . when requested by the certifying court if there are involved in any proceeding before it questions of law of this State which may be determinative of the cause ***then pending*** in the certifying court.") (emphasis added); *Brown v. Argosy Gaming Co.*, 384 F.3d 413, 416 (7th Cir. 2004) ("Without an underlying case in which to apply the answer from the state supreme court, certification can never be warranted.").

Accordingly, the Plaintiffs respectfully reiterate their request that the Court clarify this seeming contradiction by allowing final decision on Count II to be withheld until the

New Hampshire Supreme Court has an opportunity to consider questions certified to it.
This position is supported by *Migliori v. Airborne Freight Corp*, in which this Court read
a Massachusetts statute to not support the plaintiff's stated cause of action, yet certified
the state law issue to the Supreme Judicial Court of Massachusetts.  952 F.Supp. 38, 44
(D. Mass. 1997).  Although in *Migliori* this Court granted defendant's motion for
summary judgment and "administratively closed" the case, it conditioned its final order
upon the receipt of the state court's opinion.  *Id.*  Plaintiffs respectfully request that the
same procedure be ordered here.

**III.    The Court Should Stay Plaintiffs' FLSA Claim Pending Decision On The
        Certified Questions**

Since the Court ruled that it would not stay the Plaintiff's FLSA Claim, material
circumstances have changed; on May 3, 2006, on the parties consent, the FLSA class was
decertified, resulting in an expedited trial.  At this date, documents have been exchanged,
and Defendants have taken the deposition of two of the plaintiffs.  Accordingly, there is
less chance of meaningful delay due to a stay.   While the case is not yet "trial ready,"
the bulk of the pre-trial work has been accomplished, and if this Court declines to certify
or Plaintiffs lose before the New Hampshire Supreme Court, it will not take long to
prepare the case for trial.  Discovery is currently scheduled to close July 22, 2006.  Thus,
if the case is now stayed and Plaintiffs' ultimately lose on the issue of the certified
questions, it will take only a few weeks to complete discovery.

Moreover, the absence of a stay would adversely prejudice the Plaintiffs and
result in judicial inefficiency for all the reasons stated in Plaintiffs' opening brief. *See*
Pls.' Req. to Certify Questions, at 15-17.  Significantly, a refusal to stay Plaintiffs' FLSA
claim will likely ultimately deprive the New Hampshire Supreme Court of jurisdiction to

consider the Certified Questions and thus deprive the Plaintiffs of the chance of a Rule 23 class action. Even if the New Hampshire Supreme Court answers the questions, without a stay, the Plaintiffs claims will likely have already been fully adjudicated, rendering the issue moot.

Accordingly, Plaintiffs respectfully request that the Court stay all of their claims until the Court decides whether to certify, and if it does, until New Hampshire Supreme Court has resolved or otherwise disposed of the Certified Questions.

<u>**CONCLUSION**</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court certify the following unresolved questions of state law to the New Hampshire Supreme Court: (i) whether a cause of action or claim for relief under Section 275:43 for wages due may include unpaid federally required overtime wages; and (ii) whether the New Hampshire legislature directly expressed an intent to prohibit opt-out class actions for causes of action or claims for relief brought pursuant to Section 275:43 for wages due. Plaintiffs further request that this Court stay all their claims pending this Court's decision on certification and then, assuming the Court certifies, pending a decision or other disposition of the Certified Questions by the New Hampshire Supreme Court, in order to preserve the state court's jurisdiction over the Certified Questions and so as not to unfairly prejudice the Plaintiffs and/or the proposed class.

Dated:       New York, New York
             June 21, 2006

                         Respectfully submitted,

                         DEBBIE L. TREZVANT, TIMOTHY CAHILL,
                         DEBORAH CHERYL ARCH, and MARY-
                         CATHERINE PICHE, each of them individually
                         and on behalf of all others similarly situated and
                         similarly situated current and former employees of
                         Defendants,

                         By their attorneys,

                         _____/s/_Michael D. Palmer_____
                         Michael Douglas Palmer
                         Charles E. Joseph (CJ-9442)
                         Joseph & Herzfeld LLP
                         757 Third Avenue, 25th Floor
                         New York, NY 10017
                         (212) 688-5640

                         Ira Spiro (CA State Bar No. 67641)
                         James Mark Moore (CA State Bar No. 180473)
                         Spiro Moss Barness Harrison & Barge LLP
                         11377 W. Olympic Blvd., 5th Floor
                         Las Angeles, CA 90063-1683
                         (310) 235-2468

                         Thomas E. Kenney (BBO No. 516590)
                         Pierce & Mandell, P.C.
                         11 Beacon Street, Suite 800
                         Boston, MA 02108
                         (617) 720-2444

**Exhibit A**

1

```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2
                                            Civil Action
 3                                          No. 05-10673-WGY

 4

 5    * * * * * * * * * * * * * * * *
                                    *
 6    DEBBIE L. TREZVANT, et al.,   *
                                    *
 7              Plaintiffs,         *
                                    *
 8    v.                            *    MOTION HEARING
                                    *
 9    FIDELITY EMPLOYER SERVICES    *
      CORPORATION, et al.,          *
10                                  *
                Defendants.         *
11    * * * * * * * * * * * * * * * *

12

13              BEFORE:   The Honorable William G. Young,
                             District Judge
14

15    APPEARANCES:

16
                SPIRO MOSS BARNESS HARRISON & BARGE, LLP
17        (By Ira Spiro, Esq.), 11377 W. Olympic Blvd.,
          5th Floor, Los Angeles, California 90063-1683, on
18        behalf of the Plaintiffs

19              SEYFARTH SHAW, LLP (By Richard L. Alfred,
          Esq. and Barry Miller, Esq.), World Trade Center
20        East, Two Seaport Lane, Suite 300, Boston,
          Massachusetts 02210-2028, on behalf of the
21        Defendants

22

23

24                                      Boston University Law School
                                        Boston, Massachusetts
25
                                        February 14, 2006
```

2

1            THE CLERK:  Calling Civil Action 05-10673, Trezvant

2       v. Fidelity.

3            THE COURT:  Would counsel please identify

4       themselves.

5            MR. SPIRO:  Yes, your Honor.  Ira Sprio, S P I R O,

6       for the plaintiff.

7            Your Honor, I have two associate counsel here who

8       have helped a great deal on the case.  They are not members

9       of this bar.  They are with a law firm who does have an

10      attorney who's a member of the bar here.  They won't speak,

11      but if they could be here with me, I would appreciate it.

12           THE COURT:  And they certainly may.

13           MR. SPIRO:  Thank you.

14           MR. ALFRED:  And, your Honor, Richard Alfred from

15      the firm Seyfarth Shaw for the defendants, and with me today

16      is my colleague, Barry Miller.

17           THE COURT:  All right.  The defendants have moved

18      to dismiss Count II of the complaint.  I would like to start

19      the argument with why I ought not do precisely what the

20      defendants want.  There's no New Hampshire -- well, let me

21      give you my mindset at the outset and you can move me off

22      it.

23           It's that it doesn't look to me like New Hampshire

24      law applies here.  It sounds like this is an end run around

25      the Fair Labor Act's opt-in requirements.  And I guess I've

3

1    said probably too much already.  Why don't you start with

2    that.

3             MR. SPIRO:  Sure, your Honor.  I'm making a note of

4    what you said.

5             Let's see.  The end run argument has been made in a

6    lot of places and in a lot of courts including this, in a

7    case that I'll cite.  There are many state statutes that are

8    interpreted -- let me rephrase it.  There are many state

9    statutes requiring, requiring the payment of wages that are

10   interpreted to include payment of wages not only under state

11   law but under the FLSA.  And that includes state statutes

12   that do not reference, adopt, or in any way refer to, it's

13   the same as reference, the FLSA.  One of those is what's

14   sometimes called the unfair competition law, it's the Unfair

15   Practices Act in the State of California, Business

16   Professions Code, Section 1700 and following, which, oddly

17   enough, was interpreted by a case in this Court because of a

18   transfer from California to New York.

19            THE COURT:  But look what you're trying to do here,

20   always practically.  The Fair Labor Standards Act has a

21   specific opt-in requirement.  You're trying to create a

22   class action under a state law, and I have grave doubts

23   about whether that state law even applies here.

24            Why shouldn't -- why should I not dismiss Count II

25   given the laws of the State of New Hampshire which I must

4

1    respect here.

2         MR. SPIRO:  The laws of the State of New Hampshire

3    stated in Section, it's 275.483, that all wages, it says all

4    wages shall be paid on time, within eight days.  There is

5    nothing, absolutely nothing in the laws of the State of New

6    Hampshire that negate the following obvious conclusion from

7    that, those words, the word wages.  All wages due.  The

8    obvious conclusion being that all wages due means all wages

9    due --

10        THE COURT:  Including --

11        MR. SPIRO:  -- under whatever law.

12        THE COURT:  Including, you say, federally mandated

13   overtime.

14        MR. SPIRO:  That's what I'm saying.

15        THE COURT:  I do understand the argument.  But you

16   have no case in New Hampshire that supports it.

17        MR. SPIRO:  There's no case one way or the other in

18   New Hampshire that supports that.  All we have is our minds

19   on that point to figure what makes sense under the words of

20   that statute.  And, and we have the words of the

21   Massachusetts -- I'm sorry, the New Hampshire Supreme Court

22   in the case of Galloway which says interpret this statute,

23   interpret all of our wage statutes broadly so as to be most

24   protective of the employee.  In order to follow that the

25   term all wages due has to include the wages due under the

5

1     Fair Labor Standards Act.

2            THE COURT:  What makes you think -- I do understand

3     the argument and I thank you for it.  What makes you think

4     that you can get class action treatment?  There is no --

5     under, what's the New Hampshire statute, 275, Section 53.

6     What makes you think you can get class action treatment for

7     such a claim?

8            MR. SPIRO:  What makes me think that is the case of

9     McLaughlin, a case in this Court, that interpreted that,

10    that dealt with a cause of action under New Hampshire --

11    pardon me, under Massachusetts state wage law, which also

12    does not contain a provision for class action but which held

13    that a class action could and in fact was maintained under

14    Rule 23 under the New Hampshire law along with --

15           THE COURT:  No, you said that's under Massachusetts

16    law.

17           MR. SPIRO:  I keep saying New Hampshire,

18    Massachusetts.  Pardon me.  I'm from California.

19           THE COURT:  You wish it were New Hampshire.

20           MR. SPIRO:  I wish.  My fondest wish.  Under

21    Massachusetts law, the Court held that there can be both an

22    opt-out Rule 23 class action and an opt-in FLSA class, what

23    they call collective or representative action.

24           THE COURT:  Let me ask you this.  Suppose I do

25    dismiss Count II but I certify your two key questions to the

6

```
 1    Supreme Court, it is the Supreme Court, I believe, of New
 2    Hampshire, since New Hampshire has no law on it and these
 3    are questions that would be dispositive.  I'm not staying
 4    this action.  We're going ahead on this action.  But how
 5    would you feel about that, you would have to litigate in two
 6    courts at one time.
 7            MR. SPIRO:  How would I feel about it?  I would
 8    rather litigate -- I would rather that the case proceed here
 9    and that the motion to dismiss be denied.  But, I would be
10    very happy to litigate this question in front of the New
11    Hampshire Supreme Court.  I think the people of New
12    Hampshire deserve that.
13            THE COURT:  Why shouldn't I do that?  Why shouldn't
14    I, not staying anything, we'll get take care of this case in
15    accordance with the case management schedule.  But his
16    questions are interesting.  They are dispositive.  There is
17    no New Hampshire law on the case.  And New Hampshire law
18    does expressly require a liberal interpretation.
19            MR. ALFRED:  Well, your Honor, first of all, we
20    think the substantive law of New Hampshire is clear in the
21    definition of the term wages.  Wages is defined under New
22    Hampshire law limited to an agreement, a voluntary agreement
23    between an employer and an employee.  That is the policy of
24    the state, your Honor, that has been, that really is
25    consistent with the entire area of payment of wages law in
```

7

 1     New Hampshire which is quite narrow, quite more narrow than
 2     Massachusetts, for example.  And I can address the
 3     McLaughlin case in a minute.
 4            THE COURT:  Well, he's right when he says these
 5     statutes are to be interpreted literally, though, isn't he?
 6            MR. ALFRED:  Well, in a different context, not with
 7     respect to the definition.  And when you look to, if the
 8     Court looks to the Labor Ready case, which is a New
 9     Hampshire Supreme Court case, the New Hampshire Supreme
10     Court, albeit in a somewhat different context, but the New
11     Hampshire Supreme Court interpreted its law quite literally
12     and prohibited the New Hampshire Department of Labor in that
13     case from bringing a representative type action on behalf of
14     others finding specifically that its law didn't allow that.
15            THE COURT:  Well, that's because the statute says
16     specifically that the Commissioner and the Department of
17     Labor are the ones to enforce that law.
18            MR. ALFRED:  Just as the statute says specifically
19     that wages are to be defined as an agreement between, a
20     voluntary agreement, I should say, between an employer and
21     an employee.  And in this case, your Honor, if I could say,
22     there is no such agreement because from my client's
23     perspective these are exempt employees and it did not agree
24     to pay overtime wages.  There is no agreement.  So, looking
25     at the definition of the term as it says in the statute --

8

1           THE COURT:  Yes, I hear your argument but it may

2     prove too much.

3           I think you're right, though, that Count II should

4     be dismissed.  It will be dismissed.  You frame the

5     questions, the defense, or the plaintiff, rather, can frame

6     the questions to be submitted to the Supreme Court of New

7     Hampshire, serve a copy on the other side, they can state

8     their objections, and I will consider certifying the key

9     questions to the Supreme Court of New Hampshire.

10          Now, if I do that, it's not going to delay this

11    case at all.  This case is going to judgment.  That's the

12    order of the Court.  Count II's dismissed.

13          MR. SPIRO:  Thank you, your Honor.

14          MR. ALFRED:  Thank you, your Honor.  Is that both

15    questions, your Honor, both --

16          THE COURT:  Both -- yes, he can -- he's asking if

17    it's both questions.  And I do contemplate, does the wage

18    law apply here, and if it does, can it be maintained as a

19    class action.  I think they're entirely separate questions.

20          MR. ALFRED:  Yes.  Thank you, your Honor.

21          MR. SPIRO:  I would have thought the second

22    question is a federal question, your Honor.

23          THE COURT:  The question -- no.  I think not.

24          MR. SPIRO:  Well, under Massachusetts -- yes, I

25    understand what you are saying.

9

1              THE COURT:  That's the order of the Court.

2              MR. ALFRED:  Thank you, your Honor.

3              MR. SPIRO:  Thank you, your Honor.

4              (Whereupon the matter concluded.)

5

6                    C E R T I F I C A T E

7

8

9              I, Donald E. Womack, Official Court Reporter for

10    the United States District Court for the District of

11    Massachusetts, do hereby certify that the foregoing pages

12    are a true and accurate transcription of my shorthand notes

13    taken in the aforementioned matter to the best of my skill

14    and ability.

15

16

17

18

19    _____
                    DONALD E. WOMACK
20              Official Court Reporter
                   P.O. Box 51062
21         Boston, Massachusetts 02205-1062
                womack@megatran.com
22

23

24

25

**Exhibit B**

Case 1:05-cv-10673-WGY   Document 59-3   Filed 06/21/2006   Page 2 of 2

ness. *Incisive* and *trenchant* are applicable both to sharp mental perception and to its expression. They suggest the ability of the mind to penetrate to the heart of a subject and the power to express the thought thus formed clearly, usually succinctly, and very forcefully. *Biting* and *cutting* apply to expression capable of penetrating or making a sharp impression on another person, as through sarcasm. *Crisp*, in this comparison, refers to a style of expression that is clear, concise, and invigorating. *Clear-cut* specifies distinctness of outline and thus sharpness of definition of what has been put in the mind and then expressed.

**in·ci·sor** (ĭn-sī'zər) *n.* A tooth adapted for cutting, located at the apex of the dental arch.

**in·ci·ta·tion** (ĭn'sī-tā'shən) *n.* **1.** An act or instance of inciting; stimulation. **2.** Something that incites; incentive.

**in·cite** (ĭn-sīt') *tr.v.* **-cit·ed, -cit·ing, -cites.** To provoke to action; stir up or urge on. [OFr. *inciter* < Lat. *incitare*, to urge forward : *in-* (intensive) + *citare*, to stimulate, freq. of *ciēre*, to put in motion.] **—in·cite'ment** *n.* **—in·cit'er** *n.*

**Synonyms:** *incite, instigate, foment, abet.* These verbs mean to stir a group of persons to action or to give support to such action. *Incite* primarily is applied to arousing the all and spirit to act, as by forceful oratory. *Instigate* refers to conceiving a plan of action, often one involving drastic change, and making it operative. *Foment* usually refers to the systematic arousing of feelings of discord, rebellion, or the like, which produce violent action. *Abet* implies either active aid or tacit approval of actions, especially acts in violation of what is right or proper.

**in·ci·vil·i·ty** (ĭn'sĭ-vĭl'ĭ-tē) *n., pl.* **-ties. 1.** The quality or condition of being uncivil. **2.** An uncivil or discourteous act.

**in·clasp** (ĭn-klăsp') *v.* Variant of **enclasp.**

**in·clem·ent** (ĭn-klĕm'ənt) *adj.* **1.** Stormy. **2.** Severe or unmerciful. [Lat. *inclemens, inclement-*, harsh, severe : *in-*, not + *clemens*, mild.] **—in·clem'en·cy** *n.* **—in·clem'ent·ly** *adv.*

**in·clin·a·ble** (ĭn-klī'nə-bəl) *adj.* **1.** Favorably disposed; amenable. **2.** *Archaic* Disposed or inclined to do something.

**in·cli·na·tion** (ĭn'klə-nā'shən) *n.* **1.** An attitude or disposition toward something. **2.** A trend or general tendency toward a particular aspect, condition, or character. **3.** Something for which one has a preference or leaning: *"I shall* *indulge the inclination so natural in old men, to be talking of* *themselves"* (Franklin). **4.** The act of inclining, as a bow. **5.** The state of being inclined; tilt. **6. a.** A deviation from a definite direction, esp. from a horizontal or vertical. **b.** The degree of deviation from a horizontal or vertical.

**in·cline** (ĭn-klīn') *v.* **-clined, -clin·ing, -clines.** *—intr.* **1.** To deviate from a horizontal or vertical; slant. **2.** To be disposed to a certain preference, opinion, or disposition. **3.** To lower or bend the head or body, as in a nod or bow. *—tr.* **1.** To cause to lean, slant, or slope. **2.** To influence to have a certain tendency; dispose: *Recent events inclined him to distrust all politicians.* **3.** To bend or lower in a nod or bow. *—n.* (ĭn'klīn'). An inclined surface; slope or gradient. [ME *inclinen* < OFr. *encliner* < Lat. *inclinare* : *in-*, toward + *clinare*, to lean.] **—in·clin'er** *n.*

**in·clined** (ĭn-klīnd') *adj.* **1.** Having a preference, disposition, or tendency. **2.** Sloping, slanting, or leaning.

**inclined plane** *n.* A plane inclined to the horizontal, a simple machine used to raise or lower a load by rolling or sliding.

**in·cli·nom·e·ter** (ĭn'klə-nŏm'ĭ-tər) *n.* **1.** An instrument used to determine magnetic dip. **2.** An instrument for showing the inclination of an airplane or ship relative to the horizontal. **3.** A clinometer.

**in·close** (ĭn-klōz') *v.* Variant of **enclose.**

**in·clude** (ĭn-klōōd') *tr.v.* **-clud·ed, -clud·ing, -cludes. 1.** To take in as a part or member; contain. **2.** To put into a group, class, or total. [ME *includen* < Lat. *includere*, to shut in : *in-* + *claudere*, to close.] **—in·clud'a·ble, in·clud'i·ble** *adj.*

**Synonyms:** *include, comprise, comprehend, embrace, in-* *volve.* These verbs mean to take in or contain one or more things as part of something larger. *Include* and *comprise* take as their objects things or persons that are constituent parts. *Comprise* usually implies that all of the constituent parts are stated: *The track meet comprises 15 events* (that consists of or is composed of). *Include* can be so used, but for the remaining terms, more often implies an incomplete listing: *The meet includes among its high points a* *match between leading sprinters. Comprehend* and *embrace* usually refer to the taking in of intangibles as part of a broader subject: *Law and order comprehend much more than the exercise of police power. A person's tastes in reading* *can embrace every subject fashionable at the moment.* *Involve* usually suggests the relationship of a thing that is a necessary consequence or required condition of something else: *A heavy scholastic schedule involves extra ef-*

**in·clude.** *Include* is used most appropriately before an incomplete list of components: *The ingredients of the cake* *include butter and egg yolk.* If all the components are named, it is usually clearer to write: *The ingredients are. . . .* *Include* (ĭn-klōōd'did) *adj.* **1.** *Bot.* Not protruding beyond surrounding part, as stamens that do not project from a

corolla. **2.** Formed by and between two intersecting straight lines: *an included angle.*

**in·clu·sion** (ĭn-klōō'zhən) *n.* **1.** The act of including or the state of being included. **2.** Something included. **3.** A solid, liquid, or gaseous foreign body enclosed in a mineral or rock. **4.** *Biol.* A nonliving mass in cytoplasm. **5.** *Computer* *Sci.* A logical operation that assumes the second statement of a pair is true if the first one is true. [Lat. *inclusio* < *inclusus*, p.part. of *includere*, to enclose. —see INCLUDE.]

**inclusion body** *n.* An abnormal structure in a cell nucleus or cytoplasm having characteristic staining properties and associated esp. with the presence of filterable viruses.

**in·clu·sive** (ĭn-klōō'sĭv) *adj.* **1.** Taking a great deal or everything within its scope; comprehensive. **2.** Including the specified extremes or limits as well as the area between them: *the numbers one to ten, inclusive.* **—in·clu'sive·ly** *adv.* **—in·clu'sive·ness** *n.*

**inclusive of** *prep.* Taking into consideration or account; including.

**in·co·er·ci·ble** (ĭn'kō-ûr'sə-bəl) *adj.* Incapable of coercion.

**in·cog·i·tant** (ĭn-kŏj'ĭ-tənt) *adj.* Thoughtless; inconsiderate. [Lat. *incogitans, incogitant-* : *in-*, not + *cogitans*, pr.part. of *cogitare*, to think. —see COGITATE.]

**in·cog·ni·ta** (ĭn-kŏg'nĭ-tə, ĭn'kŏg-nē'tə) *adj. & adv.* With one's identity disguised or concealed. Used of a woman. [Ital., fem. of *incognito, incognito.*] **—in·cog'ni·ta** *n.*

**in·cog·ni·to** (ĭn-kŏg'nĭ-tō', ĭn'kŏg-nē'tō) *adj. & adv.* With one's identity disguised or concealed. *—n.* **1.** One who is incognito. **2.** The condition of being incognito. [Ital. < Lat. *incognitus*, unknown : *in-*, not + *cognitus*, p.part. of *cognoscere*, to learn. —see COGNITION.]

**in·cog·ni·zant** (ĭn-kŏg'nĭ-zənt) *adj.* Lacking knowledge or awareness of something; unaware.

**in·co·her·ence** (ĭn'kō-hîr'əns) *n.* **1.** The condition or quality of being incoherent. **2.** Something incoherent.

**in·co·her·en·cy** (ĭn'kō-hîr'ən-sē) *n., pl.* **-cies.** Incoherence.

**in·co·her·ent** (ĭn'kō-hîr'ənt) *adj.* **1.** Not coherent; lacking order, connection, or harmony. **2.** Unable to think or express one's thoughts in a clear or orderly manner: *incoherent* *with grief.* **—in·co·her'ent·ly** *adv.* **—in·co·her'ent·ness** *n.*

**in·com·bus·ti·ble** (ĭn'kəm-bŭs'tə-bəl) *adj.* Incapable of burning. *—n.* An incombustible object or material. [ME < Med. Lat. *incombustibilis* : Lat. *in-*, not + Lat. *comburtus*, p.part. of *comburere*, to burn up. —see COMBUSTION.] **—in'com·bus'ti·bil'i·ty** *n.* **—in'com·bus'ti·bly** *adv.*

**in·come** (ĭn'kŭm') *n.* **1.** The amount of money or its equivalent received during a period of time in exchange for labor or services, from the sale of goods or property, or as profit from financial investments. **2.** *Archaic* An influx. [ME, entrance, arrival : *in, in* + *comen*, to come.]

**income tax** *n.* A tax levied on annual income.

**in·com·ing** (ĭn'kŭm'ĭng) *adj.* **1.** Coming in; entering. **2.** About to come in: *the incoming president.* *—n.* **1.** The act of coming in; arrival. **2.** Often **incomings.** Income; revenue.

**in·com·men·su·ra·ble** (ĭn'kə-mĕn'sər-ə-bəl, -shər-) *adj.* **1. a.** Incapable of being measured. **b.** Lacking a common quality upon which to make a comparison. **2.** *Math.* Having no common measure. *—n.* Something that is incommensurable. **—in'com·men'su·ra·bil'i·ty** *n.* **—in'com·men'su·ra·bly** *adv.*

**in·com·men·su·rate** (ĭn'kə-mĕn'sər-ĭt, -shər-) *adj.* **1.** Not commensurate; disproportionate: *a reward incommensurate* *with his efforts.* **b.** Inadequate. **2.** Incommensurable. **—in'·com·men'su·rate·ly** *adv.* **—in'com·men'su·rate·ness** *n.*

**in·com·mode** (ĭn'kə-mōd') *tr.v.* **-mod·ed, -mod·ing, -modes.** To cause to be inconvenienced; disturb. [Fr. *incommoder* < OFr. < Lat. *incommodare* < *incommodus*, inconvenient : *in-*, not + *commodus*, convenient. —see COMMODIOUS.]

**in·com·mo·di·ous** (ĭn'kə-mō'dē-əs) *adj.* Inconvenient or uncomfortable, as by not affording sufficient space. **—in'com·mo'di·ous·ly** *adv.* **—in'com·mo'di·ous·ness** *n.*

**in·com·mod·i·ty** (ĭn'kə-mŏd'ĭ-tē) *n., pl.* **-ties. 1.** Inconvenience. **2.** Something that is inconvenient.

**in·com·mu·ni·ca·ble** (ĭn'kə-myōō'nĭ-kə-bəl) *adj.* **1.** Not communicable. **2.** *Rare.* Incommunicative. **—in'com·mu'ni·ca·bil'i·ty** *n.* **—in'com·mu'ni·ca·bly** *adv.*

**in·com·mu·ni·ca·do** (ĭn'kə-myōō'nĭ-kä'dō) *adj.* Without the means or right of communicating with others, as one held in solitary confinement. [Sp., p.part. of *incomunicar*, to deny communication : *in-*, not (< Lat.) + *comunicar*, to communicate < Lat. *communicare* < *communis*, common.] **—in'com·mu'ni·ca'do** *adv.*

**in·com·mu·ni·ca·tive** (ĭn'kə-myōō'nĭ-kā'tĭv, -kə-tĭv) *adj.* Not communicative; uncommunicative. **—in'com·mu'ni·ca'tive·ly** *adv.* **—in'com·mu'ni·ca'tive·ness** *n.*

**in·com·mut·a·ble** (ĭn'kə-myōō'tə-bəl) *adj.* **1.** Incapable of being exchanged. **2.** Not changeable; unalterable. **—in'com·mut'a·bil'i·ty, in'com·mut'a·ble·ness** *n.* **—in'com·mut'a·bly** *adv.*

**in·com·pa·ra·ble** (ĭn-kŏm'pər-ə-bəl) *adj.* **1.** Incapable of being compared; incommensurable. **2.** So outstanding as to be beyond comparison; unsurpassed. **—in·com'pa·ra·bil'i·ty, in·com'pa·ra·ble·ness** *n.* **—in·com'pa·ra·bly** *adv.*

**in·com·pat·i·bil·i·ty** (ĭn'kəm-păt'ə-bĭl'ĭ-tē) *n., pl.* **-ties. 1.** The state or quality of being incompatible. **2. incompati-**

ă pat / ā pay / âr care / ä father / b bib / ch church / d deed / ĕ pet / ē be / f fife / g gag / h hat / hw which / ĭ pit / ī pie / îr pier / j judge / k kick / l lid, needle / m mum / n no, sudden / ng thing / ŏ pot / ō toe / ô paw, for / oi noise / ōō took / ... / ou out / p pop / r roar / s sauce / sh ship, dish / t tight / th thin, path / th this, bathe / ŭ cut / ûr urge / v valve / w with / y yes / z zebra, size / zh vision / ə about, item, edible, gallop, circus / œ Fr. feu, *Ger.* schön / ü Fr. tu, *Ger.* über / KH *Ger.* ich, *Scot.* loch / N *Fr.* bon.

**Exhibit C**



Information Security: Internal

## Policies

| 1.1 | Introduction |
| 1.2 | At Will Employment |
| 1.3 | Policy |
| 1.4 | Full-Time and Part-time Employees |
| 1.5 | Exempt and Nonexempt Employees |
| 1.6 | Regular and Temporary Employees |
| 1.7 | Independent Contractors |
| 1.8 | Employee "In Good Standing" |

## Employment Classification - Section 1.5

| Back | Contents | Next | Policies Home | Search |

### Exempt and Nonexempt Employees

The Fair Labor Standards Act ("FLSA") sets forth various requirements applicable to the employment relationship, including minimum wage and overtime requirements.

- "Exempt" employees are exempt from the minimum wage and overtime provisions of the FLSA, as amended. An exempt employee usually falls into one of the following categories: executive/supervisory, managerial, professional or outside sales.
- "Nonexempt" employees are covered by the minimum wage and overtime provisions of the FLSA, as amended. A nonexempt employee usually performs clerical, administrative, or professional services which do not entail the management of subordinates, discretion over use of his or her time, the frequent use of independent judgment in an area which is directly related to the Company's management policies or overall business operations, or specialized training or an advanced degree. Generally, temporary employees are considered nonexempt.

The FLSA also has a partial exemption from the overtime requirement for certain computer-related occupations.

Whether an individual is classified as exempt or nonexempt is based on an analysis of the requirements of the FLSA, which cannot be overridden by individuals or the Company. The Corporate Compensation Practice Area is available to classify jobs as exempt or nonexempt.

| Back | Contents | Next | Policies Home | Search |

Questions, comments? Email the HR Webmaster
Owner: Corporate Human Resources
Last Updated: Wednesday, June 17, 1998

© Copyright 1996-1998 FMR Corp. All rights reserved.
Important Legal Information.

FID002971
CONFIDENTIAL



**Fidelity Investments**

**HRWeb**

| BENEFITS | POLICIES | RESOURCES | TRAINING & DEVELOPMENT | ON THE JOB |

HR Solution
call 800-835-50

© Fidelity
Policies

Home > Policies > Unit 4: Compensation - Section 4.13: Overtime

# Unit 4: Compensation - Section 4.13

## Overtime

Managers may find it necessary to have employees work overtime. When the need arises, employees are expected to work the overtime hours as requested. Managers are encouraged to try to anticipate the need for overtime, and provide employees with advance notice, and take into consideration any extenuating circumstances of individual employees.

Nonexempt employees are paid their regular hourly rate for all hours worked up to and including 40 hours during the workweek. Nonexempt employees are paid one and one-half times their regular hourly rate of pay for all hours worked in excess of 40 hours during the workweek. For the purpose of overtime computation, time paid but not worked while an employee is considered active (e.g., vacation, sick time and holidays) is counted as time worked. Time paid but not worked while an employee is on a leave of absence (e.g., disability or military leave) is not counted as time worked.

Nonexempt employees may not accrue overtime to take "comp time" in the future, unless the "comp time" is taken in the same workweek.

Generally, exempt employees are not paid anything extra for overtime work. Any deviations from this standard should be reviewed with the Compensation Practice Area and the Legal Department.

1-15-99

---

**Individual Policies**

Unit 1: Employment Classifications ▶

Unit 2: Nondiscrimination & Accommodation ▶

Unit 3: Staffing ▶

Unit 4: Compensation ▶

Unit 5: Insurance & CAP Programs ▶

Unit 6: Employee Programs & Services ▶

Unit 7: Time Away From Work ▶

Unit 8: Professional Conduct ▶

Unit 9: Employee Relations ▶

Unit 10: Leaving the Company ▶

Unit 11: Safety, Security & Emergencies ▶

Unit 12: Administration ▶

Unit 13: Employee Development ▶

---

Print ___ ?ee in Landscape. Need help?
Questio__ _omments? E-mail the HR Webmaster
Owner: Corporate Human Resources
Last Updated: Thursday, 03-Jan-2002 10:36:00 EST

webworks
© Copyright __ ___orp.
All rights reserved.
Important Legal Information



CENTRAL

F___003191
CONFIDENTIAL

Overtime

Page 1 of 1



| Home | Benefits & Money | Career & Training | Time Away & Vacation | Working At Fidelity | For Managers |

**HR**Solutions

Forms | Policies | Jobs | Contact Info

Monday, August 16, 2004

Home >

## Policy: Overtime

Managers may find it necessary to have employees work overtime. When the need arises, employees are expected to work the overtime hours as requested. Managers are encouraged to try to anticipate the need for overtime, and provide employees with advance notice, and take into consideration any extenuating circumstances of individual employees. Nonexempt employees should obtain manager approval prior to working overtime.

Nonexempt employees are paid their regular hourly rate for all hours worked up to and including 40 hours during the workweek. Nonexempt employees are paid one and one-half times their regular hourly rate of pay for all hours worked in excess of 40 hours during the workweek. For the purpose of overtime computation, time paid but not worked while an employee is considered active (e.g., vacation, sick time and holidays) is counted as time worked. Time paid but not worked while an employee is on a leave of absence (e.g., disability or military leave) is not counted as time worked.

Nonexempt employees may not accrue overtime to take "comp time" in the future, unless the "comp time" is taken in the same workweek.

Generally, exempt employees are not paid anything extra for overtime work. Any deviations from this standard should be reviewed with the Compensation Practice Area and the Legal Department.

Revised: 8-3-04

**Need More Info?**
Call HR Solutions at
800-835-5099
(Prompt 2, Option 3)

Comments? Email Us

Fidelity Central

Site Map

**Fidelity**

© Copyright 1998-2004 FMR Corp.
All rights reserved.
Legal Information.

08/16/2004

https://hrsolutions.fidelity.com/wps/hr/hr/Main/Simple?hrscontext=Overtime

FID003192
CONFIDENTIAL



Unit 4: Compensation - Section 4.13

HRWeb

Fidelity Investments®

© Fidelity

Policies

BENEFITS | POLICIES | RESOURCES | TRAINING & DEVELOPMENT | ON THE JOB

Home > Policies > Unit 4: Compensation - Section 4.13: Overtime

# Unit 4: Compensation - Section 4.13

## Overtime

Individual Policies ▶

Unit 1: Employment Classifications ▶

Unit 2: Nondiscrimination & Accommodation ▶

Unit 3: Staffing ▶

Unit 4: Compensation ▶

Unit 5: Insurance & CAP Programs ▶

Unit 6: Employee Programs & Services ▶

Unit 7: Time Away From Work ▶

Unit 8: Professional Conduct ▶

Unit 9: Employee Relations ▶

Unit 10: Leaving the Company ▶

Unit 11: Safety, Security & Emergencies ▶

Unit 12: Administration ▶

Unit 13: Employee Development ▶

Managers may find it necessary to have employees work overtime. When the need arises, employees are expected to work the overtime hours as requested. Managers are encouraged to try to anticipate the need for overtime, and provide employees with advance notice, and take into consideration any extenuating circumstances of individual employees.

Nonexempt employees are paid their regular hourly rate for all hours worked up to and including 40 hours during the workweek. Nonexempt employees are paid one and one-half times their regular hourly rate of pay for all hours worked in excess of 40 hours during the workweek. For the purpose of overtime computation, time paid but not worked while an employee is considered active (e.g., vacation, sick time and holidays) is counted as time worked. Time paid but not worked while an employee is on a leave of absence (e.g., disability or military leave) is not counted as time worked.

Nonexempt employees may not accrue overtime to take "comp time" in the future, unless the "comp time" is taken in the same workweek.

Generally, exempt employees are not paid anything extra for overtime work. Any deviations from this standard should be reviewed with the Compensation Practice Area and the Legal Department.

1-15-99

**Print this page in Landscape. Need help?**
Questions, comments? E-mail the HR Webmaster
Owner: Corporate Human Resources
Last Updated: Thursday, 03-Jan-2002 10:38:00 EST

Copyright 2001 FMR Corp.
All rights reserved.
Important Legal Information

CENTRAL

FID003194
CONFIDENTIAL

Overtime

Page 1 of 1

## HRSolutions

| Home | Benefits & Money | Career & Training | Time Away & Vacation | Working At Fidelity | For Managers |

Forms | Policies | Jobs | Contact Info

Monday, August 16, 2004

### Home >

### Policy: Overtime

Managers may find it necessary to have employees work overtime. When the need arises, employees are expected to work the overtime hours as requested. Managers are encouraged to try to anticipate the need for overtime, and provide employees with advance notice, and take into consideration any extenuating circumstances of individual employees. Nonexempt employees should obtain manager approval prior to working overtime.

Nonexempt employees are paid their regular hourly rate for all hours worked up to and including 40 hours during the workweek. Nonexempt employees are paid one and one-half times their regular hourly rate of pay for all hours worked in excess of 40 hours during the workweek. For the purpose of overtime computation, time paid but not worked while an employee is considered active (e.g., vacation, sick time and holidays) is counted as time worked. Time paid but not worked while an employee is on a leave of absence (e.g., disability or military leave) is not counted as time worked.

Nonexempt employees may not accrue overtime to take "comp time" in the future, unless the "comp time" is taken in the same workweek.

Generally, exempt employees are not paid anything extra for overtime work. Any deviations from this standard should be reviewed with the Compensation Practice Area and the Legal Department.

Revised: 8-3-04

### ✎ Need More Info?

Call HR Solutions at
800-835-5099
(Prompt 2, Option 3)

Comments? Email us

Fidelity Central

Site Map

© Copyright 1998-2004 FMR Corp.
All rights reserved.
Legal Information.

Fidelity

08/16/2004

https://hrsolutions.fidelity.com/wps/hr/Main/Simple?hrscontext=Overtime

FID003195
CONFIDENTIAL

**Appendix of Unpublished Cases**
(in Alphabetical Order)

Westlaw.

Slip Copy                                                                 Page 1
Slip Copy, 2005 WL 2436477 (E.D.Cal.), 151 Lab.Cas. P 35,060
**(Cite as: Slip Copy)**

# H
Briefs and Other Related Documents

United States District Court,E.D. California.
Eduardo AGUAYO, et. al, Plaintiff,
v.
OLDENKAMP TRUCKING, Defendants.
**No. CV F 04-6279 ASI LJO.**

Oct. 3, 2005.

Jerry Budin, Law Office of Jerry Budin, Modesto, CA, for Plaintiff.
David B. Chidlaw, Geoffrey David Deboskey, Sheppard Mullin Richter and Hampton, San Diego, CA, John Ward Beebe, Green And Azevedo, Sacramento, CA, for Defendants.

### FINDINGS AND RECOMMENDATIONS ON PLAINTIFF'S MOTION FOR CLASS CERTIFICATION (Doc. 18)

ONEILL, Magistrate J.

*1 Pursuant to a notice filed on August 5, 2005, plaintiff Eduardo Aguayo ("plaintiff") seeks to certify two classes in this matter. Defendant Oldenkamp Trucking filed an opposition on September 2, 2005. Plaintiff filed a reply on September 26, 2005. This matter was submitted on the pleadings without oral argument pursuant to Local Rule 78-230(h). Having considered the moving, opposition, and reply papers, as well as the Court's file, the Court issues the following order.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Eduardo Aguayo brings this action individually and on behalf of other truck drivers who now work or have worked for defendant Oldenkamp Trucking ("Oldenkamp"). Plaintiff alleges that Oldenkamp has a policy of requiring its truck drivers to work more than forty (40) hours a week without overtime payment. Plaintiff's complaint contains two claims. The first claim for relief alleges a violation of the Fair Labor Standards Action ("FLSA"), 29 U.S.C. § 210 et seq. The second claim for relief alleges violation of the California Unfair Competition law ("UCL"), Cal.Bus. & Prof.Code § 17200 et seq.

Plaintiff seeks certification of two classes, one for

each claim for relief. Plaintiff alleges he is a member of both classes. The first class (Class 1) is based on willful violations of the FLSA and incorporates the 3-year statute of limitations:

"All persons who are employed or have been employed by defendant Oldenkamp Trucking in the State of California who, on or after September 20, 2001, to the time of trial, have worked as a truck driver hauling milk from dairies to creameries and/or cheese factories solely within the State of California and have worked in excess of forty (40) hours per week without being paid overtime compensation by Oldenkamp Trucking for those excess hours."

Class 1 would be certified under 29 U.S.C. § 216(b) which states in pertinent part:An action to recover the liability prescribed in either of the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and *other employees similarly situated.*

The FLSA allows one or more employees to pursue an action in a representative capacity for "other employees similarly situated." 29 U.S.C. § 216(b). This type of action, known as a "collective action," allows potential class members who are similarly situated to the named plaintiffs to file a consent with the court to "opt in" to the case. *Morrisky v. Public Serv. Elect. and Gas Co.,* 111 F.Supp.2d 493 (D.N.J.2000).

The second class (Class 2) plaintiff proposes is based on the second claim for relief under UCL (formerly referred to as the Unfair Practices Act "UPA") and incorporates the 4-year status of limitations for such violations.

"All persons who are employed or have been employed by defendant Oldenkamp Trucking in the State of California who, on or after September 20, 2000, to the time of trial, have worked as a truck driver hauling milk from dairies to creameries and/or cheese factories solely within the State of California and have worked in excess of forty (40) hours per week without being paid overtime compensation by Oldenkamp Trucking for those excess hours.

*2 This class would be certified under Fed.R.Civ.P. 23. The requirements for maintaining a Rule 23 class action are more fully discussed below.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2436477 (E.D.Cal.), 151 Lab.Cas. P 35,060
(Cite as: Slip Copy)

P. 2

The classes proposed by plaintiff are the same classes as this Court certified in the *Willis v. Cal-Western Transport*, CV-00-5695, *Baganha v. Cal. Milk Tranport*, CV-01-5729 and *Vasquez v. Jim Aartman, Inc.*, CV-02-5624 cases.

### ANALYSIS & DISCUSSION

#### A. FLSA Claim

#### 1. Similarly Situated

To determine whether to certify the class, the main issue to be decided is whether the named plaintiffs are sufficiently "similarly situated" to the proposed opt-in plaintiffs that this case may proceed as a collective action. The FLSA provides that employees in interstate commerce shall be paid at one and one-half times their regular hourly rate for hours over forty in any work week. 29 U.S.C. § 207(a)(1). The FLSA allows one or more employees to pursue an action in a representative capacity for "other employees similarly situated" and is known as a "collective action." 29 U.S.C. § 216(b); *Morisky v. Public Serv. Elect. and Gas Co.*, 111 F.Supp.2d 493 (D.N.J.2000).

As noted in the *Willis, Baganha* and *Vasquez* actions, Section 216(b) of the FLSA does not define the term "similarly situated," and there is little circuit law on the subject. As explained in the case of *Thiessen v. GE Capital Corp.*, 267 F.3d 1095, 1102-03 (10th Cir.2001), *cert. denied*, 536 U.S. 934, 122 S.Ct. 2614, 153 L.Ed.2d 799 (2002), federal district courts have adopted or discussed at least three approaches to determining whether plaintiffs are "similarly situated" for purposes of § 216(b). *See, e.g., Mooney v. Aramak*, 54 F.3d 1207 at 1213 (5th Cir.1995) (discussing two different approaches adopted by district courts); *Bayles v. American Med. Response of Colo., Inc.*, 950 F.Supp. 1053, 1058 (D.Colo.1996). Under the first approach, a court determines, on an ad hoc case-by-case basis, whether plaintiffs are "similarly situated." *Thiessen v. GE Capital Corp; Mooney*, 267 F.3d at 1102-1103. In utilizing this approach, a court typically makes an initial "notice stage" determination of whether plaintiffs are "similarly situated." *Vaszlavik v. Storage Tech. Corp.*, 175 F.R.D. 672, 678 (D.Colo.1997). In doing so, a court " 'require[s] nothing more than substantial allegations that the putative class members were

together the victims of a single decision, policy, or plan.' " *Thiessen v. GE Capital Corp; Mooney*, 267 F.3d at 1103. (quoting *Bayles*, 950 F.Supp. at 1066). At the conclusion of discovery (often prompted by a motion to decertify), the court then makes a second determination, utilizing a stricter standard of "similarly situated." *See Thiessen v. GE Capital Corp; Mooney*, 267 F.3d at 1103. During this "second stage" analysis, a court reviews several factors, including "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; (3) fairness and procedural considerations; and (4) whether plaintiffs made the filings required by the ADEA before instituting suit." *Id.*

*3 Under the second approach, district courts have incorporated into § 216(b) the requirements of current Federal Rule of Civil Procedure 23. *See Theissen*, 267 F.3d at 1103; *Bayles*, 950 F.Supp. at 1060-61 (discussing cases adopting this approach). In a third approach, district courts have suggested incorporating into § 216(b) the requirements of the pre-1966 version of Rule 23, which allowed for "spurious" class actions. *See Bayles*, 950 F.Supp. at 1064.

*Wynn v. National Broadcasting Co.*, 234 F.Supp.2d 1067 (C.D.Cal.2002) echoes this two tier analysis. *Wynn* employed the two tier approach and noted the lenient standard for ruling on class certification at the notice stage. The Eleventh Circuit recently endorsed this "two-tiered" approach to certification of § 216(b) opt-in classes. *See Hipp v. Liberty National Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir.2001) (two tiered approach is an effective tool). *Accord Brown v. Money Tree Mortg., Inc.*, 222 F.R.D. 676, 680 (D.Kan.2004) (the court will analyze plaintiff's motion under the lenient "notice stage" standard described above and, in doing so, looks to the substantial allegations in plaintiff's first amended complaint and various affidavits filed by plaintiff.) From review of many cases, this two-tier analysis is the most generally accepted. In addition, this is the analysis the Court has employed in prior similar motions.

Here, the case is more at the "notice" stage and not at the second stage. A preliminary scheduling order has been entered setting dates for class certification, but a trial date and the related pretrial dates have not been scheduled. Discovery has been limited to the issue of class certification. Discovery on the merits is not complete and the case is not ready for trial. *Morisky*

Slip Copy
Slip Copy, 2005 WL 2436477 (E.D.Cal.), 151 Lab.Cas. P 35,060
**(Cite as: Slip Copy)**

*v. Public Serv. Elect. and Gas Co.,* 111 F.Supp.2d 493 (D.N.J.2000) (employing a stricter standard in analysis where case was beyond first stage.) Thus, the case is more at the notice stage due to the limitation in discovery and pretrial preparation.

At the "notice" stage, the representative plaintiffs bear the burden of demonstrating that they and the class members they seek to represent are similarly situated. *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1097 (11th Cir.1996) (The plaintiffs bear the burden of demonstrating a "reasonable basis" for their claim of class-wide discrimination), *cert. denied,* 519 U.S. 982, 117 S.Ct. 435, 136 L.Ed.2d 332 (1996). This burden, which is not "heavy," may be met by detailed allegations supported by affidavits. *Id.* at 1097. According to *Grayson,* under section 216(b), "plaintiffs bear the burden of demonstrating a 'reasonable basis' for their claim of class-wide discrimination, ... [and] plaintiffs may meet this burden, which is not heavy, by making substantial allegations of class-wide discrimination, that is, detailed allegations supported by affidavits which successfully engage defendants' affidavits to the contrary." *Id.* at 1097 (citations omitted); *Sperling v. Hoffman-La Roche, Inc.,* 118 F.R.D. 392, 406 (D.N.J., 1988), *aff'd in part and appeal dismissed in part,* 862 F.2d 439 (3rd Cir.1988), *aff'd and remanded, Hoffman-La Roche, Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) ("Plaintiffs have made detailed allegations in their pleadings, and have supported those allegations with affidavits which successfully engage defendant's affidavits to the contrary. Plaintiffs' allegations, as supported, describe a single decision, policy, or plan of defendant's, infected by a discriminatory aspect which led to the termination or demotion of every member of the class plaintiffs wish to represent, and the reallocation of responsibilities among the remaining, generally younger workers.") Because the court generally has a limited amount of evidence before it, the initial determination is usually made under a fairly lenient standard and typically results in conditional class certification. *Leuthold v. Destination America, Inc.,* 224 F.R.D. 462, 467 (N.D.Cal.,2004)

**\*4** Here, the allegations in the complaint state the basis for the collective action. The detailed allegations in the complaint state that plaintiffs are truck drivers and former truck drivers who worked for Defendant Oldenkamp and who have not been paid overtime compensation. (Complaint ¶ 1, 18, 20.) The complaint alleges that the members were employed by defendants during the liability period as

truck drivers, regularly worked in excess of forty hours per week without overtime compensation and drove in intrastate transportation transporting milk from dairies to creameries. Thus, the allegations are detailed allegations setting out the specific conduct allegedly giving rise to liability. (Complaint ¶ .7, 21.)

Plaintiff submits his declaration in support of the motion. In plaintiff's declaration, he states he is a former truck driver for defendant. Plaintiff was employed by defendant for four months, from January 2004 to April 2004. His declaration, which purports to establish that other truck drivers have not been paid overtime, and which is challenged by defendant, states the purported goods and routes that the similar truck drivers:

Based on my personal observations of OLDENKAMP's operations that I gained during my employment with OLDENKAMP, I know that (a) none of the truck drivers have been paid overtime for any of the hours that worked in excess of forty and (b) other truck drivers that have worked out of the Ontario and Bakersfield terminals have done the same type of hauling that I have done, i.e. hauling raw milk from dairies to milk processing plants solely within California." (Aguayo Decl. ¶ 7.)

Aguayo estimates that there are approximate 30 other truck drivers who fit the class definition. (Aguayo Decl. para. 8.)

Defendant attacks the declaration on the grounds that the declarations are based on hearsay and lack of personal knowledge that plaintiff was only a four month employee.

The declaration may not be sufficient to carry the burden of proof at trial, but it is sufficient to carry the burden on this motion. A reasonable inference from the evidence submitted is that Aguayo, as an employee of defendant, would learn, during the normal course of his employment, how the employer operates, where the employer operates, what other similar employees are doing, and where they are doing there jobs.

However, the only real concern is that plaintiff Aguayo was a four month employee and it may be questionable that he gained all the knowledge he alleges. The declarant does not lay the foundation upon which his knowledge was based such as over meetings, schedule reviews, performance reviews, etc. While the declaration does not identify the specific basis for the knowledge, it is reasonable that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 2436477 (E.D.Cal.), 151 Lab.Cas. P 35,060
**(Cite as: Slip Copy)**

Aguayo would have spoken to his other co-workers, even during a short period of time, and learned who did what. Thus, the declaration supports the substantial allegations in the complaint.

Thus, the substantial allegations in the complaint supported by the declarations argue in favor of class certification.

### 2. Motor Carrier Exemption

**\*5** The defendant contends it is exempt from overtime due to the Motor Carrier Safety Exemption. Defendant contends that this defense precludes class certification because it requires a fact-specific inquiry at the class composition stage and at the liability stage of all plaintiffs as to whether the exemption applies to the particular plaintiff. Defendant contends that it is a unique inquiry, from that of *Willis, Baganha,* and *Vasquez* because defendant's operations are different. The difference is that defendant contends the class definition encompasses employees who drove interstate routes because an employee may not have themselves driven milk outside of California, but their route may be interstate by virtue of the ultimate destination of the produce. 29 CFR 782.7(b). Many routes, while driven intrastate, are nonetheless, interstate because the final destination of the product is outside of California. Defendant will need to analyze every employee's entire driving history for the class period.

The FLSA provides that employees in interstate commerce shall be paid at one and one-half times their regular hourly rate for hours over forty in any work week. 29 U.S.C. § 207(a)(1). Plaintiff alleges that intra-state truck drivers are entitled to overtime compensation pursuant to 29 U.S.C. § 207(a), which provides:

(1) Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

The FLSA provides many exceptions, one of which is the Motor Carrier exemption, 29 U.S.C. § 213(b)(1), which provides that the provisions of 29 U.S.C. §

207 shall not apply to:(1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49.

Section 31502 of Title 49, in turn, authorizes the Secretary of Transportation, in the interest of safety, to establish "qualifications and maximum hours of service for employees" of motor carriers:The Secretary of Transportation may prescribe requirements for-

(1) qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier; and

(2) qualifications and maximum hours of serv⎯ of employees of, and standards of equipment of, a ⎯⎯ior private carrier, when needed to promote safety of operation.

The FLSA provides for overtime pay for employees generally. Section 213(b)(1) provides, however, that employees whose qualifications and maximum hours of driving are subject to regulation by the Secretary of Transportation under the Motor Carrier Safety Act are exempt from the overtime provisions of § 207(a). The Secretary of Transportation has power to regulate transportation**\*6** 1) between a place in-

(A) a State and a place in another State;

(B) a State and another place in the same State through another State;

Thus, interstate commerce falls within the jurisdiction of the Secretary of Transportation and is exempt from coverage under FLSA. Moreover, the Secretary of Transportation has jurisdiction to regulate intrastate commerce that "is a practical continuity of movement from the manufacture⎯ or suppliers without the state, through a warehou. ⎯⎯d on to customers." *Klitzke v. Steiner,* 110 F.3d ⎯ 55, 1469 (9th Cir.1997). Whether such intrastate commerce is exempt is determined on an ad hoc basis:"Whether transportation is interstate or intrastate is determined by the essential character of the commerce, manifested by shipper's fixed and persisting transportation intent at the time of the shipment, and is ascertained from all of the facts and circumstances surrounding the transportation." *Id.* at 1469.

### 3. Individualized Inquiry

Defendant argues that the class definition at issue in

Slip Copy
Slip Copy, 2005 WL 2436477 (E.D.Cal.), 151 Lab.Cas. P 35,060
(Cite as: Slip Copy)

the instant motion is improper because an intensive individualized inquiry will have to be performed to determine whether each potential member has driven outside California.

The Supreme Court has examined the interaction between FLSA and the Motor Carrier Act. The Court has mandated that the critical consideration in determining whether the Motor Carrier Act governs a motor carrier employee and so exempts him from FLSA is whether that employee's *activities* "affect safety of operation." *United States v. American Trucking Assn.,* 310 U.S. 534, 553, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940) (emphasis added); see also *Levinson v. Spector Motor Service,* 330 U.S. 649, 671, 67 S.Ct. 931, 91 L.Ed. 1158 (1947) ( "the fundamental test is simply that the employee's activities affect safety of operation."). The Code of Federal Regulations state that an individual's activities are determinative of the interstate nature of the work. In order for the Secretary of Transportation to have power to establish qualifications and maximum hours of service, the employees must have been "... and (2) *engage[d] in activities* of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. § 782.2(a) (emphasis added). Thus, as was noted in the other class certification, the focus of the inquiry is on the individual's activities.

Defendant cites to *Morisky v. Public Serv. Elec. & Gas Co.,* 111 F.Supp.2d 493 (D.N.J.2000), regarding inappropriateness of class treatment, is inapposite. *Morisky* dealt with whether employees were administrative employees such that they were exempt from overtime. Administrative functions are based on subjective criteria. There, the seven named plaintiffs held several different job titles and some with identical titles performed different types of duties. *Id.* at 495-96, 498-99. Although they sought to represent 141 other employees who also were not paid overtime wages, the plaintiffs made no showing that the job responsibilities of the other employees were the same or similar to theirs, and the defendant used employee questionnaires that showed a wide divergence of positions and job duties among the purported class members. In the truck drivers case, there is objective criteria.

*7 Records can be reviewed to eliminate the drivers involved in interstate transportation and if necessary all truck drivers who were involved in the interstate transportation. Moreover, *Morisky* was a stage two

case, where plaintiffs have already opted in. *See also Scott v. Aetna Services, Inc.,* 210 F.R.D. 51 (D.Conn.2002) (suit by engineers under the FLSA was certified, and court denied decertification notwithstanding the defense that the engineers were "exempt" requiring individualized inquiry.) *See Watkins v. Ameripride Services,* 375 F.3d 821 (9th Cir.2004) (where uniforms were purchased from out of state and held in a warehouse until later sold, trip from warehouse to customer was intrastate and the drivers were not subject to section 13(b)(1)); *Packard v. Pittsburgh Transp. Co.,* 418 F.3d 246 (3rd Cir.2005) (Motor Carrier Act (MCA) exemption from Fair Labor Standards Act's (FLSA) overtime protection was not applicable to drivers who provided intrastate transportation within a defined service area, which included railroad and bus stations, to elderly and disabled persons pursuant to federally-funded program).

Defendant submitted evidence that it has its terminals in Bakersfield and Ontario. (Oldenkamp ¶ 5.) The drivers engage in interstate hauling including "overnight trips across state lines to Utah and Nevada and intra-state trips and the inter-state routes because the product is dropped off and then taken out of state." (Oldenkamp ¶ 5.) Defendant solicits interstate work. (Oldenkamp ¶ 6.) The defendant's "drivers do not drive the same routes and a given driver's route can change." (Oldenkamp ¶ 7.) Defendant states that at times the route may stay the same, the "interstate character of the route can change from day to day because the ultimate destination of the product may change." (Oldenkamp ¶ 7.)

The evidence submitted by defendant in opposition is fairly conclusory. Implicit in defendant's evidence is that all trips are interstate because the product may go out of state. The evidence does not state whether the product dropped off is processed, but it seems only logical that in some instances, milk dropped off at plants is for processing or for incorporating into another product. The "practical continuity of interstate commerce" can be broken by processing of the product. *Kimball v. Goodyear Tire and Rubber Co.,* 504 F.Supp. 544 (E.D.Tex.1980) held there was an interruption in the "practical continuity" when a product clearly came to rest instate and was reused and changed by chemical processing. Thus, the logical inference from the current evidence demonstrates that the "practical continuity" of the intra-state hauls may be broken by processing, and thus, any individualized inquiry is minimized. Exemptions to the FLSA are "narrowly construed against the employers seeking to assert them and

Slip Copy                                                                                    Page 6
Slip Copy, 2005 WL 2436477 (E.D.Cal.), 151 Lab.Cas. P 35,060
(Cite as: Slip Copy)

their application limited to those establishments plainly and unmistakably within their terms and spirit." *Bilyou v. Dutchess Beer Distributors, Inc.,* 300 F.3d 217, 222 (2nd Cir.2002).

**8** At this early stage of the class proceeding, all that is required for class certifications is substantial allegations supported by declarations. Plaintiff has satisfied this burden.[FN1]

> FN1. Indeed, plaintiff may show a prima facie case without an individualized inquiry. An employee seeking to recover unpaid minimum wages or overtime under the FLSA "has the burden of proving that he performed work for which he was not properly compensated." *Brock v. Seto,* 790 F.2d 1446 (9th Cir.1986); *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S.Ct. 1187, 1192, 90 L.Ed. 1515 (1946). "[A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of a just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515. The burden then shifts to the employer to show the precise number of hours worked or to present evidence sufficient to negate "the reasonableness of the inference to be drawn from the employee's evidence." *Id.* at 688, 66 S.Ct. at 1192. The employer bears the burden of proof that an exemption applies. "Employers who claim an exemption applies to their employees must show that the employees fit plainly and unmistakably within its terms." *Worthington v. Icicle Seafoods, Inc.,* 774 F.2d 349, 352 (9th Cir.1984). In this case, plaintiff's could prove a prima facie case as a collective action because there are no individualized inquiries in the prima facie case.

4. Involvement by the Department of Labor

Defendant argues that DOL has contacted it to resolve the same overtime issues. Defendant says that it would be more economical, efficient and productive for the class members to have the issues resolved by DOL.

Section 29 USC § 216(b) provides that:

No employee shall be a party plaintiff to any ... action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.... The right provided by this subsection to bring an action by or on behalf of any employee, and the right of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the Secretary of Labor in an action under section 217 of this title. (Emphasis added.)

The evidence submitted by defendant in support its contention that the DOL is involved and will be resolving the issues is highly conclusory. The evidence consists of a single statement by the attorney that defendant has been "contacted" by DOL and DOL is "investigating" the same allegations.

This evidence is insufficient to establish that the DOL is involved and will be prosecuting an action against defendant. There is no evidence that DOL filed a complaint pursuant to 28 USC § § 216(b), 217. Should the DOL institute an action or if a consent decree is entered, defendant may bring a motion to decertify the class.

B. Second Claim for Relief under UCL

Defendant argues that the UCL claim is preempted and also that plaintiff has not carried his burden of satisfying the Rule 23 class requirements.

1. Pre-Emption

Defendant argues that the second class under UCL, based on the opt-out provision of Fed.R.Civ.P. 23, is preempted by the Portal to Portal Act, as a means of enforcement of FLSA violations. Defendant argues that the Portal to Portal Act represents an expansive scheme that was designed by Congress to be the exclusive vehicle for the vindication of FLSA rights enacted to limit the coverage of the FLSA. *Ballou v. General Elec.,* 433 F.2d 109, 112 (1st Cir.1970). Defendant says that it does not contend that the FLSA preempts state wage law, but instead defendant contends that by creating a detailed enforcement scheme that was designed expressly to avoid varied and expansive interpretations of the FLSA, Congress occupied the field of the vindication of the FLSA. Defendant contends that the Portal to Portal Act is the only means by which FLSA rights can be vindicated. 29 USC § 218. *Zombro v. Baltimore City Police*

Slip Copy
Slip Copy, 2005 WL 2436477 (E.D.Cal.), 151 Lab.Cas. P 35,060
**(Cite as: Slip Copy)**

*Dept.,* 868 F.2d 1364, 1369 (4th Cir.1989), 498 U.S. 850 (1989).

### a. Portal to Portal

In 1938, Congress enacted the Fair Labor Standards Act to govern the maintenance of standard hour and wage practices. The FLSA requires employers to pay their employees at least a specified minimum hourly wage for work performed, 29 U.S.C. § 206, and to pay one and one-half times the employee's regular rate of pay for hours worked in excess of forty hours per week, 29 U.S.C. § 207. The legislation propelled thousands of portal-to-portal lawsuits. The term "portal to portal" represents an employee's work day from starting time to quitting time. *Jewell Ridge Coal Corp. v. United Mine Workers,* 325 U.S. 161, 188, 65 S.Ct. 1063, 89 L.Ed. 1534 (1945) (Jackson, J., dissenting); *Connors v. Beth Energy Mines, Inc.,* 920 F.2d 205, 208 (3d Cir.1990) (work day was eight hours from portal-to-portal including thirty minutes for lunch). Responding to this increase in litigation, Congress sought "to define and limit the jurisdiction of the courts" through the Portal-to-Portal Act, Pub.L. No. 80-49, ch. 52, § 1(b)(3), 61 Stat. 85 (1947). 93 Cong. Rec. 2,087 (1947) ( "[T]he attention of the Senate is called to a dramatic influx of litigation, involving vast alleged liability, which has suddenly entered the Federal courts of the Nation."). Noting the "immensity of the [litigation] problem," *id.* at 2,082, Congress attempted to strike a balance to maintain employees' rights but curb the number of lawsuits. Under the Portal-to-Portal Act, an FLSA action for overtime pay could be maintained by "one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). But the statute contained an express opt-in provision: "No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.* Because the Portal-to-Portal Act amendment changed participation in an FLSA class from "opt-out" to "opt-in," FLSA plaintiffs could not certify a class under Fed.R.Civ.P. 23, even though federal subject matter jurisdiction obtained. *E.g., Lusardi v. Lechner,* 855 F.2d 1062, 1068 n. 8 (3d Cir.1988) ("Courts have generally recognized that Rule 23 class actions may not be used under FLSA § 16(b).")

### b. The District Court Judge's Order

*9 In the *Willis* case, the District Court Judge assigned to the case, Judge Ishii ("Judge Ishii") considered nearly the identical argument by the defendant in that case, Cal-Western Transport ("CWT"). In *Willis,* CWT also argued that the FLSA was the exclusive means for enforcement of their claim. As Judge Ishii summarized the argument: "Plaintiffs' attempt to pursue the alleged failure to pay overtime ... as [an UPA claim] contravenes the specific remedial procedures that Congress has declared to be the exclusive means for remedying violations of the FLSA." (*Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p. 7.)

In *Willis,* CWT argued that UPA's more favorable remedies, such as the longer statute of limitations, different rules governing injunctive relief, and a potentially easier class certification process, were preempted, citing congressional findings, as does defendant in this motion.

Judge Ishii extensively analyzed the issue of preemption.[FN2] Judge Ishii analyzed *Williamson v. General Dynamics Corp.,* 208 F.3d 1144, 1149-1150 (9th Cir.2000), *cert. denied,* 531 U.S. 929, 121 S.Ct. 309, 148 L.Ed.2d 247 (2000) for the three types of preemption: (1) express preemption; (2) filed preemption, and (3) conflict preemption. (*Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p. 16.) Judge Ishii found neither express preemption nor field preemption applied. (*Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p. 16, 17.) Defendant argues the FLSA contains a "detailed enforcement scheme" and "expansive interpretations." (opposition papers p. 16.) Judge Ishii held that field preemption did not apply:

> FN2. In *Vasquez v. Aartman,* Judge Ishii also relied upon the *Willis* order. (*Vasquez v. Jim Aartman, Inc.,* CV-02-5624, Doc 55, p.8.)

" 'Field preemption' occurs 'where state law attempts to regulate conduct in a field that Congress intended the federal law exclusively to occupy.' Field preemption is a 'potent' species of preemption, because under field preemption, any state regulation is preempted even if it does not actually conflict with the federal law.
"CWT does not specifically argue that the FLSA preempts the field in this case, although its 'structure

and purpose' argument could possibly be construed as such a contention. If this is CWT's argument, it must be rejected. The Ninth Circuit has already ruled in *Williamson,* a case in which no FLSA claim was pled but the defendant argued that the FLSA nevertheless preempted the plaintiffs' state common law fraud claims, that '[a]lthough this lawsuit does not invoke California's wage and hour laws, the FLSA's 'savings clause' is evidence that Congress did not intend to preempt the entire field.' *(Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p. 17.) (Citations omitted)

Judge Ishii found that due to the presence of the savings clause, "field preemption" did not apply.

As to conflict preemption, Judge Ishii noted the two kinds: (1) impossibility to comply with both state and federal requirement, or (2) state law stands as an obstacle to accomplishment of the congressional objectives. *(Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p.17-18.) Judge Ishii said that impossibility of compliance with both state and federal standards does not apply. On the issue of the second kind of conflict preemption, Judge Ishii held:
*10 "Whether state law 'stands as an obstacle to the accomplishment' of congressional objectives is a more difficult question. To the extent that by passing the statute of limitations found in section § 255(a), Congress intended to reduce the 'varying and extended periods of time for which, under the laws of the several States, potential retroactive liability may be imposed upon employers,' 29 U.S.C. section 251, imposition of the UPA's four-year limitations period would arguably be an obstacle. However, the obstacle imposed would appear relatively minor-in some cases the difference between three years and four, and in others between two and four. Moreover, as also stated above, the FLSA's limitations period by its terms only applies to actions 'under the Fair Labor Standards Act of 1938.' 29 U.S.C. § 255. It does not purport to apply to state law wage claims, whether brought in federal court as supplemental claims or filed separately in state court. Congress was presumably free at any time to enact a statutory provision eliminating the savings clause or stating that the FLSA was intended to have preemptive force, but it has not yet done so. On the other hand, as the Ninth Circuit specifically found in *Williamson,* 'the *principal purpose* of the FLSA is to protect all covered workers from substandard wages and oppressive working hours.' 208 F.3d at 1150 (quotation and citations omitted; emphasis added).

'In contrast to the Labor Management Relations Act, which was designed to minimize industrial strife and to improve working conditions by encouraging employees to promote their interests collectively, the FLSA was designed to give specific minimum protections to individual workers....' *Id.* (citations and quotations omitted). If the goal of the FLSA is generally to protect workers and their right to minimum wages and overtime, no real threat to accomplishment of that goal is posed by the UPA. This seems particularly true in this case, where the result will be not to raise the minimum wage or shorten the workweek but (assuming that the FLSA does indeed supply the correct standard) merely to look back longer in time, and thereby consider a greater number of violations of the *federal* law.
Neither of the first two types of preemption-"express preemption" and "conflict preemption"-applies in this case. In light of the Ninth Circuit's statement that the FLSA's "principal purpose" is to "protect all covered workers from substandard wages and oppressive working hours," combined with the fact that the UPA if applied here will at most permit Plaintiffs to recover for a greater number of violations of federal law, the UPA appears to pose no obstacle to the objectives of the FLSA, and "conflict preemption" is therefore inapplicable. *(Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p.17-18) (citations and footnotes omitted)

Accordingly, Judge Ishii has carefully considered the preemption arguments made herein and fully rejected it.[FN3] There is no justification for this Court to overrule Judge Ishii.

> FN3. Indeed, Judge Ishii considered the argument in *Willis,* in one form or another, on multiple occasions and rejected it each time. See Order on Motion for Reconsideration, Doc. 54, filed May 10, 2001; Order Denying motion for Summary Judgment, Doc. 97 filed Jan. 24, 2002.

### 2. Savings Clause

*11 The FLSA savings clause provides:
"No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minium wage higher than the minimum age established under this chapter or maximum work week lower than the maximum workweek established under this chapter, and no provision of this chapter

relating to the employment of child labor shall justify noncompliance with any Federal or State law or municipal ordinance establishing a higher standard than the standard established under this chapter." 29 U.S.C. § 218(a).

Defendant argues that the FLSA's savings clause does not change the result that the FLSA is the sole mechanism for the vindication of rights based on the FLSA. Defendant argues that California may institute and enforce its own minimum wage and overtime laws, but may not devise a different mechanism for the vindication of the FLSA rights.

Judge Ishii has also considered this argument and rejected it in the *Willis* case.

"Section 218(a) permits states to, in essence, set higher substantive standards than the federal government regarding wages and hours.... [T]he UPA is not being used here as a statute that requires a 'minimum wage higher than' under the FLSA, or a '[maximum workweek lower than' under the FLSA. It is being used solely to extend the statute of limitations, and for Plaintiffs to avail themselves of more favorable *remedies.* The 'minimum wage' and 'maximum workweek' according to Plaintiffs' UPA claim is identical to that under the FLSA; the very wrong that Plaintiffs complain of under the UPA is the FLSA violation. Therefore, the literal language of the 'savings clause' does not apply to Plaintiffs' claim under the UPA." *(Willis,* Memorandum Opinion and Order Denying Motion for Partial Judgment on the Pleadings, doc. 17, p.14-15.)

Again, the District Court Judge fully considered this argument and rejected it.

### 3. Requirements of Rule 23

Plaintiff also alleges that the failure to pay overtime compensation as required by 29 U.S.C. § 207(a) is a violation of the California Competition Law ("UCL"). UCL prohibits entities from engaging in unfair competition, including unlawful, unfair or fraudulent business practices. A class for this violation must satisfy Fed.R.Civ.P.23.

All class actions under Rule 23 must meet four prerequisites:
1. Numerosity,
2. Commonality,
3. Typicality,
4. Adequacy of representation.

The burden on the motion is on the party seeking to maintain the class action. In this case, plaintiff must establish a prima facie showing of each of the elements of Rule 23(a) prerequisites and the appropriate 23(b) ground for a class action. *Taylor v. Safeway Stores, Inc.* 524 F.2d 263, 270 (10th Cir.1975). Plaintiffs need only present sufficient proof to allow the court to come to a "reasonable judgment" on each requirement. *Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir.1975), *cert. denied,* 429 U.S. 816 (1976).

**\*12** Numerosity: This element is disputed in that defendant contends the class will consist of at most 34 truck drivers. In his reply brief, plaintiff does not dispute the number claimed by defendant, but contends that smaller classes under Rule 23 have been certified.

Numerosity is not a requirement for certification of the collective action under the FLSA.

For a Rule 23 class, the class must be so numerous that joinder of all members individually is "impracticable." Fed.R.Civ.P. 23(a)(1). No specific numerical threshold is required; each case must be examined. *General Tel.C. v. E.E.O.C.,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980) (15 is too small a class). Generally, 40 or more members will presumptively satisfy the numerosity requirement. *Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2nd Cir.1995), *cert. denied,* 515 U.S. 1122 (1995). Numerosity may be shown where the number is so large that it would be impossible to join every class member: i.e., 'impracticability' does not mean 'impossibility.' *Robidoux v. Celani,* 987 F.2d 931, 935 (2nd Cir.1993). Other factors considered when determining whether joinder is impracticable are: the geographical diversity of class members, the ability of individual claimants to institute separate suits, and whether injunctive or declaratory relief is sought.' *Id.,* at 936.

Defendant cites *Monarch Asphalt Sales Co., Inc. v. Wilshire Oil Co. of Texas,* 511 F.2d 1073, 1077 (C.A.Okl.1975) for the proposition that a class of 37 was not numerous. In *Monarch Asphalt,* the court decided without analysis that joinder of all members was impracticable. More significantly, the court denied certification on other grounds, that the class representative was not a member of the class. In *Moreland v. Rucker Pharmacal Co., Inc.,* 63 F.R.D. 611, 614 (W.D.La.1974), the court stated that

although mere numbers alone are not determinative, joinder has been held preferable where the number of prospective members is between thirty and forty. Many other cases have addressed the issue. *See, e. g., Kelly v. Market USA,* 2002 WL 1334830, 3 (D.Kan.,2002) (three class members); *General Tel. Co. of the Northwest, Inc.,* 446 U.S. 318, 100 S.Ct. 1698, 64 L.Ed.2d 319 (15 class plaintiffs too small); *Monarch Asphalt Sales Co. v. Wilshire Oil Co., Inc. of Texas,* 511 F.2d 1073, 1077 (10th Cir.1975) (37); *Peterson v. Albert M. Bender Co.,* 75 F.R.D. 661, 667 (N.D.Cal.1977) (too small 35-45); *Murray v. Norberg,* 423 F.Supp. 795, 798 (D.R.I.1976) (fewer than 20); *Chmieleski v. City Products Corp.,* 71 F.R.D. 118, 150-151 (W.D.Mo.1976) (22); *Lopez v. Jackson County Bd. of Supervisors,* 375 F.Supp. 1194, 1196-1197 (S.D.Miss.1974) (16); *Moreland v. Rucker Pharmacal Co.,* 63 F.R.D. 611, 613-614 (W.D.La.1974) (26); *Anderson v. Home Style Stores, Inc.,* 58 F.R.D. 125, 130-131 (E.D.Pa.1972) (18).

For certification of the class under Rule 23, there is no bright line for a potential class of 34. A class of 40 is presumptively numerous and a class of 15 is presumptively too small for certification. A class of 34 is more towards the presumptive "numerous" class. In addition, other factors weigh in favor of "numerosity." Joinder of the plaintiffs, may be possible, but it is most likely impracticable. The plaintiffs are truck drivers who likely live near both of defendant's terminals, Bakersfield, which is within this District, and near Ontario, which is outside this district. It would likely be difficult for individuals to prosecute in this distant forum. Moreover, defendant argues these truck drivers are "motivated" to institute suit as individuals, since they were highly compensated. However, some of the potential class members are still employed with defendant and are unlikely to institute action against their employer. *Mullen v. Treasure Chest Casino, LLC,* 186 F.3d 620, 625 (5th Cir.1999) (fear of retaliation at their jobs is an additional factor to consider in class certification), *cert. denied,* 518 U.S. 620 (1999). Thus, the Court finds that the class is "numerous."

**13** Commonality: There must be questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). A "common nucleus of operative facts" is usually enough to satisfy the commonality requirement. *Rosario v. Livaditis,* 963 F.2d 1013, 1017-18 (7th Cir.1992), *cert. denied,* 506 U.S. 1051, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993).

Defendant's argument is that an individualized inquiry is necessary as to each class member and therefore their claims are not common.

As shown above, there is commonality of the claims. There is commonality of facts for each truck ˙·· ˙·er and commonality of the law.

Typicality: The claims or defenses of the class representative must be typical of the claims or defenses of the class. Fed.R.Civ.P. 23(a)(3). The named plaintiff must be a member of the class. *Bailey v. Patterson,* 369 U.S. 31, 32 -33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962).

Defendant argues that the claim of the proposed class representative is not typical because he was employed only from January 2004 through April 2004. However, the time period, while not expansive, is within the limitations period. There is no evidence before the Court that defendant's operations or policy has changed such that the limited duration of plaintiff's employment would make his claims *a* typical.

Adequacy of Representation: The person representing the class must be able "fairly and adequately to protect the interests" of all members in the class. Fed.R.Civ.P. 23(a)(4). The representati˙ ˙ is "adequate" if the attorney representing the c˙. ˙ is qualified and competent and the class representatives are not disqualified by interests antagonistic to the remainder of the class. *Lerwill v. Inflight Motion Pictures, Inc.* 582 F.2d 597, 512 (9th Cir.1978).

There is not any real dispute as to the adequacy of representation.

Law or Fact Common Predominate

In addition to the above, a class action under Rule 23 must have common questions of law or fact that predominate over individuals' questions:
The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

At this stage of the litigation, the common questions of law, the overtime requirements, and the co˙˙ ˙on questions of fact predominate.

*CONCLUSION*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                    Page 11
Slip Copy, 2005 WL 2436477 (E.D.Cal.), 151 Lab.Cas. P 35,060
**(Cite as: Slip Copy)**

For the reasons stated above, the Court
RECOMMENDS that the Motion to Certify Class
Action be GRANTED under 29 U.S.C. § 216(b) and
Federal Rule of Civil Procedure 23.

The Court RECOMMENDS that the collective and
class be certified as follows:

Collective action under the FLSA:

"All persons who are employed or have been
employed by defendant Oldenkamp Trucking in the
State of California who, on or after September 20,
2001, to the time of trial, have worked as a truck
driver hauling milk from dairies to creameries and/or
cheese factories solely within the State of California
and have worked in excess of forty (40) hours per
week without being paid overtime compensation by
Oldenkamp Trucking for those excess hours."

**\*14** Class action under the UCL:

"All persons who are employed or have been
employed by defendant Oldenkamp Trucking in the
State of California who, on or after September 20,
2000, to the time of trial, have worked as a truck
driver hauling milk from dairies to creameries and/or
cheese factories solely within the State of California
and have worked in excess of forty (40) hours per
week without being paid overtime compensation by
Oldenkamp Trucking for those excess hours.

These findings and recommendations are submitted
to the United States District Judge assigned to the
case, pursuant to the provisions of Title 28 U.S.C. §
636(b)(1). Within twenty days after being served
with these findings and recommendations, any party
may file written objections with the court and serve a
copy on all parties. Such a document should be
captioned "Objections to Magistrate Judge's Findings
and Recommendations." The parties are advised that
failure to file objections within the specified time
may waive the right to appeal the District Court's
order. *Martinez v. Ylst,* 951 F.2d 1153 (9th Cir.1991).

IT IS SO ORDERED.

E.D.Cal.,2005.
Aguayo v. Oldenkamp Trucking
Slip Copy, 2005 WL 2436477 (E.D.Cal.), 151
Lab.Cas. P 35,060

Briefs and Other Related Documents (Back to top)

• 2005 WL 3242095 (Trial Motion, Memorandum
and Affidavit) Plaintiff's Reply to
Defendant'Sobjections to Magistrate Judge's Findings
and Recommendations as to Plaintiff's Motion for

Class Certification (Nov. 3, 2005) Original Image of
this Document (PDF)

• 2005 WL 2657296 (Trial Motion, Memorandum
and Affidavit) Defendant's Opposition to Plaintiff's
Motion for Class Certification (Sep. 2, 2005) Original
Image of this Document (PDF)

• 2005 WL 2290916 (Trial Motion, Memorandum
and Affidavit) Plaintiff's Memorandum of Points and
Authorities in Support of Motion for Class
Certification and Appointment of Class Counsel and
Class Representative (Fed.R.Civ.P. 23(c)(1); 29
U.S.C. | 216(b)) (Aug. 4, 2005) Original Image of
this Document (PDF)

• 2004 WL 3606396 (Trial Motion, Memorandum
and Affidavit) Defendant's Objections Tomagistrate
Judge's Findings and Recommendations as to
Plaintiff's Motion for Class Certification; Alternative
Request to Certify the Flsapreemption Issue for
Interlocutory Appeal (Mar. 15, 2004) Original Image
of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 1
Not Reported in F.Supp., 1993 WL 432402 (D.Ariz.), 126 Lab.Cas. P 33,002, 1 Wage & Hour Cas.2d (BNA) 982
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents

United States District Court, D. Arizona.
Reymundo ARAGON, et al., Plaintiffs,
v.
BRAVO HARVESTING, INC., et al., Defendants.
**No. CIV-89-1282-PHX-RCB.**

May 7, 1993.

*[Statement of Case ]*
BROOMFIELD, District Judge.
**\*1** Defendants move for judgment on the pleadings,
requesting the court to dismiss Count IV, which
alleges violation of state wage laws, and all minimum
wage-related claims asserted in Count II, which
alleges breach of contract.    Defendants argue that
these claims are preempted by the Fair Labor
Standards Act ("FLSA"), 29 U.S.C. § § 201 et seq.
Plaintiffs oppose the motion.    After consideration of
the parties' written and oral arguments, the court now
rules.

I. Background Information

In this action brought by migrant workers, Case CIV
89-1282-PHX-RCB addresses claims arising out of
the 1988 to 1989 growing season and is referred to as
Mission I.    Case CIV 91-1463 addresses claims
arising out of the 1989 to 1990 growing season and is
referred to as Mission II.    In each of the consolidated
actions, plaintiffs have alleged four virtually identical
claims:  (1) Count I-violations of the Migrant and
Seasonal Agricultural Worker Protection Act, FN1 (2)
Count II-breach of contract, (3) Count III-violations
of the Fair Labor standards Act ("FLSA"), and (4)
Count IV-violations of Arizona Wage Laws.    Counts
II and IV have been certified as class actions in
Mission I, but are asserted on behalf of only the
named plaintiffs in Mission II.

A. *Count II-Breach of Contract*

In Count II, plaintiffs allege in part that defendants
breached the contract when they "violated the terms
of the working arrangement, failed to pay wages
when due, and/or failed to pay the minimum wage."

(Second Amended Complaint for Declaratory and
Injunctive Relief and Damages Class Action
("Mission I Complaint") ¶ 44, lodged Aug. 16, 1990;
Complaint for Declaratory and Injunctive Relief and
Damages ("Mission II Complaint") ¶ 44, Sept. 12,
1991).        Regarding the terms of the working
arrangement, plaintiffs further allege:
The terms or conditions of employment as set forth
by the D.E.S. letter, and subsequent recruitment
included the promise to pay the piece rate, or the
minimum wage, whichever was higher.
(Mission I Complaint ¶ 41; Mission II Complaint ¶
41.)

B. *Count IV-State Wage Claims*

In Count IV, plaintiffs seek damages and declaratory
relief under Arizona's wage laws, sections 23-350, FN2
23-353, FN3 and 23-355 FN4 et seq.    (Mission I
Complaint ¶   49, Mission II Complaint ¶   49.)
Plaintiffs allege that defendants jointly and severally
owe each plaintiff "wages for the difference between
the amount actually paid and the minimum wages to
which each Plaintiff was entitled under FLSA" and
"wages for hours worked and not compensated by the
Defendants."    (Mission I Complaint, ¶ ¶   51, 52;
Mission II Complaint, ¶ ¶ 51, 52.)

Plaintiffs further allege that when an employee quits
or is discharged, A.R.S. §  23-353 requires payment
of wages due and owing no later than the next regular
pay day.  (Mission I Complaint ¶   53, Mission II
Complaint ¶ 53.)    Plaintiffs contend that defendants
violated section 23-353 and thus plaintiffs are entitled
to treble the amount of unpaid wages under A.R.S. §
23-355.  (Mission I Complaint ¶ ¶ 54, 55; Mission II
Complaint ¶ ¶ 54, 55.)

II. Analysis

**\*2** Defendants first argue that A.R.S. § 23-355 is not
intended to provide a remedy for alleged violations of
FLSA.    Defendants next argue that to the extent that
state statutory law or common law regarding breach
of contract provides for remedies more beneficial to
employees than FLSA remedies, *e.g.,* allowances for
interest and treble damages, longer statute of
limitations period, and the elimination of FLSA opt-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2
Not Reported in F.Supp., 1993 WL 432402 (D.Ariz.), 126 Lab.Cas. P 33,002, 1 Wage & Hour Cas.2d (BNA) 982
(Cite as: Not Reported in F.Supp.)

in requirements, these state law remedies are preempted by FLSA.

### A. *Applicability of A.R.S. § 23-355 to Plaintiffs' Claims*

Defendants argue that the history of A.R.S. § 23-355 does not lead to the conclusion that the Arizona legislature intended to apply the treble damage remedy to good faith wage disputes. Defendants correctly assert that A.R. s. § 23-352(3) removes the remedy of treble damages when a good faith dispute regarding the amount of wages exists.[FN5] *See Abrams v. Horizon Corp.,* [117 LC ¶ 56,472] 669 P.2d 51, 55 (Ariz.1983).

Defendants further argue that A.R.S. § 23-355, which provides for treble damages, only applies to claims for the withholding of contractual wages, and not for claims for violations of FLSA. In support of this argument, defendants refer to *Marshall v. Bernat Enterprises, Inc.,* 24 Wage & Hour Cas. (BNA) 78 (D.Ariz.1978). Plaintiffs do not respond to this argument.

The text of A.R.S. § 23-355, which provides for an award of treble damages, limits its application to violations of Chapter 2 of title 23 of the Arizona Revised statutes which governs "Employment Practices and Working conditions" ("Chapter 2"). Thus, plaintiffs are not entitled to treble damages for FLSA claims. A.R.S. § 23-355; *Marshall,* 24 Wage & Hour Cas. (BNA) at 78.

Furthermore, the only claim asserted by plaintiffs in their complaint which arises under Chapter 2 under section 23-353, titled "payment of wages of discharged employee; violation; classification." *See* A.R.S. § 23-353. Application of that section is limited to employees who are "discharged" or who "quit." A.R.S. 23-353(A, B). Employees who end their employment because the growing season of the specific crop picked has ended do not fall within the class of employees who have been discharged or have quit. In sum, plaintiffs' request for treble damages is limited to their claims for wages by employees who were discharged or who quit, qualified by the fact that these claims in Mission I must also meet the criteria for class action claims.

### B. *Preemption of Counts II and IV by FLSA*

With respect to Count II for breach of contract,

defendants argue that the FLSA preempts those portions of this claim which are based on the FLSA. [FN6] Defendants argue that plaintiffs' claim for unpaid wages falls within the FLSA. Defendants expressly concede that the FAA does not preempt any claims properly plead by plaintiffs for failure to provide health insurance or failure to pay piece rate in excess of minimum wage.[FN7] With respect to Count IV, defendants argue that the FAA preempts all of plaintiffs' claim, including a claim for unpaid wages.

\*3 Both parties agree that the remedies provided under Arizona statutory and common law are more beneficial to employees than remedies provided under the FLSA. Defendants argue that these state law remedies are preempted by the FAA because through these state law claims plaintiffs seek to circumvent restrictions specifically imposed by Congress on minimum wage claims.

Defendants specifically assert that Arizona law is more beneficial to employees in four respects. First, defendants contend that under Arizona law, traditional "opt-out" class actions are available, while under the FLSA, potential class members must "opt-in." Second, defendants note that Arizona law provides for a longer statute of limitations period than the two or three years period provided by the FLSA.

Third, defendants contend that while the FLSA only provides for discretionary liquidated damages, Arizona law provides for an automatic award of treble damages.[FN8] Finally, defendants note that the FLSA does not provide for an award of interest, unlike state law which provides an award of interest with certain liquidated contract claims.

Plaintiffs counter that their claims asserted in counts II and IV are not limited to claims for minimum wages and thus not preempted. Plaintiffs further argue that even if these counts asserted only claims for minimum wages, the FLSA would not preempt these claims because state law provides remedies which exceed those provided by the FLSA.

Plaintiffs argue that Congress did not intend the FLSA to preempt such state remedies and that plaintiffs are entitled to a presumption against preemption. Plaintiffs further assert that the FLSA contains no express preemption language, that the statute does not "occupy the field," and that plaintiffs' state remedies do not conflict with the FLSA because compliance with both the state laws and the FLSA is not impossible.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1993 WL 432402 (D.Ariz.), 126 Lab.Cas. P 33,002, 1 Wage & Hour Cas.2d (BNA) 962
**(Cite as: Not Reported in F.Supp.)**

In determining whether the FLSA preempts plaintiffs' state law claims for the payment of minimum wages, the court's "sole task is to ascertain the intent of Congress." *California Federal Savings and Loan Ass'n v. Guerra,* [41 EPD ¶ 36,641] 479 U.S. 272, 280, 107 S.Ct. 683, 689 (1987). When Congress legislates in areas traditionally within a state's police power, the court must find a clear and manifest purpose of congress to supersede state laws. *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152 (1947). Under their police powers, states possess broad authority to regulate employment relationships for the protection of workers. *De Canas v. Bica,* [78 LC ¶ 53,798] 424 U.S. 351, 356, 96 S.Ct. 933, 937 (1976). Thus, to find preemption in this case, the court must find a clear and manifest purpose of congress to supersede state wage laws.

Congressional intent to preempt may be found in three ways. First, congressional intent to preempt state law may be expressed in the statute. *Guerra,* at 280, 107 S.Ct. at 689. The parties do not dispute that Congress has not expressly stated an intent in the FLSA to preempt state law.

*4 Second, the court may infer congressional intent to preempt state law "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." *Id.* at 281, 107 S.Ct. at 689. The FLSA includes a "savings clause," which provides:
(a) No provision of this chapter or of any order thereunder shall excuse noncompliance with any Federal or State law or municipal ordinance establishing a minimum wage higher than the minimum wage established under this chapter or a maximum workweek lower than the maximum workweek established under this chapter, and no provision of this chapter relating to the employment of child labor shall justify noncompliance with any Federal or State law or municipal ordinance establishing a higher standard than the standard established under this chapter....

29 U.S.C. § 218(a). Plaintiffs argue, and defendants do not dispute, that this savings clause reveals that congress did not intend to "occupy the field." The court agrees.

Finally, the court may infer congressional intent to preempt state law to the extent that the state law actually conflicts with federal law. *Guerra* at 281, 107 S.Ct. at 689. Such a conflict may exist either because it is physically impossible to comply with both the federal and state law or because the state law "stands 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* (*quoting Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404 (1941)).

The parties dispute whether remedies provided under Arizona law for failure to pay wages due and owing actually conflict with the FLSA. Plaintiffs argue that it is not physically impossible to comply with both laws and that both A.R.S. § 23-355, which potentially provides for treble damages, and the FLSA serve the same remedial goal of permitting a plaintiff to recover wages earned.

Defendants argue that by providing specific remedies in FLSA, including amendments in the Portal to Portal Act, 29 U.S.C. § § 251-262, which imposed additional procedures on employees filing an FLSA action and which limited some remedies, Congress attempted to balance the competing interests of the employee and employer. Defendants argue that permitting plaintiffs to avail themselves of state remedies not provided under the FLSA would undermine congressional intent and render the remedy provisions of the FLSA meaningless.

In support of their argument, defendants rely on two district court cases, *Tombrello v. USX Corp.,* [119 LC ¶ 35,502] 763 F.Supp. 541 (N.D.Ala.1991), *Lerwill v. Inflight Motion pictures, Inc.,* [68 LC ¶ 32,717] 343 F.Supp. 1027 (N.D.Cal.1972), which hold that the FLSA provides exclusive remedies for rights under the FLSA.

In *Lerwill,* the court noted that amendments to the FLSA in the Portal to Portal Act substantially curtailed the ability of an employee to vindicate rights under the FLSA. *Lerwill,* 343 F.Supp. at 1029. The *Lerwill* court interpreted these amendments to reflect a delicate balancing process of "1) strict enforcement of the statutory objective of insuring minimally acceptable pay levels and 2) the avoidance of the economic disruption of unanticipated liabilities." *Id.* From this balancing process, the *Lerwill* court concluded that the statutory remedy of the FLSA provided the plaintiff with an exclusive remedy for rights the plaintiff may have under the FLSA. *Id.* The *Tombrello* court, without much discussion, similarly concluded that a plaintiff could not "circumvent the exclusive remedy prescribed by Congress by asserting equivalent state law claims in addition to the FLSA claim." *Tombrello,* 763 F.Supp. at 545.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 4
Not Reported in F.Supp., 1993 WL 432402 (D.Ariz.), 126 Lab.Cas. P 33,002, 1 Wage & Hour Cas.2d (BNA) 982
(Cite as: Not Reported in F.Supp.)

*5 In support of their argument, plaintiffs rely on a district court case and a case from the Alaska Supreme Court, *Spieth v. Adasen Distrib., Inc.,* [111 LC ¶ 35,176] 29 Wage & Hour Cas. (BNA) 363 (D.Ariz.1989), *Webster v. Bechtel, Inc.,* [90 LC ¶ 33,958] 621 P.2d 890 (Alaska 1980).

In *Webster,* the Alaska Supreme Court addressed the issue of whether the FLSA preempted an Alaska statute which provided for a higher minimum wage and a potentially shorter work week. The Alaska statute also differed from the FLSA in that the Alaska statute did not recognize a good faith exception for an award of liquidated damages and permitted a typical opt-out class action, rather than requiring plaintiffs to opt-in. *Webster,* 621 P.2d at 895-96. The court noted, however, that both the FLSA and the Alaska statute served similar purposes of establishing minimum wages, maximum work weeks, and overtime compensation standards adequate to maintain the health and general well-being of workers. *Id.* at 896.

After interpreting the Alaska statute to provide for an off-setting of damages in order to preclude double recovery, the *Webster* court determined that the Alaska statute did not conflict with the FLSA. The *Webster* court found that the opt-in class requirements and the provision for discretionary liquidated damages in the FLSA applied only to FLSA actions. Therefore, the state statute did not directly conflict with the FLSA by virtue of their terms. *Id.* at 902-03.

Finally, the *Webster* court rejected the argument that the Alaska statute would upset the balance created by the Portal to Portal Act amendments to the FLSA or significantly impede the purposes of the FLSA. *Id.* In so concluding, the *Webster* court analogized its situation to that presented in a case before the First Circuit, in which the First Circuit refused to apply the FLSA statute of limitations to an action brought under state law for payment of wages. *Id.* at 903 (*quoting Eastern Sugar Assoc. v. Pena,* [28 LC ¶ 69,231] 222 F.2d 934 (1st Cir.), *cert. denied,* 350 U.S. 900 (1955)). In support of its conclusion, the First Circuit in *Pena* referred to legislative history of the Portal to Portal Act which established a federal statute of limitations and provided:
The limitation herein provided applies only to the statutory actions or proceedings set forth in the acts enumerated in [the Portal to Portal Act]. Actions under the common law, or under State statutes for recovery of wages are not affected.

*Pena,* 222 F.2d at 938 n. 7 (*quoting* H.Rept. 71, 80th Cong., 1st Sess. at 7 (found in U.S.Code and Cong.Service, 80th Cong., 1st Sess. at 1035 (1947)).

In *Spieth,* the district court held that the FLSA did not preempt plaintiff's request for treble damages because the treble damages were included within FLSA's saving clause. *Spieth,* 29 Wage & Hour Cas. (BNA) at 252.

While the court finds this issue a very close one, the court does not find conflict between the FLSA and the state laws at issue in this case from which to infer a congressional intent to preempt state wage laws. Defendants essentially argue that a congressional purpose to balance employee and employer rights, as evidenced by the Portal to Portal Act, would be frustrated through state wage laws which provide remedies more beneficial to employees. A review of the text of the Portal to Portal Act, however, reveals that it was enacted not in response to state actions, but in response to judicial interpretations of the FLSA which could have devastating financial effects on employers:
*6 The Congress hereby finds that the Fair Labor Standards Act of 1938, as amended, has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive inoperation, upon employers with the results that, if said Act as so interpreted or claims arising under such interpretations were permitted to stand, (1) the payment of such liabilities would bring about financial ruin of many employers....

29 U.S.C. § 251(a). Congressional comment on this act indicates that courts were interpreting the FLSA to require compensation for preliminary activities, such as walking and other travel. U.S.Code and Cong.Service, 80th Cong., 1st Session, at 1030 (1947). The Portal to Portal Act did not result from an abundance of state wage claims which were more beneficial to employees.

Furthermore, when discussing the federal statute of limitations provided by the amendments, congressional comment expressly states that this limitation does not apply to actions for the recovery of wages brought under state law. Apparently, Congress envisioned not only that state based claims for wages could be asserted, but that they could be governed by separate procedures. *Id.* at 1035.

Not Reported in F.Supp.                                                    Page 5
Not Reported in F.Supp., 1993 WL 432402 (D.Ariz.), 126 Lab.Cas. P 33,002, 1 Wage & Hour Cas.2d (BNA) 982
(Cite as: Not Reported in F.Supp.)

In light of these considerations and recognizing the clear conflict between the *Lerwill* and *Webster* lines of cases, this court concludes that the state wage actions in this case which are governed by procedures more beneficial to plaintiffs than those in the FLSA and which may provide for remedies to plaintiffs more beneficial than those in the FLSA do not frustrate congressional purpose as evidence by the FLSA and the Portal to Portal Act amendments. Furthermore, because the state procedures and remedies only apply to state actions, and the federal procedures and remedies only apply to federal actions, this court finds no direct conflict based on the terms of the statutes.[FN9]

Finally, based on plaintiffs' counsel's express characterization of plaintiffs claims during oral argument and that no double recovery is sought, plaintiffs will be precluded from seeking or receiving double recovery under the FLSA and state laws for the same injury.[FN10]

### III. Conclusion

Plaintiff may not seek treble damages for its FLSA claims. Furthermore, plaintiffs' claims for treble damages are limited to those employees who were discharged or quit as discussed in this order. Finally, the court holds that plaintiffs' state law claims, Counts II and IV, are not preempted by the FLSA, even though these state laws may provide procedures and remedies more beneficial than those provided in the FLSA.

It Is Ordered granting in part and denying in party Defendants' Motion for Judgment on the Pleadings on Supplemental State Wage Claims (doc. 375).

FN1. The court dismissed this claim with respect to Mission II.

FN2. Section 23-350 is a definitional section.

FN3. Section 23-353 provides in part:
A. When an employee is discharged from the service of an employer, he shall be paid wages due him within three working days or the end of the next regular pay period, whichever is sooner.
B. When an employee quits the service of an employer he shall be paid in the usual manner all wages due him no later than the regular payday for the pay period during which the termination occurred....
A.R.S. § 23-353(A, B).

FN4. Section 23-355 provides:
If an employer, in violation of the provisions of this chapter, shall fail to pay wages due any employee, such employee may recover in a civil action against an employer or former employer an amount which is treble the amount of the unpaid wages.
A.R.S. § 23-355.

FN5. Section 23-352(3) provides:
No employer may withhold or divert any portion of an employee's wages unless one of the following applied: ... 3. There is a reasonable good faith dispute as to the amount of wages due, including the amount of any counterclaim or any claim of debt, reimbursement, recoupment or set-off asserted by the employer against the employee.
A.R.S. § 23-352(3).

FN6. At oral argument, defendants' counsel argued that plaintiff could not assert identical wage claims under both state and federal law, but must choose to pursue the wage claims under either state or federal law.

FN7. While not related to the topic of preemption, defendants assert that to the extent that all plaintiffs did not allegedly experience these injuries, plaintiffs may not adjudicate these claims as a class action.

FN8. Defendants are not correct. Under Arizona law, the court has discretion to deny damages where there is a reasonable good faith dispute between employer and employee. *Apache East, Inc. v. Wiegand,* 580 P.2d 769, 773 (Ariz.App.1978).

FN9. This court does not reach the question of whether the savings clause in the FLSA permits a state to provide to employees remedies more beneficial than FLSA remedies.

FN10. At oral argument, plaintiffs' counsel asserted that plaintiffs had tailored their case to provide for only one satisfaction. Plaintiffs' counsel asserted that plaintiffs'

Not Reported in F.Supp.                                                        Page 6
Not Reported in F.Supp., 1993 WL 432402 (D.Ariz.), 126 Lab.Cas. P 33,002, 1 Wage & Hour Cas.2d (BNA) 982
**(Cite as: Not Reported in F.Supp.)**

> FLSA claims were limited to four alleged
> violations: (1) failure to compensate for
> work performed during "lunch time," (2)
> failure to compensate for travel time, (3)
> failure to compensate for time spent waiting
> in the fields, exclusive of "wet" time, and
> (4) deductions for tools which caused
> plaintiffs' wages to dip below minimum
> wage.        Additionally, plaintiffs' counsel
> asserted at oral argument, that plaintiffs'
> state claims are limited to three alleged
> violations: (1) failure to compensate for
> "wet" time, (2) failure to compensate at a
> rate of minimum wage or bin rate,
> whichever is higher, and (3) failure to
> provide health insurance as agreed.

D.Ariz.,1993.

Aragon v. Bravo Harvesting, Inc.

Not Reported in F.Supp., 1993 WL 432402 (D.Ariz.),
126 Lab.Cas. P 33,002, 1 Wage & Hour Cas.2d
(BNA) 982

Briefs and Other Related Documents (Back to top)

• 2:89cv01282 (Docket) (Aug. 01, 1989)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                Page 1
Not Reported in F.Supp.2d, 2005 WL 928537 (D.N.H.), 2005 DNH 069
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents

NOT FOR PUBLICATION
United States District Court,D. New Hampshire.
BALLARD et al.
v.
TYCO INTERNATIONAL et al.
**No. 02-MD-1335-PB.**

April 22, 2005.

Kenneth G. Bouchard, Bouchard & Kleinman PA, Hampton, NH, William L. Chapman, Orr & Reno PA, Edward A. Haffer, Sheehan Phinney Bass & Green, Manchester, NH, Biron L. Bedard, Cook & Molan PA, R. Matthew Cairns, Ransmeier & Spellman, Concord, NH, Robert C. Finkel, Wolf Popper LLP, Marc Frazier Scholl, New York County District Attorney's Office, New York, NY, for Ballard et. al.
Reid H. Weingarten, Steinhart & Falconer, San Francisco, CA, William T. Hassler, Steptoe & Johnson LLP, Washington, DC, David A. Vicinanzo, Nixon Peabody LLP, Richard McNamara, Wiggin & Nourie, Arnold Rosenblatt, Cook Little Rosenblatt & Manson, Manchester, NH, Jody L. King, Stillman & Friedman PC, Peter M. Bryce, Davis Polk & Wardwell, Gregory A. Markel, Cadwalader Wickersham & Taft LLP, Francis P. Barron, Cravath Swaine & Moore LLP, Michele L. Pahmer, Stroock & Lavan LLP, Jay B. Kasner, Skadden Arps Slate Meagher & Flom LLP, Vicki K. Andreadis, Hughes Hubbard & Reed, New York, NY, Christian M. Hoffman, Foley Hoag LLP, Boston, MA, James E. Townsend, Townsend Law Office, Londonderry, NH, Michael J. Beck, Judicial Panel on Multidistrict LitigationThurgood Marshall, Washington, DC, for Tyco International et. al.

*MEMORANDUM AND ORDER*
BARBADORO, J.
\*1 Plaintiffs are former shareholders of AMP, Inc. who acquired shares of stock in Tyco International Ltd ("Tyco") on April 4, 1999, when Tyco and AMP merged ("AMP/Tyco merger"). They allege, *inter alia,* that PricewaterhouseCoopers LLP ("PwC"), as Tyco's auditor during the relevant time, violated Section 11 of the 1933 Securities Act (the "Securities Act") and Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act").

PwC argues in a motion to dismiss that plaintiffs' claims against it are time-barred. For the reasons set forth below, I grant PwC's motion.

*I. BACKGROUND*

Plaintiffs are 33 family trusts and four individuals. When Tyco and AMP merged on April 4, 1999, plaintiffs received 0.7839 of a share of Tyco stock for each share of AMP stock. Plaintiffs acquired over 2.9 million Tyco shares as a result of the merger.

On January 20, 2004, plaintiffs filed a complaint in the Southern District of New York against Tyco, several of Tyco's former officers and directors, and PwC.[FN1] Plaintiffs allege that Tyco and its former officers and directors misled investors into believing that the company was experiencing continuous, organic growth when, in fact, Tyco's apparent success was instead a result of fraudulent accounting. Specifically, plaintiffs charge that Tyco's portrayal of itself as a "turn around" specialist, able to identify troubled but promising companies, acquire them, and turn them into profitable enterprises, was materially false and misleading. Instead, plaintiffs allege, Tyco's improving earnings performance resulted from improperly causing acquisition targets, including AMP, to report artificially high pre-merger losses in order to create the illusion of post-merger performance improvements.

> FN1. Tyco has filed a separate motion to dismiss plaintiffs' claims against it and its former officers (Doc. No. 213). This Memorandum and Order addresses only plaintiffs' claims against PwC.

Plaintiffs also allege that during the relevant time, PwC "(a) audited Tyco's financial statements; (b) issued materially false and misleading opinions on those financial statements; [and] (c) consented to the use of its unqualified opinions in Tyco's publicly filed statements." Compl. ¶ 51. Pursuant to these audits, plaintiffs charge that PwC had access to Tyco's internal accounting records, and thus to intimate knowledge of Tyco's financial reporting practices. *See* Compl. ¶ ¶ 194-99. According to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 2
Not Reported in F.Supp.2d, 2005 WL 928537 (D.N.H.), 2005 DNH 069
**(Cite as: Not Reported in F.Supp.2d)**

plaintiffs, PwC either knew of or recklessly disregarded Tyco's improper financial reporting and therefore was complicit in the fraudulent scheme. Compl. ¶ 195.

This is not the first action that has been based in part on Tyco's alleged misconduct in connection with the AMP merger. As the complaint explains, on December 9, 1999, a number of Tyco shareholders filed putative class actions against Tyco in several different federal courts. *See In re Tyco International, Ltd. Sec. Litig. ("Tyco I")*, 185 F.Supp.2d 102, 109 (D.N.H.2002). The actions were transferred to this court by the Judicial Panel on Multidistrict Litigation and a consolidated complaint was filed by the designated lead plaintiffs on behalf of the class. The proposed class in *Tyco I* consisted of those individuals and entities that had acquired Tyco stock between October 1, 1998 and December 8, 1999, a period that includes the date on which plaintiffs acquired their Tyco shares. PwC was not named as a defendant. I ultimately dismissed the *Tyco I* complaint on February 22, 2000, prior to class certification. *Tyco I*, 185 F.Supp.2d at 116.

## II. *STANDARD OF REVIEW*

**\*2** When considering a motion to dismiss under Fed.R.Civ.P. 12(b)(6), I must "accept as true all well-pleaded allegations and give plaintiffs the benefit of all reasonable inferences." *Cooperman v. Individual Inc.*, 171 F.3d 43, 46 (1st Cir.1999) (citing *Gross v. Summa Four, Inc.*, 93 F.3d 987, 991 (1st Cir.1996)). However, while a court "deciding a motion to dismiss under Rule 12(b)(6) ... must take all well-pleaded facts as true ... it need not credit a complaint's 'bald assertions' or legal conclusions." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216 (1st Cir.1996) (quoting *Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 971 (1st Cir.1993)). Finally, a complaint should not be dismissed under Rule 12(b)(6) unless it "presents no set of facts justifying recovery." *Cooperman*, 171 F.3d at 46 (citing *Dartmouth Review v. Dartmouth College*, 889 F.2d 13, 16 (1st Cir.1989)).

## III. *ANALYSIS*

Prior to July 30, 2002, claims brought under § 11 of the Securities Act had to be commenced "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence" and

"no later than three years after the security was bona fide offered to the public...." 15 U.S.C. § 77m (emphasis added). Similarly, claims brought under § 10(b) of the Exchange Act had to be commenced "within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 360, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (emphasis added); *see* 15 U.S.C. § 780i(e).

Section 804 of the Sarbanes-Oxley Act of 2002 ("SOX"), extended the statutes of limitations and repose to two years and five years, respectively, for private securities actions that involve "a claim of fraud, deceit, manipulation, or contrivance." Pub.L. No. 107-204 § 804, 116 Stat. 801, *codified at* 28 U.S.C. § 1658(b). The new limitations and repose periods apply to actions that are commenced after the act's July 30, 2002 effective date. *Id.*

PwC argues that plaintiffs' Securities Act and Exchange Act claims against it are time barred because plaintiffs waited more than three years after they acquired their Tyco stock to file suit. Plaintiffs respond with two arguments. First, they argue that their claims are timely because they are saved by the class action tolling doctrine. Alternatively, they argue that their claims are saved by the five-year repose period mandated by SOX. I address each argument in turn.

### A. *Plaintiffs' claims against PwC are time-barred under the applicable three-year statute of repose*

PwC argues that plaintiffs' claims must be dismissed because they are barred by the applicable three-year statute of repose. It is undisputed that the three-year repose period began to run on plaintiffs' claims on April 4, 1999, the date they acquired their Tyco stock. It is also undisputed that plaintiffs did not file their claim until January 20, 2004, nearly two years after the three-year repose period expired on April 4, 2002. Plaintiffs nevertheless argue that their claims are not time-barred because the running of the repose period tolled between December 9, 1999, when *Tyco I* was filed, and February 22, 2002, when *Tyco I* was dismissed. *See* 185 F.Supp.2d at 115-16. I disagree.

**\*3** In support of their argument, plaintiffs attempt to invoke the class-action tolling doctrine articulated by the United States Supreme Court in *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 551, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). In *American Pipe* the Court

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 928537 (D.N.H.), 2005 DNH 069
(Cite as: Not Reported in F.Supp.2d)

held that in certain situations, the filing of a class action pursuant to Fed.R.Civ.P. 23 suspends the applicable statute of limitation and repose periods for all putative members of that class while the case is pending. *Id.* at 551. The Court explained that the class-action tolling rule is necessary to eliminate the incentive for each individual class member to file a separate action, thus defeating the purpose of Fed.R.Civ.P. 23. *Id.; see also Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 350-51, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983).

PwC counters that the *American Pipe* tolling doctrine is inapplicable because it was not named as a defendant in *Tyco I,* and *Tyco I* makes no mention of PwC. According to PwC, *American Pipe* tolling applies only with respect to subsequent actions that are brought against the same defendants sued in the original class action. *See Arneil v. Ramsey,* 550 F.2d 774, 782 n. 10 (2d Cir.1977) (declining to extend the rule and noting that "nothing in *American Pipe* suggests that the statute be suspended from running in favor of a person not named as a defendant in the class suit.... A different conclusion would not comport with reason."); *Anderson v. Cornejo,* 1999 WL 258501, at *4 (N.D.Ill. Apr.21, 1999) (concluding that the *American Pipe* rule does not apply to parties who were not previously named as defendants in a plaintiff class action unless it is a case involving a class of defendants); *Mott v. R.G. Dickinson & Co.,* 1993 WL 63445, at *5 (D.Kan. Feb.24, 1993) (concluding that the *American Pipe* rule only tolls the statute of limitations for putative class members who were the same defendants in the prior action); *In re Clinton Oil Co. Sec. Litig.,* 1977 WL 1009, at *16 (D.Kan. Mar.18, 1977) (noting that the language of *American Pipe* emphasized that "notice to the defendants of the institution of the action would be necessary to the application of this tolling concept"); *see also Lindner Dividend Fund v. Ernst & Young,* 880 F.Supp. 49, 53-54 (D.Mass.1995) (holding that the *American Pipe* tolling doctrine could not be invoked against a defendant whose auditor was originally named in the class action, but was dropped from the amended complaint).[FN2]

> FN2. I am not persuaded by plaintiffs' assertion that the cases cited by PwC are inapposite because in four of the cases (all except *Lindner* ), the defendant lacked actual notice of the original class action whereas here, PwC did have actual notice of *Tyco I.* None of these cases even considers

whether or not the defendant had actual notice of the original suit to which it was not a party. *See Arneil,* 550 F.2d at 782-83; *Anderson,* 1999 WL 258501, at 84; *Mott,* 1993 WL 63445, at *5; *Clinton Oil,* 1977 WL 1009, at *16.

Plaintiffs nonetheless urge that the *American Pipe* rule should be extended to PwC because the       ns set forth in the original action are substa.   ily similar to and involve the same evidence and witnesses as the claims against PwC in the present action. Further, plaintiffs contend that *Tyco I* put PwC on notice that stockholder claimants were seeking relief under the securities laws based on Tyco's fraudulent conduct.

Unfortunately for plaintiffs, the cases they cite in support of extending the rule are easily distinguished. For example, in *Becks v. Emery-Richardson, Inc. et al.,* the court applied the *American Pipe* rule and tolled the statute of limitations against AIG, even though AIG had not been named in the earlier class action, because two of AIG's corporate subsidiaries had themselves been named in that action. 1990 WL 303548, at *12 (S.D.Fla. Dec.21, 1990). The "parental" relationship between AIG and two of its subsidiaries persuaded the court that AIG was the "control person" as to these subsidiaries and that "constructive if not actual notice was given to AIG of this litigation, so that AIG is not unreasonably included in this action." *Id.* Those facts    'fer significantly from the situation here, where P    is not a member of Tyco's corporate family. The *Becks* holding thus does not apply. Plaintiffs fail to supply any other argument in favor of extending the *American Pipe* rule to their case.[FN3] I therefore decline to do so here.

> FN3. The other cases cited by plaintiffs do not address the question of whether the *American Pipe* tolling rule should be extended to new defendants not named in the original class action. Rather, these cases address the question of whether *American Pipe* suspends the statute of limitations on claims that are similar, but not identical, to those in the original action. *See Cullen v. Margiotta,* 811 F.2d 698, 720-21 (2d Cir.1987); *Tosti v. City of Los Angeles,* 754 F.2d 1485, 1489 (9th Cir.1985); *In re Linerboard Antitrust Litig.,* 223 F.R.D. 335, 351-52 (E.D.Pa.2004); *Barnebey v. E.F. Hutton & Co.,* 715 F.Supp. 1512.    <28

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 928537 (D.N.H.), 2005 DNH 069
(Cite as: Not Reported in F.Supp.2d)

Page 4

(M.D.Fla.1989). As such, these cases do not advance plaintiffs' argument.

### B. *Plaintiffs' claims are not saved by the Sarbanes-Oxley Act*

\*4 Plaintiffs next argue that their claims are saved by SOX's five-year statute of repose even if the *American Pipe* tolling doctrine does not apply. As an initial matter, because plaintiffs' claim under § 11 of the Securities Act does not sound in fraud and SOX applies only to fraud claims. The Act's extended limitation and repose periods do not apply to plaintiffs' § 11 claim. [FN4] *See In re FirstEnergy Corp. Sec. Litig.,* 316 F.Supp.2d 581, 601 (N.D.Ohio 2004); *Lawrence E. Jaffe Pension Plan v. Household Int'l,* 2004 WL 574665, at \*12 (D.Ill. Mar.22, 2004); *In re Enron,* 2004 WL 405886, at \*11-12; *Friedman v. Rayovac Corp.,* 295 F.Supp.2d 957, 974-75 (W.D.Wis.2003); *In re Global Crossing, Ltd. Sec. Litig.,* 313 F.Supp.2d 189, 196-97 (S.D.N.Y.2003); *In re WorldCom, Inc. Sec. Litig.,* 294 F.Supp.2d 431, 443-44 (S.D.N.Y.2003).

> FN4. Plaintiffs expressly state in their complaint that their § 11 claim against PwC "does not sound in fraud" and that "[a]ll of the preceding allegations of fraud or fraudulent conduct and/or motive are specifically excluded from this Count." Compl. ¶ 237. Accordingly, they do not strenuously argue that SOX's extended periods should be applied to this claim.

Plaintiffs' stronger argument is that SOX saves their § 10(b) claim. The difficulty with this argument, however, is that I agree with the great weight of authority which holds that SOX does not revive claims that become time-barred before the Act's effective date. *See Foss v. Bear, Stearns & Co.,* 394 F.3d 540, 542 (7th Cir.2005) (holding that SOX does not revive time-barred claims); *In re Enterprise Mortgage Acceptance Co. Sec. Litig.,* 391 F.3d 401, 406-10 (2d Cir.2004) (same); *Quaak v. Dexia,* 2005 WL 352558, at \*5 (D.Mass. Feb.9, 2005) (same); *Milano v. Perot Systems Corp.,* 2004 WL 2360031, at \*5-8 (N.D.Tex. Oct.19, 2004) (same); *Zouras v. Hallman,* 2004 WL 2191034, at \*15-16 (D.N.H. Sept.30, 2004) (same); *Zurich Capital Markets Inc. v. Coglianese,* 2004 WL 2191596, at \*9 (N.D.Ill. Sept.23, 2004) (same); *L-3 Communications Corp. v. Clevenger,* 2004 WL 1941248, at \*3-6 (E.D.Pa. Aug.31, 2004) (same); *In re Worldcom, Inc. Sec. Litig.,* 2004 WL 1435356, at \*6-7 (S.D.N.Y. June 28,

2004) (same); *Lieberman v. Cambridge Partners, LLC,* 2004 WL 1396750, at \*3 (E.D.Pa. June 21, 2004) (same); *In re ADC Telecomm., Inc. Sec. Litig.,* 331 F.Supp.2d 799, 801 (D.Minn.2004) (same); *In re Enron Corp. Securities, Derivative & ERISA Litig.,* 2004 WL 405886, at \*17 (S.D.Tex. Feb.25, 2004) (same); *Glaser v. Enzo Biochem, Inc.,* 303 F.Supp.2d 724, 733-34 (E.D.Va.2003) (same); *In re Heritage Bond Litig.,* 289 F.Supp.2d 1132, 1148 (C.D.Cal.2003) (same); *but see Roberts v. Dean Witter Reynolds,* 2003 WL 1936116 (M.D.Fla. Mar.31, 2003). Because plaintiffs' § 10(b) claim had already become time-barred when SOX became effective, SOX does not save the claim from the three-year statute of repose.

### IV. *CONCLUSION*

For the reasons set forth above, I grant PwC's motion to dismiss. (Doc. No. 308).

SO ORDERED.

D.N.H.,2005.
Ballard v. Tyco Intern. Ltd.
Not Reported in F.Supp.2d, 2005 WL 928537 (D.N.H.), 2005 DNH 069

Briefs and Other Related Documents (Back to top)

• 2006 WL 1333549 (Trial Motion, Memorandum and Affidavit) Cross-Motion of Tyco International Ltd. for Protective Order (May 1, 2006) Original Image of this Document (PDF)
• 2006 WL 1356289 (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum of Tyco International Ltd. in Opposition to Plaintiff's Motion to Remand and in Support of its Cross-Motion to Dismiss the Complaint (May 1, 2006) Original Image of this Document (PDF)
• 2006 WL 1356288 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Certain Defendants' Motion for an Order Establishing Deposition Protocol (Apr. 25, 2006) Original Image of this Document (PDF)
• 2006 WL 1044914 (Trial Pleading) Answer of Goldman, Sachs & Co., Citigroup Global Markets Inc., and Merrill Lynch, Pierce Fenner & Smith, Incoporated to the Consolidated Securities Class Action Complaint (Apr. 10, 2006) Original Image of this Document (PDF)
• 2006 WL 1028916 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Lead Plaintiffs' Motion for Partial Summary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 928537 (D.N.H.), 2005 DNH 069
**(Cite as: Not Reported in F.Supp.2d)**

Judgment as to Liability on Claims against Tyco International, Ltd. under Section 11 of the Securities Act of 1933 (Apr. 4, 2006) Original Image of this Document (PDF)

• 2006 WL 1044907 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Motion for A Protective Order Preventing Tyco International, Ltd. from Charging an Unjustified and Exorbitant Sum for its Document Production (Apr. 4, 2006) Original Image of this Document (PDF)

• 2006 WL 1044908 (Trial Motion, Memorandum and Affidavit) Assented-To Motion of Lead Plaintiffs to File Documents Under Seal - Level I (Apr. 4, 2006) Original Image of this Document (PDF)

• 2006 WL 1044909 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Motion for Partial Summary Judgment as to Liability on Claims against Tyco International, Ltd. under Section 11 of the Securities Act of 1933 (Apr. 4, 2006) Original Image of this Document (PDF)

• 2006 WL 1044911 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Lead Plaintiffs' Motion to Compel the Production of Documents by Defendant Tyco International Ltd. (Apr. 4, 2006) Original Image of this Document (PDF)

• 2006 WL 1044913 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Motion to Compel the Production of Documents by Defendant Tyco International, Ltd. (Mar. 31, 2006) Original Image of this Document (PDF)

• 2006 WL 1333548 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Motion to Compel the Production of Documents by Defendant Tyco International, Ltd. (Mar. 31, 2006) Original Image of this Document (PDF)

• 2006 WL 1044905 (Trial Motion, Memorandum and Affidavit) Plaintiff's Assented-To Motion Concerning Application of Stipulated Protective Order as Clarified (Mar. 28, 2006) Original Image of this Document with Appendix (PDF)

• 2006 WL 1044900 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Defendant Frank E. Walsh, Jr.'s Motion to Dismiss in Part the Second Amended Complaint (Mar. 14, 2006) Original Image of this Document (PDF)

• 2006 WL 1044901 (Trial Motion, Memorandum and Affidavit) Defendant L. Dennis Kozlowski's Reply Memorandum of Law in Further Support of his Motion to Dismiss in Part the Second Amended Complaint (Mar. 14, 2006) Original Image of this Document (PDF)

• 2006 WL 1050181 (Trial Motion, Memorandum and Affidavit) Reply in Support of Defendant Mark

A. Belnick's Motion to Dismiss in Part the Second Amended Complaint (Mar. 14, 2006) Original Image of this Document (PDF)

• 2006 WL 1044895 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff's Memorandum of Law in Support of Motion for Class Certification (Mar. 8, 2006) Original Image of this Document (PDF)

• 2006 WL 1044894 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Defendants Bodman and Lane's Motion to Dismiss Plaintiffs' Second Amended Complaint (Mar. 7, 2006) Original Image of this Document (PDF)

• 2006 WL 1044893 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Supplemental Memorandum in Further Support of its Motion for Class Certification (Mar. 6, 2006) Original Image of this Document (PDF)

• 2006 WL 1044891 (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum of Tyco International Ltd. in Opposition to Lead Plaintiffs' Motion for Class Certification (Feb. 24, 2006) Original Image of this Document (PDF)

• 2006 WL 691289 (Trial Motion, Memorandum and Affidavit) Supplemental Memorandum of Tyco International Ltd. in Opposition to Lead Plaintiffs' Motion for Class Certification (Feb. 24, 2006)

• 2006 WL 1050180 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Michael A. Shcroft's Motion to Dismiss the Complaint (Jan. 31, 2006) Original Image of this Document (PDF)

• 2006 WL 318852 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law in Further Support of Michael A. Ashcroft's Motion to Dismiss the Complaint (Jan. 31, 2006)

• 2006 WL 318872 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Pricewaterhousecoopers LLP in Further Support of its Motion for Summary Judgment on Loss Causation (Jan. 26, 2006)

• 2006 WL 1044890 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Pricewaterhousecoopers LLP in Further Support of its Motion for Summary Judgment on Loss Causation (Jan. 23, 2006) Original Image of this Document (PDF)

• 2006 WL 1044889 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Defendant Pricewaterhousecoopers in Further Support of its Motion to Dismiss in Part the Second Amended Complaint (Jan. 20, 2006) Original Image of this Document (PDF)

• 2006 WL 318873 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Defendant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 928537 (D.N.H.), 2005 DNH 069
(Cite as: Not Reported in F.Supp.2d)

Pricewaterhousecoopers in Further Support of its Motion to Dismiss in Part the Second Amended Complaint (Jan. 20, 2006)

• 2006 WL 1044887 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of the Ballard Plaintiffs in Opposition to Defendant Michael A. Ashcroft's Motion to Dismiss the Complaint (Jan. 17, 2006) Original Image of this Document (PDF)

• 2006 WL 318853 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of the Ballard Plaintiffs in Opposition to Defendant Michael A. Ashcroft's Motion to Dismiss the Complaint (Jan. 17, 2006)

• 2006 WL 1044884 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Pricewaterhousecoopers Llp In Support of its Motion to Dismiss (Jan. 13, 2006) Original Image of this Document (PDF)

• 2006 WL 1044885 (Trial Motion, Memorandum and Affidavit) Answer of Neil Garvey to the Consolidated Securities Class Action Complaint (Jan. 13, 2006) Original Image of this Document (PDF)

• 2006 WL 1044886 (Trial Motion, Memorandum and Affidavit) Answer of Tycom and Tyco International Ltd. to the Consolidated Securities Class Action Complaint (Jan. 13, 2006) Original Image of this Document (PDF)

• 2006 WL 318935 (Trial Pleading) Answer of Tycom and Tyco International Ltd. to the Consolidated Securities Class Action Complaint (Jan. 13, 2006)

• 2006 WL 288382 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Defendant Tyco International LTD. In Further Support of its Motion to Dismiss in Part the Second Amended Complaint (Jan. 6, 2006)

• 2005 WL 3742069 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Michael A. Ashcroft's Motion to Dismiss the Complaint (Dec. 30, 2005)

• 2005 WL 3970089 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Michael A. Ashcroft's Motion to Dismiss the Complaint (Dec. 30, 2005) Original Image of this Document (PDF)

• 2005 WL 3742068 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Memorandum of Law in Opposition to Pricewaterhousecoopers LLP's Motion for Summary Judgment on Loss Causation (Dec. 23, 2005)

• 2005 WL 3970088 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Memorandum of Law in Opposition to Pricewaterhousecoopers Llp's Motion for Summary Judgment on Loss Causation (Dec. 23, 2005) Original Image of this Document

(PDF)

• 2005 WL 3742067 (Trial Motion, Memorandum and Affidavit) Response Memorandum of Michael A. Ashcroft in Opposition to the Ballard Plaintiffs' Motion to Extend the Time to Serve Defendant Michael A. Ashcroft and for Leave to Effectuate Service by Alternative Method (Nov. 21, 2005)

• 2005 WL 3742064 (Trial Motion, Memorandum and Affidavit) New Jersey Fund Plaintiffs' Memorandum of Law in Opposition to Defendant Dennis Kozlowski's Motion to Dismiss in Part the Second Amended Complaint (Nov. 18, 2005)

• 2005 WL 3742065 (Trial Motion, Memorandum and Affidavit) Memorandum of New Jersey Fund Plaintiffs in Opposition to Defendant Mark Belnick's Motion to Dismiss in Part the Second Amended Complaint (Nov. 18, 2005)

• 2005 WL 3742066 (Trial Motion, Memorandum and Affidavit) Memorandum of New Jersey Fund Plaintiffs in Opposition to Defendant Frank E. Walsh Jr.'s Motion to Dismiss in Part the Second Amended Complaint (Nov. 18, 2005)

• 2005 WL 3970150 (Trial Motion, Memorandum and Affidavit) New Jersey Fund Plaintiffs' Memorandum of Law In Opposition to Defendant Dennis Kozlowski's Motion to Dismiss In Part the Second Amended Complaint (Nov. 18, 2005) Original Image of this Document (PDF)

• 2005 WL 3970152 (Trial Motion, Memorandum and Affidavit) Memorandum of New Jersey Fund Plaintiffs in Opposition to Defendant Frank E. Walsh Jr.'s Motion to Dismiss in Part the Second Amended Complaint (Nov. 18, 2005) Original Image of this Document (PDF)

• 2005 WL 3742063 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Erisa Plaintiffs' Stipulation and (Proposed) Order (Nov. 16, 2005)

• 2005 WL 3970149 (Trial Motion, Memorandum and Affidavit) Memorandum in Opposition to Erisa Plaintiffs' Stipulation and (Proposed) Order (Nov. 16, 2005) Original Image of this Document (PDF)

• 2005 WL 3742060 (Trial Motion, Memorandum and Affidavit) New Jersey Fund Plaintiffs' Memorandum of Law in Opposition to Pricewaterhousecooper's Motion to Dismiss in Part the Second Amended Complaint (Nov. 11, 2005)

• 2005 WL 3742062 (Trial Motion, Memorandum and Affidavit) New Jersey Fund Plaintiffs' Memorandum of Law in Opposition to Pricewaterhousecoopers, LLP's Motion to Dismiss in Part the Second Amended Complaint (Nov. 11, 2005)

• 2005 WL 3970145 (Trial Motion, Memorandum and Affidavit) New Jersey Fund Plaintiffs' Memorandum of Law in Opposition to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 7

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 928537 (D.N.H.), 2005 DNH 069
(Cite as: Not Reported in F.Supp.2d)

Pricewaterhousecooper's Motion to Dismiss in Part the Second Amended Complaint (Nov. 11, 2005) Original Image of this Document (PDF)

• 2005 WL 3970147 (Trial Motion, Memorandum and Affidavit) New Jersey Fund Plaintiffs' Memorandum of Law in Opposition to Pricewaterhousecoopers, Llp's Motion to Dismiss in Part the Second Amended Complaint (Nov. 11, 2005) Original Image of this Document (PDF)

• 2005 WL 3742059 (Trial Motion, Memorandum and Affidavit) Memorandum of Pricewaterhousecoopers LLP in Support of its Motion for Summary Judgment on Loss Causation (Nov. 8, 2005)

• 2005 WL 3970144 (Trial Motion, Memorandum and Affidavit) Memorandum of Pricewaterhousecoopers Llp in Support of its Motion for Summary Judgment on Loss Causation (Nov. 8, 2005) Original Image of this Document (PDF)

• 2005 WL 3742073 (Trial Pleading) L. Dennis Kozlowski's Answer to the Complaint (Nov. 4, 2005)
• 2005 WL 3742074 (Trial Pleading) Answer (Nov. 4, 2005)

• 2005 WL 3970143 (Trial Pleading) L. Dennis Kozlowski's Answer to the Complaint (Nov. 4, 2005) Original Image of this Document (PDF)

• 2005 WL 3742056 (Trial Motion, Memorandum and Affidavit) Memorandum of Defendants Tyco International Ltd., Tycom Ltd. And Neil R. Garvey in Opposition to Lead Plaintiff's Motion For Clarification (Oct. 20, 2005)

• 2005 WL 3742057 (Trial Motion, Memorandum and Affidavit) Memorandum of the Underwriter Defendants in Opposition to plaintiffs' """motion for Clarification"' (Oct. 20, 2005)

• 2005 WL 3970138 (Trial Motion, Memorandum and Affidavit) Memorandum of Defendants Tyco International Ltd., Tycom Ltd. and Neil R. Garvey in Opposition to Lead Plaintiff's Motion for Clarification (Oct. 20, 2005) Original Image of this Document (PDF)

• 2005 WL 3970139 (Trial Motion, Memorandum and Affidavit) Opposition of Tyco International Ltd., Tycom Ltd., and Neil R. Garvey to Lead Plaintiff's Motion for Clarification (Oct. 20, 2005) Original Image of this Document (PDF)

• 2005 WL 3970140 (Trial Motion, Memorandum and Affidavit) Memorandum of the Underwriter Defendants in Opposition to Plaintiffs' ""Motion for Clarification" (Oct. 20, 2005) Original Image of this Document (PDF)

• 2005 WL 3970141 (Trial Motion, Memorandum and Affidavit) Opposition of the Underwriter Defendants to Plaintiffs"""Motion for Clarification" (Oct. 20, 2005) Original Image of this Document

(PDF)

• 2005 WL 3970137 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Def. ..nt Michael A. Ashcroft in Support of his Motio. for Revision of the Court's October 14, 2004 Order, or Alternatively, for Judgment on the Pleadings (Oct. 19, 2005) Original Image of this Document (PDF)

• 2005 WL 3742055 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Defendant Michael A. Ashcroft in Support of His Motion for Revision of the Court's October 14, 2004 Order, or Alternatively, for Judgment on the Pleadings (Oct. 18, 2005)

• 2005 WL 3742054 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Opposition to: Defendant Michael Ashcroft's Motion for Revision of Court Order or, Alternatively, for Judgment on the Pleadings; Motion of L. Dennis Kozlowski for Revision of Court Order; and Defendants Frank E. Walsh and Mark A. Bel nick's Joinders in Tyco International, Ltd.'s Motion for Revision of Court Order or, Alternatively, for Judgment on the Pleadings (Sep. 23, 2005)

• 2005 WL 3970136 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Opposition To: Defendant Michael Ashcroft's Motion for Revi'. of Court Order Or, Alternatively, for Judgment . ne Pleadings; Motion of L. Dennis Kozlowski for Revision of Court Order; and Defendants Frank E. Walsh and Mark A. Bel nick's Joinders in Tyco International, Ltd.'s Motion for Revision of Court Order Or, Alternatively, for Judgment on the Pleadings (Sep. 23, 2005) Original Image of this Document (PDF)

• 2005 WL 3970135 (Trial Motion, Memorandum and Affidavit) Lead Plaintiff's Memorandum of Law in Support of Motion for Clarification (Sep. 21, 2005) Original Image of this Document (PDF)

• 2005 WL 3742070 (Trial Pleading) L. Dennis Kozlowski's Answer to the Complaint (Sep. 16, 2005)

• 2005 WL 3742071 (Trial Pleading) Answer of Defendant Frank E. Walsh, Jr. (Sep. 16, 2005)

• 2005 WL 3742072 (Trial Pleading) Answer of Mark A. Belnick to the Complaint and Affirmative Defenses (Sep. 16, 2005)

• 2005 WL 3970132 (Trial Pleading) Answer of Defendant Frank E. Walsh, Jr. (Sep. 16, 2005) Original Image of this Document (PDF)

• 2005 WL 3970133 (Trial Pleading) Ansv of Mark A. Belnick to the Complaint and Affirm..ive Defenses (Sep. 16, 2005) Original Image of this Document (PDF)

• 2005 WL 3970134 (Trial Pleading) Answer (Sep. 16, 2005) Original Image of this Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 928537 (D.N.H.), 2005 DNH 069
(Cite as: Not Reported in F.Supp.2d)

Page 8

• 2005 WL 3970131 (Trial Pleading) L. Dennis Kozlowski's Answer to the Complaint (Sep. 15, 2005) Original Image of this Document (PDF)

• 2005 WL 1943184 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Memorandum of Law in Opposition to Tyco International, Ltd.'s Motion for Revision of Court Order Or, Alternatively, for Judgment on the Pleadings (Aug. 05, 2005)

• 2005 WL 3742048 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Memorandum of Law in Opposition to Tyco International, Ltd.'s Motion for Revision of Court Order or, Alternatively, for Judgment on the Pleadings (Aug. 5, 2005)

• 2005 WL 3970128 (Trial Motion, Memorandum and Affidavit) Lead Plaintiffs' Memorandum of Law in Opposition to Tyco International, Ltd.'s Motion for Revision of Court Order Or, Alternatively, for Judgment on the Pleadings (Aug. 5, 2005) Original Image of this Document (PDF)

• 2005 WL 3970129 (Trial Pleading) Answer of Tyco International Ltd. to the Complaint (Aug. 5, 2005) Original Image of this Document (PDF)

• 2005 WL 3742052 (Trial Motion, Memorandum and Affidavit) Memorandum of Defendant Michael Ashcroft in Support of His Motion for Revision of Court Order or, Alternatively, for Judgment on the Pleadings (Aug. 2, 2005)

• 2005 WL 3970127 (Trial Motion, Memorandum and Affidavit) Memorandum of Defendant Michael Ashcroft in Support of his Motion for Revision of Court Order Or, Alternatively, for Judgment on the Pleadings (Aug. 2, 2005) Original Image of this Document (PDF)

• 2005 WL 3970124 (Trial Pleading) L. Dennis Kozlowski's Answer to the Amended Complaint (Jul. 18, 2005) Original Image of this Document (PDF)

• 2005 WL 3970125 (Trial Pleading) Answer (Jul. 18, 2005) Original Image of this Document (PDF)

• 2005 WL 3742046 (Trial Motion, Memorandum and Affidavit) Tyco Defendants' Memorandum in Opposition to Lead Plaintiffs' Motion for Class Certification (Jul. 11, 2005)

• 2005 WL 3970087 (Trial Motion, Memorandum and Affidavit) Tyco Defendants' Memorandum in Opposition to Lead Plaintiffs' Motion for Class Certification (Jul. 11, 2005) Original Image of this Document (PDF)

• 2005 WL 1943183 (Trial Motion, Memorandum and Affidavit) Memorandum of Defendant Tyco International Ltd. in Support of its Motion under Rule 54(b) for Revision of the Court's October 14, 2004 Order in Light of A Change in Law (Jul. 07, 2005)

• 2005 WL 3969246 (Trial Motion, Memorandum and Affidavit) Memorandum of Defendant Tyco International Ltd. in Support of its Motion under Rule

54(b) for Revision of the Court's October 14, 2004 Order in Light of A Change in Law (Jul. 7, 2005) Original Image of this Document (PDF)

• 2005 WL 3742044 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant Frank E. Walsh, Jr.'s Motion to Dismiss in Part the Second Amended Complaint (Jul. 1, 2005)

• 2005 WL 3742045 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendant Mark A. Belnick in Support of His Motion to Dismiss in Part the Second Amended Complaint (Jul. 1, 2005)

• 2005 WL 3969244 (Trial Motion, Memorandum and Affidavit) Memorandum of Defendant L. Dennis Kozlowski in Support of his Motion to Dismiss the Second Amended Complaint (Jul. 1, 2005) Original Image of this Document (PDF)

• 2005 WL 3969245 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendant Mark A. Belnick in Support of his Motion to Dismiss in Part the Second Amended Complaint (Jul. 1, 2005) Original Image of this Document (PDF)

• 2005 WL 3970086 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendant Frank E. Walsh, Jr.'s Motion to Dismiss in Part the Second Amended Complaint (Jul. 1, 2005) Original Image of this Document (PDF)

• 2005 WL 3742042 (Trial Motion, Memorandum and Affidavit) Memorandum Of Pricewaterhousecoopers LLP in Support of Its Motion to Dismiss in Part the Second Amended Complaint (Jun. 24, 2005)

• 2005 WL 3742043 (Trial Motion, Memorandum and Affidavit) Memorandum of Defendant Pricewaterhousecoopers in Support of Its Motion to Dismiss in Part the Second Amended Complaint (Jun. 24, 2005)

• 2005 WL 3742050 (Trial Motion, Memorandum and Affidavit) Memorandum of Law in Support of Defendants Bodman and Lane's Motion to Dismiss Plaintiffs' Second Amended Complaint (Jun. 24, 2005)

• 2005 WL 3970083 (Trial Motion, Memorandum and Affidavit) Memorandum of Pricewaterhousecoopers Llp in Support of its Motion to Dismiss in Part the Second Amended Complaint (Jun. 24, 2005) Original Image of this Document (PDF)

• 2005 WL 3970084 (Trial Motion, Memorandum and Affidavit) Memorandum of Defendant Pricewaterhousecoopers in Support of its Motion to Dismiss in Part the Second Amended Complaint (Jun. 24, 2005) Original Image of this Document (PDF)

• 2005 WL 3970085 (Trial Motion, Memorandum

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 9
Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 928537 (D.N.H.), 2005 DNH 069
(Cite as: Not Reported in F.Supp.2d)

and Affidavit) Memorandum of Law in Support of Defendants Bodman and Lane's Motion to Dismiss Plaintiffs' Second Amended Complaint (Jun. 24, 2005) Original Image of this Document (PDF)

• 2005 WL 4018433 (Trial Motion, Memorandum and Affidavit) Memorandum of Pricewaterhousecoopers LLP in Support of its Motion to Dismiss in Part the Second Amended Complaint (Jun. 24, 2005) Original Image of this Document (PDF)

• 2005 WL 4018440 () Declaration of Jairaj Bridglal Pachai (Jun. 23, 2005) Original Image of this Document (PDF)

• 2005 WL 3742041 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Tyco International Ltd., Edward D. Breen and David J. Fitzpatrick in Support of Their Motion to Dismiss the Consolidated Amended Class Action Complaint (Jun. 15, 2005)

• 2005 WL 3970082 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Tyco International Ltd., Edward D. Breen and David J. Fitzpatrick in Support of their Motion to Dismiss the Consolidated Amended Class Action Complaint (Jun. 15, 2005) Original Image of this Document (PDF)

• 2005 WL 3742040 (Trial Motion, Memorandum and Affidavit) Memorandum of Defendant Tyco International Ltd. In Support of Its Motion to Dismiss in Part the Second Amended Complaint (Jun. 10, 2005)

• 2005 WL 3970081 (Trial Motion, Memorandum and Affidavit) Memorandum of Defendant Tyco International Ltd. in Support of its Motion to Dismiss in Part the Second Amended Complaint (Jun. 10, 2005) Original Image of this Document (PDF)

• 2005 WL 850786 (Trial Motion, Memorandum and Affidavit) Motion of the Underwriters to Dismiss the Consolidated Class Action Complaint (Mar. 11, 2005)

• 2004 WL 3770745 (Trial Pleading) Consolidated Securities Class Action Complaint (Dec. 13, 2004) Original Image of this Document (PDF)

• 2004 WL 2157238 (Trial Motion, Memorandum and Affidavit) Reply Memorandum of Law of Defendants L. Dennis Kozlowski and Mark H. Swartz in Further Support of Their Motion to Dismiss (Sep. 13, 2004)

• 2004 WL 2157234 (Trial Motion, Memorandum and Affidavit) Defendant Breen's Reply Memorandum in Support of His Motion to Dismiss (Aug. 16, 2004)

• 2004 WL 1530501 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Defendants L. Dennis Kozlowski and Mark H. Swartz in Support of Their Motion to Dismiss (Jun. 28, 2004)

• 2004 WL 1145861 (Trial Pleading) Amended Complaint (May 14, 2004)

• 2004 WL 3686650 (Trial Pleading) Amended Complaint (May 14, 2004)

• 2004 WL 3770437 (Trial Pleading) Amended Complaint (May 4, 2004) Original Image of this Document (PDF)

• 2004 WL 1629738 (Trial Motion, Memorandum and Affidavit) Derivative Plaintiff's Memorandum in Opposition to Nominal Defendant Tyco International Ltd.'s Motion to Dismiss Second Amended Derivative Complaint (Apr. 16, 2004)

• 2004 WL 905768 (Trial Motion, Memorandum and Affidavit) Derivative Plaintiff's Memorandum in Opposition to Nominal Defendant Tyco International Ltd.'s Motion to Dismiss Second Amended Derivative Complaint (Apr. 16, 2004)

• 2004 WL 481754 (Trial Motion, Memorandum and Affidavit) Memorandum of Law of Nominal Defendant Tyco International Ltd. in Support of its Motion to Dismiss Plaintiffs' Second Consolidated and Amended Derivative Complaint (Feb. 26, 2004)

• 2004 WL 481755 (Trial Motion, Memorandum and Affidavit) Nominal Defendant Tyco International Ltd.'s Motion to Dismiss Second Amended Derivative Complaint (Feb. 26, 2004)

• 2003 WL 24309578 (Trial Pleading) Verified Stockholders' Second Consolidated and Amended Derivative Complaint (Jun. 12, 2003) Original Image of this Document (PDF)

• 2003 WL 24337759 (Trial Motion, Memorandum and Affidavit) Verified Stockholders' Second Consolidated and Amended Derivative Complaint (Jun. 12, 2003) Original Image of this Document (PDF)

• 2002 WL 33009227 () Declaration of John W. Peavy III in Support of Defendant's Memorandum in Opposition to Lead Plaintiffs' Motion for Class Certification (Aug. 23, 2002) Original Image of this Document (PDF)

• 1:02md01335 (Docket) (Aug. 23, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## Westlaw.

Not Reported in F.Supp.                                                        Page 1
Not Reported in F.Supp., 1996 WL 312063 (E.D.La.), 3 Wage & Hour Cas.2d (BNA) 893
**(Cite as: Not Reported in F.Supp.)**

**C**
Briefs and Other Related Documents

United States District Court, E.D. Louisiana.
Melissa BARROIS
v.
Hilton TITLE.
**No. CIV. A. 96-727.**

June 10, 1996.

DUVAL, District Judge.
**\*1** Plaintiff Melissa Barrois ("Barrois") filed a
Motion for Remand which was taken on the papers.
Having reviewed the pleadings, memoranda, and the
relevant law, the Court finds the motion to be without
merit.

Barrois brought the subject suit in First City Court for
the Parish of Orleans. She alleges in her petition that
she was employed by the defendant from October
1990 to August 1995. From October, 1990 until
January, 1994, she was paid an hourly wage. In
January of 1994 she was placed on salary. She
claims that during her period of employment she
often worked in excess of forty hours per week;
however, she was never paid any overtime wages.
The suit is for these allegedly unpaid overtime wages
and was brought pursuant to La.Rev.Stat. 23:631
which requires an employer to pay an employee all
wages due within seventy-two hours following an
employee's termination.

Defendant Hilton Title removed the matter to federal
court based on his contention that the action involves
a federal question arising under the Fair Labor
Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* and
thus is removable under 28 U.S.C. § 1441 regardless
of plaintiff's not having invoked the FLSA in her
petition.

Does this suit "arise under" a federal law?

A federal court has federal question jurisdiction if the
case "arises under" the federal laws of the United
States. 28 U.S.C. 1331. A case "arises under federal
law" where the vindication of a right under state law
necessarily turns on some construction of federal law.
*See Franchise Tax Board v. Construction Laborers
Vacation Trust,* 103 S.Ct. 2841, 2846 (1983).

An employee's right to overtime wages is governed
exclusively by § 207 of the FLSA; there is no
Louisiana state law requiring the payment of
overtime wages. Section 216 of the FLSA
authorizes a person to file such a lawsuit to recover
overtime pay. Here, Barrois would have no cause of
action under state law but for the existence of the
FLSA and construction of that law will be required
for the adjudication of this suit. Thus, there is
federal question jurisdiction present in this matter.

Can this suit be removed to federal court?

Section 1441(a) provides:
Except as otherwise expressly provided by Act of
Congress, any civil action brought in a State court of
which the district courts of the United States have
original jurisdiction, may be removed by the
defendant, to the district court of the United States
for the district and division embracing the place
where such action is pending.

The case was removed to the proper court under §
1441; thus the issue presented is whether Congress
has provided that FLSA claims cannot be removed.

There is a split in the circuits on the question of
whether an FLSA claim is removable. *Compare
Johnson v. Butler Bros.,* 162 F.2d 87 (8th Cir.1947)
(not removable) and *Carter v. Hill and Hill Truck
Line Inc.,* 259 F.Supp. 429 (S.D.Tex.1966) and
*Wilkins v. Renault Southwest, Inc.,* 227 F.Supp. 647
(N.D.Tex.1964) *with M. Cosme Nieves,* 786 F.2d
445, 451 (1st Cir.1985) and *Anthony v. West Coast
Drug Company,* 331 F.Supp. 1279
(W.D.Wash.1971). It should be noted that the
*Johnson* case was decided prior to the 1948
amendments to 28 U.S.C. § 1441 (formerly 28
U.S.C. § 71) which added the "[e]xcept as otherwise
expressly provided by Act of Congress." The United
States Court of Appeals for the Fifth Circuit in
*Baldwin v. Sears, Roebuck & Co.,* 667 F.2d 458, 459
(CA5 1982), noted its belief that this change in the
removal statute "puts the removability of FLSA
actions in a very different light."

**\*2** While the Fifth Circuit has not squarely addressed
the issue, the *Baldwin* case does provide guidance in
that the appellate court found that under the Age

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 312063 (E.D.La.), 3 Wage & Hour Cas.2d (BNA) 893
**(Cite as: Not Reported in F.Supp.)**

Discrimination in Employment Act ("ADEA") which provides that suits brought under the Act are to be enforced in accordance with certain provisions of the FLSA does not preclude removal of suits brought under the ADEA. While the court specifically noted that the removability of FLSA action was not addressed therein, it reviewed the salient language contained in the ADEA which provides that a plaintiff "... may bring a civil action in any court of competent jurisdiction...." 29 U.S.C.A. § 626(c)(1). With respect to that language the court stated:

This language clearly suggests that a plaintiff may institute suit based on the ADEA in either state or federal court. It does not indicate an intent on the part of Congress, however, to allow a plaintiff to prosecute the suit to final judgment in that court. In short, we find no express prohibition against removal pursuant to 28 U.S.C. § 1441(a).

Section 216 of the FLSA states in relevant part:

... An action to recover [overtime wages] may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction....

29 U.S.C. § 216. This statute contains no specific Congressional prohibition. Based on the same rationale used in the *Baldwin* case, this Court finds that this suit can be removed under 28 U.S.C. § 1441(a), and thus, there is no merit in the subject "motion for remand." *See Ramos v. H.E. Butt Grocery Company,* 632 F.Supp. 342 (S.D.Tex.1986) (FLSA does not prohibit removal); *see also* 14A Wright, Miller & Cooper, Federal Practice & Procedure: Jurisdiction 2d § 3729 at 495 (West 1985) ("A congressional grant of concurrent jurisdiction in a statute does not imply that removal is prohibited.") Accordingly,

IT IS ORDERED that the Motion for Remand is DENIED.

E.D.La.,1996.
Barrois v. Hilton Title
Not Reported in F.Supp., 1996 WL 312063 (E.D.La.), 3 Wage & Hour Cas.2d (BNA) 893

Briefs and Other Related Documents (Back to top)

• 2:96CV00727 (Docket) (Feb. 28, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*Westlaw.*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22427817 (N.D.Iowa), 9 Wage & Hour Cas.2d (BNA) 305
**(Cite as: Not Reported in F.Supp.2d)**

▷

Briefs and Other Related Documents

United States District Court,N.D. Iowa, Central
Division.
Jody M. BARTLESON, individually and on behalf of
all other similarly situated employees, Plaintiff,
v.
WINNEBAGO INDUSTRIES, INC., Defendant.
**No. C02-3008-MWB.**

Oct. 24, 2003.

Mark D. Sherinian, Pamela Jean Walker, Sherinian &
Walker Law Firm, West Des Moines, IA, for
Plaintiffs.
Gene R. La Suer, Davis Brown Koehn Shors &
Roberts, Des Moines, IA, for Defendant.

ORDER ON MOTION TO AMEND COMPLAINT
ZOSS, Magistrate J.
**\*1** On September 11, 2003, the plaintiffs filed a
motion (Doc. No. 41) for leave to amend their
complaint. The defendant filed a resistance (Doc. No.
43) on September 22, 2003. The court held a hearing
on the motion on October 2, 2003, and directed the
parties to file briefs in support of their respective
positions. The defendant filed its brief on October 14,
2003 (Doc. No. 46), and the plaintiffs filed their brief
on October 15, 2003 (Doc. No. 47). The motion is
now fully submitted and ready for consideration.

The plaintiffs in this case, who are current and former
employees of the defendant, have brought this action
for violation of overtime provisions contained in the
federal Fair Labor Standards Act, 29 U.S .C. § 201 *et
seq.* ("FLSA"). In their motion to amend, the
plaintiffs seek to add a claim "for violations of Iowa
Code Chapter 91A, the Iowa Wage Payment
Collection Act." (Doc. No. 41, ¶ 2) The defendant
objects on several grounds, discussed below. Among
other things, a real "fighting issue" with respect to
the motion is that the amendment will add a second
potential class of plaintiffs to the case. The FLSA
permits class actions for unpaid wages, but such
actions must be "opt in" class actions. In other words,
affected employees must elect to opt into the suit and
be listed as plaintiffs. See 29 U.S.C. § 216. There is
no such restriction in the Iowa Wage Payment
Collection Act ("IWPCA"), under which a class

action would involve a traditional "opt out"   ass
under Federal Rule of Civil Procedure 23, including
all affected employees as plaintiffs until they ask to
be excluded. The defendant argues the IWPCA does
not allow for a separate cause of action, Congress did
not intend that FLSA actions should be joined with
state wage payment claims, and in any event, the
court should decline to exercise supplemental
jurisdiction.

*Standards for Motion to Amend*

Rule 15(a), Federal Rules of Civil Procedure,
provides that leave to amend "shall be freely given
when justice so requires." Although, the policy
favoring liberal allowance of amendment does not
mean the right to amend is absolute, *Thompson-El v.
Jones,* 876 F.2d 66, 67 (8th Cir.1989), the Supreme
Court has interpreted Rule 15(a) to mean that "absent
a good reason for denial-such as undue delay, bad
faith or dilatory motive, repeated failure to cure
deficiencies by amendments previously a'' ed,
undue prejudice to the non-moving party, or ?    :ty
of the amendment-leave to amend shoulu be
granted." *Id.* (citing *Foman v. Davis,* 371 U.S. 178,
182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962));
*accord Hanson v. Hancock County Mem. Hosp.,* 938
F.Supp. 1419, 1430 (N.D.Iowa 1996); *Hancock v.
Thalacker,* 933 F.Supp. 1449, 1470-71 (N.D.Iowa
1996); *Quality Refrigerated Servs., Inc. v. City of
Spencer, Iowa,* 908 F.Supp. 1471, 1488-89
(N.D.Iowa 1995). The court must consider the
prejudice to the opponent, whether additional
discovery would be required, and whether the court's
docket would be adversely affected. *Elema-
Schonander, Inc. v. K.C.F. Medical Supply,* 869 F.2d
1124 (8th Cir.1989).

**\*2** In the present case, the defendant first objects to
the amendment on the basis that it is untimely. The
defendant notes all deadlines for amendments to the
pleadings have passed, notice has been given to
potential plaintiffs in the FLSA action, and 21 parties
have been added as "opt in" plaintiffs since
September 24, 2002. (*See* Doc. No. 46)  The
defendant further argues the plaintiffs "have     .1e
forward with no reason for their delay in seekin ̣ ui is
amendment." (*Id.,* p. 3) The plaintiffs' counsel
explained at the hearing that she filed the motion to
amend after learning of the possibility of adding a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

claim under the IWPCA at a recent continuing legal education seminar, and she previously had not been aware of such a claim as a potential cause of action in this type of case. The court finds the plaintiff has not withheld filing the motion to amend in bad faith, for purposes of delay, or for any other improper purpose. Counsel's explanation overcomes any implication that the motion to amend was delayed willfully, or that the court's scheduling orders were "cavalierly disregarded by counsel." *See Gestetner Corp. v. Case Equip. Co.,* 108 F.R.D. 138, 141 (D.Me.1985). Further, the amendment is not being sought to cure any deficiency in the pleadings that the plaintiffs previously failed to cure by prior amendments. Although the court is free to find that ignorance of existing law is not a satisfactory excuse for a delayed motion to amend, *see Cresswell v. Sullivan & Cromwell,* 922 F.2d 60, 72 (2d Cir.1990), the court declines to do so here, where the amendment being sought is based not on ignorance of the law, but ignorance of a creative legal theory applying that law.

As for impact on the court's docket, the trial of this case has been continued to September 13, 2004, and the discovery deadline is not until April 1, 2004. It seems unlikely the court's docket will be affected adversely if the amendment is allowed. The court similarly finds the defendant would not be prejudiced unduly by allowance of the amendment. As the defendant notes in its resistance, the facts underlying both the FLSA claim and the proposed IWPCA claim are identical. (*See* Doc. No. 46, p. 4)

Therefore, the court's ruling on the motion turns on whether or not the amendment would be futile, and, if not, whether the court should exercise supplemental jurisdiction over the IWPCA claim.

*Is the Proposed Amendment Futile?*

The defendant argues the proposed amendment is futile "because Iowa Code Chapter 91A does not provide a separate cause of action under these facts and because Congress did not intend to allow state wage payment claims to be joined with FLSA claims." (Doc. No. 46, p. 4) In their Complaint, the plaintiffs allege the defendant improperly classified them as exempt employees under the FLSA. The defendant argues the IWPCA does not contain substantive provisions that define who is an exempt employee or when an employer may not claim an individual as an exempt employee. Rather, the IWPCA relies on "the statutory structure of the FLSA to determined the alleged 'wage' due," and the Iowa

law "is purely a remedial statute that, standing alone, cannot support Plaintiffs' claims." (Doc. No. 46, pp. 4-5) The defendant argues, "A long line of cases makes clear that the [IWPCA] is only a remedial act adopted as a means of permitting employees to collect 'wages' due from an employer." (Doc. No. 46, p. 5, citing *Runyon v. Kubota Tractor Corp.,* 653 N.W.2d 582, 585 (Iowa 2002); *Condon Auto Sales & Serv., Inc. v. Crick,* 604 N.W.2d 587, 596 (Iowa 2000); *Phipps v. IASD Health Servs. Corp .,* 558 N.W.2d 198, 201 (Iowa 1997); *Maday v. Elview-Stewart Sys. Co.,* 324 N.W.2d 467, 470 (Iowa 1982); *Williams v. Davenport Comm. Ltd. P'ship* 38 N.W.2d 855, 857 (Iowa Ct.App.1989))

**\*3** The defendant's reasoning is flawed. The very fact that the Iowa law looks to the FLSA to determine the wages due under these circumstances lends support to the plaintiff's assertion that the FLSA and IWPCA claims properly may be brought in the same action. As the Iowa Supreme Court noted in *Anthony v. State,* 632 N.W.2d 897 (Iowa 2001), *cert. denied,* 534 U.S. 1129, 122 S.Ct. 1068, 151 L.Ed.2d 971 (2002), the State of Iowa has acceded to the FLSA's mandate regarding the payment of overtime wages, and the State's "statutory scheme for deriving pay plans has been implemented in a manner that includes FLSA overtime remuneration as compensation owed by an employer." *Id.,* 632 N.W.2d at 902-03. *See also Kartheiser v. American Nat'l Can Co.,* 271 F.3d 1135, 1136 (8th Cir.2001) (IWPCA "is remedial in nature and is meant to be liberally construed," citing *Hornby v. Iowa,* 559 N.W.2d 23, 26 (Iowa 1997)).

Indeed, although the Eighth Circuit Court of Appeals has not considered this particular issue,[FN1] numerous courts have recognized that joinder of claims  'er the FLSA and state wage payment law is appropriate. *See, e.g., De Asencio v. Tyson Foods, Inc.,* 342 F.3d 301, 308 (3d Cir.2003) (noting FLSA and Pennsylvania Wage Payment and Collection Law "are parallel federal and state laws," and the plaintiffs' claims sufficiently demonstrated common nucleus of operative facts, but declining to exercise supplemental jurisdiction on other grounds); *Goldman v. Radioshack Corp.,* slip op., 2003 WL 21250571 (E.D.Pa. Apr.16, 2003) (recognizing claims under FLSA and Pennsylvania wage payment laws; FLSA class certified but certification of Rule 23 class postponed pending further discovery); *Beltran-Benitez v. Sea Safari, Ltd.,* 180 F.Supp.2d 772, 774 (E.D.N.C.2001) (recognizing claims under FLSA and North Carolina wage payment statute, and holding "FLSA's prohibition of Rule 23 class actions does not bar the application of Rule 23 to a separate

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2003 WL 22427817 (N.D.Iowa), 9 Wage & Hour Cas.2d (BNA) 305
(Cite as: Not Reported in F.Supp.2d)

cause of action in the same complaint. *See Zelaya v. J.M. Macias, Inc.,* 175 F.R.D. 625, 626 (E.D.N.C.1997).")*; Robinson v. Sizes Unlimited, Inc.,* 685 F.Supp. 442 (D.N.J.1988) (recognizing claims under ADEA, which adopts FLSA's class action procedure, and New Jersey age discrimination statute). *See also Sperling v. Hoffman-LaRoche, Inc.,* 118 F.R.D. 392, 411-12 (D.N.J.1988) (recognizing claims under ADEA and New Jersey age discrimination statute, in case discussing appropriate notice procedures), *aff'd in pertinent part,* 862 F.2d 439 (3d Cir.1988), *aff'd on other grounds,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989).

FN1. The defendant recognizes there is "no case on point in the Eighth Circuit," but asserts the decision in *Fielder v. Credit Acceptance Corp.,* 188 F.3d 1031 (8th Cir.1999), "provides some guidance when confronting a state law claim and a federal law claim in the same case." (Doc. No. 46, p. 7) The defendant claims, "In *Fielder* [,] the Eighth Circuit reversed a district court's certification of two distinct classes because the second class had only state law claims. 188 F.3d at 1038." (*Id.*) The defendant misstates the holding in *Fielder,* where the court was considering whether it "should exercise supplemental jurisdiction *after* all federal claims [were] resolved." 188 F.3d at 1037 (emphasis in original). The court noted the *remaining* state law claims raised "novel, complex, and important issues of state law" that were "precisely the types of issues as to which federal courts should hesitate to exercise § 1367 supplemental jurisdiction." 188 F.3d at 1038 (citations omitted). *Fielder* is not instructive in the court's consideration of the plaintiff's motion to amend in the present case.

Rather than questioning whether FLSA and state-law claims appropriately may be brought in the same case, the issue that most often arises is whether the state-law plaintiffs have met the requirements for class certification under Rule 23. *See, e.g., Goldman, supra; Muecke v. A-Reliable Auto Parts & Wreckers, Inc.,* 2002 WL 1359411 (N.D.Ill.2002) (mem.) (recognizing actions under FLSA and Illinois wage payment statutes, but declining to certify class on state law claims for failure to make required showing under Rule 23); *Thiebes v. Wal-Mart Stores, Inc.,* 1999 WL 1081357 (D.Or.1999) (allowing joinder of FLSA and state law claims for purposes of notice and

discovery, but denying Rule 23 motion to ⌐ ⌐fy class, without prejudice to reassertion after ⌐pⁱⁱn period closed for FLSA claim); *Robinson. supra* (exercising pendent jurisdiction over ADEA and state law claims, but limiting scope of opt-out class); *Sperling, supra.* The court finds it is appropriate for FLSA and state-law claims with the same factual basis to be joined in a single action.

*\*4* The defendant further claims that because "the Plaintiffs must rely on the statutory structure of the FLSA to determine the alleged 'wage' due and to be collected under the FLSA," the plaintiffs also should be bound by the FLSA's enforcement provisions, including the requirement for an "opt in" class action. (Doc. No. 46, p. 5) Courts uniformly have found the Rule 23 factors for "opt out" class actions to be inapplicable to the FLSA's "opt in" requirement. *See, e.g., LaChapelle v. Owens-Illinois, Inc.,* 513 F.2d 286, 288 (5th Cir.1975) (concluding suit under ADEA, which adopts FLSA's "opt-in" class action provisions, could not be brought as a Rule 23-type class action; noting "fundamental, irreconci⌐ble difference between the class action described b⌐ ⌐le 23 and that provided for by FLSA § 16(b)"); *a ⌐rd Owens v. Bethlehem Mines Corp.,* 108 F.R.D. 207, 209-10 (S.D.W.Va.1985) (citing *LaChapelle* for proposition that FLSA-type class actions and Rule 23-type class actions are "mutually exclusive and irreconcilable"); *Sheffield v. Orius Corp.,* 211 F.R.D. 411 (D.Or.2002) ("The majority of courts have concluded that Rule 23 factors are inapplicable to § 216(b) actions.") (citing *Kinney Shoe Corp. v. Vorhes,* 564 F.2d 859, 862 (9th Cir.1977); *Daggett v. Blind Ent. of Oregon,* 1996 U.S. Dist. LEXIS 22465, at \*14 (D.Or.1996); *Bayles v. American Med. Response of Colo., Inc.,* 950 F.Supp. 1053, 1067 (D.Colo.1996); and *Mete v. N.Y. Office of Mental Retardation & Developmental Disabilities,* 1993 WL 226434, at \*2 (N.D.N.Y.1993)); *Wyatt v. Pride Offshore, Inc.,* 1996 WL 509654 (E.D.La.1996) (noting Rule 23 provisions "are inapplicable to any action brought under the FLSA"); *see also Sushan v. Univ. of Colo.,* 132 F.R.D. 263 (D.Colo.1990) (discussing "manifestly 'irreconcilable' ' features of section 216's opt-in provisions and Rule 23's op⌐ ⌐out provisions in case where ADEA class-action p⌐ ⌐ff sought to avoid completely all requirements o⌐ ⌐le 23). However, whether Rule 23's class action requirements can be applied to a plaintiff's FLSA-based claims is not the issue here. The plaintiffs are not seeking to graft the requirements of Rule 23 onto their FLSA action. Instead, they seek to add a separate claim for violation of the IWPCA, which would fall within the scope of the Rule 23

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22427817 (N.D.Iowa), 9 Wage & Hour Cas.2d (BNA) 305
**(Cite as: Not Reported in F.Supp.2d)**

requirements.

The defendant argues at length that the proposed amendment would be futile because certification of the state-law claim under Rule 23 would be inappropriate. That issue is not presently before the court. Whether the plaintiffs can make the necessary showing for certification of their state-law claim under Rule 23 is an issue that is separate and distinct from whether they should be permitted to amend their Complaint to assert the state-law claim in the first instance. The court finds the proposed amendment is proper on its face and is not futile. However, this does not resolve the question of whether the court should exercise supplemental jurisdiction over the proposed IWPCA claim.

### Should the Court Exercise Supplemental Jurisdiction?

**\*5** In an action predicated upon federal law, supplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims when they "derive from a common nucleus of operative fact, such that the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional case." *Chicago v. Int'l College of Surgeons,* 522 U.S. 156, 164-65, 118 S.Ct. 523, 529-30, 139 L.Ed.2d 525 (1997) (internal quotation marks omitted) (citing *Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 15 L.Ed.2d 218 (1966); other citations omitted); 28 U.S.C. § 1367(a) (state-law claims must be "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy"); *accord Wisconsin Dept. of Corrections v. Schacht,* 524 U.S. 381, 387, 118 S.Ct. 2047, 2051-52, 141 L.Ed.2d 364 (1998) (quoting 28 U.S.C. § 1367(a); citing *Chicago,* 522 U.S. at 163-66, 118 S.Ct. at 528-30). *See Chicago,* 522 U.S. at 167, 118 S.Ct. at 531 ("The whole point of supplemental jurisdiction is to allow the district courts to exercise pendent jurisdiction over claims as to which original jurisdiction is lacking.") In this case, there is no question that the proposed IWPCA claim involves the same nucleus of operative fact as the FLSA claim.

However, a court may decline to exercise supplemental jurisdiction in four distinct circumstances:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The Supreme Court, in *Chicago,* explained factors the courts should consider in exercising the discretion afforded by section 1367(c):Depending on a host of factors, including the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims-district courts may decline to exercise jurisdiction over supplemental state law claims. The statute thereby reflects the understanding that, when deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity."

*Chicago,* 522 U.S. at 173, 118 S.Ct. at 534 (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988)).

In the present case, the defendant argues the court should decline to exercise supplemental jurisdiction on the grounds set forth in subsections (2) and (4) of section 1367(c). In particular, the defendant asserts "the state law claim may predominate over the federal claim if there are more persons who are in the 'opt out' class than are in the 'opt in' class." (Doc. No. 46, p. 10, citing *De Asencio,* 342 F.3d at 311) The defendant also argues "there could be two distinct 'classes' in this case because there is no assurance that members of the Rule 23 class would opt in to the FLSA class." (*Id.,* citing *Zelaya v. Macias,* 999 F.Supp. 778, 782 (E.D.N.C.1998))

**\*6** In *Goldman, supra,* a case involving claims under the FLSA and Pennsylvania wage statutes, the court considered arguments virtually identical to those advanced by the defendant here, and expressly declined to follow *Zelaya,* noting the case had "not received a welcomed reception in federal courts." *Goldman,* at \*4 (citing cases). This court finds persuasive the reasoning of the *Goldman* court, and the court in *Ansoumana v. Gristede's Operating Corp.,* 201 F.R.D. 81 (S.D.N.Y.2001).[FN2] The *Goldman* court found considerations of judicial economy warranted trying the related FLSA and state-law claims together, noting the claims were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

P. 35

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22427817 (N.D.Iowa), 9 Wage & Hour Cas.2d (BNA) 305
**(Cite as: Not Reported in F.Supp.2d)**

premised on the same facts, parallel to one another, and likely would succeed or fail together. *Goldman,* at *5. The court opined that if the state-law claims were tried in state court while the FLSA claims were tried in federal court, "the two cases would be so related that any decision on the merits on one action would have preclusive effects on the other action. If the preclusive effects did not come to fruition, the cases [could] result in conflicting findings or judgment. Proceeding in both forums would needlessly increase litigation expenses for both parties." *Id.*

> FN2. *Ansoumana* was distinguished on other grounds by Chief Judge Mark W. Bennett in *Sanft v. Winnebago Indus., Inc.,* 216 F.R.D. 453, 459 (N.D.Iowa 2003).

The *Goldman* court adopted the reasoning of the court in *Ansoumana,* where the court explained:
Indeed, in contrast to the objections raised by the Defendants, this case demonstrates why supplemental jurisdiction should be exercised. If the related FLSA and [state-law] claims were to be litigated in parallel fashion, in this court and in the New York Supreme Court, there would be great potential for confusion of issues; considerable unnecessary costs, inefficiency and inconsistency of proceedings and results; and other problems inherent in parallel class action litigation.... Congress enacted Section 1367 to avoid such problems. Defendants short-sightedly argue to reverse the Congressional wisdom. I decline to do so.

*Ansoumana,* 201 F.R.D. at 96; *see Goldman,* at *5 n. 3. This court similarly adopts the position set forth by the courts in *Ansoumana* and *Goldman,* and finds the state-law claim does not predominate over the federal claim.

Similarly, the court finds unpersuasive the defendant's argument that "the purported conflict between 29 U.S.C. § 216(b) and Fed.R.Civ.P. 23 constitutes ... an exception circumstance" sufficient for this court to decline to assume supplemental jurisdiction over the IWPCA claim. *See Beltran-Benitez,* 180 F.Supp.2d at 773-74.

For the reasons stated above, the court will exercise its discretion to assume supplemental jurisdiction over the plaintiffs' IWPCA claim. The plaintiffs' motion to amend their Complaint is granted. The Clerk of Court is directed to file the Amended and Substituted Complaint submitted with the motion.

IT IS SO ORDERED.

N.D.Iowa,2003.
Bartleson v. Winnebago Industries, Inc.
Not Reported in F.Supp.2d, 2003 WL 22427817 (N.D.Iowa), 9 Wage & Hour Cas.2d (BNA) 305

Briefs and Other Related Documents (Back to top)

• 3:02cv03008 (Docket) (Jan. 28, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy

Slip Copy, 2005 WL 3447958 (D.N.H.), 2005 DNH 165

**(Cite as: Slip Copy)**

Page 1

# C

NOT FOR PUBLICATION

United States District Court,D. New Hampshire.

James W. MCCARTHY

v.

CITIGROUP GLOBAL MARKETS, INC.

**No. Civ. 04CV477JD.**

Dec. 15, 2005.

Shanna L. Pitts, William A. Jacobson, Law Office of William A. Jacobson Inc., Providence, RI, W. Wright Danenbarger, Wiggin & Nourie PA, Manchester, NH, for James W. McCarthy.

Carol E. Head, John F. Adkins, John R. Skelton, Bingham McCutchen LLP, Boston, MA, for Citigroup Global Markets, Inc.

## *ORDER*

DICLERICO, J.

*1 James W. McCarthy contends that his former employer, Citigroup Global Markets, Inc. ("CGMI"), violated the New Hampshire wage laws in the operation of the Capital Accumulation Plan ("CAP"), which he participated in while employed at CGMI. McCarthy and CGMI arbitrated his claims before a panel of the National Association of Securities Dealers-Dispute Resolution, Inc., as required by the parties' agreement. The panel denied McCarthy's claims and requests for relief, and McCarthy brought an action in this court, moving to vacate the panel's decision.

The court granted McCarthy's motion and remanded the case. On remand, a new panel considered McCarthy's claims and requests for relief and again denied them. McCarthy's motion to reopen the case was granted, and he moves to vacate the panel's award and to remand the case for a third arbitration proceeding. CGMI opposes McCarthy's motion to vacate and moves to confirm the award. [FN1]

> FN1. CGMI requested oral argument. Given the extensive record and the parties' memoranda, oral argument would not be of assistance to the court. LR 7.1(d).

*Background*

James W. McCarthy was financial consulta... at CGMI for eighteen years, earning commissions and other compensation. Beginning in 1993, McCarthy participated in the CAP, a stock purchase plan offered by CGMI. The CAP permitted certain employees, including McCarthy, to designate a portion of their compensation to be used to buy restricted stock at a discounted price. Participating employees, including McCarthy, elected in writing to have income withheld from their payroll checks to be used to buy shares of restricted stock. Participating employees paid income taxes on the value of the stock upon vesting unless they elected, as McCarthy did, to pay payroll taxes at the time the money was deducted.

The "quid pro quo" for the discounted price of the stock was that the shares did not vest when they were purchased, requiring the participating employee to remain employed for two years after the purchase before vesting would occur. If the employee did not remain employed for that time, both the unvested shares and the compensation that was used ... ... them were forfeited to CGMI. McCarthy le... his employment with CGMI in May of 2003, before some of the restricted shares of stock he had elected to purchase under the CAP had vested. As a result, those shares, along with the compensation that was used to purchase them, were forfeited to CGMI. McCarthy disputed that result and sought arbitration, as required by his agreement with CGMI. *See James W. McCarthy v. Citigroup Global Markets, Inc.,* NASD-DR Case No.2003-09195.

In the arbitration proceeding, McCarthy claimed that the CAP vesting provisions unlawfully caused him to forfeit $257,346 in compensation. He also claimed that CGMI violated the New Hampshire wage laws by making unlawful deductions from his compensation to purchase the shares, by failing to pay him compensation in cash, and by withholding compensation after the termination of his employment. Both McCarthy and CGMI argued their cases under the New Hampshire wage laws, which they agree apply in this case. The arbitration panel found in favor of CGMI and against McCarth... ...he panel's decision, however, was not based on th... ...w Hampshire wage laws, which the panel held were irrelevant, but instead the panel resolved the case based on its view of common practices in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 3447958 (D.N.H.), 2005 DNH 165
**(Cite as: Slip Copy)**

securities industry.

**\*2** McCarthy brought suit in this court seeking to have the decision vacated and the case remanded. The court granted McCarthy's motion, concluding that the arbitration panel's decision was based on a manifest disregard for the governing law. On remand, a second panel was convened to hear McCarthy's claims. Again, the parties presented arguments based on the New Hampshire wage laws. CGMI filed a "Motion for Judgment," asking the panel to dismiss McCarthy's claims. McCarthy objected to the motion and also moved to "poll" the arbitrators, arguing that CGMI was asking the panel to disregard the law, despite this court's order on remand, and asking the arbitrators to affirm that they would follow the rulings stated in the remand order. The panel denied both motions.

After a hearing, the panel issued its decision, titled "Modified Award," denying McCarthy's claims and requests for relief. The panel reviewed the procedural history of the case, acknowledging this court's remand order. In the part of the award titled "Panel's Report," the panel stated that it had "fully considered all claims and defenses, including the applicability of the New Hampshire Wage Laws, which were heavily argued by both sides. After full consideration of the matter, the Panel decided to deny all claims with prejudice." McCarthy asks that the "modified award" be vacated and that the case be remanded for a third arbitration proceeding.

*Discussion*

As the court explained in the previous order, "[j]udicial review of an arbitrator's decision is extremely narrow and deferential." *Poland Spring Corp. v. United Food & Commercial Int'l Union,* 314 F.3d 29, 33 (1st Cir.2002). The Federal Arbitration Act provides certain limited grounds for vacating an arbitration award. *See* 9 U.S.C. § 10. "[T]he statute 'carefully limits judicial intervention to instances where the arbitration has been tainted in certain specific ways ... [and] contains no express ground upon which an award can be overturned because it rests on garden-variety factual or legal [errors]." ' *P.R. Tel. Co. Inc. v. U.S. Phone Mfg. Corp.,* 427 F.3d 21, 25 (1st Cir.2005) (quoting *Advest, Inc. v. McCarthy,* 914 F.2d 6, 8 (1st Cir.1990)); *see also Poland Springs,* 314 F.3d at 33 (court not conducting appellate review "to hear claims of factual or legal error by an arbitrator or to consider the merits of an award"). "An arbitrator's award must be enforced if it

is in any way plausible, even [if the court] think[s] [the panel] committed serious error." *Wonderland Greyhound Park, Inc. v. Autotote Sys., Inc.,* 274 F.3d 34, 35 (1st Cir.2001) (internal quotation marks omitted).

The stringent standard of review leaves only rare circumstances when an arbitration award will be vacated, "such as when there was misconduct by the arbitrator, when the arbitrator exceeded the scope of her authority, or when the award was made in manifest disregard of the law." *Airline Pilots Ass'n, Int'l v. Pan Am. Airways Corp.,* 405 F.3d 25,30 (1st Cir.2005). The court concluded that the first arbitration award was made in manifest disreg    of the governing law, based on the panel's statement that the New Hampshire wage laws were irrelevant. McCarthy argues that the second panel's decision was also made in manifest disregard of the law.

**\*3** " '[M]anifest disregard' means that arbitrators knew the law and explicitly disregarded it." *P.R. Tel. Co.,* 427 F.3d at 32 (internal quotation marks omitted). "Put differently, disregard implies that the arbitrators appreciated the existence of a governing legal rule but wilfully decided not to apply it." *Id.* Because arbitrators are not required to explain or provide reasoning for their decisions, and frequently do not do so, an award will be vacated due to a manifest disregard of the law "only when the award is unfounded in reason and fact, ... based on reasoning so palpably faulty that no judge or group of judges could ever conceivably have made such a ruling, or is mistakenly based on a crucial assumption which is decidedly a non-fact." *Id.* (internal quotation marks omitted).

In the first award, the panel stated that the New Hampshire wage laws were irrelevant. As such, the panel explicitly disregarded the governing law so that it was not necessary to look behind that decision to determine its basis. In vacating that award and remanding the case, the court held that the New Hampshire wage laws were the governing law. The second panel stated in its award that it had "fully considered ... the applicability of the New Hampshire Wage Laws." The panel did not say whether it concluded that the wage laws were applicable or not applicable or whether it had applied that law in making its decision. Therefore, while the second panel's statement did not clearly demonstrate a manifest disregard of the governing law, as the first panel did, the second panel left open the possibility that, contrary to the court's direction in the remand order, the panel concluded that the New Hampshire

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 3447958 (D.N.H.), 2005 DNH 165
**(Cite as: Slip Copy)**

wage laws do not apply.

### A. *Request for a Poll*

McCarthy contends that the panel demonstrated its manifest disregard of the governing law by refusing his request that the panel be polled before issuing its award. McCarthy contends that the poll was necessary because CGMI had urged the panel to disregard the governing law and argues that the panel's refusal to affirm that it would follow this court's "legal findings" indicates that the panel did not intend to apply the governing wage laws. The panel stated, however, that it did not grant the motion for the poll because it found no legal basis for such an action. McCarthy has cited no case or any other legal authority supporting his request for a poll, and the court has found none. In the absence of any requirement that the panel submit to such a request, the panel's denial of McCarthy's motion does not support his argument that the panel disregarded the governing law.

### B. *Inference of Manifest Disregard*

McCarthy contends that the panel's manifest disregard of the governing law may be inferred from the combination of CGMI's arguments to the panel, which McCarthy characterizes as urging the panel to ignore the wage laws, and the panel's resulting decision, which McCarthy contends cannot be justified under the governing law. CGMI responds that the panel's statements in its award mean that it fully considered and applied the wage laws. CGMI argues that because there is no New Hampshire case directly on point, it was free to provide legal arguments taken from other jurisdictions to support its position that the CAP did not violate the New Hampshire wage laws. CGMI also argues that its theories, rather than McCarthy's, persuaded the panel.

### 1. Panel's modified award.

**\*4** As is explained above, the second panel's modified award does not expressly state or otherwise show that the panel applied or did not apply the New Hampshire wage laws in this case.[FN2] When the case was remanded for further arbitration and was heard by the second panel, the issue of the applicability of the New Hampshire wage laws had been resolved by the court in the remand order, which stated that the case was to be decided under the New Hampshire

wage laws. Order, Jan. 28, 2005, at 8. Therefore the panel's statement that it had considered the applicability of the New Hampshire wage laws, without any stated resolution of that question, equally supports a conclusion that the panel ignored the direction in the court's remand order and again decided that the wage laws were irrelevant.[FN3]

> FN2. An arbitration panel need not, and generally does not, provide reasons for or an explanation of its decision. *See, e.g., P.R. Tel. Co.,* 426 F.3d at 32; *Keebler Co. v. Truck Drivers, Local 170,* 247 F.3d 8, 12 (1st Cir.2001).

> FN3. In fact, CGMI's counsel argued to the second panel that it could conclude that the New Hampshire wage laws did not apply. That is a curious argument given CGMI's position before the court that the wage laws do govern McCarthy's claims, the court's remand order directing further proceedings under the wage laws, and CGMI's statement in its motion to the arbitration panel that the CAP was lawful under New Hampshire law.

### 2. Invitation to ignore the law.

McCarthy contends that this case mirrors the circumstances in *Montes v. Shearson Lehman Bros., Inc.,* 128 F.3d 1456, 1464 (11th Cir.1997), where the court vacated a decision of the arbitration board as being in manifest disregard of the law. There, counsel for the defendant, Shearson, asked the arbitration board not to follow the Fair Labor Standards Act if they found that the plaintiff, Montes, was not exempt from its coverage; the board noted Shearson's plea in its decision; and nothing in the decision or the record indicated that the board did not follow Shearson's urging. *Id.* at 1459, 1461, 1462. The court concluded that Shearson had blatantly urged the board to disregard the applicable law in order to rule in its favor and that both the written decision and the lack of evidentiary support for Shearson's position demonstrated that the board did as it was urged to do. *Id.* at 1461 & 1464.

The concurring judge in *Montes* summarized the factual predicate necessary to support the narrow decision in that case as follows:
1) the party who obtained the favorable award had conceded to the arbitration panel that its position was not supported by the law, which required a different result, and had urged the panel not to follow the law;

2) that blatant appeal to disregard the law was explicitly noted in the arbitration panel's award;
3) neither in the award itself nor anywhere else in the record is there any indication that the panel disapproved or rejected the suggestion that it rule contrary to law; and 4) the evidence to support the award is at best marginal.

*Id.* at 1464. In this case, CGMI did not concede that its position was unsupported by the New Hampshire wage laws, which would require a different result. Instead, CGMI argued the CAP was lawful. The arbitration panel's decision did not note an appeal by CGMI to disregard the law. Therefore, the circumstances in this case are not sufficiently similar to those in *Montes* to permit application here of that narrowly limited decision.

### 3. Arguable or plausible basis for decision.

The court's review of an arbitration award "is extremely narrow and deferential." *Poland Spring,* 314 F.3d at 33. "Nevertheless, acknowledging that [the court's] role is a limited one is not the equivalent of granting limitless power to the arbitrator." *Id.* Although an arbitration award cannot be vacated due to garden variety legal or factual errors, the award will be vacated if it is in manifest disregard of the law, meaning that the arbitrator recognized the applicable law but ignored it. *Bull HN Info. Sys. v. Hutson,* 229 F.3d 321, 330-31 (1st Cir.2000). In other words, an arbitration award will be confirmed unless it is in no way arguably or plausibly compatible with the governing law. *Wonderland,* 274 F.3d at 35. When the governing standard is clear, arbitrators are not free to substitute their own view of justice based on practices within the industry. *See Poland Spring,* 314 F.3d at 33.

*5 In the remand order, the court set forth the governing legal principles under the New Hampshire wage laws as follows:
The pertinent New Hampshire statutes impose restrictions on employers and provide a cause of action for employees to claim unpaid wages. *See* RSA 275:42, et seq. The New Hampshire wage laws apply to "compensation ... for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or other basis of calculation." RSA 275:42, III. Incentive compensation plans and profit sharing plans are compensation covered by the wage laws. *See In re Coffey,* 144 N.H. 531, 744 A.2d 603 (1999); *Ives v. Manchester Subaru, Inc.,* 126 N.H. 796, 799-

800, 498 A.2d 297 (1985). Among other restrictions and requirements provided by the New Hampshire statutes, RSA 275:43 governs the payment of wages and salaries; RSA 275:48 restricts deductions that may be made from an employee's compensation, limiting authorized deductions to those listed in the New Hampshire Department of Labor regulations, and RSA 275:50 prohibits waiver of the wage laws by private agreement.

Order, Jan. 28, 2005, at *2-3.[FN4] In response to CGMI's argument that it would prevail on the merits of McCarthy's claims, based on *Marsh v. Prudential Secs. Inc.,* 1 N.Y.3d 146, 770 N.Y.S.2d 271, 802 N.E.2d 610 (N.Y.2003) (construing New York Labor Law § 193), the court declined to address the merits but explained that "[b]ecause the *Marsh* decision is based on a provision in § 193 that broadens the circumstances when such deductions may be made, which the New Hampshire statute does not include, that decision is not on point as to the deduction issue." Order at 8, n. 5.

> FN4. Parts of RSA 275 were amended after 2003, making those changes inapplicable in this case.

There is no dispute in this case that the CAP was an incentive compensation plan, and CGMI stated as much to the arbitration panel. Through McCarthy's authorized participation in the CAP, he received some of his compensation in cash and the remainder was deducted or withheld by CGMI to pay for Citigroup Restricted Stock. The stock did not vest when it was issued but, instead, vested two years later so that if a participating employee, such as McCarthy, resigned within the two-year vesting period, he forfeited the stock to CGMI. Therefore, there is no dispute that CGMI deducted or withheld compensation, with authorization, that was used to pay for stock, which was subject to a two-year vesting rule. CGMI also does not dispute that it did not pay McCarthy the compensation he had earned that was deducted to pay for stock that was forfeited. In other words, when McCarthy resigned, CGMI kept both the stock and McCarthy's compensation that was deducted to purchase it.

In the arbitration proceeding, McCarthy argued that the CAP violated New Hampshire wage laws because his compensation was neither paid entirely in cash nor legally deducted and because the CAP vesting provision caused him to forfeit both the stock and the compensation deducted to pay for it. He also claimed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that New Hampshire law prohibited private agreements that waived the requirements of the New Hampshire wage laws. CGMI argued that the CAP was lawful, analogizing to *Marsh,* and that McCarthy had voluntarily undertaken the risk of the CAP and had profited from it.

**\*6** The principles of the New Hampshire wage law are set forth in the statutes, and McCarthy argued those principles to the arbitration panel. New Hampshire law requires employers to pay their employees the wages they have earned, RSA 275:43, I & 275:43-b, and to pay any wages earned to an employee who resigns, RSA 275:44,II. Lawful deductions are limited to those an employer is required or empowered to make by federal or state law, those authorized by an employee in writing and provided in the labor regulations, and those made for certain medical services pursuant to rules or regulations.<u>FN5</u> RSA 275:48, I; N.H. Admin. Rules, Lab. 803.03(c) (1999). In addition, the requirements of the New Hampshire wage laws may not be waived by private agreement. RSA 275:50, I.

> <u>FN5.</u> The applicable regulation provides that properly authorized deductions may be made for payroll taxes or as otherwise required by statute; payments for legitimate loans by the employer; union dues; health and pension fund contributions; voluntary contributions to charities; housing and utilities; "[p]ayments into savings funds held by someone other than the employer;" voluntary rental fees for non-required clothing; costs of voluntary cleaning of clothing, and for an employee's use of a demonstrator vehicle. N.H. Admin. Rules 803.03(c).

CGMI's arguments to the arbitration panel, that the CAP was lawful because McCarthy's compensation, paid in cash and restricted stock, conferred a benefit to him, because McCarthy had agreed to participate in the CAP and was a sophisticated and intelligent financial consultant, and because McCarthy had benefitted in the past from the CAP, are not pertinent to the principles of New Hampshire law. Instead, CGMI's argument is based on the reasoning of the Court of Appeals of New York in *Marsh,* construing New York law. CGMI represented to the arbitration panel that the New Hampshire wage laws allowed deductions as long as they accrued "to the benefit of the employee," Motion for Judgment at 7, that the New Hampshire laws, like the New York law,

allowed a deduction "for the benefit of the employee," *id.* at 8, 770 N.Y.S.2d 271, 802 N.E.2d 610, and that the CAP was a lawful fringe benefit plan as was held in *Marsh, id.*

As this court pointed out in the remand order, which the arbitration panel noted in the award, New York law, which was at issue in *Marsh,* is significantly different from New Hampshire law. The pertinent provision under New York law, § 193, states that an employer may make authorized deductions from an employee's wages for specified purposes and for "similar payments for the benefit of the employee." The corresponding New Hampshire statute, RSA 275:48, I(b), requires that deductions *both* accrue to the benefit of the employee *and* be for one of the specified purposes listed in 803.03(c). Therefore, under New Hampshire law, unlike New York law, a deduction is not lawful simply because it accrues to the benefit of an employee. Because *Marsh* was decided based upon the "benefit of the employee" provision in § 193, neither its analysis nor its reasoning is applicable or persuasive here. In addition, *Marsh* did not address the issue of forfeiture of earned compensation, which is part of McCarthy's claim in this case.

CGMI also argued that the CAP was a lawful deduction as a payment into a savings fund held by someone other than the employer and that it was empowered by the federal tax treatment of similar plans to offer the CAP. *See* N.H. Admin. Rules, Lab. 803.03(c)(2)(f) (1999); 26 U.S.C. § § 83, 125. The argument that the CAP is a savings fund might hold more sway if it did not require forfeiture of the unvested portion of the compensation deducted, which would be an unusual provision in a savings fund. CGMI's argument that the tax code "empowers" it to deduct compensation for the CAP depends on both an expansive view of "empowers" and the amendments to RSA 275:48 that were not in effect at the time in question. Neither argument is persuasive.

**\*7** Nevertheless, it is perhaps arguable that the panel was sufficiently confused or misled by CGMI's arguments to conclude that the CAP deductions comported with New Hampshire law. Even assuming that the CAP deductions were lawful, however, CGMI did not offer the arbitration panel any justification under New Hampshire law for its failure to pay McCarthy the compensation that he had earned before he resigned. That he had profited from his past participation in the CAP does not excuse CGMI from paying him as required under New

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2005 WL 3447958 (D.N.H.), 2005 DNH 165
**(Cite as: Slip Copy)**

Hampshire law. CGMI's oft-repeated theory, that McCarthy was intelligent and sophisticated and voluntarily undertook the risk of forfeiting compensation by agreeing to participate in the CAP, persuaded the Court of Appeals of New York but does not comport with New Hampshire law that requires an employer to pay an employee his earned compensation. RSA 275:43 & 275:44. New Hampshire law also does not allow employees and employers to agree to waive the requirement that wages be paid.

Judicial review of the panel's decision is complicated in this case, as in most arbitration cases, by the lack of any reasons given for the decision. *See Bull HN Info.,* 229 F.3d at 331 n. 7. In the absence of any explanation, there appears to be no arguable or plausible basis for the panel to have ruled either that the New Hampshire wage laws did not apply to McCarthy's claims or that CGMI's failure to pay McCarthy earned compensation, based on the forfeiture provision in the CAP, was lawful. In either case, the panel's decision necessarily was made in manifest disregard of the law.[FN6] *See, e.g., Hardy v. Walsh Manning Secs., L.L.C.,* 341 F.3d 126, 133 (2d Cir.2003); *Poland Spring,* 314 F.3d at 33-37; *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 203-04 (2d Cir.1998).

> FN6. Because neither alternative basis for the decision is reasonable, given the governing law, a remand for clarification would not be beneficial here. *Cf. U.S. Energy Corp. v. Nukem, Inc.,* 400 F.3d 822, 831 (10th Cir.2005) (holding that where two reasonable alternative interpretations of arbitration award were possible, remand for clarification was necessary); *Lanier v. Old Republic Ins. Co.,* 936 F.Supp. 839, 845-48 (M.D.Ala.1996) (discussing availability of remand to arbitration panel for clarification).

Once again the case must be remanded to have McCarthy's claims decided under the New Hampshire wage laws through arbitration as provided by the National Association of Securities Dealers, Inc. Before more time and money is spent on litigation, however, the court expects the parties to use their best efforts to resolve this matter between them. In the event those efforts are not successful and the case returns to arbitration, the court asks the parties to request that the arbitration panel provide an explanation or reasons for its decision to allow meaningful judicial review, if that again should be necessary.

*Conclusion*

For the foregoing reasons, the plaintiff's motion to vacate and remand (document no. 20) is granted. The defendant's cross motion to confirm (document no. 28) and motion for oral argument (document no. 29) are denied.

The case is remanded for further arbitration proceedings as provided by National Association of Securities Dealers-Dispute Resolution, Inc.

The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

D.N.H.,2005.
McCarthy v. Citigroup Global Markets, Inc.
Slip Copy, 2005 WL 3447958 (D.N.H.), 2005 DNH 165

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 589425 (D.N.H.), 2005 DNH 040
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**
<u>Briefs and Other Related Documents</u>

NOT FOR PUBLICATION
United States District Court,D. New Hampshire.
Robert THERRIEN, Plaintiff
v.
Mark F. SULLIVAN, Defendant
**No. Civ. 04-31-SM.**

March 14, 2005.

<u>Sven D. Wiberg</u>, Desfosses Law Firm, Portsmouth,
NH, for Plaintiff.
<u>Richard Bell</u>, Nelson Kinder Mosseau & Saturley PC,
Manchester, NH, for Defendant.

*ORDER*

<u>MCAULIFFE</u>, Chief J.

*1 In 1996, plaintiff, Robert Therrien, was charged
with one count of aggravated felonious sexual
assault, for having allegedly forced his first-grade
daughter to perform fellatio on him. Therrien retained
the defendant, Mark Sullivan, Esq., to represent him
in defending against that charge. Following a jury
trial, Therrien was convicted and sentenced to seven
and one-half to fifteen years in state prison. That
conviction was affirmed on appeal.

Subsequently, however, Therrien moved for, and was
granted, a new trial on grounds that Sullivan provided
constitutionally deficient representation. In granting
Therrien's requested relief, the state court concluded
that Sullivan failed to file appropriate pretrial
motions in limine seeking to prevent the State from
introducing evidence of Therrien's prior bad acts, and
failed to properly object to the introduction of that
prejudicial evidence at trial.

Therrien then filed this civil suit against Sullivan,
invoking this court's diversity jurisdiction. In the sole
count of his complaint, Therrien asserts claims for
"legal malpractice, negligence, breach of contract,
fraud and other [unspecified] causes of action arising
out of [Sullivan's] deficient representation of
Plaintiff." Amended complaint at para. 1. Sullivan
moves to dismiss Therrien's claims, saying his
complaint fails to state a claim upon which relief may
be granted and that those claims are barred by the
pertinent statute of limitations. In the alternative,

Sullivan moves this court to certify the potentially
dispositive statute of limitations question to the New
Hampshire Supreme Court. Therrien objects.

Standard of Review

When ruling on a motion to dismiss under
<u>Fed.R.Civ.P. 12(b)(6)</u>, the court must "accept as true
the well-pleaded factual allegations of the complaint,
draw all reasonable inferences therefrom in the
plaintiff's favor and determine whether the complaint,
so read, sets forth facts sufficient to justify recovery
on any cognizable theory." *Martin v. Applied
Cellular Tech.,* 284 F.3d 1, 6 (1st Cir ?? '2).
Dismissal is appropriate only if "it clearly a[p]  ..'s,
according to the facts alleged, that the plaintiff c..ot
recover on any viable theory." *Langadinos v.
American Airlines, Inc.,* 199 F.3d 68, 69 (1st
Cir.2000).

Notwithstanding this deferential standard of review,
however, the court need not accept as true a plaintiff's
"bald assertions" or conclusions of law. *See
Resolution Trust Corp. v. Driscoll,* 985 F.2d 44, 48
(1st Cir.1993) ("Factual allegations in a complaint
are assumed to be true when a court is passing upon a
motion to dismiss, but this tolerance does not extend
to legal conclusions or to 'bald assertions." ')
(citations omitted). *See also Chongris v. Board of
Appeals,* 811 F.2d 36, 37 (1st Cir.1987).

Factual Background

The relevant factual background is described in detail
in the New Hampshire Supreme Court's opinion
affirming Therrien's criminal conviction. *Sta?  v.
Therrien,* 144 N.H. 433, 744 A.2d 85  .  '9)
(*"Therrien I"* ). Only an abbreviated recitation  .  he
pertinent facts is necessary here.

*2 While living in Portsmouth, New Hampshire,
Therrien allegedly forced his first-grade daughter to
perform fellatio on him. Soon thereafter, the family
moved to Maine. In 1995, the victim informed her
mother about the assault that had allegedly occurred
earlier in Portsmouth. Therrien was charged with that
assault, but before he was brought to trial in New
Hampshire, he was tried for other alleged sexual
assaults against his daughter in Maine. Therrien was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 2

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 589425 (D.N.H.), 2005 DNH 040
(Cite as: Not Reported in F.Supp.2d)

acquitted of those charges.

At his subsequent trial on the Portsmouth charge, the jury was allowed to hear evidence of Therrien's alleged sexual assaults against his daughter in Maine. Defense counsel was not, however, permitted to introduce evidence that Therrien had been acquitted of those charges. Additionally, over defense counsel's objection, the jury was allowed to hear testimony from the victim's social worker, who testified that Therrien had abused the victim until she was thirteen years old. In March of 1997, Therrien was convicted of aggravated felonious sexual assault. On April 25, 1997, he was sentenced to serve seven and one-half to fifteen years in prison.

On direct appeal to the New Hampshire Supreme Court, Therrien, represented by different counsel, asserted that the trial court erred in admitting evidence of other bad acts (i.e., the alleged sexual assaults that occurred in Maine), without permitting him to introduce evidence that he had been acquitted of those charges. He also challenged the trial court's decision to allow the victim's therapist to testify about multiple incidents of abuse. The state supreme court affirmed Therrien's conviction, concluding that the victim's testimony about sexual assaults that allegedly took place in Maine amounted to harmless error. It also concluded that Therrien failed to preserve for appellate review his objections to: (1) the court's ruling precluding introduction of evidence of his acquittal of the Maine charges; and (2) introduction of the social worker's testimony. *See Therrien I.*

Therrien then sought collateral relief in the state trial court, moving for a new trial. He asserted that he had been denied effective assistance of counsel at his trial. The superior court denied that motion, concluding that counsel provided constitutionally adequate representation. The state supreme court vacated that holding, reasoning that the trial court should have conducted an evidentiary hearing on the matter prior to ruling. The case was transferred to a new judge, an evidentiary hearing was held, and the court determined that Sullivan did, in fact, provide constitutionally deficient representation:
The court finds that Sullivan's representation of defendant at trial was deficient, as he failed to properly prepare for, attempt to exclude, try to mitigate, or even preserve for appeal the issue of defendant's inherently prejudicial prior bad acts.

*State v. Therrien,* No. 96-S-541 (N.H.Super.Ct. May 7, 2002) (*"Therrien II"* ). Accordingly, the court

vacated Therrien's conviction and granted his motion for a new trial. The State, however, declined to re-prosecute Therrien, perhaps because he had already served approximately five years in prison.

*3 On January 28, 2004, Therrien filed this d⬝ ⬝⬝ty action against Sullivan, asserting that he is ac⬝ ily innocent of the charges brought against hin⬝ and saying that Sullivan's deficient representation proximately caused his allegedly wrongful conviction and incarceration.[FN1] As noted above, Sullivan moves to dismiss Therrien's one-count complaint on grounds that it is barred by the applicable limitations period.

> FN1. It is appropriate, in this context, to note that no court has determined that Therrien was actually innocent of the criminal charge against him; his conviction was set aside on other grounds, and the charges were then dropped as a matter of prosecutorial discretion.

### Discussion

I. *Essential Elements of a Viable Claim.*

Under New Hampshire law, a plaintiff in a trad⬝⬝ ⬝al civil legal malpractice case must prove:

(1) that an attorney-client relationship existed, which placed a duty upon the attorney to exercise reasonable professional care, skill and knowledge in providing legal services to that client; (2) a breach of that duty; and (3) resultant harm legally caused by that breach.

*Furbush v. McKittrick,* 149 N.H. 426, 432, 821 A.2d 1126 (2003). In a criminal legal malpractice action-one in which the plaintiff asserts that counsel provided deficient representation in a criminal proceeding-the plaintiff must also demonstrate that he or she was "actually innocent" of the conduct giving rise to the criminal charges.While [a criminal malpractice claim] requires all the proof essential to a civil malpractice claim, a criminal malpractice action will fail if the claimant does not allege and prove, by a preponderance of the evidence, actual innocence. It is not sufficient for a claimant to allege and prove that if counsel had acted differently, *legal* guilt would not have been established. As a matter of law, the gateway to damages will remain closed unl⬝ ⬝ a claimant can establish that he or she is, ir ⬝⬝ct, innocent of the conduct underlying the cri⬝.⬝⬝al charge.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 3

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 589425 (D.N.H.), 2005 DNH 040
(Cite as: Not Reported in F.Supp.2d)

*Mahoney v. Shaheen, Cappiello, Stein & Gordon, P.A.,* 143 N.H. 491, 496, 727 A.2d 996 (1999) (emphasis in original).

Here, Therrien's complaint plainly sets forth each of the essential elements of a viable claim for criminal legal malpractice. Whether he can actually prove each of those elements, and whether he can demonstrate a causative link between Sullivan's conduct and Therrien's criminal conviction, *see, e.g., Carbone v. Tierney,* 151 N.H. 521, 864 A.2d 308 (2004), are not issues that are appropriate for resolution on a motion to dismiss. *See, e.g., Gorski v. N.H. Dep't of Corr.,* 290 F.3d 466, 472 (1st Cir.2002) ("The issue presently before us, however, is not what the plaintiff is required ultimately to *prove* in order to prevail on her claim, but rather what she is required to *plead* in order to be permitted to develop her case for eventual adjudication on the merits.") (emphasis in original).

## II. *Statute of Limitations and Tolling.*

Malpractice actions are governed by N.H.Rev.Stat. Ann. ("RSA") 508:4, which establishes a three-year limitations period for all personal injury actions. *See Furbush,* 149 N.H. at 430, 821 A.2d 1126. "A cause of action arises once all the necessary elements are present." *Shaheen, Cappiello, Stein & Gordon, P.A. v. Home Ins. Co.,* 143 N.H. 35, 40, 719 A.2d 562 (1998) (citation and internal punctuation omitted). Accordingly, a cause of action for legal malpractice accrues when "an attorney breaches a professional duty *and* damages occur as a result," *Id.* (emphasis in original). So, an action to recover for alleged criminal legal malpractice must be brought within three years of that coincidence.

*4 In this case, Sullivan's breach of professional duty consisted of his failure to adequately prepare for, and address at trial, the prior bad acts evidence offered against Therrien. *See* Complaint at para. 7. *See also Therrien II.* That alleged malpractice first caused harm to Therrien when he was convicted (wrongly, according to Therrien) of aggravated felonious sexual assault. The harm associated with Sullivan's alleged malpractice was, therefore, manifest by December 13, 1999, when the New Hampshire Supreme Court affirmed Therrien's conviction.

Therrien was certainly aware of his potential malpractice claim against Sullivan, at the very latest, when Therrien filed his motion for a new trial, on

March 2, 2000. In that motion, Therrien alleged, among other things, that "The prejudice from trial counsel's deficient performance is palpable.... If proper arguments had been made by [Attorney Sullivan], there is a reasonable probability that either the verdict would have been different, or that Mr. Therrien's conviction would have been reversed on appeal." Exhibit A to defendant's memorandum, Therrien's motion for new trial at 19. Plainly, by that time, Therrien knew or believed that: (1) he was actually innocent of the charge against him; (2) he was, nevertheless, convicted of that charge; and (3) Attorney Sullivan had not properly objected to (or preserved issues for appeal related to) the admission of prejudicial bad acts evidence, preclusion of evidence of the Maine acquittals, and admiss of the social worker's testimony. Thus, he was aw of both Sullivan's alleged malpractice and the causal link between that alleged malpractice and his wrongful conviction.

In short, once his conviction was affirmed on appeal (and certainly by March 2, 2000, when he filed his motion for a new trial), Therrien knew his attorney had allegedly "breach[ed] a professional duty *and* damages occur[red] as a result." *Home Ins. Co.,* 143 N.H. at 40, 719 A.2d 562 (emphasis supplied). It would seem apparent, then, that Therrien's criminal malpractice suit, which was filed on January 28, 2004, is untimely under New Hampshire's three-year limitations period.

But Therrien asserts that the limitations period did not begin to run (or should have been tolled) until May 7, 2002, when the state trial court determined that Sullivan's representation had been constitutionally deficient and granted his motion for a new trial. Only then, says Therrien, was he legally capable of establishing an essential element of his criminal malpractice claim against Sullivan: his actual innocence of the crime of aggravated felonious sexual assault. Before his conviction was set aside, he says, principles of collateral estoppel would have precluded him from denying that he was guilty of the criminal charge. That is to say, until his conviction was set aside, he was legally prevented from proving an essential element of his criminal malpractice claim: that he was actually innocent of the charges against him.

*5 Accordingly, says Therrien, only after his conviction was vacated and his motion for new trial granted, were all of the legal bars to his malpractice claim against Sullivan removed. It naturally follows, then, that he claims it was at that point that his

Page 4

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 589425 (D.N.H.), 2005 DNH 040
(Cite as: Not Reported in F.Supp.2d)

malpractice cause of action actually "accrued," and the time in which to file began to run. Alternatively, he says the applicable limitations period should be tolled until the collateral estoppel bar to his proving actual innocence was lifted (when his motion for new trial was granted, on May 7, 2002).

Although the New Hampshire Supreme Court has yet to address the legal question presented by this case, numerous other state courts have wrestled with the issue. Among those courts, there is a decided lack of agreement regarding when a criminal defendant's legal malpractice claim actually accrues. Some courts have adopted what has become known as the "one track approach," holding that a criminal malpractice action does not accrue until the defendant has obtained collateral relief from his or her conviction. The Supreme Court of Minnesota has, for example, observed that until appellate (or collateral) relief is obtained with regard to the underlying conviction, a claim for criminal malpractice cannot survive a motion to dismiss. Principles of collateral estoppel would preclude a criminal defendant from establishing his or her innocence of the underlying crime-an essential element of the malpractice claim.

Our holding today is a recognition that as long as a valid criminal conviction is in place a legal malpractice cause of action based on a defense counsel's ineffective assistance cannot withstand a Rule 12.02(e) motion to dismiss.

Additionally, by precluding claims from proceeding in which a plaintiff's criminal conviction has not been overturned and will likely never be overturned, our decision comports with another fundamental policy of the statute of limitations, which is to permit the judicial system to husband its limited resources. Therefore, in this case, the policy against allowing a defendant to collaterally attack a valid criminal conviction in a subsequent civil proceeding outweighs the policy of preventing stale claims.

*Noske v. Friedberg,* 670 N.W.2d 740, 745-46 (Minn.2003) (citation and internal punctuation omitted). *See also Canaan v. Bartee,* 276 Kan. 116, 72 P.3d 911, 921 (Kan.) ("We hold that before [a criminal defendant] may sue his attorneys for legal malpractice he must obtain postconviction relief"), *cert. denied,* 540 U.S. 1090, 124 S.Ct. 962, 157 L.Ed.2d 795 (2003); *Adkins v. Dixon,* 253 Va. 275, 482 S.E.2d 797, 801 (Va.1997) ("Since successful termination of [post-conviction collateral challenges to the conviction] is a part of [plaintiff's] cause of

action, he has no right of action until that time and, thus, the statute of limitations does not begin to run until termination of the post-conviction proceeding."); *Stevens v. Bispham,* 316 Or. 221, 51 P.2d 556, 566 (Or.1993) ("We hold that, in order for one convicted of a criminal offense to bring an action for professional negligence against that person's criminal defense counsel, the person must, in addition to alleging a duty, its breach, and causation, allege 'harm' in that the person has been exonerated of the criminal offense through reversal on direct appeal, through post-conviction relief proceedings, or otherwise.").

*6 Other courts, however, have adopted a "two track approach," concluding that a malpractice cause of action accrues as soon as the criminal defendant becomes aware of his or her attorney's negligence and the resulting injury (typically, not later than the date on which the criminal defendant filed his or her petition seeking collateral relief from the conviction). So, for example, the Colorado Supreme Court has held:

[A]n underlying criminal appeal or motion for postconviction relief does not affect the accrual for related legal malpractice claims. Similarly, such criminal matters do not require tolling of the state of limitations of related malpractice claims. Criminal defendants must file their malpractice actions within two years of discovering the attorney's negligence and the resulting injury. In the event that a particular criminal defendant must obtain appellate relief to avoid dismissal of a pending malpractice action, or if proceeding with a malpractice action would jeopardize the criminal defendant's rights, the trial court may stay the malpractice action pending resolution of the criminal case.

*Morrison v. Goff,* 91 P.3d 1050, 1058 (Colo.2004). *See also Ereth v. Cascade County,* 318 Mont. 355, 81 P.3d 463, 469 (Mont.2003) ("[W]e hold that a criminal defendant must file a malpractice complaint within three years of discovering the act, error or omission ... [W]ith the claim preserved, the defendant can seek a stay in the civil suit until the criminal case is resolved."); *Gebhardt v. O'Rourke,* 444 Mich. 535, 510 N.W.2d 900, 904 (Mich.1994) ("[Plaintiff] knew that she had a possible claim against [her criminal defense counsel] when she moved for a new trial. At this time, she was able to allege the elements of a malpractice claim.").

To be sure, a cause of action "accrues" when all elements of that claim are present. Whether a plaintiff can actually *prove* each of those essential elements is,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 589425 (D.N.H.), 2005 DNH 040
(Cite as: Not Reported in F.Supp.2d)

typically, not relevant for purposes of determining when the pertinent limitations period has begun to run. Consequently, the New Hampshire Supreme Court might well adopt the "two track approach," concluding that the running of the limitations period is not affected by the fact that a defendant in a criminal malpractice action can assert, by way of affirmative defense, that the plaintiff is collaterally estopped from proving one or more essential elements of his or her malpractice claim.

On the other hand, there might well be sound policy reasons that counsel in favor of recognizing that a criminal defendant's malpractice cause of action does not accrue (or that the limitations period is tolled) until the criminal defendant obtains collateral relief from his or her conviction. Concluding otherwise might effectively encourage every defendant convicted of a crime to immediately file a malpractice action against his or her attorney (and then seek a stay of that proceeding), to protect against losing the cause of action before he or she obtains collateral relief from the underlying conviction. That, in turn, would likely have an adverse impact on the number of attorneys willing to represent criminal defendants. It would also put substantial pressure on the State's limited judicial resources.

*7 Resolving such fundamental questions of state law is a role best left to the state courts. When a federal court is called upon to apply state law, it must "take state law as it finds it: 'not as it might conceivably be, some day; nor even as it should be.' ' *Kassel v. Gannett Co.,* 875 F.2d 935, 950 (1st Cir.1989) (*quoting Plummer v. Abbott Laboratories,* 568 F.Supp. 920, 927 (D.R.I.1983)). When state law has been authoritatively interpreted by the state's highest court, this court's role is straightforward: it must apply that law according to its tenor. *See Kassel,* 875 F.2d at 950. When the signposts are somewhat blurred, the federal court may assume that the state court would adopt an interpretation of state law that is consistent with logic and supported by reasoned authority. *See Moores v. Greenberg,* 834 F.2d 1105, 1107 n. 3 (1st Cir.1987). However, this court should be, and is, hesitant to blaze new, previously uncharted state-law trails. Accordingly, when a dispositive legal question is novel and the state's law in the area is unsettled, certification is often appropriate. *See Lehman Bros. v. Schein,* 416 U.S. 386, 391, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974); *Arizonans for Official English v. Arizona,* 520 U.S. 43, 76, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997). *See also Acadia Ins. Co. v. McNeil,* 116 F.3d 599, 605 (1st Cir.1997).

An expansive reading of New Hampshire's statutory limitations period or the State's controlling principles of equitable tolling, particularly when resolution of a novel question of New Hampshire law implicates substantial public policy concerns, is a realm best occupied by the New Hampshire Supreme Court. Because that court has yet to address the discrete issue presented in this case, and because it is unclear how it would likely resolve that issue in the context of the facts as pled, the fairest and most prudent course of action at this stage is to certify the question. Otherwise, the case would be dismissed (perhaps wrongly) and the Court of Appeals would likely have to revisit the question of certification. Alternatively, if the case were not dismissed, extended and expensive litigation would proceed, perhaps unnecessarily, on a claim of questionable viability. Neither situation represents an efficient use of judicial, or the litigants', resources.

## Conclusion

Defendant's motions to dismiss (documents no. 3 and 7) are denied. His motion to reconsider denial of motion to dismiss or in the alternative for certification to the New Hampshire Supreme Court (document no. 11) is granted in part and denied in part.[FN2] To the extent it seeks certification to the New Hampshire Supreme Court of the controlling legal issues presented in this case, the motion is granted. In all other respects, it is denied.

> FN2. For procedural reasons, the court's original ruling on defendant's motion to dismiss (document no. 7), issued by the Magistrate Judge, was vacated *after* defendant filed his motion to reconsider or, in the alternative, to certify. Accordingly, both the motion to dismiss and the motion to reconsider are, technically, ripe for review.

The court proposes to certify the following questions of law to the New Hampshire Supreme Court:
1. In the context of a civil action for criminal legal malpractice, *see, e.g., Mahoney v. Shaheen, Cappiello, Stein & Gordon, P.A.,* 143 N.H. 491, 727 A.2d 996 (1999), when does a criminal defendant's cause of action against his or her defense counsel accrue?
*8 2. If the cause of action for criminal legal malpractice accrues upon the criminal defendant's discovery of the attorney's alleged negligence and the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 589425 (D.N.H.), 2005 DNH 040
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

resulting harm, is the pertinent state limitations period tolled until the criminal defendant obtains collateral relief from his or her underlying criminal conviction (thereby avoiding estoppel bars to proving actual innocence)?

*See generally* N.H.Supr. Ct. R. 34. If either party objects to the form of the questions the court proposes to certify, a written objection, along with suggested alternatives, shall be filed on or before April 8, 2005. The court proposes to submit to the Supreme Court, as its statement of facts, the facts as presented in this order. If either party objects or wishes the court to supplement that statement of facts, that party shall submit an objection and/or proposed statement of supplemental facts by April 8, 2005. The parties should, of course, bear in mind that because defendant's pending motion is one to dismiss, the court must assume that all properly alleged facts in plaintiff's amended complaint (document no. 6) are true.

SO ORDERED.

D.N.H.,2005.
Therrien v. Sullivan
Not Reported in F.Supp.2d, 2005 WL 589425 (D.N.H.), 2005 DNH 040

Briefs and Other Related Documents (Back to top)

• 1:04cv00031 (Docket) (Jan. 28, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1

2

3

4

5

6

FILED

7050 DEC 22  P  3: 1 0

7

8

9

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

10

11

12

13

14

15

16

17

18

RANDALL WILLIS, RICHARD
BETTENCOURT, individually and on
behalf of all others similarly situated,

        Plaintiffs,

    v.

CAL-WESTERN TRANSPORT, and
DOES 1 through 100,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

CV F 00-5695 AWI LJO

MEMORANDUM OPINION
AND ORDER DENYING
MOTION FOR PARTIAL
JUDGMENT ON THE
PLEADINGS

[Doc. 8]

19

20

21

22

23

24

25

    In this case, plaintiffs Randall Willis and Richard Bettencourt ("Plaintiffs") are truck
drivers who are employed by defendant Cal-Western Transport ("CWT"). The complaint alleges
that they have been so employed since 1991, but that for at least four years prior to
commencement of this action (the "liability period") CWT has had a "consistent policy of
requiring their truck drivers . . . to work in excess of eight (8) hours per day and in excess of
forty (40) hours per week without paying them overtime compensation as required by Federal
and State wage and hour laws." (Compl. at 2:12-16.)

26

27

28

    Plaintiffs instituted this action in Stanislaus County Superior Court in April of 2000,
asserting four claims for relief: (1) willful and intentional failure to pay overtime wages under
California Labor Code section 1194; (2) willful failure to pay overtime in violation of the federal



1   Fair Labor Standards Act ("FLSA"), 29 U.S.C. section 201 et seq.; (3) for all terminated
2   employees, willful and intentional failure to pay all wages due within 72 hours of termination of
3   employment under California Labor Code sections 201, 202, and 203; and (4) unfair business
4   practices in violation of the California Unfair Business Practices Act ("UPA"), also commonly
5   referred to as the Unfair Competition Law, California Business and Professions Code section
6   17200 et seq. Plaintiffs state that the unfair business practices here took the form of the wrongful
7   refusal to pay overtime as alleged above. In addition to the foregoing, Plaintiffs' complaint
8   contains class action allegations, and requests injunctive relief under the UPA.

9        On May 8, 2000 CWT removed this case to this court pursuant to 28 U.S.C. sections
10  1441 and 1331 (federal question jurisdiction). Following the initial scheduling conference, and
11  concluding that the status of Plaintiffs' request for class certification would determine the course
12  of this litigation, Magistrate Judge O'Neill issued an order on August 16, 2000 directing
13  Plaintiffs to move for certification of the class. (See Doc. 6 at 2:1-3.) Magistrate Judge O'Neill
14  further directed that the class certification motion be filed on or before December 15, 2000 and
15  heard on January 15, 2001. To date Plaintiffs have not moved for class certification. The par...
16  subsequently stipulated to the dismissal of the first and third claims for relief, leaving only the
17  second and fourth claims arising under the FLSA and the UPA. (See Doc. 7.)

18       CWT has now moved for judgment on the pleadings pursuant to Federal Rule of Civil
19  Procedure 12(c) as to the fourth claim arising under the UPA, arguing that Plaintiffs' UPA claim
20  is preempted by the FLSA. On December 18, 2000 the court held a hearing on CWT's motion to
21  dismiss, and following the hearing took the matter under submission. The court now issues this
22  order denying CWT's motion for the reasons set forth in greater detail below.

23

24                    **APPLICABLE STATUTES AND LEGAL STANDARDS**

25  I. Motion for Judgment on the Pleadings

26       Under Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for

27

28                                          2

1    judgment "after such time as the pleadings are closed but within such time as not to delay the

2    trial." Fed. R. Civ. P. 12(c). The legal standard for this motion is essentially the same as for a

3    motion to dismiss under Rule 12(b)(6): the "allegations of the non-moving party must be

4    accepted as true, while the allegations of the moving party which have been denied are assumed

5    to be false." Hal Roach Studios, Inc. v. Richard Feiner and Company, Inc., 896 F.2d 1542, 1550

6    (citation omitted); see also 2 SCHWARZER ET AL., FEDERAL CIVIL PROCEDURE

7    BEFORE TRIAL ¶ 9:335 (2000). The movant must establish "on the face of the pleadings" that

8    there is no material issue of fact, and the movant is "entitled to judgment as a matter of law." [Hal]

9    Roach Studios, 896 F.2d at 1550 (citation omitted).

10        Although, as the name implies, in ruling for a motion for judgment on the pleadings the

11   court ordinarily considers only the pleadings themselves, the court may consider matters outside

12   the pleadings if it treats the motion as a motion for summary judgment under Rule 56 and affords

13   the parties a "reasonable opportunity" to present all pertinent material under such a motion. Fed.

14   R. Civ. P. 12(c). In this case the motion is "converted": it is "treated as one for summary

15   judgment and disposed of as provided in Rule 56." Id.

16   II. Fair Labor Standards Act

17        In its most general terms, the FLSA creates a federal statutory right to be paid a minimum

18   wage as specified in the statute, see 29 U.S.C. section 206(a)(1), and subject to certain exceptions

19   requires that employment beyond 40 hours per workweek be compensated at a rate of one and

20   one-half times the minimum wage. See 29 U.S.C. § 207(a)(1). The purpose of the FLSA is to

21   "protect all covered workers from substandard wages and oppressive working hours," to

22   guarantee a "fair day's pay for a fair day's work," and to protect employees "from the evil of

23   'overwork' as well as 'underpay.'" Williamson v. General Dynamics Corp., 208 F.3d 1144, 1150

24   (9th Cir. 2000) (citations and internal quotations omitted). This purpose is accomplished through

25   a private right of action on the part of the affected employee or employees, which includes the

26   possibility of liquidated damages. See 29 U.S.C. § 216(b). In addition, the statute provides for

27

28                                        3

1   costs and reasonable attorney's fees. See id. The district courts are authorized to enjoin

2   violations of the foregoing provisions, see 29 U.S.C. section 217, with (except in cases of child

3   labor) the action for injunctive relief required to be brought by the Secretary of Labor (formerly

4   by the Wage and Hour Administrator). See 29 U.S.C. §§ 211(a), 212.

5       The statute contains an "anti-retaliation" provision, which in addition to the foregoing

6   provisions prohibits "discharg[ing] or in any other manner discriminat[ing] against any

7   employee" because the employee has instituted or testified in a proceeding under the FLSA, or

8   served on an industry committee. The anti-retaliation provision, if violated, carries with it the

9   possibility of criminal penalties. See 29 U.S.C. §§ 215(a)(3), 216(a).

10      The FLSA has a two-year statute of limitations. In the case of a willful violation, the

11  statute of limitations is three years. See 29 U.S.C. § 255(a). The FLSA permits class actions,

12  but in contrast to the UPA, requires each plaintiff to consent in writing to become a party and the

13  consent to be "filed in the court in which [the] action is brought." 29 U.S.C. § 216(b).

14      Finally, although it might appear from the preceding description that the FLSA is a

15  comprehensive remedial statute, Congress did not intend that it supply the exclusive standards

16  used to regulate wages and hours. Section 218(a), often referred to as the FLSA's "savings

17  clause," states that

18
19      [n]o provision of this chapter . . . shall excuse noncompliance with any . . . State
        law or municipal ordinance establishing a minimum wage higher than the
        minimum wage established under this chapter or a maximum workweek lower
20      than the maximum workweek established under this chapter. . . . No provision of
        this chapter shall justify any employer in reducing a wage . . . which is in excess
21      of the applicable minimum wage under this chapter, or justify any employer in
        increasing hours of employment . . . which are shorter than the maximum hours
22      applicable under this chapter.

23  29 U.S.C. § 218(a). This clause has been relied upon by those courts which conclude that the

24  FLSA does not preempt state law in a particular case. See, e.g., Williamson, 208 F.3d at 1150

25  (footnote omitted); Bureerong v. Uvawas, 922 F. Supp. 1450, 1477 & n.30 (C.D. Cal. 1996)

26  (citations omitted).

27

28                                      4

1  III.  Unfair Business Practices Act

2        The UPA prohibits "unfair competition," which is defined to include "any unlawful,

3  unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading

4  advertising."  Cal. Bus. & Prof. Code § 17200. Section 17200, thus defined, includes "anything

5  that can properly be called a business practice and that at the same time is forbidden by law."

6  "[A]n action based on . . . section 17200 to redress an unlawful business practice 'borrows'

7  violations of other laws and treats these violations, when committed pursuant to business

8  activity, as unlawful practices independently actionable under section 17200 et seq. and subject

9  to the distinct remedies provided thereunder."  Farmers Ins. Exch. v Superior Court, 2 Cal. 4th

10  377, 383 (1992) (citations and quotations omitted).[1]

11        The remedies potentially available under the UPA are almost as broad as the definitional

12  provisions. Although "damages" as such are not available, the California courts have held that

13  "restitution," broadly defined to include overtime wages that have been earned but not paid, may

14  be awarded. See, e.g., Cortez v. Purolator Air Filtration Products Co., 23 Cal. 4th 163, 177-78

15  (2000) (citations and quotations omitted). Moreover, the persons to whom relief is awarded need

16  not have been either parties or class members: section 17203 (permitting "such orders as may be

17  necessary to . . . restore to any person in interest any money or property . . . acquired by means of

18  ───────────────────────────────

19        [1] Although a UPA violation is thus generally based on the violation of a "predicate"
   statute, it need not be. While the language quoted in text above is universally accepted as a
20  correct statement of the law, other California courts have stated that

21        the law does more than just borrow. The statutory language referring to 'any
       unlawful, unfair or fraudulent' practice . . . makes clear that a practice may be
22        deemed unfair even if not specifically proscribed by some other law.

23  Roskind v. Morgan Stanley Dean Witter & Co., 80 Cal. App. 4th 345, 351 (2000) (citations and
   quotations omitted).
24
       Because Business and Professions Code section 17200 is written in the
25        disjunctive, it establishes three varieties of unfair competition—acts or practices
       which are unlawful, or unfair, or fraudulent.  In other words, a practice is
26        prohibited as 'unfair' or 'deceptive' even if not 'unlawful' and vice versa."

27  Id. (citations and quotations omitted).

28                                          5

1   such unfair competition") allows "some form of class-wide relief . . . without class certification.

2   Reese v. Wal-Mart Stores, Inc., 73 Cal. App. 4th 1225, 1240-41 (1999).  The court may "grant

3   equitable relief, including restitution in favor of absent persons, without certifying a class

4   action."  Id. at 1240 (quotation omitted).

5        In contrast to the FLSA, the UPA has a four-year statute of limitations, see Business and

6   Professions Code section 17208, and while a UPA claim normally "borrows" from an underlying

7   statute, it does not borrow the underlying statute's limitations period.  See Cortez, 23 Cal. 4th at

8   178 (although Labor Code has shorter limitation period, a UPA cause of action for unpaid

9   overtime based on Labor Code violation is subject to UPA's four-year limitation period).

10       Finally, and also in contrast to the FLSA, an action for injunctive relief under the UPA

11  need not be initiated by a public official such as the Secretary of Labor or the Wage and Hour

12  Administrator, but may be prosecuted by an Attorney General, district attorney, county counsel

13  or city attorney, city prosecutor, "or by any person acting for the interests of itself, its members

14  or the general public."  Cal. Bus. & Prof. Code § 17204 (emphasis added).

15

16                                    **DISCUSSION**

17       This memorandum opinion and order will first discuss the contentions of the parties, and

18  why in the court's view they do not adequately answer the fundamental question—whether the

19  UPA as Plaintiffs hope to utilize it in this case is preempted by the FLSA.  Second, it will

20  consider the role of the FLSA's "savings clause," and whether it provides an answer to the

21  question as framed above.  Third, this order will discuss preemption analysis in general, and

22  conclude that the preemption doctrine as announced by the relevant caselaw does not compel

23  finding the UPA preempted here.  Finally, this order will consider the rulings of other courts to

24  address similar preemption issues—although not identical issues, since as will be explained

25  below there is no case cited by the parties, nor has the court's research revealed any, which is

26  dispositive of the present case—and whether any of them helps to answer to the preemption

27

28                                        6

1  question presented here.

2      If the FLSA preempts Plaintiffs' claims under the UPA, the UPA's enhanced remedies
3  (such as the longer statute of limitations, different rules governing injunctive relief, and a
4  potentially easier class certification process) will be precluded under the Supremacy Clause of
5  the Constitution, U.S. Const. art. VI, cl. 2, because they will all constitute "Thing[s] in the . . .
6  Laws of [a] State . . . Contrary" to a federal law. Id. If it does not, because Congress did not
7  intend for the FLSA to have any preemptive effect, the enhanced remedies potentially available
8  under the UPA will not conflict with any congressional purpose. As such, it will do no harm to
9  either the intent of Congress or to the supremacy of federal law to permit Plaintiffs to pursue the
10  superior remedies that the UPA may provide them.

11      The court will conclude based on the current posture of the case that the FLSA does not
12  preempt the UPA according to the preemption analysis approved by the Ninth Circuit.

13  I. The Parties' Contentions

14      A. CWT

15      In moving for partial judgment on the pleadings, CWT contends that "Plaintiffs' attempt
16  to pursue the alleged failure to pay overtime . . . as [a UPA claim] contravenes the specific
17  remedial procedures that Congress has declared to be the exclusive means for remedying
18  violations of the FLSA." (Mot. at 3:8-11.) More specifically, CWT makes the following
19  arguments.

20      First, CWT points to the two-year statute of limitations contained in the FLSA (three in
21  the case of willful violations) and the longer four-year limitations period found in the UPA, and
22  argues that "Plaintiffs cannot be allowed to disguise their FLSA overtime claim as an unfair
23  competition claim in an attempt to recover overtime pay beyond the period for which they can
24  seek a remedy under the FLSA." (Mot. at 14:3-6.) CWT cites congressional findings that
25  accompanied the passage of the Portal-to-Portal Act in 1947 (amending the FLSA as originally
26  enacted in 1938), which state that

27

28                                  7

1
2
3

> The Congress further finds that the varying and extended periods of time for which, under the laws of the several States, potential and retroactive liability may be imposed upon employers, have given and will give rise to great difficulties in the sound and orderly conduct of business and industry.

4   29 U.S.C. § 251.[2] In addition to the foregoing, CWT quotes portions of the legislative history

5   relating to the passage of the 1947 amendments, and cites various cases which stand for the

6   general proposition that the 1947 amendments were designed to reduce what was seen at that

7   time as an excessive number of lawsuits with correspondingly great cumulative liability for

8   employers. (See Mot. at 6:17-20 (citations omitted).)

9       The court finds CWT's statute of limitations argument essentially unpersuasive, for

10  several reasons. First, CWT's argument is fundamentally based on the assumption that the UPA

11  is preempted, and therefore its longer statute of limitation is in fact contrary to federal law.

12  However, if the FLSA does not preempt the UPA, this argument fails. Strictly speaking, the

13  authorities cited by CWT hold that a plaintiff is limited to two years' worth of recovery on a

14  claim for violation of the FLSA, not that a supplemental state law claim would be subject to a

15  similar limitations period. Stated differently, CWT's argument overlooks the possibility that a

16  plaintiff might bring a state law claim, supplemental to a claim under the FLSA but based on the

17  same essential facts,[3] for which a longer statute of limitations applies. This is arguably what

18  Plaintiffs have attempted to do here: the UPA claim is pled in the complaint as a separate claim

19  for relief, and the two claims (state and federal) have different statutory sources for the remedies

20  they provide. Second, and on a related point, CWT's argument appears to ignore the possibility

21  that a plaintiff might bring a state law claim that is specifically permitted by the FLSA under the

22

---

23      [2] This statement was passed into law at the same time the statute of limitations was
24  enacted. See Historical and Statutory Notes, 29 U.S.C. § 255(a). Prior to this date, the statute
    limitations for an FLSA claim was the same as the state in which it was brought. See, e.g.,
    Barrett v. National Malleable & Steel Castings Co., 68 F. Supp. 410, 417 (W.D. Penn. 1946)
25  (citations omitted).

26      [3] This would ordinarily be the case, since under 28 U.S.C. section 1367 a supplemental
    claim must be "so related" to the original claim as to form part of the "same case or controversy."
27  28 U.S.C. § 1367(a).

28                                              8

1   "savings clause" provision allowing the states to impose a higher (but not a lower) minimum
2   wage than the FLSA, and a shorter (but not longer) workweek than the FLSA. Because the
3   FLSA does not "excuse noncompliance" with any such law, and because under the terms of the
4   "savings clause" it would not be preempted, it seems reasonable to conclude that an action to
5   enforce such a law would apply the limitations period applicable to that claim.[4] Third, and most
6   important, even if the "savings clause" does not operate to "save" a UPA claim in this context
7   because by its terms it only applies to state laws which impose a higher minimum wage or
8   shorter maximum workweek (and the UPA does neither), the "savings clause" is not irrelevant
9   here. To the contrary, it is highly pertinent to a proper analysis of the preemption issue, which
10  will be discussed below. Finally, CWT cites no case holding that the FLSA preempts a UPA
11  claim due to the differences in the statutes of limitations discussed above, or for any other reason.
12  Indeed, there is one district court case from within the Ninth Circuit which holds the opposite,
13  Bureerong, 922 F. Supp. at 1477 & n.30 (C.D. Cal. 1996) (citations omitted), although on
14  admittedly somewhat different facts.

15      CWT's second main argument is that the FLSA is incompatible with a claim under the
16  UPA because the UPA allows class actions without any special procedural requirements (such
17  opting in) and even permits classwide or quasi-classwide relief in the absence of a certified class,
18  while the FLSA requires each plaintiff to personally consent in writing to be a member of the
19  class. In support of this argument CWT again cites provisions of the Portal-to-Portal Act's
20  legislative history, as well as cases stating that the class action provisions of the FLSA are in
21  conflict with those of Federal Rule of Civil Procedure 23 (governing class actions in federal
22  court). Among others, CWT cites Kinney Shoe Corporation v. Vorhes, 564 F.2d 859, 862 (9th

23

24      [4] In this vein, it is well worth noting that although the congressional findings mentioned
    above speak of the undesirability of varying state statutes of limitations for claims under the
25  FLSA, the statute itself specifically permits at least some kinds of state wage and hour laws
    under its provisions. See 29 U.S.C. § 255(a). This fact detracts from the persuasiveness of
26  CWT's claim that Congress intended to abolish all state statutes of limitations. If Congress had
    intended to abrogate state statutes of limitations as to state claims, it probably would not have
27  included the "savings clause" as written.

28                                          9

1  Cir. 1977) for the proposition that class actions under the FLSA are incompatible with Rule 23,
2  which would presumably apply in a federal court class action brought under the UPA.

3      As with the statute of limitations argument, above, this argument appears to be based on
4  the assumption that the UPA claim is preempted, since if it is not preempted the more permissive
5  treatment of class actions under the UPA, and even the provision allowing the court to order
6  relief in favor of "any person in interest" without the certification of a class, would not conflict
7  with any congressionally mandated exclusive arrangement.[5]  One factor to consider in deciding if
8  a state law is preempted by a federal law is whether it is "impossible to comply with both state
9  and federal requirements," or as some cases put it, whether it is "physically impossible" to
10  comply with both. Based on the FLSA and UPA claims as alleged in the complaint, it would .
11  appear impossible to simultaneously comply with the standards imposed by both statutes. For
12  example, as explained above the UPA "borrows" violations of other statutes—in this case, the
13  FLSA—and treats them as UPA violations. The only practice alleged in the complaint to be an
14  "unfair and unlawful business practice" is the claimed withholding of overtime wages in
15  violation of the FLSA. Because in this case at least, the UPA borrows its substantive standards
16  from the FLSA, compliance with the FLSA would in essence constitute compliance with the
17  UPA. It is therefore not "impossible" to comply with both the FLSA and the UPA. Likewise,
18  the FLSA imposes certain requirements on class membership which are more restrictive than the
19  UPA, and both more and less restrictive than those found in Rule 23.[6]  However, this does not

21      [5] None of the parties has argued, and the court therefore will not consider, whether the
provision of the UPA permitting relief to be awarded on behalf of nonparties is procedural ra^h
22  than substantive, and also conflicts with Rule 23 of the Federal Rules of Civil Procedure—an.
should therefore be disregarded by this court in favor of Rule 23 under the doctrine of Erie
23  Railroad Co. v. Tompkins, 304 U.S. 64 (1938).

24      [6] Rule 23 contains the requirements commonly referred to as "numerosity,"
"commonality," "typicality," and "adequacy of representation"—none of which are specifically
25  mentioned in section 216(b). In this sense Rule 23 is more restrictive. On the other hand, Rule
23 contains no opt-in requirement, and in this sense section 216(b) is arguably more restrictive.
26  Section 216(b) also provides that the right to a class action terminates upon the Secretary's filing
of an injunctive relief action under section 217, a provision with no counterpart in the UPA or
27  Rule 23.

28                                         10

1  mean that the requirements of both cannot be complied with. Without listing all the alternatives,
2  it might well be at least possible to permit multiple classes to be certified or to allow different
3  relief for different segments of each class.[7] Moreover, Kinney Shoe, the Ninth Circuit case tha
4  CWT relies on above, has been since overruled by the Supreme Court to the extent that it held
5  that the district court may not participate in or supervise the mailing of class notices. See
6  Hoffmann-La Roche Inc. v. Sperling, 493 U.S. 165, 167 & n.1. This ruling makes the differences
7  between Rule 23 and UPA class actions, on the one hand, and FLSA class actions on the other,
8  less irreconcilable. See id. at 169 (district court may play role in the terms and conditions of
9  communications from named plaintiffs to members of potential class). Finally, as already noted,
10  the issue of class certification in this case is the subject of a future motion. Plaintiffs have been
11  ordered by Magistrate Judge O'Neill to move for class certification by December 15, 2000, but
12  have not yet done so.[8] To the extent that CWT is seeking a ruling that members of a potential
13  class cannot recover in this case, this determination should await the court's consideration of the
14  motion for class certification.

15      Third, CWT points to the different rules for injunctive relief, namely those permitting
16  only the Secretary to seek an injunction in an FLSA case as opposed to those allowing an
17  injunction to be ordered at the request of "any person" in a UPA action, claiming that Plaintiffs'
18  UPA claim "impermissibly seeks injunctive relief to enforce the FLSA." (Mot. at 15:12-13.) By

19

20
21      [7] Federal courts are no strangers to UPA class actions, and at least two reported district
    court cases deal specifically with the requirements for certification of classes of section 17200
    claimants. See, e.g., Irwin v. Macsott, 96 F. Supp. 2d 968, 971-83 (N.D. Cal. 1999); Hickey v.
22  Great Western Mortgage Corp., 158 F.R.D. 603, 607-14 (N.D. Ill. 1994).
        Assuming they decide to move for class certification, Plaintiffs should consider how to
23  structure their class or classes so as to comply with both the procedural requirements of the
    FLSA for their FLSA claim, and of Rule 23 for their UPA claim, and make their class proposals
24  accordingly.

25      [8] At the hearing on the present motion the court asked Plaintiffs' counsel what was the
    status of the class action certification motion, which was at that time already approximately three
26  days late in violation of Magistrate Judge O'Neill's order. Plaintiff's counsel responded that he
    had telephoned CWT's counsel and asked for "professional courtesy" in the form of an extension
27  of the deadline for filing the motion, but that CWT's counsel had not returned the call.

28                                          11

1   this CWT appears to contend that Plaintiffs are seeking an injunction to enforce the UPA, which

2   they in turn would like to use to enforce the FLSA, but that using injunctive relief to enforce the

3   FLSA, unless the injunction is sought by the Secretary, would violate the FLSA.

4        This argument is persuasive, but only if it is first determined that the UPA is preempted

5   by the FLSA; if Congress did not intend to preempt the states with respect to state wage and hour

6   laws, and if it may reasonably be inferred that Congress therefore also did not intend to preclude

7   all state law remedies available thereunder, the enhanced injunctive remedies under the UPA

8   would not seem to conflict with any purpose of Congress. (This becomes more apparent when

9   one considers the analysis employed by the Ninth Circuit in preemption cases, discussed below,

10  and the fundamental purpose of the FLSA.) The more extensive remedies would supplement, at

11  the option of individual states, rather than supplant the FLSA. Again, CWT has cited no case

12  which holds that the UPA is preempted here.

13       Fourth, citing state regulations for the proposition that California exempts "all drivers of

14  tractor-trailers" from overtime pay, CWT states for the first time in its reply that although

15  "California has adopted through its Wage Orders a more generous minimum wage and a more

16  stringent overtime obligation" than exists under the FLSA, it has also enacted a "broad

17  exemption for truck drivers such as those at issue here, and Plaintiffs have well advisedly

18  dismissed their state-law based overtime claims." (Mot. at 4:28-5:3 (citation omitted).) This

19  may be an argument that because overtime recovery is unavailable under one California statute, it

20  should also be barred if sought under the guise of a UPA claim. This argument, if that is CWT's

21  argument, is raised for this first time in CWT's reply, and the court will not consider it at this

22  time. See Kotev v. First Colony Life Ins. Co., 927 F. Supp. 1316, 1323 (C.D. Cal. 1996)

23  (citation omitted).

24       B. Plaintiffs

25       In opposing CWT's motion, Plaintiffs makes the following contentions.

26       First, Plaintiffs contend that in general a claim for unpaid overtime wages may be brought

27

28                                         12

1   under section 17200 of the UPA pursuant to the <u>Cortez</u> case, cited above. <u>See</u> 23 Cal. 4th 163,

2   177-78. This statement is correct as a matter of California law, but it does not aide in the

3   resolution of the preemption issue.

4       Second, Plaintiffs state that both class actions and quasi-classwide relief are permitted

5   under the UPA, and that "any law, state or federal, may serve as a predicate for an unlawful

6   business practice proscribed by B & C § 17200." (Opp. at 3:5-17.) Again, the court agrees that

7   in general both class actions and the granting of relief to nonparties where represented by parties

8   are proper under the UPA. <u>See, e.g., Reese,</u> 73 Cal. App. 4th at 1240-41. The court further

9   agrees that in general the violation of a federal law may serve as a predicate for a UPA claim,

10  <u>see, e.g., Citizens for a Better Environment—California v. Union Oil</u>, 966 F. Supp. 934, 938

11  (N.D. Cal. 1997) (federal Clean Water Act as predicate for UPA claim) (citations omitted);

12  <u>Ballard v. Equifax Check Serv., Inc.</u>, 27 F. Supp. 2d 1201, 1207 (E.D. Cal. 1998) (federal Fair

13  Debt Collection Practices Act claim as predicate for UPA claim) (citations omitted), but only to

14  the extent that the federal law which forms the basis for the UPA claim does not preempt the

15  UPA. <u>See, e.g., Roskind v. Morgan Stanley Dean Witter & Co.</u>, 80 Cal. App. 4th 345, 351

16  (2000) (federal securities law violation was basis for UPA claim; UPA "could potentially provide

17  a remedy for the conduct in issue here, <u>if [it] is not preempted by federal law</u> in this context")

18  (emphasis added; citations and quotations omitted); <u>People ex rel. Dep't of Transp. v. Naegle</u>

19  <u>Outdoor Advertising Co, Inc.</u>, 38 Cal.3d 509, 523 (1985) (federal agency, rather than state

20  agency, was "appropriate agency" to enforce violation of federal law, if any, where claimed

21  violation occurred on Indian lands) (citations and quotations omitted). Thus, once again, the

22  outcome of this motion depends upon the preemption issue.

23      Finally, apparently in acknowledgment that the fundamental issue is preemption and not

24  whether their UPA claim would otherwise be permitted as a matter of statutory construction,

25  Plaintiffs contend that the UPA is not preempted by the FLSA in this case. They argue, first, that

26  <u>Bureerong</u>, cited above, has already decided this issue. Second, citing admiralty cases from t'

27

28                                      13

1   Ninth Circuit and the California Supreme Court, they assert that the FLSA has not been given

2   great preemptive effect by either state or federal courts interpreting it.  Finally, they assert that

3   the "savings clause," quoted above, "does more than just permit states to create more generous

4   standards for overtime pay and/or work-week hours. [It] also permits states to enforce more

5   generous remedies, e.g., a longer statute of limitations."  (Reply at 7:8-13.)

6          Plaintiffs are correct in saying that the fundamental question to be decided here, at least

7   as the case now stands, is whether the FLSA preempts their claims under the UPA.  However,

8   their papers contain no detailed discussion of the preemption doctrine and how it might apply

9   here, nor do they offer any reason why Congress may have intended to allow more extensive

10  state law remedies such as those that exist under the UPA, independently of the higher minimum

11  wage or lower maximum workweek that states are undoubtedly free to enact pursuant to the

12  "savings clause" (see below).

13         The court will therefore undertake a more comprehensive preemption analysis than

14  performed by the parties, following a brief discussion of the savings clause in the next section.

15  II.  The Role of the "Savings Clause"

16         Before discussing the question of preemption per se, the role of the "savings clause"

17  should be addressed.  See 29 U.S.C. § 218(a).

18         The language of the "savings clause" is set forth above.  It provides that no provision of

19  the FLSA "shall excuse noncompliance with any Federal or State law or municipal ordinance

20  establishing a minimum wage higher than the minimum wage established under [the FLSA] or a

21  maximum workweek lower than the maximum workweek established under [the FLSA]."

22  Plaintiffs contend that the "savings clause" "permits California to provide more generous

23  overtime remedies through B & P § 17200, even when the underlying predicate for the B & P

24  violation is the FLSA."  (Opp. at 7:23-8:2.)  While this argument is appealing, in the context of

25  this case its conclusion may not be warranted.

26         Section 218(a) permits states to, in essence, set higher substantive standards than the

27

28                                              14

1  federal government regarding wages and hours. Thus, if Plaintiffs were pursuing claims for state
2  labor law violations such as the first claim for relief (now dismissed) for unpaid overtime
3  compensation under Labor Code section 1194, their UPA claims would probably also not be
4  preempted. CWT's counsel conceded as much at the hearing on this motion. However, the UPA
5  is not being used here as a statute that requires a "minimum wage higher than" under the FLSA,
6  or a "maximum workweek lower than" under the FLSA. It is being used solely to extend the
7  statute of limitations, and for Plaintiffs to avail themselves of more favorable remedies. The
8  "minimum wage" and "maximum workweek" according to Plaintiffs' UPA claim is identical to
9  that under the FLSA; the very wrong that Plaintiffs complain of under the UPA is the FLSA
10 violation. Therefore, the literal language of the "savings clause" does not apply to Plaintiffs'
11 claim under the UPA.[9]

12      Even if the "savings clause" does not by itself "save" section 17200 from preemption,
13 however, this does not make it irrelevant to the preemption analysis. As will be discussed below,
14 there are three types of preemption that may be found in a given case, and the Ninth Circuit has
15 already held that the existence of the "savings clause" requires the conclusion that one type of
16 preemption, "field preemption," does not exist. See Williamson, 208 F.2d at 1151 (citation
17 omitted).

18

19      [9] The case that Plaintiffs cite for the proposition that the "savings clause" also permits
   "more generous remedies" such as a longer statute of limitations is a 1998 district court case
20 from the Eastern District of Louisiana. Cranford v. City of Slidell, 25 F. Supp. 2d 727, 729 (E.D.
   La. 1988). The court in Cranford ruled in part that the longer statute of limitations under
21 Louisiana state law applied to the police officer plaintiffs, but did so only after concluding that
   the state law, which specifically provided for more favorable overtime pay and hours than the
22 FLSA (the FLSA has a partial overtime exemption for police and firefighters), applied because
   of the "savings clause." See id. at 729 (citations omitted). In other words, even Cranford
23 involved a bona fide shorter workweek rule under state law, in contrast to the UPA.
      Plaintiffs also rely on Bureerong, cited above, for the proposition that the FLSA does not
24 preempt the UPA and in fact may supply the substantive provision of law which forms the basis
   for a UPA claim. While Bureerong undoubtedly supports Plaintiffs' position, it may be
25 somewhat factually distinguishable from the present case, as will be discussed in text in greater
   detail below.
26      Plaintiffs have not cited any other case, nor is the court aware of any, which holds that the
   "savings clause" makes a UPA claim under the FLSA, where the harm alleged is a violation of
27 the FLSA, non-preempted.

28                                      15

1    III.  Preemption Doctrine in General

2         The preemption doctrine has its roots in the Supremacy Clause of the Constitution, which

3    provides that the Constitution, laws, and treaties of the United States are the "supreme Law of the

4    Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

5    U.S. Const. art. VI, cl. 2.

6         There are three types of preemption that may be found in a given case: (1) "express

7    preemption"; (2) "field preemption"; and (3) "conflict preemption." Williamson, 208 F.3d at

8    1149-50 (citations and quotations omitted).  Although described as separate categories, they are

9    not "rigidly distinct."  Industrial Truck Assoc., Inc. v. Henry, 125 F.3d 1305, 1309 (citation and

10   quotation omitted).  In each, the ultimate question is the intent of Congress, which may be either

11   "express" or "implied through the structure and purpose" of a federal law.  Williamson, 208 F.3d

12   at 1150 (citations omitted).  Here, CWT contends it is the "structure and purpose of the FLSA, as

13   expressed in its clearly defined remedial and procedural schemes, which compels preemption."

14   (Mot. at 16:2-4.)

15        A.  "Express Preemption"

16        "Express preemption" occurs "where Congress explicitly defines the extent to which its

17   enactments preempt state law," Williamson, 208 F.3d at 1149 (quotation omitted); in other

18   words, where Congress passes a law explicitly stating the extent to which state laws are

19   preempted by it.  In its papers, CWT does not contend that the UPA is expressly preempted by

20   the FLSA.  Such a claim would be unsupportable in the absence of any explicit preemption

21   language in the federal statute, and in the face of a "savings clause" which states a directly

22   contrary intent.[10]

23        The court concludes that express preemption does not apply in this case.

24   _____

25        [10] At the hearing on the present motion CWT's counsel, in response to a question from
     the court, stated that the UPA was expressly preempted even though the word "preempt" is not
26   used in the statute.  The court rejects this contention.  By definition, preemption cannot be
     "express" unless it is expressed in the language of the statute; therefore, "preempt," or some
27   synonymous word, must be used in order for express preemption to apply.

28                                                    16

1    B. "Field Preemption"

2    "Field preemption" occurs "where state law attempts to regulate conduct in a field that

3    Congress intended the federal law exclusively to occupy." Id. (quotation omitted). Field

4    preemption is a "potent" species of preemption, because under field preemption, any state

5    regulation is preempted even if it does not actually conflict with the federal law. See Industrial

6    Truck, 125 F.3d at 1309 (citations omitted).

7    CWT does not specifically argue that the FLSA preempts the field in this case, although

8    its "structure and purpose" argument could possibly be construed as such a contention. If this is

9    CWT's argument, it must be rejected. The Ninth Circuit has already ruled in Williams, a case in

10   which no FLSA claim was pled but the defendant argued that the FLSA nevertheless preempted

11   the plaintiffs' state common law fraud claims, that "[a]lthough this lawsuit does not invoke

12   California's wage and hour laws, the FLSA's 'savings clause' is evidence that Congress did not

13   intend to preempt the entire field." 208 F.3d at 1151.

14       Under field preemption, it does not matter whether the common law claim
         conflicts with the statute. . . . The [state] common law claim is preempted
15       because the statute provides exclusive remedies. While the FLSA may be a
         comprehensive remedy, as the district court argues, the 'savings clause' indicates
16       that it does not provide an exclusive remedy.

17   Id. (emphasis added, citation omitted).

18   Here, as in Williams, this lawsuit does not directly invoke the wage and hour laws of

19   California. These claims were already dismissed by stipulation of the parties. However, just as

20   in Williams, the "savings clause" suggests that state laws in general do not "regulate conduct in a

21   field that Congress intended the federal law exclusively to occupy" because Congress explicitly

22   permitted at least some state regulation of the "field."

23   The court concludes that "field preemption" does not apply here.

24   C. "Conflict Preemption"

25   "Conflict preemption" may be either of two types: "[1] where it is impossible to comply

26   with both state and federal requirements, or [2] where state law stands as an obstacle to the

27

28                                              17

1  accomplishment and execution of the full purpose and objectives of Congress." Industrial Truck,

2  125 F.3d at 1309 (citation omitted).

3        As already discussed above, it would not be impossible to comply with both the FLSA

4  and the UPA in this case. To the contrary, Plaintiffs' UPA claim "borrows" from the alleged

5  FLSA violation, and compliance with the substantive requirements of the FLSA would therefo

6  in essence amount to compliance with the UPA. Thus, the first type of conflict

7  preemption—impossibility of compliance with both state and federal standards—does not apply.[11]

8        Whether state law "stands as an obstacle to the accomplishment" of congressional

9  objectives is a more difficult question. To the extent that by passing the statute of limitations

10  found in section § 255(a), Congress intended to reduce the "varying and extended periods of time

11  for which, under the laws of the several States, potential retroactive liability may be imposed

12  upon employers," 29 U.S.C. section 251, imposition of the UPA's four-year limitations period

13  would arguably be an obstacle. However, the obstacle imposed would appear relatively

14  minor—in some cases the difference between three years and four, and in others between two and

15  four. Moreover, as also stated above, the FLSA's limitations period by its terms only applies to

16  actions "under the Fair Labor Standards Act of 1938." 29 U.S.C. § 255. It does not purport to

17  apply to state law wage claims, whether brought in federal court as supplemental claims or file

18  separately in state court. Congress was presumably free at any time to enact a statutory provision

19  eliminating the savings clause or stating that the FLSA was intended to have preemptive force,

20  but it has not yet done so.[12] On the other hand, as the Ninth Circuit specifically found in

21

22        [11] Some cases state this factor in the analysis as asking whether compliance with both the
state and federal laws is "physically impossible." See, e.g., Radici v. Associated Ins. Cos., 217
23  F.3d 737, 741 (citations omitted). This slight reformulation of the standard would make little
difference, if any, in this case.

24

25        [12] CWT quotes statements from the legislative history of the FLSA to the effect that the
lack of uniformity in FLSA actions pursuant to the various states' statutes of limitations under
caselaw prior to the Portal-to-Portal Act amendments to the FLSA was inefficient and harmful to
26  commerce, and a national standard more desirable. However, the relevance of these statements is
undercut to some extent by other statements from the legislative history, especially from the
27  House Judiciary Committee, stating that the statutes of limitations for wage claims under state

28                                          18

1  Williamson, "the principal purpose of the FLSA is to protect all covered workers from
2  substandard wages and oppressive working hours." 208 F.3d at 1150 (quotation and citations
3  omitted; emphasis added). "In contrast to the Labor Management Relations Act, which was
4  designed to minimize industrial strife and to improve working conditions by encouraging
5  employees to promote their interests collectively, the FLSA was designed to give specific
6  minimum protections to individual workers . . . ." Id. (citations and quotations omitted). If the
7  goal of the FLSA is generally to protect workers and their right to minimum wages and overtime,
8  no real threat to accomplishment of that goal is posed by the UPA. This seems particularly true
9  in this case, where the result will be not to raise the minimum wage or shorten the workweek but
10  (assuming that the FLSA does indeed supply the correct standard) merely to look back longer
11  time, and thereby consider a greater number of violations of the federal law.

12      Neither of the first two types of preemption—"express preemption" and "conflict
13  preemption"—applies in this case. In light of the Ninth Circuit's statement that the FLSA's
14  "principal purpose" is to "protect all covered workers from substandard wages and oppressive
15  working hours," combined with the fact that the UPA if applied here will at most permit
16  Plaintiffs to recover for a greater number of violations of federal law, the UPA appears to pose
17  no obstacle to the objectives of the FLSA, and "conflict preemption" is therefore inapplicable.

18      Furthermore, as discussed below, there is no caselaw which precludes Plaintiffs' UPA
19  claim, and at least some support for allowing it. The court concludes that the UPA is not

20

21
law were unaltered by the introduction of a statute of limitations in the FLSA. See Appendix F
22  TEXT OF HOUSE JUDICIARY COMMITTEE'S REPORT ON H.R. 2157, reprinted in
BUREAU OF NATIONAL AFFAIRS, THE PORTAL-TO-PORTAL ACT OF 1947 at D-1, i.
23  (1947). In particular, the House Committee's report states that the "limitation herein provided
applies only to the statutory actions or proceedings set forth in the acts enumerated in [the
24  amendments]. Actions under the common law, or under State statutes for recovery of wages are
not affected." Id. (emphasis added).
25      Based on this statement and others like it, it seems reasonable to conclude that Congress,
while intending to supply a new statute of limitations as to FLSA claims, wanted to do no more,
26  and that it certainly did not wish to impose a new statute of limitations on state law claims
(whether supplemental to federal claims or brought independently in state court) or to preempt
27  the FLSA.

28                           19

1  preempted by the FLSA in this case, and Plaintiffs may proceed with their UPA claim.

2  IV.  Caselaw

3      CWT cites no case which holds that a UPA claim is barred by the FLSA.  Plaintiff cit∴

4  one case, Burerong, which holds the opposite, but on fairly different facts and only after noting

5  that the UPA claim was premised not only on an alleged FLSA violation but also on "violations

6  of the California Labor Code, and violations of various regulations."  922 F. Supp. at 1477.

7  CWT relies on other cases, primarily (as relevant here) Tombrello v. USX Corp., 763 F. Supp.

8  541, 545 (N.D. Ala. 1991) and Kim v. Regents of the University of California, 80 Cal. App. 4th

9  160, 167-68 (2000), in support of its claim that the UPA is preempted.

10     The court will now briefly consider these cases, as well as a recent Ninth Circuit case not

11  mentioned by the parties (Williamson, discussed above), and whether any of them alters the

12  court's conclusion that the FLSA does not preempt the UPA.[13]

13

14  ───────────────

   [13] In addition to the cases discussed above in text, there are certain others, either cited by
   the parties or located by the court, which are arguably relevant to this motion but in general not
15  too helpful.  Many are from other jurisdictions, and none involved the potential conflict betwee
   the UPA and the FLSA.  See Biggs v. Wilson, 1 F.3d 1537, 1543 (9th Cir. 1993) ("we . . . find
16  that the application of the FLSA is not preempted by the Tenth Amendment"); Pacific Merch.
   Shipping Assn'n v. Aubrey, 918 F.2d 1409, 1426-26 (9th Cir. 1990) (FLSA does not preempt
17  California wage laws for seamen; California wage laws do not conflict with purpose of FLSA,
   and FLSA was not intended to create "absolute uniformity in minimum wage and overtime
18  standards"); Irwin v. Mascott, 96 F. Supp. 2d 968, 973-74 (N.D. Cal. 1999) (Fair Debt Collection
   Practices Act does not preempt UPA claim); Schwartz v. Upper Deck Co., 967 F. Supp. 405,
19  415-16 (S.D. Cal. 1997) (RICO and state gambling laws a predicate for UPA claim), vacated,
   104 F. Supp. 2d 1228, 1231-32; Bowe v. SMC Elec. Prods., Inc., 916 F. Supp. 1066, 1072 (D.
20  Colo. 1996) (overtime pay in excess of two-year statute of limitations under FLSA permitted;
   claim with longer limitations period "would supplement rather than abridge [plaintiff's] rights
21  under the FLSA"); Xerox Corp. v. Apple Computer, Inc., 734 F. Supp. 1542, 1550 (N.D. Cal.
   1990) (federal Copyright Act preempts UPA claim; Copyright Act contains provision explicitly
22  stating that state law is preempted); Bloom v. Universal City Studios, Inc., 734 F. Supp. 1553,
   1560-61 (C.D. Cal. 1990) (federal Labor Management Relations Act preempts section 17200
23  claim; LMRA preempts state law under Supreme Court precedent); Utley v. Varian Assocs., Inc.,
   625 F. Supp. 104, 106-07 (N.D. Cal. 1985) (Executive Order of President Johnson preempts state
24  law remedies under UPA), rev'd on other grounds, 811 F.2d 1279, 1281 (9th Cir. 1987); Davis v.
   Jobs for Progress, Inc., 427 F. Supp. 479, 483 (D. Ariz. 1976) (FLSA did not preempt claim for
25  treble damages arising under state law; "[n]either the Civil Rights Act nor the FLSA have
   preempted state regulation nor the imposition of state remedies for violations arising out of the
26  same circumstances); Lerwill v. Inflight Motion Pictures, Inc., 343 F. Supp. 1027, 1028-29 (N.D.
   Cal. 1972) (FLSA provides exclusive remedies for FLSA violations), called into doubt by
27  Williamson, 208 F.3d at 1153 ("Lerwill is a dubious authority"); Tidewater Marine Western, ∘ ∴

28                                      20

1    Bureerong provides some support for Plaintiffs' position. It clearly states that "the FLSA

2    does not preempt Plaintiffs' claim under Cal. Bus. & Prof. Code § 17200." 922 F. Supp. at 1477

3    n.30 (citations omitted). However, as CWT has pointed out, Bureerong is also different from the

4    present case in some respects.

5    Bureerong was "one of several civil and criminal proceedings" based on allegations that

6    plaintiffs, immigrants from Thailand, were falsely imprisoned and forced to work in a "system of

7    involuntary servitude." The defendants were charged with "peonage and involuntary servitude,

8    various labor violations, violations of [RICO], violation of 42 U.S.C. § 1985(3), fraud,

9    misrepresentation, intentional infliction of emotional distress, assault, and false imprisonment.

10    Id. at 1458. Other defendants, not alleged to be directly involved in the operation of the facility

11    at which the work was performed, were added by an amended complaint on allegations that they

12    failed to pay overtime in violation of the FLSA and certain state wage laws; employed plaintiffs

13    in "industrial homework" in violation of other federal and state statutes and regulations;

14    contracted with entities not registered with the state Labor Commissioner in violation of certain

15    state laws and regulations; engaged in unfair business practices in violation of the UPA;

16    improperly deducted wages for transportation, board, and outstanding debt in violation of the

17    FLSA and a provision of the California Labor Code; and committed negligence per se, negligent

18    supervision, and negligent hiring. See id. at 1459. Among the arguments the district court

19    confronted in ruling on various defense motions was apparently a contention that plaintiffs' claim

20    under the UPA should be dismissed, either because defendants had not engaged in unfair

21    business practices, the FLSA preempted this claim, or both. See id. at 1477. Rejecting these

22    contentions, the district court noted, first, that plaintiffs had premised their unfair practices

23

24    _____

25    v. Bradshaw, 14 Cal. 4th 557, 566-68 (1996) (FLSA's seamen exemption does not preempt
     seamen's claims for overtime under California statute; FLSA does not "actually conflict" with
     California law and its history "does not suggest implicit preclusion").

26    Perhaps the conclusion that can most fairly be drawn from the foregoing holdings is that
     there is no unanimity regarding the preemptive force of the FLSA or other federal statutes that

27    potentially conflict with the UPA.

28    21

1  allegations on violations of the FLSA, the California Labor Code, and certain regulations, and
2  that a UPA violation may be premised on a violation of virtually any law. The court went on *v*
3  hold that the complaint "[c]learly . . . allege[d] that Defendants . . . engaged in unfair business
4  practices, including violations of the federal and state labor laws." Id. In so holding, the court
5  stated in a footnote that "the FLSA does not preempt Plaintiffs' claim under Cal. Bus. & Prof.
6  Code § 17200." Id. n.30 (citations omitted). In support of this proposition the court relied on the
7  savings clause, and on a Ninth Circuit case which holds that in spite of an exemption provision in
8  the FLSA, it does not preempt California wage laws as to seamen. See Pacific Merch. Shipping
9  Ass'n v. Aubrey, 918 F.2d 1409 (9th Cir. 1990).

10      Bureerong is distinguishable from the present case on several grounds. Among them is
11  that in Bureerong the defendants were charged with numerous violations of both state and federal
12  laws—civil and criminal, statutory, regulatory, and common law, labor and other non-labor
13  torts—while in the present case Plaintiffs' only non-UPA claims are for the alleged FLSA
14  violations. In addition, because it is from the Central District of California, whatever its
15  persuasive force it is not binding on this court. Nevertheless, the court finds that Bureerong
16  supports the conclusion already reached that the FLSA does not preempt the UPA in this
17  situation. Although the Bureerong court's preemption analysis was not extensive, it appears to
18  reach the proper result in light of the preemption discussion above and the fundamental purpose
19  of the FLSA as stated by the Ninth Circuit: "protect[ing] all covered workers from substandard
20  wages and oppressive working hours."

21      Williamson is the most recent FLSA preemption case from the Ninth Circuit. Most of the
22  details of the case are already set forth above. After performing a thorough analysis of the three
23  types of preemption, including the two sub-types of "conflict preemption," and noting the
24  FLSA's fundamental purpose of protecting employees, the Ninth Circuit concluded that the
25  plaintiffs' common law fraud claims were not preempted. In so doing, the court made the
26  following statement:

27

28                                          22

1
2
3

Claims that are directly covered by the FLSA (such as overtime and retaliation disputes) must be brought under the FLSA. That is not the case here. Thus, neither the district court nor [the defendant] has presented a convincing case that the [common law] fraud claims conflict with the purposes of the FLSA.

4   208 F.3d at 1154 (emphasis added).

5   The foregoing statement might at first seem to support CWT's preemption argument;
6   however, upon careful consideration the court concludes that in light of the Ninth Circuit's
7   extensive preemption analysis and the general purpose of the FLSA, the better interpretation i
8   that it does not. The court's analysis in Williamson clearly supports the result reached above; as
9   already discussed, under Williamson the UPA is neither expressly preempted, nor is its "field" of
10  operation occupied solely by the FLSA. This leaves "conflict preemption," which is similarly
11  inapplicable in light of the fact that compliance with both laws is not impossible and their
12  purposes—in this case at least—are so nearly identical. Moreover, the Ninth Circuit was almost
13  certainly aware of Bureerong when it wrote Williamson; Bureerong is very often cited for its
14  statement of the standard used on motions to strike. Yet the Ninth Circuit did not overrule its
15  statement that the FLSA does not preempt the UPA, or even mention it.

16  In spite of any doubts created by the statement quoted above, the court concludes that
17  Williamson does not change the outcome of this motion. This statement simply did not relate to
18  any issue actually decided in that case, but was made in passing as an example of what the case
19  was not deciding.

20  Both in its papers and at the hearing on this motion, CWT relied on Tombrello, 763 F.
21  Supp. 541, as support for its contention that the FLSA precludes enforcement of remedies
22  potentially available under the UPA. In Tombrello, the plaintiff had asserted claims under the
23  FLSA, claims under the federal Labor Management Relations Act ("LMRA"), 29 U.S.C. section
24  185, and certain supplemental state law claims. The Tombrello court held that plaintiff's state
25  law claims were preempted by the FLSA, stating that "[a]s a matter of law, plaintiff cannot
26  circumvent the exclusive remedy prescribed by Congress by asserting equivalent state law claims
27
28                                              23

1    in addition to the FLSA." Id. at 545.

2        The court finds the foregoing statement inapplicable to this case. Unfortunately, the
3    Tombrello opinion was somewhat vague as to which state law claims were precluded by the
4    FLSA and, aside from an invasion of privacy claim, what specific state law claims the plaintiff
5    had pled. The opinion at one point refers to "all three state law claims," finding them preempted
6    by a different federal statute, the LMRA. Id. at 544. At another point it describes claims two
7    and three as "claims to recover wages." Later it refers to a fourth claim, apparently also brought
8    under state law, for invasion of privacy. Id. at 544-45. As to this claim, the court found that it
9    was preempted by the LMRA, see id., and that the plaintiff failed to establish its elements. See
10   id. at 545-46. From this it might be inferred that there were three state law claims for (1) unpaid
11   wages; (2) unpaid wages; and (3) invasion of privacy. However, at no point does the opinion
12   state with clarity which specific claims it found barred by the FLSA. With all of the plaintiff'
13   state law claims either preempted by the LMRA or barred due to plaintiff's inability to establish
14   their elements, it is difficult to see why the Tombrello court should go on to find them precluded
15   under the FLSA. Moreover, the Tombrello opinion engaged in no analysis of the preemption
16   issue, relying instead on certain district court cases that hold that the FLSA provides the
17   exclusive remedy for violation of its provisions. As is most relevant here, the one case to so hold
18   was Lerwill v. Inflight Motion Pictures, Inc., 343 F. Supp. 1027, 1029 (N.D. Cal. 1972).
19   However, Lerwill has been severely restricted, if not completely overruled, by the Ninth Circuit
20   in Williamson. See 208 F.3d at 1153 ("Lerwill is a dubious authority").

21       Based on the foregoing, this court concludes that Tombrello, like Lerwill, is a "dubious
22   authority." Its holding regarding the FLSA is vague, and its reasons for this holding unclear.
23   Moreover, as a case from the Northern District of Alabama it is in no way binding on this court.
24   CWT's reliance on Tombrello is therefore misplaced.

25       Kim v. Regents is similarly unhelpful to CWT. There, a former employee of the
26   University of California asserted claims for breach of the implied covenant of good faith and fair
27

28                                          24

1  dealing, wrongful withholding of overtime in violation of California Labor Code section 1194,
2  and violation of Government Code section 12941. As is relevant here, the court held that the
3  claim under the Labor Code was barred because it was essentially one against the state, and the
4  employment of public employees in California is governed by statute rather than by contract. In
5  so doing, the court considered an argument of the plaintiff that she was entitled to overtime
6  pursuant to the Labor Code (in spite of an exemption contained therein for both state and
7  "administrative" employees) because the FLSA requires payment of overtime wages. In
8  response, the court noted first that plaintiff had not chosen to bring an action under the FLSA,
9  see 80 Cal. App. 4th at 167-68, but was instead seeking to enforce the FLSA by using the Labor
10 Code as a "vehicle" for FLSA enforcement. Id. at 165-66. Not surprisingly, the court
11 disapproved of plaintiff's attempt to make such a novel use of the FLSA (i.e., using it to enforce
12 another law), and stated that "the remedies available under the FLSA are exclusive." Id. at 168.
13 (citations omitted). In other words, as the court stated, the plaintiff "cannot circumvent the
14 FLSA through the state Labor Code." Id.

15     This case is very different from Kim. This case is about preemption; Kim was not. Here,
16 in contrast to Kim, Plaintiffs have pled an FLSA violation. The holding in Kim was essentially
17 that a plaintiff who pleads a Labor Code violation but not an FLSA violation, where due to an
18 exemption the Labor Code does not require that overtime be paid to that plaintiff, may not avo.
19 the Labor Code exemption by arguing that the FLSA requires payment of overtime. This
20 relatively uncontroversial proposition does not support CWT's contention that the FLSA
21 preempts the UPA. In addition, the case that the Kim court relied on in support of this holding
22 was Lerwill which, once again, the Ninth Circuit has subsequently declared to be "dubious."
23 Williamson, 208 F.3d at 1153.[14]

24     In sum, there is nothing Bureerong, Williamson, Tombrello, or Kim that causes the court
25
26
     [14] In fairness to the Kim court, Williamson was not decided until after Kim, and the Kim
27 court therefore did not have the benefit of the Ninth Circuit's statement quoted above in text.

28                                      25

1  to doubt the correctness of its determination, above, that the FLSA does not preempt the UPA in

2  this case.

3

4  **CONCLUSION**

5      For the reasons stated above, IT IS HEREBY ORDERED THAT CWT's motion for

6  partial judgment on the pleadings is DENIED.  Denial is without prejudice to the court

7  considering any of the issues discussed herein in the course of ruling on any future motion.

8

9  DATED:  _Dec. 22_, 2000

10

11                                     ANTHONY W. ISHII
                                       UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                          26

rab

United States District Court
for the
Eastern District of California
December 26, 2000


\* \* CERTIFICATE OF SERVICE \* \*


1:00-cv-05695


Willis

    v.

Cal Western

---

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  December 26, 2000, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


                        AWI  LJO

    Jermoe Neal Budin
    Green and Azevedo
    1316 K Street
    Modesto, CA  95354

    Shelline Kay Bennett
    Littler Mendelson
    A Professional Corporation
    1690 West Shaw
    Suite 201
    Fresno, CA  93711-2709


                             Jack L. Wagner, Clerk

                          BY: _____
                              Deputy Clerk